

Potter
Anderson
&Corroon LLP

**David E. Moore**
Attorney at Law
dmoore@potteranderson.com
302 984-6147  Direct Phone
302 658-1192  Fax

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

**www.potteranderson.com**

December 17, 2007

**VIA ELECTRONIC FILING**

The Honorable Sue L. Robinson
United States District Court
  for the District of Delaware
844 N. King Street
Wilmington, DE  19801

> Re:  **Solvay, S.A. v. Honeywell Specialty Materials, LLC, et al.**
>      **C.A. No. 06-557-SLR**

Dear Judge Robinson:

Solvay submits this letter pursuant to the Court's December 10, 2007 communication (D.I. 99) concerning whether requests for legal advice made to or legal advice received from a European Patent Attorney as to patent matters are entitled to the protection of the attorney-client privilege.

**I.    Response to Honeywell's Statement of Facts**

Solvay is an international chemical and pharmaceuticals company headquartered in Belgium.  When individuals within Solvay's chemical business sector desire to ensure that their activities conform with applicable patent laws, they consult with Solvay's in-house corporate intellectual property department ("Intellectual Assets Management" or "IAM" department). Solvay's IAM department employs specialists in patent law, including Messrs. Jacques and Mross, who were involved in many of the privileged communications presently before the Court for its *in camera* review.

The patent specialists in Solvay's IAM department are not "attorneys at law." Instead, they hold the title and are referred to as "European Patent Attorney."  In Europe, unlike in the United States, attorneys at law (*i.e.*, members of a bar of a court) do *not* typically provide legal services in the area of patent law.  *See* Declaration of William James Kopacz, Esq., ("Kopacz Decl."), ¶ 9, submitted herewith. Mr. Kopacz is a former U.S. patent examiner, a graduate of Georgetown University Law School, a registered U.S. patent attorney, a member of the bars of Virginia and California, a European Patent Attorney admitted to practice before the European Patent Office ("EPO"), a member of the Paris bar and a trial attorney ("avocat") which permits him to represent clients before the courts in France. *Id.*, ¶ 2, 3.  Mr. Kopacz has, with but two

The Honorable Sue L. Robinson
December 17, 2007
Page 2

brief interruptions, resided and practiced in Paris since 1976. *Id.*, ¶ 4. In Europe, almost all patent-related legal services are provided by a European Patent Attorney (or a local country's patent attorney, such as a French Patent Attorney). *Id.*, ¶ 9.

Patent Attorneys in Europe provide the same types of legal services as their attorney at law counterparts do in the United States. *Id.*, ¶ 20. Such services include, for example, assessing the patentability of a client's inventions; drafting patent applications; analyzing prior art; performing freedom to operate studies; and providing all manner of advice, opinions and counseling relating to validity, enforceability, scope, licensing, and infringement of patents. *Id.* In Europe, these activities are not performed by European attorneys at law. *Id.*

The qualifications for becoming a European Patent Attorney are similar to (more accurately, more rigorous than) those for becoming an attorney at law in Europe.[1] *See Id.*, ¶¶ 12-19 and Exhibit 1 thereto. To become a European Patent Attorney, an individual first must have earned a university degree in a qualifying field of science or engineering. *Id.*, ¶ 12. The individual must then undergo a formal training period of between 3-6 years in the work force under the supervision of a patent professional, during which time the individual would be required to take part in a wide range of activities relating to patents. *Id.*, ¶ 15. Additionally, the individual must supplement the on-the-job training with formal coursework in the field of patent and intellectual property law. *Id.*, ¶ 16. Finally, after completing the apprenticeship and studies, the individual must pass a three-day Qualifying Examination, given once per year, which is similar to a bar examination for attorneys at law. *Id.*, ¶ 17-18. The Qualifying Examination is rigorous, and passage rates for the European Examination are relatively low (*e.g.*, a 24% first time passage rate in 2007). *Id.*, ¶ 19. An individual who passes the Qualifying Examination may then hold himself out as a "European Patent Attorney."

Among other tasks that they perform, a European Patent Attorney is authorized to practice in all *ex parte* and *inter partes* matters before the EPO, including patent prosecution, oppositions and appeals. *Id.*, ¶ 21. An opposition proceeding in the EPO is roughly analogous to an invalidity declaratory judgment action in a United States district court. Attorneys at law in Europe essentially do not participate in such proceedings. *Id.*, ¶ 22. Moreover, in appeals before the EPO, the European Board of Appeals is essentially the "court of last resort" (there are no further reviews as there are in the United States). European Patent Attorneys represent their clients in those appellate proceedings. *Id.*, ¶ 23.

## II.    Response to Honeywell's Argument

The purpose underlying the attorney-client privilege is not to frustrate discovery but to encourage individuals and companies to consult with attorneys so that they can conduct their

---

[1] To become an attorney at law in Europe, one does not attend a graduate law school program after completing undergraduate study. Rather, in Europe, law is an undergraduate field of study open to all high school graduates. After receiving an undergraduate degree in law, it is only necessary to pass a bar examination (similar to a state bar examination) to become a European "attorney at law." Kopacz Decl., ¶ 8.

The Honorable Sue L. Robinson
December 17, 2007
Page 3

activities in a lawful manner. Individuals and companies would, understandably, be reluctant to do so if their disclosures to their attorneys and the advice they receive from their attorneys could then be used against them in a court of law. As the Supreme Court has explained, the purpose of the privilege

> is to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice. The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client.

*Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).

The important public policy interests that the privilege serves to protect are grounded on the need to "encourage clients to make full disclosure to their attorneys." *Fisher v. United States*, 425 U.S. 391, 403 (1976). Those interests would be frustrated if clients' confidential disclosures to and confidential advice received from their attorneys could be used against them in a court of law. Indeed, the Supreme Court has long recognized this concern, and it has explained that the privilege

> is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of *when free from the consequences or the apprehension of disclosure*.

*Hunt v. Blackburn*, 128 U.S. 464, 470 (1888) (emphasis added).

Honeywell's assertion (at 1-2) that there must be a foreign "attorney at law" involved in the communication in order for the privilege to apply is contrary to the strong public policy behind the privilege. There is little difference between a client who seeks patent legal advice from an attorney at law in the United States, and one who seeks patent legal advice from a qualified patent legal advisor in Europe. In both cases, there is a common public interest of ensuring that the client is able to have "full and frank" communications with their counsel. In both cases, maintaining the client's communications to and advice received from his attorney as privileged will encourage the client to provide all relevant information to its legal advisor. *See Upjohn*, 449 U.S. at 339.

Honeywell asserts (at 2) that the decision in *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 188 F.R.D. 189 (S.D.N.Y. 1999) supports its position that there is no European Patent Attorney-client privilege. However, the facts upon which *Bristol-Myers* is based are no longer applicable. In *Bristol-Myers*, the district court concluded that the European Patent Office ("EPO") regulations that were then in effect did "not confer the equivalent of the United States attorney-client privilege on EPO representatives." *Id.* at 201. Since the *Bristol-Myers* case was

The Honorable Sue L. Robinson
December 17, 2007
Page 4

decided, however, the EPO has amended its rules. One of the purposes behind the amendment of the EPO's rules was to make clear that, contrary to the *Bristol-Myers* decision, there is an evidentiary privilege for European Patent Attorneys. *See* Kopacz Decl., ¶ 26. The current European Patent Convention rules (known as "EPC 2000") *expressly provide an evidentiary privilege for confidential communications between a European Patent Attorney and his or her client. Id.*, ¶¶ 27-29 and Exhibits 2-3 thereto. Thus, Honeywell's reliance on the *Bristol-Myers* decision is misplaced.[2]

The pertinent cases, and the ones that further the policy behind the privilege, are the ones that Solvay cited in its November 21, 2007 letter. In *Vernitron Medical Products, Inc. v. Baxter Laboratories, Inc.*, 1975 U.S. Dist. LEXIS 12613 (D.N.J. Apr. 29, 1975), the court made clear that it is the "substance of the function, rather than the label given to the individual registered with the Patent Office," that controls whether there is an evidentiary privilege that applies to "patent agents."

