IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOLVAY, S.A., | ) | |
| | ) | |
| Plaintiff and Counterclaim | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-557-SLR |
| | ) | |
| HONEYWELL SPECIALTY MATERIALS LLC, | ) | PUBLIC VERSION |
| and HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Defendants and Counterclaim | ) | |
| Plaintiffs. | ) | |

**EXHIBITS 1 AND 2 TO**
**HONEYWELL INTERNATIONAL INC.'S OPPOSITION TO SOLVAY'S *DAUBERT***
**MOTION TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TRIAL**
**TESTIMONY OF HONEYWELL'S PATENT LAW EXPERT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Thomas C. Grimm (#1098)
Benjamin J. Schladweiler (#4601)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
tgrimm@mnat.com
bschladweiler@mnat.com
*Attorneys for Defendant*

OF COUNSEL:

Robert G. Krupka, P.C.
Laura M. Burson
Amber T. Aubry
Jacob R. Buczko
KIRKLAND & ELLIS LLP
777 S. Figueroa Street, Suite 3400
Los Angeles, CA 90017
(213) 680-8400

Confidential Version Filed: March 3, 2008
Public Version Filed: March 10, 2008

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SOLVAY, S.A.,                    )
                                 )
                *Plaintiffs*     )
                                 )
                                 )
        v.                       )
                                 )
                                 )    Civil Action
HONEYWELL SPECIALTY MATERIALS,   )    No. 06-557-SLR
LLC and HONEYWELL INTERNATIONAL  )
INC                              )
                                 )
                *Defendants*     )
                                 )
                                 )

**EXPERT REPORT OF MELVIN GARNER**

I.    **INTRODUCTION**

1.      Pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, I, Melvin Garner, give this Expert Report. I am prepared to testify at trial on behalf of Defendants as an expert on the operation, rules of practice and procedures of the United States Patent and Trademark Office ("USPTO"), and the reasonable practices of patent attorneys prosecuting patent applications before the USPTO, including the duty to disclose and its relationship to inequitable conduct.

2.      I have been retained by the attorneys for defendants in this case, Honeywell Specialty Materials, LLC ("HSM") and Honeywell International Inc. ("Honeywell"). I understand that HSM is no longer a party to this case. It is also my understanding that tehe case is a patent infringement suit involving United States Patent Nos. 6,730,817 of Wilmet et al. ("the '817 Patent") assigned to Solvay, S.A. ("Solvay").

3.      I reserve the right to give opinions on facts and other matters made known to me or arising subsequent to this report, including in rebuttal to any matter raised by Solvay or its

experts, either prior to or during any hearing or trial in this action.  I reserve the right to amend or supplement this report as appropriate.

4.      This report is to be used only for the purposes of this litigation and may not be published or used for any other purpose without prior written consent.

## II.   **MATERIALS CONSIDERED**

5.      In rendering my opinions, I reviewed and considered the materials listed in **Exhibit A** to this report.

## III.   **QUALIFICATIONS**

6.      I graduated from Drexel University in 1964 with a B.S. in Electrical Engineering degree.  While at Drexel I received the Drexel Technical Journal Award for the best student article published in 1963.  I was elected to Eta Kappa Nu, the Electrical Engineering Honor Society, and was President of the student chapter of the Institute of Electrical and Electronic Engineers.  I obtained an M.S. in Electrical Engineering degree from New York University in 1967.

7.      I was employed as an Electrical Engineer by IBM, CBS Laboratories and Sequential Information Systems, respectively, from 1964 to 1970.  During this period I rose from the rank of Junior Engineer to Project Engineer.

8.      From 1970 to 1973 I was employed as a Member of Patent Staff at Bell Telephone Laboratories (now Alcatel-Lucent Inc.) becoming a Patent Agent registered to practice before the USPTO in 1972.  All of my work during that period of time involved patent prosecution.

9.      While working at Bell Telephone Laboratories I attended Brooklyn Law School, graduating in 1973.  At Brooklyn Law School I was on Law Review and was a Senior Editor of the Law Review in 1973.

10.      From 1973 through 1981 I was an Associate at the law firm of Brumbaugh, Graves, Donohue & Raymond (now part of Baker & Botts) where I was primarily involved in patent prosecution, but also worked on patent litigation and opinions.

11.      In 1982 I joined the law firm of Darby & Darby P.C. as an Associate and became a Principal in 1985.  I remain with Darby to this day.  My work at Darby has been a mix of patent prosecution, litigation and opinion work.

12.      As part of my work at Darby I have acted as an expert witness in a number of cases.  In three of those cases, which were tried in New York, Connecticut and Virginia, I was asked to testify at trial and was accepted by the Court as an expert in patent office procedure and the practice of patent law by those registered to practice before the USPTO, as well as electrical engineering.  Those cases are *Velobind v. Southwest Plastics*, Civ. Action No. 89-0193-C-A (S.D.N.Y. 1989); *Ethicon, Inc. v. United States Surgical*, 937 F. Supp. 1015 (D. Conn. 1996); and *Berry Sterling Corp. v. Pescor Plastics, Inc.*, Civ. Action No. 95-1412A (AVB) (E.D. VA 1995).

13.      I have lectured at the Practising Law Institute ("PLI") since about 1985.  This non-profit organization provides educational training to lawyers on a variety of topics.  Up until 2005, at least once a year, and more often twice a year, I lectured at the PLI to practicing lawyers on patent prosecution topics.  In addition, I have lectured at the PLI on patent litigation, patent licensing and patent portfolio management strategies.  For about three years I also lectured on

patent prosecution at programs sponsored by the American Intellectual Property Law Association.

14.    During my career I have been lead counsel in about 30 litigations, and have prosecuted or supervised the prosecution of thousands of patent applications.

15.    I received the Drexel University Distinguished Alumni Award in 2005.

16.    I am listed in (a) 2007 New York Super Lawyers for Intellectual Property; (b) as a finalist in the 2007 Lawdragon 500 list of Leading Lawyers in America 2007; (c) Who's Who Legal - Patents 2005; and (d) in Euromoney's *Guide to the World's Leading Patent Law Experts*.

17.    I was recognized as one of "America's Top Black lawyers" in the November, 2003 issue of *Black Enterprise Magazine* and as one of the "Intellectual Property Superstars" in the May/June issue of *Diversity & the Bar*.

18.    I was President of the New York Intellectual Property Law Association, 2003-2004, and was President of the American Intellectual Property Law Association, 2005-2006.

19.    The accompanying Curriculum Vitae provides additional background material relating to my professional experience.  (**Exhibit B**)


IV.    **PUBLICATIONS**

20.    A list of my publications within the preceding 10 years is set forth in attached **Exhibit C**.


V.    **COMPENSATION**

21.    I am being compensated for my work in connection with this litigation at my normal hourly rate of $675 per hour.  I have no financial interest in the outcome of the case.  The amount of my fees is not contingent upon the opinions expressed herein.

VI.    **PRIOR TESTIMONY**

22.     In the last 4 years, I have not provided deposition or trial testimony as an expert in any case.

VII.    **BACKGROUND**

23.     I have been retained by Honeywell in this action as a consultant, and prospectively as a testifying expert witness, to provide my opinion as to the prosecution before the U.S. Patent & Trademark Office of U.S. Patent No. 6,730,817 of Wilmet et al. (the "'817 patent" attached as **Exhibit D**).  In particular, I have been retained to provide an opinion as to whether the inventors and/or their agents made intentional misrepresentations of material fact to the Patent Office regarding prior art United States Patent No. 5,574,192 of Van Der Puy ("the '192 patent")  and regarding other prior art.

VIII.    **DISCLOSURE OF U.S. PATENT NO. 6,730,817**

24.     The '817 patent purports to disclose a process for making 1,1,1,3,3-pentafluoropropane (HFC-245fa) by a reaction between 1,1,1,3,3-pentachloropropane and hydrogen fluoride (HF) in the presence of a hydrofluorination catalyst.  As disclosed, the 1,1,1,3,3-pentachloropropane may be obtained by a reaction between vinyl chloride and tetrachloromethane in the presence of a telomerization catalyst and of a nitrile. (Abstract).  HFC-245fa, which may be used as a blowing agent for the preparation of expanded polymeric materials, is a possible substitute for halogenated chlorofluoro hydrocarbons (CFCs and HCFCs) which are suspected of having a detrimental effect on the ozone layer. Col. 1, lines 4-14.  The catalyst may be chosen from the derivatives of metals of groups 3, 4, 5, 13, 14 and 15 of the Periodic Table of Elements (IUPAC 1988) and their mixtures (groups previously called IIIA,

IVa, IVb, Va, Vb and VIb), and preferably chosen from tin and antimony derivatives.  Examples are tin tetrachloride and antimony pentachloride. Col. 1, line 51 to Col. 2, line 5.

25.    The temperature at which the hydrofluorination is performed is generally between 50° and 150° C.  Col. 2, lines 34-40.  It is carried out in liquid phase at a pressure from 2 bar to 40 bar, wherein the HFC-245fa is at least partially in gaseous form.  These parameters enable the HFC-245fa to be isolated from the reaction mixture. Col. 2, lines 40-48.  The reaction in the liquid phase can be conducted continuously while maintaining a molar ratio of catalyst to 1,1,1,3,3-pentachloropropane from 0.001 to 1000. Claim 2.

26.    The only embodiment disclosed in the patent for making HFC-245fa, Example 4, describes a process for making HFC-245fa from HCC-240fa and HF but does not disclose how or whether the product of the reaction is removed continuously in a gas phase.

IX.    **OVERVIEW OF THE USPTO PATENT EXAMINATION PROCESS**

27.    The Patent System is based on the U.S. Constitution, which in Article I, Section 8, gives Congress the power to pass laws to promote the progress of science and the useful arts by granting to inventors exclusive rights over their inventions for a limited time.  In carrying out this Constitutional provision, Congress enacted the Patent Laws which established the United States Patent and Trademark Office ("USPTO") to administer the Patent System.  The patent laws require the inventors to provide full disclosure of their inventions to the public in exchange for the exclusive rights.

28.    When an inventor develops an invention, he or she typically contacts a patent attorney or agent to prepare a description of the invention in the format required by the Patent Office.  The description is combined with claims, i.e., sentences which describe the exclusive rights the inventor is seeking.  The description and claims, perhaps with drawings, form a patent

application that can be filed with the USPTO.  The rules also require that the inventor submit an oath or declaration that he or she is in fact the inventor of the subject matter.  Attorneys or agents who prepare and file such patent applications are registered by the USPTO.

29.    When an invention is made outside of the United States the description of it may be prepared by someone who is not registered to practice before the US Patent application.  In that case after it is prepared, it may be first filed in the foreign country and then subsequently sent to an attorney in the US who is registered to practice before the USPTO.  In such a case the inventor may work for a foreign company, who engages the person in that country to prepare the case, who then engages a US attorney to file the case in the US.  Thus, there is a chain of people involved in the application from the inventor to the US attorney.