Moreover, in *Renfield Corp. v. E. Remy Martin & Co.*, 98 F.R.D. 442 (D. Del. 1982), this Court, in denying a defendant's motion to compel discovery of privileged documents, held that:

> Because there is no clear French equivalent to the American 'bar,' in this context *membership in a 'bar' cannot be the relevant criterion for whether the attorney-client privilege is available. Rather, the requirement is a functional one of whether the individual is competent to render legal advice and is permitted by law to do so.* French 'in-house counsel' certainly meet this test; like their American counterparts, they have legal training and are employed to give legal advice to corporate officials on matters of legal significance to the corporation.

As to this "function requirement," there can be no question but that a European Patent Attorney is "competent to render legal advice [on patent matters] and is permitted by law to do so." In fact, as noted above, in most instances, a European attorney at law would not be competent to render such patent legal advice.

## III.    Conclusion

For the foregoing reasons, this Court should deny Honeywell's motion.

---

[2] In its letter submission (at 2), Honeywell also cites *Commissariat a l'"Energie Atomique v. Samsung Electronics Co.*, 245 F.R.D. 177 (D.Del. 2007). However, that case did not involve the issue of whether there is a European Patent Attorney-client privilege, nor did it interpret or apply the EPO rules. Rather, the issue decided in that case was whether an evidentiary privilege applied under French law to a certain type of patent agent. This decision is inapposite.

The Honorable Sue L. Robinson
December 17, 2007
Page 5


      Finally, as this Court requested, Solvay has prepared an addendum to this letter to explain the positions of the authors and recipients of the 25 documents submitted for *in camera* review.


                      Respectfully,

                      */s/ David E. Moore*

                      David E. Moore

DEM:nmt
837964 / 30651

Enclosures
cc:     Clerk of the Court (via hand delivery)
        Counsel of Record (via electronic mail)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SOLVAY, S.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) C. A. No. 06-557-SLR |
| HONEYWELL SPECIALTY | ) |
| MATERIALS, LLC and | ) |
| HONEYWELL INTERNATIONAL INC., | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF WILLIAM JAMES KOPACZ, ESQ.

I, William James Kopacz, hereby declare as follows:

1. I am competent to testify as to the matters set forth herein.

2. I am a graduate of Georgetown University School of Law, where I received my J.D. in 1968. I am a member of the state bars of Virginia and California. I served as a patent examiner in the United States Patent Office from 1965 to 1969. I am registered to practice before the United States Patent and Trademark Office ("USPTO").

3. In addition to my United States legal background, I am admitted to practice before the European Patent Office ("EPO"), the French Patent and Trademark Office, and the European Community Trademark/Design Office ("OHIM"). I am also a member of the Paris bar and am a trial attorney ("avocat"), which allows me to represent clients before the courts in France.

4. I have practiced and resided in Paris, France since 1976 with two brief interuptions. In 1980, I founded the Law Office Kopacz, located in Paris, France. The Law Office Kopacz specializes in French and European patent and other intellectual property matters. The Law Office Kopacz consists of trial attorneys. I am the only registered European Patent Attorney in the firm.

5. I am knowledgeable about the differences in how lawyers are educated and trained in Europe as compared to how they are educated and trained in the United States.

1

6.  I am also knowledgeable about the way that legal services in the field of patent law are provided in Europe, who provides such patent-related legal services, the qualifications of and process for becoming a European Patent Attorney, and the types of legal services that European Patent Attorneys provide.

7.  Attached to this declaration as Exhibit 1 is an article that I authored entitled *Note: The European Patent Attorney Qualifying Examination.  An American Perspective*, 69 J. Pat. & Trademark Off. Soc'y 47 (1987).

8.  In most countries in Europe, including France and Belgium, unlike in the United States, law is an undergraduate field of study generally open to all high school graduates.  If an individual desires to become a member of a bar of a court in Europe after they earn their law degree, they are required to take and pass an examination for attorneys at law (similar to a state bar examination in the United States).

9.  In general, in Europe, attorneys at law, and individuals with a degree in law, do not typically provide legal services in the field of patent law which require proficiency in one or more of the sciences or engineering.  In Europe, almost all patent-related legal services are provided not by attorneys at law but rather by what is referred to as a "Patent Attorney" (e.g., European Patent Attorney, French Patent Attorney).

10. The term "European Patent Attorney" refers to an individual who has met the qualifications for and passed the European Patent Attorney Qualifying Examination.

11. The training necessary to become a European Patent Attorney differs from the training required to become an attorney at law in Europe.

12. To become a European Patent Attorney, an individual must first have earned a university degree in a field of engineering or science.  A law degree is not relevant or required and, as stated above, it is very rare indeed to find a  European Patent Attorneys who possesses a law degree.  I would estimate that less than 1% of the European Patent Attorneys have a law degree.

13. In addition to their technical educational background, an individual who wishes to become a Patent Attorney in Europe must take and pass the European Patent Attorney Qualifying Examination.

2

14. In addition to their technical educational background, an individual who wishes to become a Patent Attorney in Europe must take and pass the European Patent Attoreny Qualifying Examination.

15. Candidates for the European Patent Attorney Qualifying Examination must have trained under the supervision of a professional representative or as an employee or an assistant of an employee dealing with patent matters in an industrial company established in one of the member countries that are currently parties to the European Patent Convention. This training period must last from three years to six years depending upon the educational and technical background of the candidate. During this training period, prospective candidates must take part in a wide range of activities pertaining to patent applications or patents.

16. At some point during their apprenticeship, an individual who wishes to become a Patent Attorney in Europe usually takes formal coursework in the field of patents and intellectual property law.

17. The European Patent Attorney Qualifying Examination is held once a year, usually in March. The Qualifying Examination takes a full three days and consists of four separate parts on different aspects of patent law.

18. One part of the Qualifying Examination is a Legal Section. The types of questions encountered in the Legal Section are, in my experience, not dissimilar to those found on an American bar examination.

19. The European Patent Office publishes on its web site statistics on the pass and failure rates for candidates taking the Qualifying Examination. For example, in 2007, the pass rate for those who took the Qualifying Examination for the first time was 24% (165 candidates passed out of a total of 684 who took the examination). For individuals who were re-sitting for the Qualifying Examination, the pass rate was 0% (0 candidates passed out of a total of 54). *See* http://www.epo.org/patents/learning/qualifying-examination/statistics.html

20. Whether they work in-house for a corporate intellectual property department or are in private practice, Patent Attorneys in Europe provide the same types of legal services in the field of patent law as do their attorney at law counterparts in the United States. In Europe, as in the United States,

such patent-related legal services typically include, for example, assessing the patentability of a client's invention; drafting patent applications for their client; analyzing and applying prior art; performing freedom to operate studies relating to third-party patents; and providing all manner of advice, opinions, and counseling relating to the validity, invalidity, scope, coverage, licensing, enforceability, infringement, or non-infringement of patents.    In my experience, none of these activities are ever preformed by attorneys at law.