30.    When the patent application is filed, it is first examined for formalities, for example, whether the required parts of application are present, whether the oath has been submitted and whether the proper fees have been paid.  After the formalities have been checked, the application is assigned to a Group Art Unit that is responsible for examining applications in a particular technological area.  The application is then assigned to a specific examiner for examination.

31.    As part of the examination the examiner reads the application to determine what is being claimed as the invention and conducts a search to find prior patents and/or publications ("prior art") that may anticipate the invention or render it obvious.  Next the examiner makes patentability determinations with respect to each of the claims based on the results of the prior art search and any information submitted by the applicant.

32.    The examiner also considers other requirements of the patent law.  For example the patent law requires that the application contain a written description of the invention in such

clear and concise terms as to enable a person skilled in the art to practice the invention. Further, it requires that the application disclose the best mode contemplated by the inventor of carrying out the invention. The examiner's decisions on the formalities and patentability are communicated to the applicant in a written document typically referred to as an "office action." Problems with formalities are listed as objections to the application and substantive problems, e.g., a lack of novelty or obviousness are listed as rejections.

33.    If the examiner makes rejections and/or objections, the applicant may respond by amending the claims and/or presenting arguments to overcome the examiner's position. If the examiner determines that all of the claims are allowable (either as originally filed or in light of amendments and/or arguments ), a notice of allowance is issued and the application is issued as a patent.

34.    If the claims of the application continue to be rejected, normally the examiner's second office action is made final and prosecution is closed. At that point the applicant can appeal the examiner's decision, file a proposed amendment, make arguments that may be considered by the examiner, file a continuing application or abandon the application.

35.    Patent prosecution is an "ex parte" process between the applicants or their attorneys and the USPTO examiner. Except to a limited extent, third party participation is not permitted. As a result, it is absolutely essential that patent applicants and their attorneys deal fairly with the USPTO examiner by providing all information that is material to the examination process. This obligation is referred to as the applicant's "duty of candor and good faith" and is important to the successful operation of the Patent System. Since the examiner has time constraints in searching for prior art dealing with any particular application and has limited resources to conduct scientific experiments, it is essential that applicants assist the examiner by

providing information that they are aware of that is material to the examination of their application and make accurate representations regarding the state of the art. This trust between the applicant and the USPTO is based on the applicant's full compliance with his duty of candor and disclosure.

X. **FILE HISTORY OF THE '817 PATENT**

36.    U.S. Patent No. 6,730,817 of Wilmet et al. was first filed as French Patent Application No. 96 12558 on October 23, 1995. The applicant filed corresponding Patent Cooperation Treaty ("PCT") Application No. PCT/EP96/04315 on October 4, 1996. The PCT application designated the United States and the national stage prosecution of the PCT application in the US was filed on June 8, 1998 as U.S. Application Serial No. 09/051,746.

37.    The claims of the US application, i.e., claims 1-17, were based on French claims in the PCT case that were translated into English.

38.    Independent claim 1 was directed to a "[p]rocess for the preparation of 1,1,1,3,3-pentafluoropropane, according to which 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst." Independent claim 17 was directed to a "[p]rocess for the preparation of 1,1,1,3,3-pentachloropropane in which vinyl chloride and tetrachloromethane are reacted in the presence of a chloride of a metal of groups 8 to 11 of the Periodic Table of the elements (IUPAC 1988) and of a nitrile."

39.    A PCT search report accompanied the filing of the application in the US in which PCT application WO 96/01797 of Allied Signal (which correspond to the '192 patent), EP Application 0 703 205 of Atochem Elf SA, and EP Application 0 729 932 of Central Glass Co. Ltd were cited as being particularly relevant.

40. An assignment of the application to Solvay was filed in the case on June 8, 1998. Further, in response to a Notice of Missing Parts, a Declaration was filed in the case on the same day by Solvay's U.S. patent counsel at the time, George H. Spencer of Spencer & Frank in Washington, DC.

41. On July 30, 1998, the basic filing fee and a Preliminary Amendment were filed. In the amendment, original claims 1-17 were cancelled and replaced with claims 18-27. Independent claim 18 seems to be the same as former independent claim 1. Independent claim 27 differs from prior claim 17 by reciting a "process for the preparation of 1,1,1,3,3-pentachloropropane, in which vinyl chloride and tetrachloromethane are reacted continuously in the presence of a telomerization catalyst chosen from copper compounds.

42. On December 4, 1998, the applicant filed an Information Disclosure Statement which cited documents from an International Search conducted by the European Patent Office on January 13, 1997 in PCT/EP 96/04315. The references include WO95/05353; WO95/04022; EP 0 611 744; WO96/01797 (which corresponds to the '192 patent); EP 0 703 205; Australian Patent No. 32843/95; EP 0 729 932; EP 0 522 639 and WO95/04021. Also cited were Derwent Abstract No. 94-265357; Kotora, Martin et al., "Addition of Tetrachloromethane to Halogenated Ethenes Catalyzed by Transition Metal Complexes," Journal of Molecular Catalysis, Vol. 77, pgs 51-60 (1992); and an English translation of EP 0 522 639.

43. In an Office Action dated February 9, 1999, all of the claims were rejected as obvious under 35 USC 103 based on US Patent No. 5,395,997 of Van Der Puy et al. in view of U.S. Patent No. 3,862,978 of Decker et al. In particular, the Examiner stated that:

> Van Der Puy et al disclose a process wherein carbon tetrachloride is reacted with vinylidene chloride to produce 1,1,1,3,3,3-hexachloropropane. The reaction is conducted in the presence of a copper catalyst (See Example 1). The resulting product is reacted with HF in the

presence of an antimony catalyst at a temperature of 125 C and a pressure of 400 psig (See Example 3). Thus, Van Der Puy et al disclose the instantly claimed process except for the use of a different and analogous starting material. It would have been obvious to one of ordinary skill in the art to utilize the starting materials of the instantly claimed process in the process of Van Der Puy et al. because there would have been a reasonable expectation of obtaining the corresponding analogous product, namely 1,1,1,3,3-pentafluoropropane. This reasonable expectation would have motivated one of ordinary skill because the expected analogous product is a known and useful compound.

Decker et al discloses the use of a copper and amine catalyst in a process similar to the first step (Example 1) of Van Der Puy et al. In view of the similarity of the processes it would have been obvious to one of ordinary skill in the art to use such a catalyst in the Van Der Puy process.

44.    On April 12, 1999 the applicant filed a request for a corrected filing receipt to properly set forth the total number of claims and the number of independent claims.

45.    The applicant on June 9, 1999, filed a Response to the Office Action of February 9, 1999. The response, which was filed by Marina Schneller of Venable, Baetjer, Howard and Civiletti, did not amend the claims, but cited pages 499 to 515 of Kirk-Othner Vol. 11 to show fluorinated aliphatic compounds. In responding to the rejection over the Van Der Puy '997 patent and the Decker patent the applicant stated that:

Van der Puy relates to the production of hydrofluorocarbons of the formula $CF_3(CH_2CF_2)nF$ where n=1 to 3. The process of forming the Van Der Puy hydrofluorocarbons comprises reacting at least one reactant selected from $CCl_3(CH_2CCL_2)nCl$, $CCL_3(CH_2CF_2)nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$, in the presence of a fluorination catalyst, wherein HF is present in at least stoichiometric amounts per mole of reactant. Van der Puy describes the reaction of vinylidene chloride with carbon tetrachloride to give $CCl_3(CH_2CCL_2)nCl$ or carbon tetrachloride with vinylidene fluoride to give $CCl_3(CH_2CF_2)nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$.

Decker describes the reaction of a symmetrical alkene with a halogenated compound to form a product containing at least two halogen atoms [G and G'] and up to 4.

With respect to the differences between the two references and the claimed subject matter, the references do not describe the reactant of the claims, nor the products; in fact, by definition in each, the references exclude the product of the claim from their respective descriptions. This

is underscored by the fact that, in the opinion of applicants' foreign representative, vinylidene compounds used by Van der Puy are not useful for making 1,1,1,3,3-pentachloropropane.

46.    The applicant cited the Kirk-Othner reference to show which hydrofluorocarbons are desirable, but the reference does not mention 1,1,1,3,3-pentafluoropropane.  Accordingly, the applicant argued that there is no motivation to make HFC-245fa or use it as a blowing agent or propellant.  Further, the applicant argued that the art is silent as to a continuous process as recited in some of the claims.  In addition, the applicant argued that if the Van der Puy '997 and Decker patents were combined, the result would not produce the product of the rejected clams.

47.    In an office action dated August 24, 1999, the Examiner made a final rejection of the claims, again over the same references.  In response to applicant's argument that the references do not produce the claimed product, the Examiner asserted that the references produce an analogous product and there would be a reasonable expectation that using a different starting material would result in the claimed product.  As to whether the prior art shows the product to be useful, the Examiner notes that the specification of the application states that it is a known and useful product.

48.    A Notice of Appeal and a Response to the final rejection were filed on February 24, 2000.  In the Response the applicant provided a copy of a reference, *Advances in Fluorine Chemistry*, Vo1. 3, pp 180-183 and 200-209.  No changes were made to the claims, but the applicant argued that the Examiner should not rely on "the alleged 'analog' between 1,1,1,3,3,3-hexachloropropane and 1,1,1,3,3-pentachloropropane; an 'analogy' between vinyl chloride, and vinylidene chloride, and an 'analogy' of reactivity 'expected' when using 1,1,1,3,3-pentachloropropane with a catalyst and hydrogen fluoride."

49.    The applicant specifically stated that:

The references do not describe the reactant or the product of the rejected claims.  Moreover, the generic formula of Van der Puy, at, e.g., column 1, line 13, does not embrace the compounds recited in the claims.  Whatever the number of carbon atoms in the Van der Puy generic formula, the number of fluorine atoms in the compounds is an even number, and never an odd number.  By comparison, applicants' product contains 5 halogen atoms.  Moreover, the reactants described at column 2, lines 17-18, require an even number of halogen atoms – not an odd number of halogen atoms.  There is no description in Van der Puy of how to make a halogenated organic compound with an odd number of halogen atoms.

Decker on the other hand, excludes the possibility of making the 1,1,1,3,3-pentachloropropane.  Firstly, Decker only describes the possibility of adding up to four halogen atoms to an olefin.  By comparison, applicants' claims call for 5 halogen atoms.  Moreover Decker's formula for products requires a terminal -Cl $(R)_2$-G' which means that one terminal carbon atom can only contain one halogen atom, by virtue of the definition of G'.  Decker differs from applicants' compound.

50.    The applicant also argued that the "the references exclude the product of the claim from their respective descriptions."  Further, the applicant stated that there is no motivation to make these combinations.  As a result there is no "expectation of success."   Also, the book, *Advances in Fluorine Chemistry* refutes the Examiner's concept of an analogy.