21. A Patent Attorney in Europe is entitled to practice before the particular patent office in which that person is admitted.  For example, a European Patent Attorney may participate in all *ex parte* and *inter partes* matters before the EPO, including patent prosecution, oppositions, and appeals.

22. An opposition proceeding before the EPO is roughly analogous to a declaratory judgment action that would be filed in a U.S. district court to have a granted patent declared invalid.  European Patent Attorneys represent their clients in EPO opposition proceedings.  Attorneys at law essentially never participate in such proceedings.

23. In the United States, an adverse ruling by the USPTO can be reviewed by the courts.  This is not the case in appeals from the European Patent Office.  The European Board of Appeals is, in effect, the "court of last resort," and its decisions can not be appealed to a national court.  European Patent Attorneys represent their clients in such appellate proceedings.

24. I am also familiar with the United States rules of pretrial discovery and how civil litigation  in the United States compares generally with the practices in Europe.  In countries such as France and in Belgium, there is no pretrial discovery. There are no depositions or requests for production of documents, for example, and the parties in these countries are expected to present their case based upon whatever information, documents or testimony they have or are able to obtain on their own. While in some countries such as France, a party may ask a judge to order the opposing party to provide certain information, in my experience, this rarely occurs.  In proceedings in the UK, some forms of discovery do exist, but this is the exception.

25. On December 13, 2007, the 13th edition of the European Patent Convention (EPC) went into effect. The EPC contains, among other things, the texts of the Convention, its Implementing Regulations

and protocols, and rules relating to fees in connection with practice before the European Patent Office. The most recent EPC is also known as EPC 2000. Thirty-two countries, including Belgium, have adopted EPC 2000. A link to the EPO website from which a complete text of the 13th edition of the EPC can be found at http://www.epo.org/patents/law/legislative-initiatives/epc2000.html.

26. Article 134 and Implementing Rule 153 of the EPC 2000 specifically, and expressly, provide for an attorney-client privilege with respect to communications between European Patent Attorneys and their clients. I understand that one of the reasons why the EPC 2000 included such an express European Patent Attorney-client privilege was due to the decision in *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, 188 F.R.D. 189 (S.D.N.Y. 1999), in which the district court concluded that the EPO's rules that were then in effect (prior to EPC 2000) did not establish an evidentiary privilege for European Patent Attorneys but only conferred a duty of secrecy. Thus, EPC 2000 was revised to make explicit that the duty imposed on European Patent Attorneys was not just limit to maintaining secrecy but that it also included an evidentiary privilege similar to the attorney-client privilege in the United States.

27. Article 134a of EPC 2000 is entitled "Institute of Professional Representatives before the European Patent Office." In relevant part, Article 134a(1) authorizes the Administrative Council to adopt and amend provisions regarding, among other things, "the obligation of confidentiality on the professional representative [i.e., European Patent Attorney] and the privilege from disclosure in proceedings before the European Patent Office in respect of communications between a professional representative [i.e., European Patent Attorney] and his client or any other person. Article 134a is attached hereto as Exhibit 2 (emphasis added).

28. The provisions of the various Articles set forth in the EPC 2000 are implemented under what are called "Implementing Regulations" or Rules. Rule 153 is entitled "Attorney evidentiary privilege." Rule 153(1) provides in relevant part that where advice is sought from a European Patent Attorney in his capacity as such, then all communications between the European Patent Attorney and his client or any other person relating to that purpose are privileged from disclosure in proceedings before the EPO unless the privilege is waived by the client.

29. Rule 153(2) states that the privilege from disclosure shall apply to any communication or document relating to:

    a.   the assessment of the patentability of an invention;

    b.   the preparation or prosecution of a European patent application; and/or

    c.   any opinion relating to the validity, scope of protection, or infringement of a European patent or a European patent application.

Rule 153(1) and (2) is attached hereto as Exhibit 3.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief. Executed on this 14th day of December, 2007 in Paris, France.

William James Kopacz

**EXHIBIT 1**

# Note: The European Patent Attorney Qualifying Examination. An American Perspective

### *William James Kopacz\**

## INTRODUCTION

American attorneys must pass a special examination administered by the United States Patent Office in order to be admitted to practice before that Office. Practice before the European Patent Office is also regulated, with prospective European Patent Attorneys being required to take an examination given by the European Patent Office prior to being admitted to practice.

I recently took the European Patent Attorney Qualifying Examination. This would not be of the slightest interest to anyone except for the unusual circumstances that:

a) surprisingly enough, most practicing European Patent Attorneys, for reasons which shall be discussed, have never taken the examination, and thus, the examination is still somewhat of a novelty, even among Europeans, and,

b) I am an American attorney, and possibly, the only American attorney who has taken the examination.

I thought American attorneys might be interested in learning a bit about the manner in which European Patent Attorneys become qualified to practice before the European Patent Office, and the nature of their practice, from an American perspective.

## THE SCOPE OF PRACTICE OF THE EUROPEAN PATENT ATTORNEY

Admission to the European Patent Office entitles the attorney to practice before the Office in all *ex parte* and *inter-parte* matters.

This would include, in addition to the expected patent prosecution, *Opposition* and *Appellate* Practice before the Office Tribunals.

---

*Attorney at Law, 4 rue Brunel, Paris 75017 France. Member Virginia and California Bars, registered United States and European Patent Attorney, registered Counseil Juridique, Republic of France.

47

*Oppositions* to the grant of European Patents are heard by the European Patent Office Opposition Divisions. A European Opposition is very roughly analogous to a U.S. Declaratory Judgement Action in that the plaintiff seeks to cancel a granted patent. Unlike the situation in the United States, anyone may oppose a European patent, there being no need of a prior threat of an infringement action. In Europe, however, oppositions must be filed within 9 months of the grant of the patent, so it is necessary to monitor the publication of the granted patents of competitors continuously if one wishes to use the opposition procedure.

The opposition is an extremely useful tool for any company which is involved in patent confrontations, and should never be overlooked. Bringing an opposition against a European patent not only might eliminate or restrict that patent in Europe, the opposition also requires the patentee to take positions regarding the nature of its invention and the prior art, and these positions could be highly relevant as admissions in existing or future litigation in the United States on the corresponding United States Patent.

Another fact which enhances the value of an opposition to the opposer is that, if the opposer wins before the European Patent Office Opposition Division and Board of Appeals, it is a final decision which the patentee cannot further appeal. The patent is permanently cancelled or restricted in scope in accordance with the ruling of the Opposition Division and the European Board of Appeals.

On the other hand, if the opposer loses before the European Patent Office, it is not the "end of the line" for him. The opposer can still attack the validity of the granted European patent before the national courts. The national courts are in no way bound by a ruling of validity of the European Patent Office, and must undertake their own independent analysis. Even an opposition which is lost is useful to the opposer in that it allows the opposer to sharpen its case, and eliminate the weak points which were revealed during the opposition procedure. Thus, in a way, the opposer has "two bites at the apple" while the patentee has only one.