51.    Concerning claims 20-22, the applicant asserted that the Van der Puy '997 reference does not suggest the catalyst/hexachloropropane ratio to be maintained in a continuous process.  Applicant further asserted that the '997 patent does not contain any suggestion to draw off hexafluoropropane and HCL as they are being formed.  On the issue of the telomerization process, the applicant argued that the prior art does not suggest that vinyl chloride in the present invention would be expected to behave analogously to vinylidene chloride in the Puy process.  Also, applicant claimed that if Van der Puy '997 and Decker were combined it would not result in the invention.

52.    Apparently inadvertently, a copy of the first page of a letter from someone at Solvay to Ms. Schneller dated February 18, 2000, was enclosed with the Response. This letter discloses the *Fluorine Chemistry* text and explains how it is relevant to the application. The arguments regarding how *Advances in Fluorine Chemistry* refutes the examiner's position (arguments made in the response to the Office Action rejection) also appear in this letter.

53.    The Examiner issued an Advisory Action on March 3, 2000 in which he stated that the Response did not put the case in condition for allowance and refused to make the textbook of record in the application because it was not submitted in response to a new issue in the final rejection.

54.    A Continued Prosecution Application (CPA) was filed on April 21, 2000 by attorney Marina Schneller. The CPA was accompanied by a Preliminary Amendment in which the applicant amended claim 19 as follows:

> 19. (Amended) A process for the preparation of 1,1,1,3,3-pentafluoropropane, [according to which] <u>wherein</u> 1,1,1,3,3-pentachloropropane hydrofluorination catalyst, <u>under conditions of temperature and pressure at which 1,1,1,3, 3-pentafluoropropane is gaseous; and wherein 1,1,1,3,3- pentafluoropropane are drawn off in the gaseous phase as they are being formed.</u>

Further, claim 22 was canceled and dependent claims 37-42 were added. The applicant indicated that claim 19 included the limitations of claim 22 and that was the reason claim 22 had been cancelled. Claims 37-42 were asserted to be supported by the specification. An Information Disclosure Statement (IDS) was filed indicating that U.S. Patent No. 5,574,192 to Van Der Puy corresponds to PCT application WO96/01797, which was submitted with the IDS of December 4, 1998.

55.    An office action issued on May 31, 2000, in which the claims were again rejected over the Van Der Puy '997 patent in combination with the Decker patent. The Examiner noted

that in the Preliminary Amendment the applicant presented no new arguments for patentability.

Further, the Examiner rejected all of the new claims under section 112 of the statute as being

indefinite.

56.     The applicant in an Amendment dated August 30, 2000, cancelled existing claims

19-21 and 23-42 in favor of new claims 43-62.  These claims ultimately became the claims of the

patent.

57.     In the remarks the applicant also stated that:

> Applicants respectfully traverse the rejections of the claims under 35 USC
> 103 over Van Der Puy [hereinafter Van Der Puy '997] and Decker, as
> applied by the USPTO, and also consider the Van Der Puy reference
> [hereinafter Van Der Puy '192 cited in applicants most recent Information
> Disclosure Statement thereafter.]  The error in the art rejection is
> foreshadowed by the fact that the references alone and the references in
> combination do not describe the recitations in applicants' claims.  The
> references applied by the USPTO do not describe or suggest the claimed
> subject matter.  The references do not describe the reactant or the product
> of the rejected claims or conditions. (page 6)
>                                         …
> It is applicants' understanding that the examiner's rejection of the claims
> over VAN DER PUY '997 is based on the alleged analogy of 1,1,1,3,3,3-
> hexachloropropane and 1,1,1,3,3,-pentachloropropane, and, on the basis of
> that alleged analogy, the USPTO suggests that alleged analogy would
> convey a reasonable expectation of success when using 1,1,1,3,3,-
> pentachloropropane with a catalyst and hydrogen fluoride in analogy to
> VAN DER PUY.  The record is devoid of evidence to support such an
> analogy.  Moreover, applicants presented a reference Advances in
> Fluoride Chemistry, Vol. 3, p .180-183, 200-209) relating to the synthesis
> of 2,2-dihydrofluoropropanes, which directly disputes that inference of
> any analogy. (page 9)
>
> Applicants note Van Der Puy '192 which was cited by applicants in the
> April 21, 2000 Information Disclosure.  The instant claim 43 requires the
> reaction at a temperature and under a pressure at which 1,1,1,3,3-
> pentafluoropropane is gaseous and isolating said 1,1,1,3,3-pentafluoropropane
> from the reaction mixture by drawing off 1,1,1,3,3-pentafluoropropane
> and hydrogen chloride in a gaseous phase as each of said 1,1,1,3,3-
> pentafluoropropane and hydrogen chloride is being formed.  Example 3 of
> VANDERPUY '192 describes a hydrofluorination process of 1,1,1,3,3-

pentachloropropane in the presence of a catalyst wherein hydrogen chloride is periodically vented.

VANDERPUY '192 does not provide motivation:

(a) to select carrying out the reaction at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous,

(b) to draw off in vapour phase 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3- pentafluoropropane and hydrogen chloride is being formed.

In fact, as stated on p. 3, 1.13-15 of the application, the process of the invention enables 1,1,1,3,3-pentafluoropropane to be easily separated from the reaction mixture, which is an advantage as it makes it possible to retain or to return to the reactor the unconverted reactants and chlorofluoropropanes possibly formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane (see p. 3, 1.28-30).

This advantage is even more apparent in the second independent claim which is limited to a process wherein the reaction is carried out in a reactor equipped with a device for drawing off a gas stream which is controlled.

(a) to draw of a gas stream of 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed thereby isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture.

(b) to keep in the reactor in the liquid state the unconverted 1,1,1,3,3-pentachloropropane, most of the hydrogen fluoride and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.

Feature (b) is not suggested in VANDERPUY '192.

The claimed process is particularly suitable for carrying out the manufacture of 1,1,1,3,3-pentafluoropropane in a continuous mode, as claimed in claim 44.

In sum, the inventive process provides specific instructions how to advantageously operate a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride by using embodiments which are neither taught nor suggested in VANDERPUY '192. (pp 11-12)

58.    The Examiner issued an office action on October 13, 2000 in which the claims were again rejected over Van der Puy '997 and Decker.  The action was made final.

59.    On January 12, 2001, the applicant filed a Notice of Appeal.  The appeal brief was filed on March 13, 2001.  In the brief the applicant addressed the Van der Puy '997 patent and repeated the previous arguments, including a reference to the '192 patent and the *Advances in Fluorine Chemistry*.  In particular, the applicant argued that unlike the "applied art," the claims require a compound of five (5) fluorine atoms.  Further, the applicant argued that independent claims 43 and 54 are limited to a hydrofluorination process of 1,1,1,3,3-pentachloropropane in the presence of a catalyst at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous.  Claims 20-26 and 28-36 relate to continuous reactions.

60.    The applicant stated that:

> Moreover, as stated on p. 3, 1.13-15 of the application, the process of the claims enables 1,1,1,3,3-pentafluoropropane to be easily separated from the reaction mixture.  This ease of separation which is an advantage as it makes it possible to retain or to recycle to the reactor the unconverted reactants and chlorofluoropropanes possibly formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane (see p. 3, 1.28-30).
>
> This advantage is emphasized by the terms in independent claim 54 which is limited to a process wherein the reaction is carried out in a reactor equipped with a device for drawing off a gas stream which is controlled.
>
> > (a) to draw of a gas stream of 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed thereby isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture...
> >
> > b) to keep in the reactor in the liquid state the unconverted 1,1,1,3,3-pentachloropropane, most of the hydrogen fluoride and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.
>
> This is quite distinct from Van Der Puy 5,574,192 (corresponding to WO 96/01797) submitted in the Information Disclosure Statement.
>
> Van Der Puy 5,574,192 discloses a process for manufacturing 1,1,1,3,3-pentafluoropropane by fluorination of 1,1,1,3 3-

> pentachloropropane in the presence of HF and antimony pentachloride;
> pressure is maintained in autoclave (at 300-400 psig) by periodically
> venting HC1-by product. (Brief pp. 3-4)

61. In the brief the applicant stated that there was no motivation in the prior art to undertake the applicant's process and does not disclose applicant's method or the reactant. The invention teaches an odd number of halogen atoms, e.g., 5, while the prior art use an even number of atoms.

62. The Examiner filed an Answer on May 10, 2001, which essentially repeated the prior rejection, but this time without including the Decker reference. The Examiner stated that since claim 43 is a Jepson type claim, the applicant admits that the method of producing 1,1,1,3,3-pentafluoropropane by catalytic hydrofluorination of 1,1,1,3,3-pentachloropropane with HF is prior art. Van der Puy discloses a process using 1,1,1,3,3,3-hexachloropropane reacted with HF in the presences of a catalyst to produce 1,1,1,3,3,3-hexafluoropropane (Example 3). It further discloses that HCl and 1,1,1,3,3,3-hexafluoropropane products are vented to control pressure. It would have been obvious to utilize 1,1,1,3,3-pentachloropropane as the starting material in the Van der Puy process to obtain the invention. It would also be obvious to use gas phase recovery in the process. Further, there would have been a reasonable expectation of success.

63. A request for oral hearing was filed on July 10, 2001.

64. In a document dated November 22, 2002, the applicant changed representation from Marina Schneller of Venable, Baetjer, Howard and Civiletti of Washington, DC to Ashley Pezzner of Connolly, Bove, Lodge & Hurtz of Wilmington, DE.

65. The Board Decision was issued on January 30, 2003. In the decision, the Board overturned the rejection. In particular, the Board noted that the Examiner relied on the Van der Puy '997 patent which shows a different starting material in its process to produce a different

18

result, but contended that they were analogs. The Examiner also relied on Van Der Puy '997 to show recovering the resulting material as gaseous overhead to control pressure. However, the Board held there was insufficient evidence to support a prima facie case of obviousness. The Board noted that the crux of the Examiner's argument was that there is an "analogy" between the Van der Puy materials and process, and those of the invention. However, the applicant's reliance on <u>Advances in Fluorine Chemistry</u> refutes this analogy and the Examiner has done nothing to show that overcome it. Thus, the Examiner is overruled.

66.    A Notice of Allowability and Notice of Allowance issued on March 17, 2003. The issue fee was paid and the patent issued on May 4, 2004.

## XI. DISCLOSURE OF THE '192 PATENT

67.    U.S. Patent No. 5,574,192 of Van Der Puy et. al. is entitled "Process for the Manufacture of 1,1,1,3,3-pentafluoropropane," i.e., HFC-245fa. It issued on November 12, 1996 and claims priority to an application that was filed on July 11, 1994.