*Appellate* practice in the European Patent Office is before the Boards of Appeal. A final ruling by a European Patent Office Examination Division or Opposition Division may be appealed to one of the European Patent Office Boards of Appeal.

There is a dramatic difference between the European and United States Patent Office Boards of Appeal. In the United States, the Patent Office tribunals are administrative in nature and an adverse ruling by

the Office can be reviewed by the courts, including, in some cases, the Supreme Court. The situation is otherwise in regard to the appellate tribunals of the European Patent Office. The European Board of Appeals, is, in fact, the "Court of Last Resort." No further appeal lies from a ruling of the Board, either to the national courts of general jurisdiction, or to any supranational authority such as the European Court of Justice. The European Board of Appeals is therefore a combination of the United States Patent Office Board of Appeals, the District Court for the District of Columbia, the Court of Appeals for the Federal Circuit, and the United States Supreme Court.[1]

Since the Board regularly decides whether exclusive patent rights, which can cover 13 important industrial European countries, will be granted or denied, its jurisdictional mandate is impressive, and the responsibilities of the European Patent Attorneys who practice before the Office and this Board are correspondingly great.

### THE EXAMINATION AND THE "GRANDFATHER CLAUSES"

As alluded to before, although there are numerous European Patent Attorneys admitted to practice before the European Patent Office, only a small percentage of these have been admitted to practice pursuant to examination.

Specifically, as of 1985, there were over 4000 registered European Patent Attorneys, and, of these, only 165, about 4%, had taken and passed the European Patent Attorney Qualifying Examination.

This is so for the following reasons:

Prior to the establishment of the European Patent Office, there were, of course, numerous patent agents practicing before the various

---

1 While the Board is the "Court of Last Resort" in that no *appeals* lie from its rulings, as mentioned above in connection with opposition procedure, the issues which were before the Board may be *re-litigated* in the national courts in some circumstances. If the Board refuses to grant, or invalidates, a European patent, that is the end of it. If, however, the Board *grants* a European patent, the European Patent Office forever loses jurisdiction over the patent and that unitary European patent is transformed into a bundle of entirely independent national patents. If the patentee wishes to bring suit against an alleged infringer who is, for example, manufacturing in France, Germany, and Great Britain, the patentee must bring separate independent actions in all three of these countries on what are now the independent French, German, and British national patents. The infringer may attack the validity of these independent patents, and thereby re-litigate issues which may have already been considered by the Board of Appeals in the European Patent Office. It is entirely possible for a national court to render a decision which is inconsistent with the findings of the Board, as well as being inconsistent with the decisions of its sister national courts; for example, the German court might find the German portion of the European patent invalid, while the French court might uphold its validity.

national patent offices in the European countries which ultimately were to participate in the European Patent System.[2]

These national patent practitioners came from countries having diverse legal systems and traditions—in some of these countries the patent profession was closely regulated, while in others the practice of patent law was traditionally an unregulated business activity open to anyone who wished to offer his or her services to the public.[3]

With the advent of the unified European Patent System in the 1970's, it was the common desire of the European Patent Office and the national practitioners that there be a unified admission procedure for practice before the European Patent Office. It was decided that admission should be strictly regulated, with relatively severe examination and professional requirements for future European Patent Attorneys. It was correctly appreciated that this would ensure the orderly operation of the system and contribute to its ultimate value to the public.

However, not surprisingly, it was simultaneously felt that it would be totally unreasonable and unduly burdensome to require the already established national practitioners to be subjected to these same strict examination requirements.

Thus what occurred was that special admission arrangements were instituted for the national patent practitioners who, in the early years of the European Patent System, were already practicing before their national patent offices. These national practitioners were automatically admitted to practice before the European Patent Office pursuant to various *grandfather clauses* and transitory provisions without being required to take an examination.

The less fortunate newcomers who did not qualify under any *grandfather clause*, however, were required to satisfy various professional prerequisites and to take the Qualifying Examination as a condition for admission to practice before the European Patent Office.

This is the reason why today there are several thousand registered European Patent Attorneys with only a relatively small number having been admitted pursuant to examination.

---

2 The European Patent System today includes thirteen member countries: Great Britian, France, Germany, Belgium, Luxembourg, Holland, Italy, Sweden, Switzerland, Liechtenstein, Austria, Spain and Greece.

3 For example, Great Britain and Germany had strict examination and other professional requirements for patent agents while in France and Italy any resident could practice before the national patent offices.

As Mr. Duncan, Chairman of the Committee on the European Qualifying Examination, put it in a recent article:[4]

The vast majority of representatives currently practicing before the European Patent Office are unqualified, that is to say, whatever experience and examinations we may have undertaken in our own countries, we have never had to sit down and do the hard work of learning the working and effect of the European Patent Convention for the purpose of passing the Qualifying Examination. How many of us can be confident that we would do so? Only one person on the list has the proud distinction of having risked submitting himself to the examination although entitled to be on the list anyway.

For those interested in statistics, there are now one hundred and sixty-five people on the list who have passed the Qualifying Examination, something over four thousand who have not.

PRELIMINARY REQUIREMENTS FOR THE EXAMINATION

There are some preliminary professional requirements which must be satisfied before a candidate is permitted to take the Examination:

1) As would be expected, a *University degree in engineering* or one of the sciences is required. The United States Patent Office, of course, has a similar requirement.

In Europe, a law degree is not relevant to entry on the list of admitted European Patent Attorneys. In the United States, we distinguish between the titles *patent agent* and *patent attorney* with a *patent agent* being a scientist admitted to practice before the Patent Office, but not a member of the bar, and a *patent attorney* being a member of the bar who is also qualified to practice before the United States Patent Office. The Europeans do not make this distinction—virtually all *patent attorneys* in Europe have *only* a technical or scientific background and, with rare exceptions, have no legal training and are not members of the bar.

The American *patent lawyer* or *patent attorney*, having university degrees in both law and one of the sciences, is something of a professional anomaly on the world scene. As mentioned above, in Europe, as in most countries of the world, the typical *patent attorney* will have only a technical background, and attorneys-at-law will have only a legal background. The duality of the American attorneys' training is not occasioned by our enthusiasm for advanced education, but rather

---

4 *Training of Future Members of the Profession,* EPI Information, 4-1985.

results from the fact that our law schools are post-graduate schools which demand a university degree as an entrance requirement. Thus in the United States virtually all lawyers of necessity have educational backgrounds in two fields, law and the undergraduate field of special- ization. In Europe, law is an undergraduate field of study generally open to all high school graduates. Thus in Europe, engineers and lawyers are trained in parallel, not successively, and the professions permanently bifurcate.

2) There is an unusual *language requirement* for prospective Euro- pean Patent Attorneys. The Examination is given in three languages: French, English, and German. By this I do not mean that there are three alternative languages from which the candidate chooses the most convenient, rather all three languages are used in the examination papers, and if a candidate does not understand all three of these languages, he will not be able to understand a portion of the exami- nation materials.

The degree of proficiency required in these languages is that necessary to be able to read and understand patents and other tech- nical publications written in the languages.

Language proficiency is tested in a very practical manner. During the examination the candidates will be asked, for example, to write a brief in opposition to the grant of a European patent. The prior art and other documents on which the candidates are to rely in attacking the validity of this patent will consist of an assortment of technical documents, letters, memos, and the like written in French, German, and English. If the candidate has mastered only two of these lan- guages, he will not be able to appreciate the significance of a third of the evidence and, in the absence of extraordinary luck, his brief will reflect this and be defective.