68.    "This invention is related to the preparation of hydrofluorocarbons (HFCs). Specifically, it relates to the fluorination of a compound of the formula:

$$CF_yCL_{3-y}CH_2CHF_wCL_{2-w}$$

wherein w=0 or 1, and y=0-3, with hydrogen fluoride in the presence of a fluorination catalyst under conditions sufficient to produce a compound of the formula $CF_3CH_2CF_2H$. $CF_3CH,CF_2H$ or HFC 245fa may be used as a blowing agent, a propellant, and a heat transfer agent." Abstract.

69.    The process can be carried out on a continuous basis. Col. 3, lines 31-35; Col. 3, line 67 to Col. 4, line 1.

70.    Example 3 in the patent is as follows:

EXAMPLE 3

Fluorination of $CCl_3CH_2CHCl_2$ with $HF/SbCl_5$

A 600-mL monel autoclave equipped with mechanical stirrer was charged with 8.7 g $SbCl_5$ and cooled to -27° C. The autoclave was then evacuated and charged with 49.8 g of anhydrous HF. The contents were cooled to -40° C., and 44 g $CCl_3CH_2CHCl_2$ was added. The reactor was then connected to a packed column/condenser assembly. The condenser was maintained at -20° C. The reaction mixture was heated to 135° C. over 2.25 hours and maintained at that temperature for an additional 2 hours. During this heating period, the pressure in the autoclave was maintained from about 1965 to 2655 KPa (300-400 psig) by periodically venting pressure (HCl by-product) in excess of 2655 KPa (400 psig). Venting was done from the top of the condenser to a cold aqueous KOH scrubber which was connected to -78° C. cold trap. The reactor was then completely vented to the cold trap. 18.5 g of a colorless liquid were collected. The identity of this liquid was determined by GC analysis to be 84% $CF_3CH_2CHF_2$ (corresponding to a yield of 57%) and 11 % $CF_3CH_2CHClF$.

## XII.    THE DUTY OF CANDOR AND INEQUITABLE CONDUCT

71.    As noted above, it is essential to the patenting process that patent applicants and their attorneys deal fairly with the USPTO examiner and provide all information that is material to the examination process.

72.    The duty of candor and good faith is set forth in the regulations of the USPTO, i.e., 37 CFR 1.56(c): In particular, the regulation provides that:

(c)    Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

(1)    Each inventor named in the application;

(2)    Each attorney or agent who prepares or prosecutes the application; and

(3)    Every other person who is substantively involved in the preparation or prosecution of the application and who is

> associated with the inventor, with the assignee or with
> anyone to whom there is an obligation to assign the
> application.

### A.    MATERIALITY

73.    The duty of candor and good faith extends to all dealings with the USPTO and is broader than just the duty to disclose information material to the examination process.  The term "information" in 37 CFR 1.56 includes any information "material to patentability" including prior art, but also includes information on enablement, possible prior public use, sales, offers to sell, derived knowledge, prior invention by another, who the identity of the real inventor, and the like.  *See* MPEP 2001.04.  Thus, this duty extends to any information that a reasonable examiner would consider important in deciding whether to allow an application to issue as a patent.

74.    Prior to March 16, 1992, 37 CFR 1.56 defined the term "material" using the so-called "reasonable examiner" standard as follows:

> Such information is material where there is a substantial likelihood that a
> reasonable examiner would consider it important in deciding whether to
> allow the application to issue as a patent.  The duty is commensurate with
> the degree of involvement in the preparation or prosecution of the
> application.

75.    After that date 37 CFR 1.56 was amended to replace the "reasonable examiner" standard with the current definition of "material information," as specified in 37 CFR 1.56(b). The new definition is as follows:

> (b)    Under this section, information is material to patentability when it
> is not cumulative to information already of record or being made
> of record in the application, and
>
> (1)    It establishes, by itself or in combination with other
> information, a prima facie case of unpatentability of a
> claim; or
>
> (2)    It refutes, or is inconsistent with, a position the applicant
> takes in:
>
> (i)    Opposing an argument of unpatentability relied on
> by the Office, or
>
> (ii)    Asserting an argument of patentability.

A *prima facie* case of unpatentability is established when the information compels a conclusion that a claim is unpatentable under the preponderance of evidence, burden-of-proof standard, giving each term in the claim its broadest reasonable construction consistent with the specification, and before any consideration is given to evidence which may be submitted in an attempt to establish a contrary conclusion of patentability.

76.     Although the "reasonable examiner" language found in the pre-1992 version of 37 CFR 1.56 was replaced with the language of the 1992 version of the Rule, a Federal Circuit decision has held that information may be considered "material" under both the 1992 version of 37 CFR 1.56 as well as the former "reasonable examiner" standard.[1]

77.     In *Digital Control Inc. v. Charles Machine Works*, the Federal Circuit stated that:

The PTO's recent adoption of an arguably narrower standard of materiality does not supplant or replace our case law. Rather, it merely provides an additional test of materiality. That is, if a misstatement or omission is material under the new Rule 56 standard, it is material. Similarly, if a misstatement or omission is material under the 'reasonable examiner' standard or under the older three tests, it is also material. As we reasoned in *American Hoist*, to the extent that one standard requires a higher showing of materiality than another standard, the requisite finding of intent may be lower.

78.     Thus, under Federal Circuit precedent, it is appropriate to consider both the "reasonable examiner" standard as well as the standard set forth in the current version of 37 CFR 1.56. Under either standard of materiality, information that is cumulative to information already of record is not considered "material"[2] and therefore the applicant is under no obligation to cite cumulative information to the USPTO.[3]

79.     However, information that is not cumulative, especially if it establishes a prima facia case of unpatentability or refutes a position taken by the applicant, must be disclosed to the examiner.

---

[1]     *See* Digital Control Inc. v. Charles Machine Works, 437 F 3d 1309, 1314 (Fed. Cir. 2006).

[2]     *See Digital Control Inc. v. Charles Machine Works*, 437 F 3d 1309, 1319 (Fed. Cir. 2006) (Citing *Molins PLC*, 48 F.3d at 1179, the courts states that "a withheld otherwise material prior art reference is not material for the purposes of inequitable conduct if it is merely cumulative).

[3]     *See* MPEP 2001.05; *see also* 37 C.F.R. § 1.56(b).

## B.    INEQUITABLE CONDUCT

80.    In order to establish inequitable conduct, the challenging party must provide clear and convincing evidence of "affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false information, coupled with intent to deceive."[4]  The clear and convincing evidence standard is met when the evidence shows that it is "substantially more likely than not" that the allegation is proven by the evidence.

81.    If a party can establish threshold levels of both materiality and intent to deceive the USPTO by clear and convincing evidence, then the court balances the level of materiality against the level of intent to deceive the USPTO to determine if inequitable conduct has been committed.  For information that has a high level of materiality, a relatively low level of intent to deceive must be established.[5]

82.    In determining intent, "the involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive".[6]  However intent need not be shown by direct evidence, but may be inferred from the totality of the evidence.[7]

## XIII.    BASIS AND REASONS FOR THE OPINION

### A.    Example 3 of the '192 Patent

83.    I rely on the expert report of Dr. Michael F. Doherty for an analysis of the information disclosed by Example 3 of the Van der Puy '192 patent.  His report basically states that Example 3 of the '192 patent anticipates the claims of the '817 patent because when hydrogen chloride is removed in the vent gas in the experiment reported in Example 3 of the '192 patent, there must have been other compounds present, including the compounds HFC-

---

[4]      *Baxter Int'l, Inc. v. McGraw, Inc.*, 149 F.3d 1321, 1327 (Fed. Cir. 1998).

[5]      *Digital Control*, at 1313 (quoting *Union Pacific Resources Co. v. Chesapeake Energy Corp.*, 236 F. 3d 684, 693 (Fed. Cir. 2001)).

[6]      *See Kingsdown Med. Consultants ltd. v. Hollister, Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988 (en banc))

[7]      *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed. Cir. 1995)

245fa, HFC-244fa, and hydrogen fluoride. These other compounds would be removed in the vent gas. In particular, it is impossible to remove a single compound alone, without it being accompanied by other compounds, as a gas from a liquid mixture of several compounds, with which the gas is in contact, by evaporation alone.

84.      Dr. Doherty states that the '192 patent anticipates the '817 patent, because at the conditions of Example 3 in the 192 patent, namely, 135°C and pressures between 21.7 bar (300 psig) and 28.6 bar (400 psig) there is an azeotrope between HF and HFC-245fa which boils at a pressure of approximately 36.9 bar. This mixture has the highest vapor pressure (i.e., it is the lightest composition) in a mixture consisting of HFC-245fa + HFC-244fa + HF. The reaction liquid towards the end of run in Example 3 will consist primarily, but not exclusively, of these compounds. At the lowest end of the vent pressure range, namely 21.7 bar (300 psig), the HF/HFC-245fa azeotrope is even more volatile and the gaseous phase will be even richer in HFC-245fa. The significance of the HF/HFC-245fa azeotrope is that it creates a mixture containing HFC-245fa that is even more volatile than would be expected from the pure component vapor pressures alone at a temperature of 135°C. Moreover, it will be gaseous over a wider range of temperatures and pressures than reported specifically in Example 3.

85.      Also, according to Doherty, Honeywell has replicated Example 3 of the '192 patent and confirmed the technical arguments developed above.

86.

**B.    Applicant's Statements about Example 3 of the '192 Patent During Prosecution of the '817 Patent**

87.    As noted in the summary of the file history above, during the prosecution of the '817 patent, the applicant characterized the prior art generally as follows:

a.    The prior art does not disclose the reactant of the claims, nor the products. Response of June 9, 1999; Response of February 24, 2000.

b.    On the issue of the telomerisation process, the prior art does not suggest that vinyl chloride in the invention would be expected to behave analogously to vinylidene chloride in the Van Der Puy '997 process. Response of February 24, 2000.

c.    The references do not describe the recitations in applicant's claims. The references do not describe the reactant or the product of the claims and conditions. Amendment of August 30, 2000.

88.    Even though the Examiner did not cite the '192 patent against the claims, the applicant voluntarily made detailed comments about the '192 reference as follow:

a.    The references combined (including the '192 patent) do not describe the recitations in the claims.  Amendment of August 30, 2000 (page 6).

b.    The '192 patent does not provide motivation to select and carry out the reaction at a temperature and under a pressure at which HFC-245fa is gaseous. Amendment of August 30, 2000 (page 11)

    *c.*    The '192 patent does not provide motivation to draw off HFC-245fa and HCl as each is being formed. Amendment of August 30, 2000 (page 11)

    *d.*    The '192 patent does not suggest keeping in the reactor in liquid state unconverted 1,1,1,3,3-pentachloropropane, most of the HF and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane. Amendment of August 30, 2000 (page 12)

C.    Advances in Fluorine Chemistry

89.    I have reviewed in part the expert report of Dr. David G.R. Short. In this report he asserts that the *Advances in Fluorine Chemistry* reference was material to the prosecution of the '817 patent because it showed that by the 1960s it was known in the art to control the manufacturing process of a fluorocarbon so that the lower boiling fluorocarbon product was removed from the reactor as a gas in a continuous process.