It was felt that the requirement for proficiency in French, German, and English was not unreasonable in view of the fact that all three of these languages are official working languages of the European Patent Office.

3) Another preliminary requirement for admission which does not exist in the United States is a four year *apprenticeship period*. All candidates must have four years of practical patent experience prior to taking the Qualifying Examination. The experience can be in private practice or in a corporate patent department, but must be in one or more of the European contracting states. This apprenticeship period ensures that newly registered European Patent Attorneys will have

some "hands on" experience with patent matters prior to hanging up their shingles and being unleashed on the public.[5]

4) Finally, there is a *nationality requirement*. In order to be registered as a European Patent Attorney, the candidate must have the nationality of one of the contracting states of the European Patent Convention. This unfortunate discriminatory provision, of course, excludes Americans.[6]

Nationality restrictions in regard to the practice of law are found in numerous countries and take various forms. For example, Germany will not allow non-Germans to be admitted to the practice of law or be admitted as patent agents. In Great Britian a solicitor must be a British national, but, somewhat surprisingly, a barrister need not. Numerous American law firms have officers in traditionally liberal France, with the American attorneys being admitted as *conseils jurdiques*, a sort of solicitor. Only French nationals, however, may be admitted as barristers.

In the United States, numerous states restricted the practice of law to United States citizens. These nationality restrictions were, however, held to be unconstitutional by the Supreme Court in the 1973 *Griffiths* decision (413 U.S. 717), the Court holding that there is no reasonable relation between nationality and the ability to practice law.

Thus, since 1973, U.S. citizens and non-citizens stand on an equal footing in regard to the practice of law in the United States and foreigners are freely admitted to the bar in the United States. Similarly, the United States Patent Office admits non-American attorneys to practice, as it must under the principles of the *Griffiths* decision. 37 CFR 10.6 a, b, and c.

Although practice before European Office is restricted to nationals of the contracting states, there is fortunately a provision in the Convention whereby the President of the European Patent Office can grant exemptions from this nationality requirement. The European

---

5 In the United States, there is no such apprenticeship requirement. There is, however, a procedure in the United States Patent Office whereby patent examiners who have served four years in the Office are registered as attorneys or agents without being required to take the United States patent attorney examination. There is no equivalent procedure in the European Patent System.

6 Although there are a handful of Americans registered to practice before the European Patent Office, perhaps 3 or 4, these attorneys were admitted under *grandfather clauses*, not pursuant to examination. Those Americans who qualified under a *grandfather clause* were exempted from the nationality requirement.

Patent Office favors a liberal approach in regard to exemptions, but some of the national practitioners are less than enthusiastic in this regard and the latter view apparently has influenced the Office. Although it is unofficial, there is a *de facto* requirement for American attorneys that they have a *10 year period* of practice in Europe to qualify for the nationality exemption.

I was granted an exemption from the nationality requirement since I had been practicing in Europe for well over ten years.

### THE EUROPEAN QUALIFYING EXAMINATION

After having satisfied the above preliminaries, the candidate has only to take and pass the Qualifying Examination.

The Examination takes a full three days and consists of four separate papers:

Paper A: The candidates receive a letter from a client wherein the client discusses what he believes to be a patentable invention, and alludes to various facts and circumstances which may or may not be relevant. There is included a detailed technical description of the client's device, together with a bundle of prior art documents.

It is the candidate's task to wade through the client's description and the prior art and try to identify those features of the client's device which are not taught by the prior art and could be patentable. The candidate is then to develop a "theory of the invention" and draft the introductory portion of a patent specification wherein the patentable features are extolled and contrasted with the prior art, with the patentability of these features being convincingly supported. The candidate is also to draft a set of claims which are broad enough to protect all aspects of the client's contributions, without being so broad as to be invalid.

Narrow claims which might be reassuringly secure from serious attack based on the prior art, but which give the client less than that to which it is entitled, will receive a failing or a low grade. Similarly the sort of broad, wishful, and whimsical claims which are often initially submitted in new patent applications and which are remarkably easy to draft, and just as remarkably easy to invalidate, are also down-graded.

The technical aspects of the invention and the prior art, while not enormously complex, are by no means frivolous. In order to understand the operation of the invention and the prior art, at least several

highly focused readings are necessary.[7] As any patent attorney knows, even with a thorough understanding of the technical details of the invention and the prior art, the drafting of a set of claims is essentially an open-ended task which is never really completed and the result is never entirely satisfactory. Time can be a problem.

Paper B: This paper is related to Paper A and takes the invention through the first stage of the patent prosecution. The candidates are given a patent application as filed in the European Patent Office together with an Office action raising a variety of objections to the application. Numerous prior art documents are cited. The candidate is to analyze the examiner's action and the cited prior art, refute those arguments of the examiner which are reasonably refutable, and recognize those which are well founded. The candidate then drafts an amendment including appropriate argumentation and a new set of claims which define over the cited prior art while being broad enough to protect the client's rights. As in Paper A, the technology is not frivolous and requires close analysis.

Paper C: In this part of the examination, the applicant abandons his role as advocate for the inventor and assumes that of an attorney for a client who will be adversely affected by the grant of a European patent. The candidate is to attack the validity of a granted European patent in a European Opposition Proceeding.

A variety of prior art documents and items of possibly relevant evidence are provided, these materials being in the French, German, and English languages.

The documents are selected so that numerous legal, as well as technical, issues are raised. For example, a particular piece of art might be prior art in only certain contracting countries, or might be prior art only in regard to novelty issues but not in regard to issues of inventive level, or might not be prior art at all.[8]

---

7 The candidates select between electrical, mechanical, and chemical technologies.

8 To illustrate, there follows a factual situation which is representative of the kinds of issues raised. The objective of the opposition, a European patent Z, was filed December 1, 1980. A patent application X having a relevant teaching was filed in the European Patent Office on January 1, 1980, and published on July 1, 1981. The owner of patent application X has an even earlier co-pending application Y having a teaching which is, however, further from that of Z. During the prosecution of Y, in response to the first Office action, on November 1, 1980, the owner in his amendment makes reference to his co-pending application X.

First, since X was published after Z, it is not *prior art* in the usual sense. However, since X was filed in the Office prior to the filing date of Z, it is prior art for limited purposes, namely, only for novelty puposes, not for purposes of determining obviousness. Thus, X will be relevant

The candidate is to identify the issues which can be validly raised in a European Opposition, draft a Notice of Opposition, and present a reasoned argument attacking those claims which are vulnerable.

Paper D: This is the Legal Section of the Examination and is, by far, the most interesting. It is also the most difficult and, of the candidates who fail the exam, most of them do so because of the Legal Section.

The types of questions encountered in the Legal Section are not dissimilar to those found on an American bar examination. Paper D has two parts, the first having 10–15 relatively abbreviated fact patterns which call for highly specific knowledge of the details of European Patent Convention, the various rules and regulations promulgated under that Convention, the Examination Guidelines (which correspond to the ''M.P.E.P.'' of the U.S. Patent Office), and the case law developed by the various tribunals of the European Patent Office. There are also questions posed in regard to ancillary national laws and treaties, such as the Paris Convention, the Community Patent Convention, and the dreaded Patent Cooperation Treaty.