**D.    Applicant's Statements about *Advances in Fluorine Chemistry***

90.    During the prosecution of the case the applicant cited to the text, *Advances in Fluorine Chemistry* to demonstrate that there was no motivation to combine the Van Der Puy '997 and Decker patents and that there was no analogy between the starting and ending products of Van Der Puy and the claims of the application. Response dated February 24, 2000. This information apparently was provided by the foreign representative of Solvay. *See* the letter of February 18, 2000, in the file history. This argument was repeated in the applicant's brief on appeal dated March 13, 2001.

91.    In deciding to allow the claims, the Board of Appeals in its Decision of January 30, 2003, overruled the examiner on the basis of this document.

## C.     Inequitable Conduct

92.     Given that the title of the '192 patent (as well as the specification and claims) shows it is directed to making HFC-245fa, there can be no doubt that it is material.  Further, since according to Dr. Doherty the '192 patent discloses the invention, it is clearly not cumulative of the other cited references.

93.     While the applicant did disclose the '192 patent to the Examiner, if Dr. Doherty's analysis is accepted, it is also clear that the applicant's misrepresented the meaning of the prior art including the '192 patent, particularly Example 3.  In fact it shows that the applicant's statements to the examiner as listed above, were material misrepresentations of material facts, which constitute inequitable conduct.  Further, the true meaning of the '192 patent, according to Dr. Doherty, is contrary to the positions the applicant took about the prior art during prosecution of the patent.

94.     Since the Examiner did not cite the '192 patent but the applicant voluntarily chose to discuss it, it is equally clear that the applicant knew of its materiality.  Given the title and the citation to corresponding applications in the PCT search and the European Patent Office search where it was indicated at being an X reference (a "document particularly pertinent") as being highly relevant, it is hard to conceive of any other view of the '192 patent reference.

95.                                        REDACTED

REDACTED

96.    Thus, when the applicant stated that the prior art does not disclose the reactant of the claims, nor the products, Dr. Doherty shows that in fact the prior art disclosed exactly the reactants and products.  Even the title of the '192 patent discloses the product.

97.    The applicant's statement that '192 patent does not provide motivation to select and carry out the reaction at a temperature and under a pressure at which HFC-245fa is gaseous is also an affirmative misrepresentation, as indicated by Dr. Doherty.

98.    An equal affirmative misrepresentation is the applicant's statement that the '192 patent does not suggest keeping in the reactor in liquid state unconverted 1,1,1,3,3-pentachloropropane, most of the HF and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.  Dr. Doherty demonstrates that the '192 patent does describe this and other elements of the claims of the '817 patent.

99.    Not only were these statements a misrepresentation of material information, they were made by persons who have a duty of candor and good faith to the USPTO.  Clearly the statements were made by the applicants' US counsel.  Further, the statement in June 9, 1999 Response that "[t]his is underscored by the fact that, in the opinion of applicants' foreign representative…" and the portion of the letter from Solvay that accompanied the February 24, 2000 Response, show that "others substantially involved in the prosecution" outside the country, perhaps including the inventors, provided this misleading information.  37 CFR 1.56(c).

REDACTED

REDACTED

100.    Even though the applicant cited and explained one chapter of *Advances in Fluorine Chemistry* (pp. 181-183 and 200-209) to the Patent and Trademark Office during prosecution, the applicant did not provide the Hamilton chapter (pp.117-180) of the same text, which was more relevant and refuted the applicant's position.  Further, on page 184, the very next page *after* the material submitted to the Examiner, the text refutes the applicants arguments to the Examiner.  Assuming the correctness of Dr. Short's report, the Hamilton chapter and the reference on page 184, which surround the material provided by the applicant, created a substantial likelihood that a reasonable examiner (including reasonable members of the Board of Patent Appeals) would have considered this reference important in deciding whether to allow the application to issue as a patent.  Thus, it should have been cited.

101.    Because of the letter from Solvay's foreign representative dated February 18, 2000, it is clear that the applicant was fully aware of the *Advances in Fluorine Chemistry*.  Also, the portion that was cited was immediately before the portion that was cited.  Thus, since the reference was highly material and the applicant knew of the reference, it would not be unreasonable for a jury to find that intent to withhold the portion of the reference can be implied.  In such a case a court would likely find such a finding to be supported by credible evidence.

XIV.  **CONCLUSION**

102.    Based on a review of the patent-in-suit, its file history, the '192 patent, Advances in Fluroine Chemistry, and the report of Dr. Doherty, it is my opinion that a jury could find that

those involved in the prosecution of the '817 patent engaged in inequitable conduct, and if a jury so found, there is substantial evidence to support such a finding.

103.    I reserve the right to give opinions on facts and other matters arising subsequent to this report, including in rebuttal, either prior to or during any hearing or trial in this action.

104.    Further, I reserve the right to supplement this report.

Dated: October 22, 2007

_____
Melvin C. Garner

30

# EXHIBIT A

## EXHIBIT A

I have considered the following materials in preparing this Report:

1.      United States Patent Nos. 6,730,817 of Wilmet et al. and 6,930,215 of Wilmet et al..

2.      The file history of United States Patent Nos. 6,730,817 of Wilmet et al. and the references cited therein.

3.      The pleadings in the case, including:

      a.   Defendant Honeywell International Inc.'s Third Supplemental Response to Plaintiff's First Set of Interrogatories Nos. 1-8;

      b.   Solvay's Responses and Objections to Defendant Honeywell International Inc.'s First Set of Requests for Admissions Nos. 1-27;

      c.   Solvay's Responses and Objections to Defendant Honeywell International Inc.'s Second Set of Requests for Admissions Nos. 28-37;

      d.   Plaintiff's Responses and Objections to Defendant Honeywell International Inc.'s Third Set of Interrogatories Nos. 17-24.

4.      The expert reports of Dr. Michael E. Doherty and Dr. David G.R. Short.

5.      The following depositions:

      a.   Vincent Wilmet – July 9-10, 2007

      b.   Jean-Paul Schoebrechts – July 11, 2007

      c.   Francine Janssens - July 12-13, 2007

      d.   Marina Schneller – August 28, 2007

      e.   Ashley Pezzner – September 11, 2007

      f.   George H. Spencer – September 12, 2007

      g.   30(b)(6) of Solvay through Phillipe Jacques – September 24-25, 2007

h.   Dominique Balthasart – October 10, 2007

# EXHIBIT B

## Melvin C. Garner
*PRINCIPAL*

Phone: 212.527.7717
Fax: 212.753.7701
mgarner@darbylaw.com



**PRACTICE AREAS**

Electronics & Software Technologies
Medical & Mechanical Technologies
Trademark, Copyright & Unfair Competition
Litigation & Dispute Resolution

**EDUCATION**

Drexel University

B.S., Electrical Engineering, 1964
Eta Kappa Nu Honor Society
Technical Journal Award
Student Chapter, IEEE, President

New York University

M.S., Electrical Engineering, 1968

Brooklyn Law School

J.D., 1973
*Brooklyn Law Review*, 1971-1973
Senior Editor, 1972-1973

**ADMISSIONS**

New York State Bar
District Court for the Southern District of New York
District Court for the Eastern District of New York
Court of Appeals for the Second Circuit
Court of Appeals for the Federal Circuit
United States Supreme Court

**PROFESSIONAL ASSOCIATIONS**

**American Intellectual Property Law Association**
*Immediate Past Present (2006-2007)*
*President* (2005-2006)
*President Elect* (2003-2004)
*Second Vice President* (2002-2003)
*Board of Directors* (1999-present)
*Vice Chairman, Committee on Electronics and Computer Law* (1998-1999)

**New York Intellectual Property Association**
*Immediate Past President* (2004-2005)
*President* (2003-2004)
*President Elect* (2002-2003)
*First Vice President* (2001-2002)
*Second Vice President* (2000-2001)
*Secretary* (1998-2000)
*Board Member* (1997-1998)
*Chairman, Committee on Trade Secret Law and Practice* (1990-1996)

**Melvin C. Garner**
*(continued)*

**American Intellectual Property Law Education Foundation**
*Trustee* (2003-2006
*Secretary* (2002-2003)
*Vice President* (2001-2002)

**National Inventors Hall of Fame**
*Board of Directors* (2001-present)

**American Bar Association**
*Member, Committee on Patent, Trademark and Copyright Law*

**The Association of the Bar of the City of New York**
*Member, Committee on Patent Law and Practice* (1989-1992)
*Member, Committee on Trademark Law and Practice* (1986-1988)

EXEMPLARY CASES

***Concept Innovation v. CFM Corp.***
Civ. Action No. 04C 3345 (N. D. Ill 2004)
Patent infringement settled with a recovery by client

***OP Solutions, Inc. v. Intellectual Property Network, Ltd.***
52 U.S.P.Q.2d 1818 (SDNY 1999)
Judgment for client in computer software copyright case.

***Pitney Bowes, Inc. v. Bell & Howell Mail Processing Systems***
Civ. Action No. 99 263 GMS (D. Del. 1999)
Patent Infringement settled with client receiving multi-millions
of dollars.

***Universal Gym Equip., Inc. v. ERWA Exercise Equip. Ltd.***
229 U.S.P.Q. 335 (D Md 1985), 827 F.2d 1542 (Fed. Cir. 1987)
Judgment for client in trade secret case.

EXEMPLARY AUTHORSHIP
AND RELATED ACTIVITIES

Commentator    Commentator on patent issues, CNBC

Author     "Mock Argument to the Federal Circuit," *AIPLA Mid-Winter Meeting*
(2003)

"Advanced Claim Drafting and Amendment Writing Workshop for
Electronics and Computer-Related Subject Matter," *14th Annual Patent
Prosecution Workshop*, Practicing Law Institute (2004)

2

**Melvin C. Garner**
*(continued)*

Chapter 13, "Intellectual Property Protection of E-Commerce," *Intellectual Property Counseling and Litigation,* (Matthew Bender) (2002)

"Inevitable Disclosure of Trade Secrets by the Departing Employee," Selected Legal Papers, *American Intellectual Property Law Association* (April 1995)

"Report of the Committee on Trade Secret Law and Practice," *Intellectual Property Law Annual* (1995)

"Discovery and Related Motion Practice," *Anatomy of Patent Litigation,* Practising Law Institute (1994)

"Trade Secret Causes of Action and Defenses," *Intellectual Property Counseling and Litigation,* (Matthew Bender) - Chapter 58 (1988), Chapter 44 (1994)

"Trade Secrets Civil Legislation," *Legal Notes & Viewpoints Quarterly,* Vol. 7, No. 1, Practising Law Institute, pp. *59 et seq.* (Nov. 1986)

Listing

Euromoney's *Guide to the World's Leading Patent Law Experts*

*New York Super Lawyers, Intellectual Property, 2007*

*Finalist, Lawdragon 500 Leading Lawyers in America, 2007*

Who's Who Legal - Patents 2006

Lecturer

Practising Law Institute, "Fundamentals of Patent Prosecution" and "Advanced Claim Drafting and Amendment Workshop" (annually 1992-2005)

ADDITIONAL INFORMATION

Melvin C. Garner specializes in the procurement and litigation of patent, trademark, trade secret and copyright matters involving various technologies including video circuits, cellular telephones, office products, medical products, and computer hardware and software. Mr. Garner serves a broad range of clients from *Fortune* 500 and *Forbes* International 500 corporations such as Pitney Bowes, Johnson & Johnson and Sanyo, to small and mid-sized companies.