In regard to these shorter questions, to give a feeling for the types of questions asked, one is reproduced below:

—Question: On 1 March 1984, Mr. Gry, a British national resident in Munich, writes to a professional representative in Munich as follows:

''Two weeks ago, I read in the European Patent Bulletin that on 1 July 1983 a Mr. Crooks filed a European patent application, I have reason to believe that this scoundrel has stolen my invention, having lived in my house for over four years.

''I have opened proceedings against Mr. Crooks to establish that it is I who am entitled to the grant of the European patent. However, I am afraid that he will withdraw the application once he learns that these proceedings have been opened.

''As I myself intended to file a European patent application in respect of the invention concerned (a new configuration of mowing machine blades), I do not want the proceedings for grant stopped.''

What further action, if any, should Mr. Gry take?

While in the United States the application of Crooks could never lead to the grant of a valid patent, this is not necessarily so in Europe.

only if it is a *fully met* type reference. However, X was included in the prosecution history of another European patent application Y prior to the filing date of Z. The prosecution files of European patent applications are open to the public after the publication of the application. Therefore, when X was included in the Office prosecution file of Y, it was made available to the public and became prior art against Z for all purposes.

If a third party, who did not himself invent the subject matter, files a patent application, and the true inventor finds out about it, the true inventor can file an action in a national court having jurisdiction over the "scoundrel", requesting a ruling to the effect that the true inventor's rights have been violated. After having filed the action in the national court, the true inventor must then notify the European Patent Office of the pending action, and the European Patent Office will automatically stay the patent prosecution proceedings. When the true inventor (ideally) prevails in the national court proceedings, he may then take over prosecution of the patent application, and the patent will be granted to him. In the question, however, the true inventor does not want the European patent prosecution proceeding stopped. He has the option of allowing the proceedings to continue, but he must notify the Office in writing of this desire. In addition, the true inventor is concerned that Crooks will withdraw the application now that his scheme has been uncovered. This is impossible. Once the Office has been notified of the existence of the national proceedings, the application may not be withdrawn.

In addition to these relatively short questions, there is one long essay type question which consists of a very complex fact pattern raising a host of issues. A thorough analysis of such a question would be beyond the scope of this short Note, and, as the typical essay type question is several typewritten pages in length, even reproducing one here would not be appropriate.

## PASS RATE STATISTICS

I took the European Qualifying Examination in 1984. As I had practiced patent law for almost 15 years, I had the ill-conceived notion that the Examination would be somewhat of a formality. However, during the initial stages of my preparation, upon obtaining and reading one of the earlier Qualifying examinations, I immediately realized to my dismay that the Examination would have to be taken very seriously indeed. The Examination is not an easy one and is graded severely with a pass rate not dissimilar to that of a California bar examination.

Chairman Duncan, in another recent article[9], sets forth some statistics in regard to the first six European Qualifying Examinations:

The first Examination was given in 1979; 44 candidates took the exam, 16 passed, for a distressingly dismal pass rate 36%.

---

9 *The European Qualifying Examination So Far: Some Statistics*, EPI Information 2-1986.

There was an insufficient number of candidates in 1980 and thus no Examination was given.

There were only 18 candidates in 1981, and, of these, 12 passed, yielding at least a more encouraging, if not reassuring, pass rate of 66%.

In 1982, there were 26 candidates, 14 passed, for a pass rate of 53%.

In 1983 there were 64 candidates, 40 passed, for a pass rate of 62%.

In 1984, the year in which I took the examination, there were 86 candidates, and exactly one half of these passed.

In 1985, there were 90 candidates, 40 passed, for a pass rate of 44%.

The cumulative results for the first six examinations are, out of a total of 328 candidates, 165 passed, for a pass rate of approximately 50%.

These pass rates, as discouraging as they are, do not tell the entire story. As discussed above, one does not simply register for and take the European Qualifying Examination. In order to take the exam, the candidate must have first completed an ''apprenticeship'' period, working in the patent profession for at least four years. Thus, even the unsuccessful candidates are neither novices nor dilettantes, but rather experienced committed professionals, all of whom have been practicing for a considerable period of time.

*(EDITOR'S NOTE——Later this year, with the cooperation of the European Patent Office and the Japanese Patent Office, we plan to devote an issue of the Journal to the Patent & Trademark Office Society Symposium on Patent Examination from an International Perspective held in conjunction with the Trilateral Conference in January of 1987)*

February 1987
Volume 69, No. 2
Pages 59–116

# JOURNAL

## of the

# PATENT

## and

# TRADEMARK

# OFFICE

# SOCIETY



*A medium of expression for the exchange of thought in the fields of Patents, Trademarks and Copyrights; a forum for the presentation and discussion of legal and technical subjects relating to the useful arts; a periodical for the dissemination of knowledge of the functional attributes of the patent, trademark, and copyright laws, in order to effect a more uniform practice thereof and through which all interested in the development and appreciation thereof may work to a common end.*

**EXHIBIT 2**

Artikel 134a[142]
**Institut der beim Europäischen Patentamt zugelassenen Vertreter**

(1) Der Verwaltungsrat ist befugt, Vorschriften zu erlassen und zu ändern über:

a)[143] das Institut der beim Europäischen Patentamt zugelassenen Vertreter, im folgenden Institut genannt;

b) die Vor- und Ausbildung, die eine Person besitzen muss, um zur europäischen Eignungsprüfung zugelassen zu werden, und die Durchführung dieser Eignungsprüfung;[144]

c)[145] die Disziplinargewalt, die das Institut oder das Europäische Patentamt über die zugelassenen Vertreter ausübt;

d) die Verschwiegenheitspflicht und das Recht des zugelassenen Vertreters, die Offenlegung von Mitteilungen zwischen ihm und seinem Mandanten oder Dritten in Verfahren vor dem Europäischen Patentamt zu verweigern.

(2) Jede Person, die in der in Artikel 134 Absatz 1 genannten Liste der zugelassenen Vertreter eingetragen ist, ist Mitglied des Instituts.

Article 134a[142]
**Institute of Professional Representatives before the European Patent Office**

(1) The Administrative Council shall be competent to adopt and amend provisions governing:

(a)[143] the Institute of Professional Representatives before the European Patent Office, hereinafter referred to as the Institute;

(b) the qualifications and training required of a person for admission to the European qualifying examination and the conduct of such examination[144];

(c)[145] the disciplinary power exercised by the Institute or the European Patent Office in respect of professional representatives;

(d) the obligation of confidentiality on the professional representative and the privilege from disclosure in proceedings before the European Patent Office in respect of communications between a professional representative and his client or any other person.

(2) Any person entered on the list of professional representatives referred to in Article 134, paragraph 1, shall be a member of the Institute.

---

[142] Eingefügt durch die Akte zur Revision des Europäischen Patentübereinkommens vom 29.11.2000.

[143] Siehe hierzu die Vorschriften über die Errichtung eines Instituts der beim Europäischen Patentamt zugelassenen Vertreter (ABl. EPA 1997, 350) und die Änderungen vom 07.06.2002 (ABl. EPA 2002, 429 ff.) und 17.06.2004 (ABl. EPA 2004, 361).