Over the years, Mr. Garner has handled a wide range of intellectual property litigation matters, representing both plaintiffs and defendants. For example:

He was lead counsel for the plaintiff in a case in which patents on

3

{W:\MCG\RESUMES\01216772.

**Melvin C. Garner**
*(continued)*

dental implants were asserted. After defeating five summary judgment motions by the defendants, he successfully negotiated a settlement worth over $5,000,000 for the inventors

He successfully registered a trademark in a shape that was previously the subject of a utility patent. Then he was able to enforce that trademark in a litigation against an infringer.

After a plaintiff had successfully enforced a patent covering video equipment against several defendants, he defeated a preliminary injunction motion filed against his client on the same patent. The Court found that the plaintiff did not have a likelihood of success in proving infringement. The case settled favorably for Mr. Garner's client.

Working with other attorneys at Darby & Darby as well as lawyers at several other firms, he defended a major cellular phone company in a procedure brought against it for a temporary exclusion order before the International Trade Commission. Although the plaintiff won other aspects of the case, Mr. Garner was successful in defeating the motion with respect to a design patent on the cellular phone.

He represented the holder of patent and trade dress rights in a handheld labeling machine. In a litigation that involved proceedings in several states in the United States and European countries, he was able to force a favorable settlement for his client which required the defendant to change the design of its product, as well as pay past damages and a running royalty for use of the client's rights.

He also defended a major media company against charges of unfair business practices in a dispute over a computer software development contract. The plaintiff was seeking several million dollars in damages, but the case ended with a settlement of a few hundred thousand dollars after the jury trial began.

Representing the plaintiff in a case regarding infringement of copyrights in a computer software program that manages trademark portfolios, Mr. Garner was able to get a decision which upheld the copyrightability of various elements of a graphical user interface and determined that the elements had been infringed.

Mr. Garner also counsels a wide variety of clients, frequently providing infringement opinions for potential plaintiffs, non-infringement opinions for potential defendants and validity opinions for both litigants and inventors. For example, he assisted a client facing bankruptcy after a loss in a patent infringement over an electronic circuit that causes shoes to light while the user is walking.

4

**Melvin C. Garner**
*(continued)*

The case previously had been handled by another firm.  Mr. Garner was able to find non-infringing technology for the client and have the trial court clear that technology of the injunction that had been issued. He also assisted the client in defeating a second infringement suit brought by the plaintiff with regard to the new technology.  The process took nearly four years and now the client is a leader in the field.  Mr. Garner also helped another company that was operating under a burdensome patent license to develop and patent its own technology.  Eventually, as a result of this strategy, the client was able to avoid the patent covered by the license, and the original licensor was forced to be come a licensee of his client and to pay an even larger royalty to his client.

Mr. Garner has also appeared as an expert witness in key trials throughout the United States.  He frequently lectures on a variety of technology-related legal issues.  His approach is to find out the business goal of the client and their present position.  Then he seeks to utilize the  client's intellectual property assets, and the capabilities of Darby & Darby in terms of prosecution, litigation and negotiation, to help the client reach their business goal.

{W:\MCG\RESUMES\01216772.

EXHIBIT C

**MELVIN C. GARNER - Publications**

1.  Garner & Lerch, "Prosecution of Patent Applications," *PLI Fundamentals of Patent prosecution*, June 22-24. 2005 and annually since 1992

2.  Garner, "Managing Your Intellectual Property Assets for Maximizing Value," *Handling Intellectual Property Issues in Business Transactions*, Practising Law Institute, March 29-30, 2004 and annually since 2003.

3.  Garner, Pfeffer & Levy "Advanced Claim Drafting and Amendment Writing Workshop for Electronics and Computer-Related Subject Matter," *14th Annual Patent Prosecution Workshop*, Practicing Law Institute, November 15-16, 2004

4.  Garner, "Responding to the Increasing Threat of Internet and Technology Patents," Eighth Annual Internet Law Institute - How Corporate America is Harnessing the Internet, Practicing Law Institute, July 12-13, 2004

5.  Garner, "Managing International Litigation for a U.S. Company," *Trying an IP Infringement Case in Foreign Countries*, AIPPI, ABA-IP Section, ABA-International Law & Practice Section, Fordham University Law School, October 4, 2003.

6.  Garner, "Introduction to Claim Drafting," *AIPLA Practical Patent Prosecution Training for New Lawyers*, August 13, 2003 and annually from 2000.

7.  Garner, Chapter 13, "Intellectual Property Protection of E-Commerce," *Intellectual Property Counseling and Litigation,* (Matthew Bender) (2002)

8.  Garner, "Special issues in Business Method Patent Litigation," *AIPLA 2001 Road Show, Advance Patent Litigation Seminar,* June 2001.

9.  Garner, "The Inception, Development and Maintenance of an Intellectual Property Portfolio and Management Program," *Intellectual Property Management for Corporate Counsel,* Insight, Chicago, November 1999.

10. Garner, "The Utilization of Patent Rights in the Automated Call handling and Prepaid Phone Card Industry," *American Tele-Card Expo*, Miami Beach June 1996.

11. Garner, "Inevitable Disclosure of Trade Secrets by the Departing Employee," Selected Legal Papers, *American Intellectual Property Law Association* (April 1995)

12. Garner et al., "Report of the Committee on Trade Secret Law and Practice," *Intellectual Property Law Annual* (1995)

13. Garner, "Discovery and Related Motion Practice," *Anatomy of Patent Litigation,* Practising Law Institute (1994)

14. Garner, "Contracting For Telecommunications Equipment," DATAPRO, McGraw-Hill, October 1993.

15.    Garner, "Trade Secret Causes of Action and Defenses," *Intellectual Property Counseling and Litigation*, (Matthew Bender) - Chapter 58 (1988), Chapter 44 (1994)

16.    Garner, "Preliminary Injunctions in Patent Cases," *Fourth Annual Joint Seminar of the New Jersey, New York, Philadelphia and Connecticut Patent Law Associations* (1988)

17.    Garner, "Trade Secrets Civil Legislation," *Legal Notes & Viewpoints Quarterly*, Vol. 7, No. 1, Practising Law Institute, pp. 59 *et seq.* (Nov. 1986)

18.    Garner, "Patent Office Rules," Patent Bar Review Course, Practising Law Institute (1991 and annually from 1986)

19.    Garner, "Trade Secrets," Seminar on Opportunities for Minorities in Intellectual Property Law, ABA Section on Patents, Trademarks & Copyrights (1986)

20.    Garner, "Recent Developments in Patent Law," Southwestern Legal Foundation 24th Institute On Patent Law (1986)

21.    Garner, "Trademark Litigation," National Bar Association Annual Meeting, Chicago (1985)

22.    Garner, "Patent Litigation," National Bar Association Annual Meeting, New Orleans (1984)

23.    Note, "Application of 'One Man, One Vote' to a County Committee," 39 Brooklyn L. Rev. 992 (1973)

24.    Note, "Preliminary Injunctions In Infringement Suits," 38 Brooklyn L. Rev. 1150 (1972)

25.    Note, "The Future of Record Piracy," 38 Brooklyn L. Rev. 406 (1971)

# EXHIBIT D



US006730817B1

(12) **United States Patent**
Wilmet et al.

(10) Patent No.:     **US 6,730,817 B1**
(45) Date of Patent:     **May 4, 2004**

(54) **METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE**

(75) Inventors: **Vincent Wilmet**, Wavre (BE); **Francine Janssens**, Vilvoorde (BE); **Jean-Paul Schoebrechts**, Grez-Doiceau (BE)

(73) Assignee: **Solvay (Societe Anonyme)** (BE)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/051,746**

(22) PCT Filed: **Oct. 4, 1996**

(86) PCT No.: **PCT/EP96/04315**

§ 371 (c)(1),
(2), (4) Date: **Jun. 8, 1998**

(87) PCT Pub. No.: **WO97/15540**

PCT Pub. Date: **May 1, 1997**

(30) **Foreign Application Priority Data**

Oct. 23, 1995 (FR) .............................................. 95 12558

(51) Int. Cl.[7] ............................ C07C 17/00; C07C 17/08; C07C 19/08; C07C 17/266; C07C 21/18

(52) U.S. Cl. ............................................ 570/167; 570/172

(58) Field of Search ................................... 570/167, 172

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,862,978 A * 1/1975 Decker et al. ............. 570/172

5,395,997 A * 3/1995 Van Der Puy et al. ..... 570/167
5,574,192 A 11/1996 VanDerPuy et al.

FOREIGN PATENT DOCUMENTS

| AU | 32843/95 | 4/1996 |
| EP | 0 522 639 | 1/1993 |
| EP | 0 611 744 | 8/1994 |
| EP | 0 703 205 | 3/1996 |
| EP | 0 729 932 | 9/1996 |
| WO | WO95/04021 | 2/1995 |
| WO | WO95/04022 | 2/1995 |
| WO | WO95/05353 | 2/1995 |
| WO | WO96/01797 | 1/1996 |

OTHER PUBLICATIONS

Kotora, Martin et al., "Addition of tetrachloromethane to halogenated ethenes catalyzed by transition metal complexes", *Journal of Molecular Catalysis*, vol. 77, pp. 51–60 (1992).

* cited by examiner

*Primary Examiner*—Johann Richter
*Assistant Examiner*—Elvis O. Price
(74) *Attorney, Agent, or Firm*—Connolly Bove Lodge & Hutz LLP

(57)     **ABSTRACT**

1,1,1,3,3-Pentafluoropropane is produced by reaction between 1,1,1,3,3-pentachloropropane and hydrogen fluoride in the presence of a hydrofluorination catalyst. The 1,1,1,3,3-pentachloropropane may advantageously be obtained by reaction between vinyl chloride and tetrachloromethane in the presence of a telomerization catalyst and of a nitrile.

**22 Claims, No Drawings**



DEPOSITION EXHIBIT
6
Defendant

PENGAD 800-631-6989

S0001496

US 6,730,817 B1

1

# METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE

The present invention relates to a process for the preparation of 1,1,1,3,3-pentafluoropropane (HFC-245fa). It also relates more particularly to a process for the preparation of 1,1,1,3,3-pentafluoropropane from 1,1,1,3,3-pentachloropropane.