[144] Siehe hierzu die Vorschriften über die europäische Eignungsprüfung für die beim Europäischen Patentamt zugelassenen Vertreter in der Fassung vom 24.10.2002 (ABl. EPA 1994, 7 ff.; 2000, 320 ff; 2002, 565 ff.), die Ausführungsbestimmungen in der Fassung vom 24.10.2002 (ABl. EPA 1998, 364 ff; 2003, 25 f.) und die Anweisungen betreffend die für die Zulassung zur europäischen Eignungsprüfung erforderlichen Qualifikationen (ABl. EPA 1994, 599). Eine Neufassung dieser Texte ist in Vorbereitung.

[145] Siehe hierzu die Vorschriften in Disziplinarangelegenheiten von zugelassenen Vertretern vom 21.10.1977 (ABl. EPA 1978, 91 ff.), die ergänzenden Verfahrensordnungen der drei Disziplinarorgane vom 06.06.1980 (ABl. EPA 1980, 176 ff.) und die Richtlinien des Instituts der beim EPA zugelassenen Vertreter für die Berufsausübung (ABl. EPA 2003, 523 ff.).

[142] Inserted by the Act revising the European Patent Convention of 29.11.2000.

[143] See Regulation on the establishment of an Institute of Professional Representatives before the European Patent Office (OJ EPO 1997, 350) and the changes of 07.06.2002 (OJ EPO 2002, 429 ff) and of 17.06.2004 (OJ EPO 2004, 361).

[144] See Regulation on the European qualifying examination for professional representatives before the European Patent Office as of 24.10.2002 (OJ EPO 1994, 7 ff; 2000, 320 ff, 2002, 565 ff), the implementing provisions as of 24.10.2002 (OJ EPO 1998, 364 ff; 2003, 25 f) and the Instructions concerning the qualifications required for enrolment for the European qualifying examination (OJ EPO 1994, 599). A revision of those texts is under preparation.

[145] See Regulation on discipline for professional representatives of 21.10.1977 (OJ EPO 1978, 91 ff), the Additional Rules of Procedure of the three Disciplinary Bodies of 06.06.1980 (OJ EPO 1980, 176 ff) and the Code of Conduct of the Institute of Professional Representatives before the EPO (OJ EPO 2003, 523 ff).

**EXHIBIT 3**

(7) Die Absätze 2 und 4 sind auf den Widerruf von Vollmachten anzuwenden.

(8) Ein Vertreter gilt so lange als bevollmächtigt, bis das Erlöschen seiner Vollmacht dem Europäischen Patentamt angezeigt worden ist.

(9) Sofern die Vollmacht nichts anderes bestimmt, erlischt sie gegenüber dem Europäischen Patentamt nicht mit dem Tod des Vollmachtgebers.

(10) Hat ein Beteiligter mehrere Vertreter bestellt, so sind diese ungeachtet einer abweichenden Bestimmung in der Anzeige über ihre Bestellung oder in der Vollmacht berechtigt, sowohl gemeinschaftlich als auch einzeln zu handeln.

(11) Die Bevollmächtigung eines Zusammenschlusses von Vertretern gilt als Bevollmächtigung für jeden Vertreter, der den Nachweis erbringt, dass er in diesem Zusammenschluss tätig ist.

**Regel 153**
**Zeugnisverweigerungsrecht des Vertreters**

(1) Wird ein zugelassener Vertreter in ebendieser Eigenschaft zurate gezogen, so sind in Verfahren vor dem Europäischen Patentamt alle diesbezüglichen Mitteilungen zwischen dem Vertreter und seinem Mandanten oder Dritten, die unter Artikel 2 der Vorschriften in Disziplinarangelegenheiten von zugelassenen Vertretern fallen, auf Dauer von der Offenlegung befreit, sofern der Mandant darauf nicht ausdrücklich verzichtet.

(2) Von der Offenlegung befreit sind insbesondere Mitteilungen und Unterlagen in Bezug auf:

a) die Beurteilung der Patentierbarkeit einer Erfindung;

b) die Erstellung oder Bearbeitung einer europäischen Patentanmeldung;

c) Stellungnahmen zu Gültigkeit, Schutzbereich oder Verletzung eines europäischen Patents oder einer europäischen Patentanmeldung.

(7) Paragraphs 2 and 4 shall apply to the withdrawal of an authorisation.

(8) A representative shall be deemed to be authorised until the termination of his authorisation has been communicated to the European Patent Office.

(9) Unless it expressly provides otherwise, an authorisation shall not terminate vis-à-vis the European Patent Office upon the death of the person who gave it.

(10) If a party appoints several representatives, they may act either jointly or singly, notwithstanding any provisions to the contrary in the communication of their appointment or in the authorisation.

(11) The authorisation of an association of representatives shall be deemed to be an authorisation of any representative who can provide evidence that he practises within that association.

**Rule 153**
**Attorney evidentiary privilege**

(1) Where advice is sought from a professional representative in his capacity as such, all communications between the professional representative and his client or any other person, relating to that purpose and falling under Article 2 of the Regulation on discipline for professional representatives, are permanently privileged from disclosure in proceedings before the European Patent Office, unless such privilege is expressly waived by the client.

(2) Such privilege from disclosure shall apply, in particular, to any communication or document relating to:

(a) the assessment of the patentability of an invention;

(b) the preparation or prosecution of a European patent application;

(c) any opinion relating to the validity, scope of protection or infringement of a European patent or a European patent application.

412

## AUTHORS AND RECIPIENTS OF DOCUMENTS FOR *IN CAMERA* REVIEW

| Doc. No. | Author(s) | Recipient(s) and CC(s) |
|---|---|---|
| 22 | Stefan Mross[1] - European Patent Attorney, a member of patent group within Solvay's intellectual property department known as the "Intellectual Assets Management" (IAM) department | Jean-Francois Serrier - head of Solvay IAM department<br><br>Sandrine Hellinckx – Solvay employee in licensing group of Solvay IAM department |
| 718 – This document incudes several separate emails | Stefan Mross - European Patent Attorney (author of April 20, 2004 embedded email)<br><br>Bill Crowley – consultant employed by Competitive Analysis Technologies and specially engaged by Solvay as part of its pre-suit investigation regarding Honeywell's possible infringement of its patents (author of April 14, 2004 email) | Jacqueline Panier – Solvay employee<br><br>Philippe Jacques - European Patent Attorney, head of patent group within Solvay's IAM department<br><br>Eberhard Piepho – head of Solvay fluorine commercial business unit<br><br>Hartmut Heidler – Solvay employee in fluorine commercial business unit<br><br>Wilfried Moritz – Solvay employee in fluorine commercial business unit<br><br>Francine Delplanque –Solvay employee involved in technical research and development and a co-inventor of the patent-in-suit<br><br>Jean-Francois Serrier – head of Solvay IAM department |

[1] Dr. Mross received a Ph.D. in chemistry in 1996. He began working in the technical information group of the IAM in 1996. In 1999, he began working as a junior patent counsel within Solvay's patent group under the supervision of Philiipe Jacques. In 2001, he received a diploma from the International Center of Studies of Intellectual Property in Strasbourg, France. He became licensed as a European Patent Attorney in 2003. His present title is Senior Patent Counsel.