1,1,1,3,3-Pentafluoropropane is a possible substitute for wholly or partially halogenated chlorofluoro hydrocarbons (CFCs and HCFCs) suspected of having a detrimental effect on the ozone layer. In particular, it is found to be especially advantageous as a blowing agent for the preparation of expanded polymeric materials.

In application WO 95/05353 it has been proposed to prepare 1,1,1,3,3-pentafluoropropane by reaction between 1,1-dichloro-2,2,2-tri-fluoroethane (HCFC-123) and dichlorodifluoromethane (CFC-12), followed by hydrogenation of the 1,1,1,3,3-pentafluoroprop-2-ene obtained. The yield of the first stage of this known process (synthesis of the 1,1,1,3,3-pentafluoroprop-2-ene intermediate) is, however, very low.

In application WO 95/04022 it has been proposed to prepare 1,1,1,3,3-pentafluoropropane by a three-stage process consisting, in a first stage, in the preparation of 1,1,1,3,3,3-hexachloropropane by reaction between tetrachloromethane and vinylidene chloride, in a second stage in the conversion of the hexachloropropane obtained to 1,1,1,3,3-pentafluoro-3-chloropropane by reaction with hydrogen fluoride and, in a third stage, in the reduction of the pentafluorochloropropane obtained to 1,1,1,3,3-pentafluoropropane by reaction with hydrogen. This process has the disadvantage of giving rise to large quantities of 1,1,1,3,3,3-hexafluoropropane during the second stage.

In application EP-A-611744 it has been proposed to prepare 1,1,1,3,3-pentafluoropropane by reaction between 1,1,1,3,3-pentafluoro-2,3-dichloropropane and hydrogen. The 1,1,1,3,3-pentafluoro-2,3-dichloropropane employed as raw material in this known process is not, however, a common product and cannot be easily prepared.

The objective of the present invention is to provide a process for the preparation of 1,1,1,3,3-pentafluoropropane which does not exhibit the disadvantages of the abovementioned known processes, which uses reactants that are commonly or easily accessible and which has a high yield, thus meeting industrial economic requirements.

The invention consequently relates to a process for the preparation of 1,1,1,3,3-pentafluoropropane, according to which 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

In the process according to the invention the hydrofluorination catalyst is advantageously chosen from the derivatives of metals of groups 3, 4, 5, 13, 14 and 15 of the Periodic Table of the elements (IUPAC 1988) and their mixtures (groups of the Periodic Table of the elements which were previously called IIIA, IVA, IVb, Va, Vb and VIb). The derivatives of the metals are intended to mean the hydroxides, oxides and the organic or inorganic salts of these metals, as well as their mixtures. Those particularly adopted are the titanium, tantalum, molybdenum, boron, tin and antimony derivatives. The catalyst is preferably chosen from the derivatives of metals of groups 14 (IVa) and 15 (Va) of the Periodic Table of the elements, and more particularly from tin and antimony derivatives. In the process according to the invention the preferred derivatives of the metals are the salts and these are preferably chosen from the halides and more particularly from chlorides, fluorides and chlorof-

2

luorides. Particularly preferred hydrofluorination catalysts according to the present invention are tin and antimony chlorides, fluorides and chlorofluorides, especially tin tetrachloride and antimony pentachloride. Antimony pentachloride is very particularly recommended.

In the case where the catalyst is selected from metal fluorides and chlorofluorides, these can be obtained from a chloride which is subjected to an at least partial fluorination. This fluorination may, for example, be carried out by means of hydrogen fluoride, before the catalyst is brought into contact with 1,1,1,3,3-pentachloropropane. In an alternative form, it may be carried out in situ, during the reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride.

The quantity of catalyst used can vary within wide limits. It is generally at least 0.001 mole of catalyst per mole of 1,1,1,3,3-pentachloropropane. It is preferably at least 0.01 mole of catalyst per mole of 1,1,1,3,3-pentachloropropane. In principle there is no upper limit to the quantity of catalyst used. For example, in a process carried out continuously in liquid phase, the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane may reach 1000. In practice, however, at most approximately 5 moles of catalyst are generally employed per mole of 1,1,1,3,3-pentachloropropane. Approximately 1 mole is preferably not exceeded. In a particularly preferred manner, approximately 0.5 moles of catalyst per mole of 1,1,1,3,3-pentachloropropane are generally not exceeded.

The molar ratio of hydrogen fluoride to the 1,1,1,3,3-pentachloropropane used is generally at least 5. The work is preferably done with a molar ratio of at least 8. The molar ratio of hydrogen fluoride to the 1,1,1,3,3-pentachloropropane used generally does not exceed 100. It preferably does not exceed 50.

The temperature at which the hydrofluorination is performed is generally at least 50° C. It is preferably at least 80° C. The temperature generally does not exceed 150° C. It preferably does not exceed 130° C. With antimony pentachloride as catalyst good results are obtained at a temperature of 100 to 120° C.

The process according to the invention is preferably carried out in liquid phase. In this case the pressure is chosen so as to keep the reaction mixture in liquid form. The pressure used varies as a function of the temperature of the reaction mixture. It is generally from 2 bar to 40 bar. The work is preferably carried out at a temperature and pressure at which, furthermore, the 1,1,1,3,3-pentafluoropropane produced is at least partially in gaseous form, which enables it to be easily isolated from the reaction mixture.

The process according to the invention may be carried out continuously or noncontinuously. It is to be understood that, in a noncontinuous process, the quantity of catalyst used is expressed in relation to the initial quantity of 1,1,1,3,3-pentachloropropane used and, in a continuous process, in relation to the stationary quantity of 1,1,1,3,3-pentachloropropane present in the liquid phase.

The residence time of the reactants in the reactor must be sufficient for the reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride to take place with an acceptable yield. It can easily be determined as a function of the operating conditions adopted.

The process according to the invention can be carried out in any reactor made of a material that is resistant to the temperature, the pressure and the reactants employed, especially to hydrogen fluoride. It is advantageous to separate the 1,1,1,3,3-pentafluoropropane and the hydrogen chloride from the reaction mixture as they are being formed and to keep in, or return to, the reactor the unconverted reactants,

S0001497

US 6,730,817 B1

3

as well as the chlorofluoropropanes possibly formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane. To this end the process according to the invention is advantageously carried out in a reactor equipped with a device for drawing off a gas stream, this device consisting, for example, of a distillation column and a reflux condenser mounted above the reactor. By means of suitable control, this device makes it possible to draw off in vapour phase the 1,1,1,3,3-pentafluoropropane and hydrogen chloride which are produced while keeping in the reactor, in the liquid state, the unconverted 1,1,1,3,3-pentachloropropane and most of the hydrogen fluoride, as well as, where appropriate, most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.

The 1,1,1,3,3-pentachloropropane used in the process according to the invention can advantageously be obtained by reaction of vinyl chloride with tetrachloromethane, as described, for example, by M. Kotora et al., Journal of Molecular Catalysis, (1992), vol. 77, p. 51–60. It is thus possible to obtain 1,1,1,3,3-pentafluoropropane in two stages from easily accessible materials.

In a preferred alternative form the process according to the invention for the preparation of 1,1,1,3,3-pentafluoropropane includes a telomerization stage in which vinyl chloride and tetrachloromethane are reacted in the presence of a telomerization catalyst, so as to obtain 1,1,1,3,3-pentachloropropane, and the subsequent hydrofluorination stage in which the 1,1,1,3,3-pentachloropropane obtained in the telomerization stage is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

The telomerization catalyst may be chosen from the compounds of metals from groups 8 to 11 of the Periodic Table of the elements (IUPAC 1988) and their mixtures. Compounds of metals of groups 8 and 11 are preferred. Iron and copper compounds are adopted in particular, those of copper being very particularly preferred. Compounds of metals of groups 8 to 11 are intended to mean the organic and inorganic derivatives of these metals and their mixtures. The preferred derivatives are the inorganic salts, the chlorides being particularly preferred. Telomerization catalysts which are particularly preferred according to the present invention are cuprous chloride, cupric chloride and their mixtures. Very good results have been obtained with copper (I) chloride (cuprous chloride).

The quantity of telomerization catalyst used can vary within wide limits. It is generally at least 0.001 mole of catalyst per mole of vinyl chloride. It is preferably at least 0.005 moles of catalyst per mole of vinyl chloride. In a process carried out continuously in liquid phase the molar ratio of the catalyst to vinyl chloride in the reaction mixture can reach 1000. In a process carried out noncontinuously at most approximately 0.5 moles of catalyst are preferably employed, preferably not more than 0.2 moles of catalyst and, in a particularly preferred manner 0.1 mole or less of catalyst per mole of vinyl chloride used.

A cocatalyst can be used in the telomerization stage. Amines can be employed as cocatalyst, preferably in a concentration of 0.1 to 20 moles per mole of telomerization catalyst. Amines which may be mentioned as being usable as cocatalyst in the telomerization stage of the process according to the invention are alkanolamines, alkylamines and aromatic amines, for example ethanolamine, n-butylamine, n-propylamine, isopropylamine, benzylamine and pyridine.

The molar ratio of tetrachloromethane to the vinyl chloride used in the telomerization stage is generally at least 1.5. The work is preferably done with a molar ratio of at least 2. In principle there is no upper limit to the molar ratio of

4

tetrachloromethane to vinyl chloride. For example, in a process carried out continuously in liquid phase, the molar ratio of the stationary quantities of tetrachloromethane and vinyl chloride in the reaction mixture may reach 1000. In a process carried out noncontinuously at most approximately 50 moles, preferably at most 20 moles and, in a particularly preferred manner, at most 10 moles of tetrachloromethane are generally used per mole of vinyl chloride.

The temperature at which the telomerization of vinyl chloride with tetrachloromethane is performed is generally at least 25° C. It is preferably at least 70° C. In general the telomerization temperature does not exceed 200° C. It preferably does not exceed 160° C. With cuprous chloride as catalyst good results have been obtained at a temperature of 100 to 140° C., in particular at a temperature of 110 to 130° C.

The telomerization reaction is generally carried out in liquid phase, advantageously in the presence of a solvent. Solvents that can be employed in the telomerization stage are especially alcohols such as methanol, ethanol, isopropanol and tert-butanol, and nitriles, in particular acetonitrile and propionitrile. Nitriles are preferred. The molar ratio of the solvent to the telomerization catalyst generally does not exceed 1000. Good results have been obtained with a molar ratio of the solvent to the telomerization catalyst of 20 to 400.

In the process according to the invention the presence of a nitrile is particularly advantageous, especially when the telomerization catalyst is a chloride, most especially cuprous chloride. The invention consequently also relates to a process for the preparation of 1,1,1,3,3-pentachloropropane, in which vinyl chloride and tetrachloromethane are reacted in the presence of a chloride of a metal of groups 8 to 11 of the Periodic Table of the elements (IUPAC 1988) and of a nitrile, as defined and in the conditions described above.