1

| Doc. No. | Author(s) | Recipient(s) and CC(s) |
|---|---|---|
| 914 | Stefan Mross – European Patent Attorney | |
| 980 | A member of the patent group within Solvay's IAM department, believed to be Stefan Mross and/or Philippe Jacques (European Patent Attorneys) | |
| 1005 | A member of the patent group within Solvay's IAM department, believed to be Philippe Jacques (European Patent Attorney) | |
| 1029 – document containing multiple emails | Luc Delcommune – head of the licensing group of Solvay's IAM department (author of top level email dated September 24, 2002)<br><br>Note : No privilege claimed as to the bottom level email dated September 12, 2002 authored by James Harris of Honeywell | Philippe Jacques[2] – European Patent Attorney and head of Solvay's patent group<br><br>Wilfried Moritz – Solvay employee in fluorine commercial business unit |
| 1100 | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group<br><br>Luc Delcommune – current head of Solvay's licensing group within IAM department | Hartmut Heidler – Solvay employee in fluorine commercial business unit<br><br>Lothar Zipfel – Solvay employee in fluorine commercial business unit<br><br>Wilfried Moritz, Harold Bruhns, Johann Rieger, Ulrich Klinner, Marion Bess- |

---

[2] Mr. Jacques has worked at Solvay since 1988. Mr. Jacques has been licensed as a European Patent Attorney since 1991. He has been the head of the patent group of the IAM since 2003. All of the patent attorneys in the group report report to Mr. Jacques.

| Doc. No. | Author(s) | Recipient(s) and CC(s) |
|---|---|---|
| | | Schmaer, Christoph Meurer and Horst Kroger – Solvay employees in fluorine commercial business unit |
| | | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group |
| | | Luc Delcommune – current head of Solvay's licensing group within IAM department |
| 1173 | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group | Hartmut Heidler – Solvay employee in fluorine commercial business unit |
| | | Sabine Kaschube – Solvay employee and administrative assistant in its fluorine commercial business unit |
| 1238 | Lothar Zipfel – Solvay employee in fluorine commercial business unit | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group |
| 1268 | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group | Members of Solvay's fluorine commercial business unit |
| 1290 | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group (author of top level email dated December 23, 1999) | Top Email : |
| | | Janine Schaheys – Solvay employee |
| Multiple emails | Wilfried Moritz (author of second email dated December 23, 1999) – Solvay employee in flourine commercial business | Stefan Mross –Employed in Solvay patent group at the time |
| | | Second Email : |

3

| Doc. No. | Author(s) | Recipient(s) and CC(s) |
|---|---|---|
| | unit | Pierre Barthelemy, Hartmut Heider, Bernhard Schulte, Patrick Roumegoux, Lothar Zipfel and Dieter Laurer – Solvay employees in fluorine commercial business unit |
| | | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group |
| 1444 | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group | Francine Janssens – co-inventor of patent-in-suit and Solvay employee |
| | C. Louis – Solvay employee in patent group | Vincent Wilmet – co-inventor of patent-in-suit and Solvay employee |
| | | Dr. Piepho – head of Solvay flourine commercial business unit |
| | | Copies were also made for the patent and literature groups of Solvay's IAM department. |
| 1508 Two emails | Dr. Pierre Barthelemy – Solvay employee in flourine commercial business unit (first email dated April 6, 1998) | First and second emails: Hartmut Heider, Wilfried Ken Neugebauer, Patrick Roumegoux, and Dr. Lothar Zipfel – Solvay employees in flourine commercial business unit |
| | Ken Neugebauer – Solvay commercial employee (second email dated April 3, 1998) | |

4

| Doc. No. | Author(s) | Recipient(s) and CC(s) |
|---|---|---|
| 1534 | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group<br><br>W. Nichels – Assistant to the corporate manager of the Solvay IP department. | Eberhard Piepho –head of Solvay fluorine commercial business unit |
| 1631 | Philippe Jacques – European Patent Attorney and current head of Solvay's patent group | Eberhard Piepho – head of Solvay fluorine commercial business unit<br><br>Copies also appear to have been circulated to:<br><br>Francine Jannsens and Vincent Wilmet – Solvay employees who were co-inventors of the patent-in-suit |
| 1634 | Hartmut Kruger – Solvay employee in fluorine commercial business unit | Philippe Jacques – European Patent Attorney and current head of the patent group |
| 1635 | Hartmut Kruger – Solvay employee in fluorine commercial business unit | Philippe Jacques – European Patent Attorney and current head of the patent group |
| 1639 | Philippe Jacques – European Patent Attorney and current head of the patent group | |
| 1647 | Philippe Jacques – European Patent Attorney and current head of the patent group | |
| 1650 | Vincent Wilmet – Solvay employee and co-inventor of the patent-in-suit and Solvay | Various Solvay individuals and organizations, including Philippe Jacques – |

| Doc. No. | Author(s) | Recipient(s) and CC(s) |
|---|---|---|
| | employee | European Patent Attorney, current head of the patent group |
| 1672 | Vincent Wilmet – Solvay employee and co-inventor of the patent-in-suit | Solvay's intellectual property department. Received by Philippe Jacques – European Patent Attorney |
| 1676 | Vincent Wilmet – Solvay employee and co-inventor of the patent-in-suit | Solvay's intellectual property department. Received by Philippe Jacques – European Patent Attorney |
| 1679 | Francine Delplanque – Solvay employee and co-inventor of the patent-in-suit | Philippe Jacques – European Patent Attorney<br><br>Vincent Wilmet – Solvay employee and co-inventor of the patent-in-suit<br><br>Copies also sent to the following Solvay employees:<br><br>Alfred Hoffait<br>Jean-Pierre Hermans<br>Liliane Meyers (the former head of the Solvay intellectual property department)<br>Andre Delbouille<br>Francis Baugnies<br>Maurice Planchon<br>Paul Baekelmans<br>Leopold Demiddeleer<br>Fredy Declerck<br>Luc Lerot<br>Marc Obsomer |

6

| Doc. No. | Author(s) | Recipient(s) and CC(s) |
|---|---|---|
|  |  | Philippe Doultremont<br>Guillaume Coppens<br>Charles Bienfait<br>James Franklin<br>Bernard Boon<br>William Nichels |
| 1681 | F. Delplanque-Janssens – Solvay employee and co-inventor of the patent-in-suit | Directed to Solvay's intellectual property department.<br>Copies were provided to five other Solvay employees, one of which was Vincent Wilmet – co-inventor of the patent-in-suit (identified only by their initials on the document). |
| 1682 | F. Delplanque-Janssens – Solvay employee and co-inventor of the patent-in-suit | Directed to Solvay's intellectual property department. Copies were also provided to five other Solvay employees, one of which was Vincent Wilmet – co-inventor of the patent-in-suit (identified only by their initials on the document, as with document 1681). |
| 1683 | J.P. Schoebrechts – Solvay employee and co-inventor of the patent-in-suit<br><br>V. Wilmet – Solvay employee and co-inventor of the patent-in-suit | Directed to Solvay's intellectual property department. Copies were also provided to five other Solvay employees, one of which was Vincent Wilmet – co-inventor of the patent-in-suit (identified only by their initials on the document, as with document 1681 and 1682) |
| 1688 | F. Delplanque-Janssens – Solvay employee and co-inventor of the patent-in-suit | Directed to Solvay's intellectual property department.<br><br>Copies were provided to five other Solvay |

7

| Doc. No. | Author(s) | Recipient(s) and CC(s) |
|---|---|---|
|  |  | employees, one of which was Vincent Wilmet – co-inventor of the patent-in-suit (identified only by their initials on the document). |