The examples hereinafter illustrate the invention without any limitation being implied.

EXAMPLE 1

Preparation of 1,1,1,3,3-pentachloropropane

4.43 moles of acetonitrile, 6.57 moles of tetrachloromethane, 0.11 mole of copper(I) chloride and 2.21 moles of vinyl chloride were introduced into a 1.5 l autoclave lined with a Teflon® fluorocarbon resin, equipped with a mechanical stirrer and a temperature probe. The autoclave was then immersed in a thermostated bath maintained at a temperature of 120° C. for 66 h with continuous stirring. After having reached 8.5 bar the autogenous pressure decreased, reaching 6 bar after 24 hours' reaction and 5.9 bar after 66 hours. The autoclave was then cooled and then the reaction mixture was distilled at reduced pressure. 380 g of 1,1,1,3,3-pentachloropropane were obtained, which represents a yield of 80% relative to the vinyl chloride used.

EXAMPLES 2–3

Preparation of 1,1,1,3,3-pentachloropropane

Acetonitrile (AcN), tetrachloromethane, copper(I) chloride and vinyl chloride (VC) were introduced into the autoclave described in Example 1 in the proportions reported in Table I. The conditions of reaction under autogenous pressure and the results obtained are also presented in Table 1.

S0001498

US 6,730,817 B1

5

TABLE 1

| Example | 2 | 3 |
|---|---|---|
| VC/CCl₄/AcN/CuCl molar ratio | 1/6/2/0.07 | 1/3.1/2.2/0.03 |
| Reaction temperature | 120° C. | 115° C. |
| Reaction period | 36 h | 96 h |
| VC conversion (% of VC used) | 83% | 99% |
| Selectivity for 1,1,1,3,3-pentachloro-propane (% of the VC converted transformed into 1,1,1,3,3-pentachloropropane | 91% | 85% |

EXAMPLE 4

Hydrofluorination of 1,1,1,3,3-pentachloropropane

0.21 moles of 1,1,1,3,3-pentachloropropane, 0.076 moles of antimony pentachloride and 10 moles of hydrogen fluoride were introduced into a 0.5 l autoclave made of Hastelloy B2 stainless steel, equipped with a bladed mechanical stirrer, a temperature probe and a dip pipe enabling liquid phase samples to be taken during the test. The autoclave was then immersed in a thermostated bath maintained at a temperature of 120° C. with continuous stirring for 21 hours. The pressure was controlled at 25 bar. A sample taken after 2 hours' reaction showed that more than 99 mol % of the 1,1,1,3,3-pentachloropropane used was already converted, including 66% to 1,1,1,3,3-pentafluoropropane. After 21 hours' reaction virtually all the 1,1,1,3,3-pentachloropropane used was converted, including 92 mol % to 1,1,1,3,3-pentafluoropropane and approximately 6% to intermediate chlorofluoropropanes formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane.

What is claimed is:

1. In a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst, the improvement which comprises carrying out the reaction at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and isolating and 1,1,1,3,3-pentafluoropropane from the reaction mixture by drawing off 1,1,1,3,3-pentafluoropropane and hydrogen chloride in a gaseous phase as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed.

2. The process of claim 1, which comprises conducting the reaction continuously in a liquid phase and maintaining a molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000.

3. The process of claim 2, wherein the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is greater than 0.5.

4. The process of claim 3 wherein from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

5. The process of claim 1 wherein the reaction is carried out at a temperature of approximately 50 to 150° C.

6. The process of claim 1 wherein the 1,1,1,3,3-pentachloropropane is prepared by reaction between vinyl chloride and tetrachloromethane.

6

7. The process of claim 1, wherein the hydrofluorination catalyst is selected from the group consisting of derivatives of metals of Groups IIIa, IVa, IVb, Va, Vb and VIb of the periodic table.

8. The process of claim 7, wherein the hydrofluorination catalyst is a derivative of a metal selected from the group consisting of titanium and tin.

9. The process of claim 7, wherein the pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

10. The process of claim 7, wherein the hydrofluorination catalyst is selected from the group consisting of tin and antimony chlorides, fluorides and chlorofluorides.

11. The process of claim 7, wherein the catalyst is antimony pentachloride.

12. In a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst, the improvement which comprises carrying out the reaction in a reactor equipped with a device for drawing off a gas stream at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and wherein said device is controlled (a) to draw off a gas stream comprising 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed thereby isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture (b) to keep in the reactor in the liquid state the unconverted 1,1,1,3,3-pentachloropropane, most of the hydrogen fluoride and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.

13. The process of claim 12, which comprises conducting the reaction continuously in a liquid phase and maintaining a molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000.

14. The process of claim 13, wherein the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is greater than 0.5.

15. The process of claim 12, wherein from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

16. The process of claim 12, wherein the reaction is carried out at a temperature of approximately 50 to 150° C.

17. The process of claim 12, wherein the 1,1,1,3,3-pentachloropropane is prepared by reaction between vinyl chloride and tetrachloromethane.

18. The process of claim 12, wherein the hydrofluorination catalyst is selected from the group consisting of derivatives of metals of Groups IIIa, IVa, IVb, Va, Vb and VIb of the periodic table.

19. The process of claim 18, wherein the hydrofluorination catalyst is a derivative of a metal selected from the group consisting of titanium and tin.

20. The process of claim 18, wherein the pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

21. The process of claim 18, wherein the hydrofluorination catalyst is selected from the group consisting of tin and antimony chlorides, fluorides and chlorofluorides.

22. The process of claim 18, wherein the catalyst is antimony pentachloride.

* * * * *

# EXHIBIT 2

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------------x

SOLVAY, S.A.,

                   Plaintiff,

                       Civil Action No.

     -against-        06-557-SLR


HONEYWELL SPECIALTY MATERIALS LLC

and HONEYWELL INTERNATIONAL, INC.,

                Defendants.

----------------------------------------x

                 January 10, 2008

                 10:05 a.m.


     Deposition of MELVIN GARNER, taken by

the Plaintiff, pursuant to Agreement, at the

offices of Kirkland & Ellis LLP, 153 East 53rd

Street, New York, New York, before David Levy,

CSR, a Notary Public of the State of New York.

1    to at least show that it's there.

2        Q.    Well, if Ms. Schneller understood the

3    '192 patent to be teaching only a batch process, as

4    Mr. Roberts argued it was only teaching a batch

5    process, did she violate a duty of disclosure?

6            MR. PARK:  Can you repeat that question,

7    please?

8            (Record read.)

9            MR. PARK:  I'm going to object to that as

10    lack of foundation.

11        A.    The difficulty that I find with her

12    behavior is that, even though she thought it was a

13    batch process, there were clear statements in the

14    patent itself which would suggest otherwise.

15    Clearly.

16        Q.    I -- I'm sorry.

17        A.    And it doesn't matter whether it's right

18    or not.  That information has to be brought to the

19    attention of the examiner once you raise it.

20            Now, you can say, "Mr. Examiner, here are

21    statements in column 3 and column 4 of the patent

22    that use the word 'continuous.'  My understanding

1    don't talk about the continuous injection of the

2    starting materials into the reactor.  They are not

3    -- actually, the claims of the '817 patent are

4    broader.  They are not limited to continuous

5    addition.  You could have continuous addition of

6    the starting material and non-continuous addition

7    of the starting material.

8          But what's being claimed is the drawing

9    off of the 245 from the reaction mixture; that is,

10   on the outlet side, and that that's being done in a

11   continuous process, do you understand that?

12         MR. PARK:  I'm going to object, again,

13   compound, outside the scope of Mr. Garner's report

14   and lacks foundation.

15     A.   Okay.  The details of the technical

16   distinction between what is disclosed in the '192

17   is not the basis upon which my opinion is based.

18         I believe that there was an obligation to

19   disclose to the examiner that this patent is

20   talking about a continuous mode.

21         Now, subsequently, Ms. Schneller would

22   have been free to say, "In that continuous mode,

115

**1/10/2008  Garner, Melvin**

1    the only thing continuous is the input of the

2    material."  That's sort of coming back with

3    argument afterwards.  But it doesn't detract from

4    the materiality of the reference that it talks

5    about there being a continuous mode here, as well

6    as at the top of column 4, where it says, "A

7    continuous fluorination process."  And the bottom

8    part I think is talking about drawing off the HF

9    layer in a, what can be part of a continuous

10   process.

11            Now, I may be wrong technically because

12   I'm not here to testify about technology. But

13   there's enough of this information about

14   "continuous" that it would have been fair for the

15   examiner to know about that and to allow the

16   examiner to be persuaded by the argument that

17   you're now raising.

18        Q.   But isn't your, what Honeywell's own

19   position, what Honeywell's own conduct, doesn't

20   that cut against your opinion?

21        A.   I'm not intimately familiar with

22   Honeywell's conduct.

Garner, Melvin                                    January 10, 2008
New York, NY

265

```
 1        STATE OF NEW YORK )

 2                              ss:

 3        COUNTY OF NEW YORK)

 4

 5              I, MELVIN GARNER, the witness

 6        herein, having read the foregoing testimony of

 7        the pages of this deposition, do hereby certify

 8        it to be a true and correct transcript, subject

 9        to the corrections, if any, shown on the attached

10        page.

11                          oOo

12

13

14                      MELVIN GARNER

15

16

17        Subscribed and sworn to before me

18        this 2 day of March , 2008.

19

20        _____

21              Notary Public

22
```

RICHARD J. KATZ
NOTARY PUBLIC, State of New York
No. 02KA6092499
Qualified in Suffolk County
Commission Expires May 19, 2007

<u>258:14</u>     Change from: ___has_____

                        Change to: ___have_____

Signature:_____    Date: __2/26/08___

Sworn to before me this 26ᵗʰ Day 7 February 2008

ELIZABETH MARMO
NOTARY PUBLIC, State of New York
No. 01MA7725970
Qualified in New York County
Commission Expires April 30, 2010

4

## CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2008, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing to all registered recipients.

I also certify that on March 10, 2008, I caused to be served true and correct copies of the foregoing document on the following in the manner indicated below:

### BY HAND & E-MAIL

Richard L. Horwitz, Esquire
David E. Moore, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street, P.O. Box 951
Wilmington, DE  19899-0951

### BY E-MAIL

Arthur I. Neustadt, Esquire
Jean-Paul Lavalleye, Esquire
Barry J. Herman, Esquire
Jeffrey B. McIntyre, Esquire
Michael E. McCabe, Jr., Esquire
Aarti Shah, Esquire
John F. Presper, Esquire
OBLON, SPIVAK, MCCLELLAND, MAIER
   & NEUSTADT, P.C.
1940 Duke Street
Alexandria, VA  22314

*/s/ Thomas C. Grimm*

_____
Thomas C. Grimm (#1098)
tgrimm@mnat.com