**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

SOLVAY, S.A.                                )
                                            )
            Plaintiff,                      )
                                            )          C.A. No. 06-557-SLR
      v.                                    )
                                            )          **JURY TRIAL DEMANDED**
HONEYWELL SPECIALTY                         )
MATERIALS, LLC and                          )          **PUBLIC VERSION**
HONEYWELL INTERNATIONAL INC.,               )
                                            )
            Defendants.                     )

## SOLVAY'S  RESPONSIVE CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Arthur I. Neustadt
Jean-Paul Lavalleye
Barry J. Herman
Michael E. McCabe, Jr.
John F. Presper
OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.
1940 Duke St.
Alexandria, VA 22314
Tel.: (703) 413-3000

Dated: March 17, 2008
Public Version Dated: March 24, 2008
856809 / 30651

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Plaintiff Solvay, S.A.*

# TABLE OF CONTENTS

Page

I.    SUMMARY ....................................................................................................1

II.    ARGUMENT..................................................................................................3

    A.    Claim 1.................................................................................................3

        1.    Claim 1 -- First Contested Term................................................3

        2.    Claim 1 – Second Contested Term ............................................6

    B.    Claim 12...............................................................................................8

        1.    Claim 12 – First and Second Contested Terms...........................8

        2.    Claim 12 – Third Contested Term .............................................9

    C.    Claims 2 and 13 .................................................................................11

        1.    Claims 2 and 13 --- First Contested Term .................................11

        2.    Claims 2 and 13 – Second Contested Term ...............................12

    D.    Claims 3 and 14 .................................................................................12

        1.    Claims 3 and 14 – Contested Term............................................12

    E.    Claims 4 and 15 .................................................................................12

        1.    Claims 4 and 15 – First Contested Term ...................................12

III.    CONCLUSION..............................................................................................13

# TABLE OF AUTHORITIES

Cases                                                                Page

*Atofina v. Great Lakes Chemical Corp.*,
   441 F.3d 991 (Fed Cir. 2006)..................................................................6, 7

*E.I. DuPont de Nemours and Co. v. Phillips Petroleum Co.*,
   849 F.2d 1430 (Fed. Cir. 1988)............................................................3, 7, 12

*Genentech, Inc. v. Chiron Corp.*,
   112 F.3d 495 (Fed. Cir. 1997)............................................................. 3-4, 7

*Moba, B.V. v. Diamond Automation, Inc.*,
   325 F.3d 1306 (Fed. Cir. 2003)..................................................................10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)...........................................1, 10

*PSC Comp. Prods., Inc. v. Foxconn Int'l, Inc.*,
   355 F.3d 1353 (Fed. Cir. 2004)..................................................................11

*Talbert Fuel Systems Patents Co. v. Unocal Corp.*,
   275 F.3d 1371 (Fed. Cir. 2002)..............................................................8, 13

*Toro Co. v. White Consolidated Indus., Inc.*,
   383 F.3d 1326 (Fed. Cir. 2004)..................................................................11

## I.   SUMMARY

In its opening claim construction brief (D.I. 137), Honeywell argues that the '817 patent claims should be interpreted (1) in a manner inconsistent with their plain and ordinary meaning; (2) by adding new limitations to the claims; and/or (3) in a manner contrary to the specification and claim language of the '817 patent. Honeywell tries to support its arguments in two ways: (i) by creating a faulty premise and then "proving" the premise is, indeed, faulty, and (ii) by relying heavily on extrinsic evidence.[1]  Such straw-man tactics and heavy reliance upon extrinsic evidence do not change the fact that Honeywell's proposed interpretations are not only improper, but also contrary to the intrinsic evidence of record as well as well-settled legal principles. The proper interpretation for the '817 patent claims --- their plain and ordinary meaning --- is set forth in Solvay's opening claim construction brief. (D.I. 124).

A comparison between Solvay's proposed construction of claim 1 of the '817 patent with Honeywell's proposed construction makes evident the impropriety of Honeywell's proposed construction. The preamble of claim 1, which contains no disputed terms, reads as follows:

> "In a process for the preparation of [HFC-245fa] comprising reaction of [HCC-240fa] with [HF] in the presence of a hydrofluorination catalyst, the improvement which comprises ..."[2]

The disputed terms are found in the body of the claim. It reads, *in toto*, as follows:

> "... carrying out the reaction at a temperature and under a pressure at which [HFC-245fa] is gaseous and isolating [said HFC-245fa] from the reaction mixture

---

[1] Honeywell relies heavily on the opinion of its expert, ▉▉▉▉▉▉, to support its arguments. However, "...conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (*en banc*) (internal quotation omitted).

[2] For clarity [HFC-245fa], [HCC-240fa], [HCl], and [HF] are used in place of the chemical names 1,1,1,3,3-pentafluoropropane, 1,1,1,3,3-pentachloropropane, hydrogen chloride, and hydrogen fluoride, respectively.

by drawing off [HFC-245fa] and [HCl] in a gaseous phase as each of said [HFC-245fa] and [HCl] is being formed."

The body of the claim sets forth two requirements: 1) carrying out the reaction under conditions at which at least some of the HFC-245fa produced is gaseous; and 2) isolating produced HFC-245fa from the reaction mixture by continuously drawing off, i.e., removing, the HFC-245fa and HCl.

Solvay's proposed construction of the terms in the body of the claim does not change the plain and ordinary meaning of these terms, requiring "carrying out the reaction at a temperature and pressure at which at least some HFC-245fa produced is present as a gas in the reactor and separating gaseous HFC-245fa from the reaction mixture in the reactor by continuously separating a gas stream containing HFC-245fa and HCl from the reaction mixture."

Honeywell's proposed interpretation, on the other hand, attempts to considerably narrow their scope. Honeywell asserts that the body of the claim requires: "carrying out the reaction that creates HFC-245fa at a temperature and under a pressure *such that pure HFC-245fa would exist only as a gas* and *separating HFC-245fa from the mixture of HCC-240fa, HF, hydrofluorination catalyst, and partially fluorinated intermediates by removing as a gas only the HFC-245fa and HCl* from that mixture as soon as HFC-245fa and HCl are created." As seen from the italicized portions of Honeywell's proposed interpretation, Honeywell attempts to require, *inter alia*, that:

    i.)    the reaction conditions (temperature and pressure) correspond to those at which pure HFC-245fa would exist only as a gas, and

    ii.)    only HFC-245fa and HCl are isolated as a gas from the reaction mixture.

There is no support for Honeywell's attempts to unduly narrow the claims of the '817 patent.

2

## II.    ARGUMENT

### A.    Claim 1

Claim 1 includes two contested phrases.  Each phrase is addressed individually below.

#### 1.    Claim 1 – First Contested Term

**the improvement which comprises carrying out the reaction at a temperature and under a pressure at which [HFC-245fa] is gaseous**

As set forth in Solvay's opening claim construction brief, the phrase "carrying out the reaction at a temperature and under a pressure at which [HFC-245fa] is gaseous" should be interpreted according to the plain and ordinary meaning of this phrase; namely, HFC-245fa produced in the reaction is at least partially gaseous at the reaction conditions.  (D.I. 124 at 3). In contrast, Honeywell argues that this phrase should be interpreted by reading limitations into the phrase to require "carrying out the reaction that creates HFC-245fa at a temperature and under a pressure such that <u>pure</u> HFC-245fa would exist <u>only</u> as a gas."  (D.I. 137 at 12) (emphasis added).  Honeywell's proposed interpretation is improper for the following reasons.

First, Honeywell's proposed interpretation reads limitations into claim 1 requiring HFC-245fa to relate to hypothetical "pure" HFC-245fa, thereby divorcing the claim from actual process conditions.  However, it is improper to read a limitation into a claim "wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *E.I. DuPont de Nemours and Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988).

Second, Honeywell asserts that this phrase of claim 1 and the "nearly identical" phrase in claim 12 "should be consistently construed."  (D.I. 137 at 20).  The phrase in claim 12 reads: "wherein said device is controlled (a) to draw off a gas stream **comprising** [HFC-245fa] and [HCl]."  The term "comprising" is an open-ended, non-exclusionary term. *Genentech, Inc. v.*

*Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997). Thus, the gas stream in claim 12 can include elements other than HCl and HFC-245fa --- the gas stream of claim 12 is not limited to only HCl and HFC-245fa. To consistently construe claim 1 and claim 12, the phrase in claim 1 should be construed to cover a gas mixture containing HFC-245fa, HCl and other compounds

Third, Honeywell argues that Solvay excluded a gaseous mixture containing HFC-245fa from the '817 patent claims when it argued to the United States Patent and Trademark Office ("PTO") that U.S. patent 5,574,192 ("the '192 patent") neither teaches nor suggests the invention of the '817 patent claims. (D.I. 137 at 12-14). Specifically, Honeywell argues that because the '192 patent discloses HFC-245fa in a gaseous mixture, Solvay's statement that the '192 patent neither teaches nor suggests the methods of the '817 patent claims *ipso facto* means that the '817 patent claims are limited to pure HFC-245fa. Honeywell's argument is baseless.

Claim 1 relates to producing a gaseous mixture containing HFC-245fa and HCl, and continuously separating this mixture from the reactor contents. The '192 patent does not teach or suggest such methods for at least the reason that it does not teach or suggest methods in which continuous HCl removal occurs. Honeywell has admitted that the '192 patent does not disclose continuous removal of HCl. For instance, during prosecution of its U.S. patent 7,214,839 ("the '839 patent"), Honeywell stated to the PTO that: (1) the '192 patent does not disclose continuous removal of HCl; and (2) the '192 patent's batch processes "teach away" from the '817 patent's continuous processes. (Ex. 1, S0023756). Specifically, Honeywell argued that the '192 patent:

> "…….. teaches away from Wilmet '817 and the present claims.
> To begin, [the '192 patent] fails to teach the removal of HCl in a
> continuous process. The only mention of any HCl removal in [the
> '192 patent's] disclosure is in Example 5, where HCl is
> *periodically* vented. During such a periodic venting of HCl, the
> process would be operating in a batch mode. … The only
> embodiment of [the '192 patent] where HCl is removed is during a
> *batch mode*, where chlorine is then also added periodically, *not*

4

> *continuously.* [The '192 patent's] only embodiment including a continuous addition of chlorine would not include the removal of HCl, thereby teaching away from Wilmet '817 and the present claims."

*Id.* (emphasis in original).

Merely because Solvay argued to the PTO that the '192 patent does not teach or suggest the invention in the '817 patent claims does not mean that Solvay excluded gaseous mixtures containing HFC-245fa from the claims. Rather, it simply means that the '192 patent does not teach or suggest the claimed methods (as demonstrated above).

Fourth, in attempting to support its erroneous interpretation, Honeywell argues that Solvay supposedly defined HFC-245fa during prosecution to mean "pure HFC-245fa" when Solvay referred to the "atmospheric boiling point" of HFC-245fa in remarks it made to the PTO. (D.I. 137 at 13-14). Honeywell's argument is baseless. Solvay did not exclude gaseous mixtures containing HFC-245fa from the '817 patent claims, nor did Solvay affirmatively state that the '817 patent claims cover only pure, gaseous HFC-245fa. Rather, in its comments to the PTO, Solvay merely distinguished HFC-245fa from a different compound, HFC-236fa. (Ex. 2, HON0021479-21480).

As noted by Honeywell in its opening brief, boiling points of gaseous materials can vary depending on the composition of the materials: "the boiling point of HFC-245fa alone is different from the boiling point of HFC-245fa when mixed together with other substances (as in the reactor)..." (D.I. 137 at 12). Because boiling points can vary in this manner, a benchmark (i.e., atmospheric conditions) can be helpful when comparing the relative boiling points of HFC-245fa and HFC-236fa. Solvay's statement merely provides such a benchmark (atmospheric boiling point), not a subliminal, broad disclaimer of subject matter clearly encompassed by the claims.

5

Honeywell relies upon *Atofina v. Great Lakes Chemical Corp.*, 441 F.3d 991 (Fed Cir. 2006) to support its argument that Solvay's statements during prosecution of the '817 patent should be used to limit the scope of the '817 claims. (D.I. 137 at 18). However, Honeywell's reliance on this case is misplaced. In *Atofina*, "the patentee spoke expressly to the meaning of 'chromium catalyst,' both in the specification and prosecution history, noting that the catalyst was limited 'to pure chromium (without the addition of another metal oxide).'" *Id.* at 998. Here, as noted above, none of the statements by Solvay during prosecution of the '817 patent approach the level of an express disclaimer. Honeywell's attempts to use Solvay's statements during prosecution as a means of narrowing the scope of the '817 patent claims are improper.

For the above reasons, Honeywell's proposed interpretation of the phrase "carrying out the reaction at a temperature and under a pressure at which [HFC-245fa] is gaseous" is baseless.

2.      **Claim 1 – Second Contested Term**

> **and isolating the[3] [HFC-245fa] from the reaction mixture by drawing off [HFC-245fa] and [HCl] in a gaseous phase as each of said [HFC-245fa] and [HCl] is being formed.**

As set forth in Solvay's opening claim construction brief, the plain and ordinary meaning of the phrase "isolating the [HFC-245fa] from the reaction mixture by drawing off [HFC-245fa] and [HCl] in a gaseous phase as each of said [HFC-245fa] and [HCl] is being formed" is that gaseous HFC-245fa is separated from the reaction mixture by continuously separating a gas stream containing HFC-245fa and HCl from the reaction mixture. (D.I. 124 at 4). In its opening brief, Honeywell accuses Solvay of "read[ing] the key 'isolating' term out of the claim," (D.I. 137 at 15), and argues that this phrase means that <u>only</u> HCl and HFC-245fa are separated from

---

[3] That claim 1 states "isolating the [HFC-245fa]" instead of "isolating and [HFC-245fa]" is stated, during prosecution of the '817 patent, in the Examiner's Answer dated May 10, 2001 (at page 3). (Ex. 3, HON0021504).

the reaction mixture. (D.I. 137 at 16). Honeywell's proposed interpretation is improper for the following reasons.

First, Honeywell's proposed interpretation reads limitations into claim 1 requiring the gaseous stream to contain <u>only</u> HFC-245fa and HCl. As noted above, however, it is improper to read a limitation into a claim "wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *DuPont,* 849 F.2d at 1433.

Second, also as noted above, the phrase in claim 12 "wherein said device is controlled (a) to draw off a gas stream **comprising** [HFC-245fa] and [HCl]" should be interpreted in an open-ended, non-exclusionary manner, meaning that the gas stream in claim 12 can include elements other than HCl and HFC-245fa. *Genentech, Inc.*, 112 F.3d at 501. Thus, to consistently construe claim 1 and claim 12, the phrase in claim 1 should be construed to cover gas mixtures containing HFC-245fa, HCl and other compounds.

Third, also as noted above, Honeywell's argument that Solvay excluded a gaseous mixture containing HFC-245fa from the '817 patent claims when it argued to the PTO that the '192 patent neither teaches nor suggests the methods of the '817 patent claims, and Honeywell's reliance upon *Atofina* are baseless.

Fourth, Honeywell's argument that the dictionary definition of "isolate" supports its claim interpretation and that Solvay reads the term "isolate" out of the claims similarly lacks merit. The '817 patent claims require isolation of the gaseous stream containing HCl and HFC-245fa **from the reaction mixture**. Thus, Solvay does not read "isolate" out of the claims --- Solvay's claim interpretation requires separation (isolation) of the gaseous stream containing HCl and HFC-245fa from the reaction mixture.

Finally, Honeywell's attempts to improperly read limitations into claim 1 would render the claim meaningless as it would be limited to practical impossibilities. Honeywell's proposed interpretation requiring the temperature and pressure to be such that **pure** HFC-245fa is gaseous and requiring **only** HFC-245fa and HCl to be drawn off from the reaction mixture would render the claims meaningless. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

An azeotrope is a mixture of compounds which does not decompose when in gaseous phase.

██████████████████████████████████████████████████████

Requiring conditions related to **pure** HFC-245fa and/or requiring drawing off of **only** HFC-245fa and HCl would limit the claims to practical impossibilities ████████████████

██████████, thereby rendering the claims meaningless. Such claim construction "should be viewed with extreme skepticism." *Talbert Fuel Systems Patents Co. v. Unocal Corp.*, 275 F.3d 1371, 1376 (Fed. Cir. 2002).

For the above reasons, Honeywell's proposed interpretation of the phrase "carrying out the reaction at a temperature and under a pressure at which [HFC-245fa] is gaseous" is baseless.

### B.    Claim 12

#### 1.    Claim 12 – First and Second Contested Terms

**the improvement which comprises carrying out the reaction at a temperature and under a pressure at which [HFC-245fa] is gaseous**

**and isolating the [HFC-245fa] from the reaction mixture by drawing off [HFC-245fa] and [HCl] in a gaseous phase as each of said [HFC-245fa] and [HCl] is being formed.**

Because the first and second contested terms in claim 12 are essentially the same as the first and second contested terms in claim 1, the terms in claim 12 should be interpreted consistently with the terms in claim 1.

8

2.    **Claim 12 – Third Contested Term**

> **(b) to keep in the reactor in the liquid state the unconverted [HCC-240fa], most of the [HF] and most of the products of partial fluorination of [HCC-240fa]**

In its opening claim construction brief, Solvay stated that the ordinary meaning of this phrase should be that the unconverted HCC-240fa, most of the HF and most of the products of partial fluorination of HCC-240fa are present in the reactor so that they can react with each other in the liquid phase, but do not have to be present in the reactor on a continuous basis. (D.I. 124 at 11-12).

In contrast, Honeywell argues that the phrase "to keep in the reactor" means that the substances identified in claim 12 (HCC-240fa, HF and the products of partial fluorination) "must not leave the reactor." (D.I. 137 at 21, line 5). Honeywell bases its erroneous interpretation on the argument that the '817 patent, which discloses that it is advantageous "to keep in, or return to, the reactor" the identified substances (Ex. 5, '817 patent, col. 2, line 64 – col. 3, line 2), sets forth two alternatives, "keep in" or "return to," and that "keeping in" is different from "returning to." However, Honeywell's reading of the disclosure in the '817 patent is baseless, with the result that its proposed claim interpretation is similarly baseless.

The intrinsic evidence of record supports Solvay's interpretation, not Honeywell's. By their very nature, the distillation column(s) and/or condenser(s) disclosed in the '817 patent to "keep in, or return to" the reactor the identified substances (Ex. 5, '817 patent, col. 3, lines 2-7) allow material to leave the reactor, to enter the distillation column/condenser device and then to be returned to the reactor. One skilled in the art would interpret the disclosure of the '817 patent to comport with Solvay's construction. ███████████████████████████████████

9

Indeed, one skilled in the relevant art would understand that "keeping in" and "returning to" are not diametrically opposed concepts, but rather are related concepts. As noted in Honeywell's Opening Brief in Support of Summary Judgment of Noninfringement, it is commonplace to have ███████████████████████████████████████████ ███████████ The purpose ██████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

The common usage of the phrase "keep in" in the art was demonstrated by Honeywell's ████████. During his deposition, ██████ stated ███████████████████████ ████████████████████████████████████████████████ ████████████████████.

This same usage of "keep in" was used by Honeywell's ██████████ who testified ████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ ██████████████████████████████████

"The best indicator of claim meaning is its usage in the context as understood by one of skill in the art at the time of invention." *Moba, B.V. v. Diamond Automation, Inc.*, 325 F.3d 1306, 1315 (Fed. Cir. 2003); *see also Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). Here, the usage of the term "keep in" by Honeywell's ████ and ████ includes "return to" the reactor.

Finally, Honeywell asserts that the '817 patent discloses "keeping in" and "returning to" disjunctively but only claims "keeping in," resulting in the dedication to the public of the disclosed but not claimed "returning to" embodiment. (D.I. 133 at 11). However, the Federal

10

Circuit has held that the level of disclosure required to trigger the disclosure-dedication rule "must be of such specificity that one of ordinary skill in the art could identify the subject matter that had been disclosed and not claimed." *Toro Co. v. White Consolidated Indus., Inc.*, 383 F.3d 1326, 1334 (Fed. Cir. 2004) (*quoting PSC Comp. Prods., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1356-57 (Fed. Cir. 2004)).  Given that Honeywell's ▓▓ and ▓▓ use the term "keep in …" in a manner that includes "return to," it is clear that those of skill in the art would understand the phrases "keep in" and "return to" to be related concepts, not disjunctive concepts, making it difficult if not impossible for them to determine which "return to" subject matter is disclosed by the '817 patent but not claimed.  Under such circumstances, the disclosure-dedication rule is not applicable.

Accordingly, the phrase "keep in, or return to" is not disjunctive as Honeywell asserts, but rather sets forth the understanding of those skilled in the art that materials are present in the reactor so that they can react with each other, but do not have to be present in the reactor on a continuous basis.

C.    **Claims 2 and 13**

1.    **Claims 2 and 13 --- First Contested Term**

**conducting the reaction continuously in a liquid phase**

In its opening claim construction brief, Honeywell asserts that Solvay agrees that the reaction occurs <u>wholly</u> in a liquid state.  (D.I. 137 at 22).  This is not correct.  As noted in Solvay's opening claim construction brief, the ordinary and customary meaning of the new limitation added by claim 2 is that HCC-240fa and HF are continuously fed into a reactor wherein HCC-240fa and HF are reacted in the liquid phase in the presence of a hydrofluorination catalyst.  (D.I. 124 at 5).  Honeywell, again, attempts to improperly read a limitation into the

11

claims, requiring the reaction to occur <u>wholly</u> in the liquid phase.  Such interpretation of claim 2 is improper.  *DuPont,* 849 F.2d at 1433.

### 2. Claims 2 and 13 – Second Contested Term

### maintaining a molar ratio of the catalyst to [HCC-240fa] maintained from 0.001 to 1000

Honeywell asserts that this claim term refers to the quantity of the catalyst.  However, Honeywell does not define any measure of quantity.  Solvay's interpretation, that the quantity must be a molar quantity, is based on the plain words of the claims, which require that the ratio of the amount of catalyst to the amount of HCC-240fa is a molar ratio.

### D. Claims 3 and 14

### 1. Claims 3 and 14 – Contested Term

### the molar ratio of the catalyst to [HCC-240fa] is greater than 0.5

As with claims 2 and 13, Honeywell asserts that this claim term refers to the quantity of the catalyst, but does not define any measure of quantity.  Solvay's interpretation is based on the plain words of the claims, which require that the ratio of the amount of catalyst to the amount of HCC-240fa is a molar ratio.

### E. Claims 4 and 15

### 1. Claims 4 and 15 – First Contested Term

### from 5 to 100 moles of [HF] are used per mole of [HCC-240fa]

In its opening claim construction brief, Honeywell argues that the word "used" should mean "consumed" because "Solvay's patent is directed towards a process in which HCC-240fa reacts with HF."  (D.I. 137 at 26).  However, Honeywell does not cite to any intrinsic evidence in support of its baseless interpretation.

Under Honeywell's proposed interpretation, claims 4 and 15 would cover a process in which 100 moles of HF is "consumed" for each mole of HCC-240fa. However, it is not possible to "consume" 100 moles of HF (or even 50 moles of HF) for each mole of HCC-240fa. Rather, it is only possible to consume approximately 5 moles of HF per mole of HCC-240fa. (D.I. 137 at 4). Honeywell's proposed interpretation would limit the claims to practical impossibilities, excluding all claimed HF to HCC-240fa ratios from slightly greater than 5:1 to 100:1, thereby rendering the claims meaningless. Such claim construction "should be viewed with extreme skepticism." *Talbert Fuel Systems*, 275 F.3d at 1376.

In contrast, Solvay's proposed construction, supported by intrinsic evidence (D.I. 124 at 8), is that the ordinary and customary meaning of this term is that from 5 to 100 moles of HF are added to the reactor for each mole of HCC-240fa added to the reactor. Solvay's interpretation permits the entire scope of the claim to be meaningful, not merely a fraction of it.

## III.    **CONCLUSION**

For the foregoing reasons, Solvay respectfully requests that the Court construe the contested terms of the '817 patent in accordance with Solvay's proposed constructions.

Respectfully submitted,

OF COUNSEL:
Arthur I. Neustadt
Jean-Paul Lavalleye
Barry J. Herman
Michael E. McCabe, Jr.
John F. Presper
OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.
1940 Duke St.
Alexandria, VA 22314
Tel.: (703) 413-3000

Dated:  March 17, 2008
Public Version Dated: March 24, 2008
856809 / 30651

POTTER ANDERSON & CORROON LLP

By: */s/ David E. Moore*
        Richard L. Horwitz (#2246)
        David E. Moore (#3983)
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, Delaware 19801
        Tel:  (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

*Attorneys for Plaintiff Solvay, S.A.*

13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on March 24, 2008, the attached document was

electronically filed with the Clerk of the Court using CM/ECF which will send notification to the

registered attorney(s) of record that the document has been filed and is available for viewing and

downloading.

I hereby certify that on March 24, 2008, the attached document was

Electronically Mailed to the following person(s):

Thomas C. Grimm
Benjamin J. Schladweiler
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
tgrimm@mnat.com
bschladweiler@mnat.com

Robert G. Krupka
Laura M. Burson
Helen Hong
Kirkland & Ellis LLP
777 S. Figueroa Street, Suite 3400
Los Angeles, CA 90017
service-solvay@kirkland.com

By: /s/ David E. Moore
  Richard L. Horwitz
  David E. Moore
  Potter Anderson & Corroon LLP
  Hercules Plaza, 6th Floor
  1313 N. Market Street
  P.O. Box 951
  Wilmington, DE 19899-0951
  (302) 984-6000
  rhorwitz@potteranderson.com
  dmoore@potteranderson.com

799366 / 30651

# EXHIBIT 1

(b) *optionally recycling a portion of any unreacted HF back to step (a);*

(c) *continuously adding sufficient chlorine to keep the activity of the fluorination catalyst;*

(d) *removing any HCl produced by step (a); and*

(e) recovering at least one hydrofluorocarbon.

Wilmet '817 relates to a process for the production of 1,1,1,3,3-pentafluoropropane. Indeed some process steps of the present invention are conducted in Wilmet '817. For instance, one step of Wilmet '817 includes the reacting of a hydrochlorocarbon with HF in the presence of a hydrofluorination catalyst. However, as the Examiner agrees, certain features of the present invention are not disclosed by this reference. For example, the Examiner states that Wilmet '817 fails to teach the continuous addition of chlorine to maintain activity of the catalyst, and the recycling of unreacted HF. Thus, the Examiner cites VanDerPuy in an effort to fill this void. Applicants respectfully urge that one skilled in the art would not have combined the teachings of VanDerPuy with Wilmet '817.

VanDerPuy relates to process for forming pentafluoropropane. However, it is urged that this reference teaches away from Wilmet '817 and the present claims. To begin, VanDerPuy fails to teach the removal of HCl in a continuous process. The only mention of any HCl removal in VanDerPuy's disclosure is in Example 5, where HCl is *periodically* vented. During such a periodic venting of HCl, the process would be operating in a batch mode. Further, as stated in VanDerPuy in col.3, lines 31-35, chlorine is only continuously added while in continuous mode, but is *periodically added* when the process is operating in a batch mode. Thus, the only embodiment of VanDerPuy where HCl is removed is during a *batch mode*, where chlorine is then also added periodically, *not continuously*. VanDerPuy's only embodiment including a continuous addition of chlorine would not include the removal of HCl, thereby teaching away from Wilmet '817 and the present claims. Thus, one would not have combined this reference with Wilmet '817 in an effort to devise a continuous process with a continuous removal of HCl and a continuous addition of chlorine. It is further urged that even a hypothetical combination

2

S0023756

# EXHIBIT 2

1,1,1,3,3,-pentafluoropropane.  In addition, the applied art does not enable the subject matter of the claims.  Moreover, the applied art is silent with respect to claims 20-26 and 28-36, which relate to continuous reactions.

The record here provides no basis for a reasonable expectation of producing the process of the rejected claims.  As noted above, the 1,1,1,3,3-pentachloropropane is structurally different from compounds fluorinated in Van der Puy, by one chlorine atom; it is structurally different from the compound of the comparative example 1 by exchange of a methyl group for a hydrogen; the compounds fluorinated in the examples of Van der Puy differ from the one in the comparative example by exchanging Cl for methyl.  For said compounds, totally different behavior in fluorination reaction is observed.  Consequently, the behavior of 1,1,1,3,3-pentachloropropane in fluorination reaction was unpredictable over Van der Puy '997; hence Van der Puy '997 provides no reasonable expectation of producing the process of the rejected claims.

Lastly, it is noted that, if the actual description of the two references to Van der Puy and Decker were combined, the literal combination would not produce the recitations of the rejected claims.  Accordingly, it is believed that the grounds of rejection must be based on applicants' own disclosure, which violates of the language of Section 103(a).

The claims are now directed to a hydrofluorination process of 1,1,1,3,3-pentachloropropane to produce 1,1,1,3,3-pentafluoropropane under specific process conditions.

09/051,746

HON0021479

Both independent claims are limited to a hydrofluorination process of 1,1,1,3,3-pentachloropropane in presence of a catalyst at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous. It is submitted that in view of this limitation, 1,1,1,3,3-pentafluoropropane which has an atmospheric boiling point of +14° C is not analogous to 1,1,1,3,3,3-hexafluoropropane which has an atmospheric boiling point of -1° C.

Applicants note Van Der Puy '192 which was cited by applicants in the April 21, 2000 Information Disclosure. The instant claim 43 requires the reaction at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture by drawing off 1,1,1,3,3-pentafluoropropane and hydrogen chloride in a gaseous phase as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed. Example 3 of VANDERPUY '192 describes a hydrofluorination process of 1,1,1,3,3-pentachloropropane in presence of a catalyst wherein hydrogen chloride is periodically vented.

VANDERPUY '192 does not provide motivation:

(a)    to select carrying out the reaction at a temperature and under a pressure at which    1,1,1,3,3-pentafluoropropane is gaseous,

(b)    to draw off in vapour phase 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each    of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed.

11

09/051,746

HON0021480

# EXHIBIT 3

Application/Control Number: 09/051,746                                      Page 3

Art Unit: 1621

(7)   *Grouping of Claims*

    The rejection of claims 20-26, 28-36 and 44 stand or fall together because appellant's

brief does not include a statement that this grouping of claims does not stand or fall together

and reasons in support thereof. See 37 CFR 1.192(c)(7).

(8)   *Claims Appealed*

    A substantially correct copy of appealed claim 43 appears on page 1 of the Appendix to

the appellant's brief. The minor errors are as follows: in line 5 of claim 43, the recitation

"isolating and 1,1,1,3,3-pentafluoropropane" should read "isolating the 1,1,1,3,3-

pentafluoropropane".

(9)   *Prior Art of Record*

    The following is a listing of the prior art of record relied upon in the rejection of claims

under appeal.

        5,395,997                  Van Der Puy et al            3-1995
(10)   *Grounds of Rejection*

    The following ground(s) of rejection are applicable to the appealed claims:

    Claims 20-26, 28-36 and 44 stand rejected under 35 U.S.C. 103(a) as unpatentable

over Van Der Puy et al.

    In view of the fact that all of the claims stand or fall together, the Van Der Puy et al

reference will be applied against claim 43.

HON0021504

# EXHIBIT 4

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 5

US006730817B1

(12) **United States Patent**          (10) **Patent No.:**     **US 6,730,817 B1**

Wilmet et al.                          (45) **Date of Patent:**       **May 4, 2004**

(54) **METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE**

(75) Inventors: **Vincent Wilmet**, Wavre (BE); **Francine Janssens**, Vilvoorde (BE); **Jean-Paul Schoebrechts**, Grez-Doiceau (BE)

(73) Assignee: **Solvay (Societe Anonyme)** (BE)

( * ) Notice:    Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/051,746**

(22) PCT Filed:    **Oct. 4, 1996**

(86) PCT No.:    **PCT/EP96/04315**

§ 371 (c)(1),
(2), (4) Date:    **Jun. 8, 1998**

(87) PCT Pub. No.: **WO97/15540**

PCT Pub. Date: **May 1, 1997**

(30)        **Foreign Application Priority Data**

Oct. 23, 1995    (FR) .............................................. 95 12558

(51) Int. Cl.[7] ......................... C07C 17/00; C07C 17/08; C07C 19/08; C07C 17/266; C07C 21/18

(52) U.S. Cl. .......................................... 570/167; 570/172

(58) Field of Search ................................... 570/167, 172

(56)            **References Cited**

U.S. PATENT DOCUMENTS

3,862,978 A  * 1/1975 Decker et al. .............. 570/172

5,395,997 A  * 3/1995 Van Der Puy et al. ..... 570/167
5,574,192 A  11/1996 VanDerPuy et al.

FOREIGN PATENT DOCUMENTS

| AU | 32843/95 | 4/1996 |
| EP | 0 522 639 | 1/1993 |
| EP | 0 611 744 | 8/1994 |
| EP | 0 703 205 | 3/1996 |
| EP | 0 729 932 | 9/1996 |
| WO | WO95/04021 | 2/1995 |
| WO | WO95/04022 | 2/1995 |
| WO | WO95/05353 | 2/1995 |
| WO | WO96/01797 | 1/1996 |

OTHER PUBLICATIONS

Kotora, Martin et al., "Addition of tetrachloromethane to halogenated ethenes catalyzed by transition metal complexes", *Journal of Molecular Catalysis*, vol. 77, pp. 51–60 (1992).

* cited by examiner

*Primary Examiner*—Johann Richter
*Assistant Examiner*—Elvis O. Price
(74) *Attorney, Agent, or Firm*—Connolly Bove Lodge & Hutz LLP

(57)            **ABSTRACT**

1,1,1,3,3-Pentafluoropropane is produced by reaction between 1,1,1,3,3-pentachloropropane and hydrogen fluoride in the presence of a hydrofluorination catalyst. The 1,1,1,3,3-pentachloropropane may advantageously be obtained by reaction between vinyl chloride and tetrachloromethane in the presence of a telomerization catalyst and of a nitrile.

**22 Claims, No Drawings**

US 6,730,817 B1

1

# METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE

The present invention relates to a process for the preparation of 1,1,1,3,3-pentafluoropropane (HFC-245fa). It also relates more particularly to a process for the preparation of 1,1,1,3,3-pentafluoropropane from 1,1,1,3,3-pentachloropropane.

1,1,1,3,3-Pentafluoropropane is a possible substitute for wholly or partially halogenated chlorofluoro hydrocarbons (CFCs and HCFCs) suspected of having a detrimental effect on the ozone layer. In particular, it is found to be especially advantageous as a blowing agent for the preparation of expanded polymeric materials.

In application WO 95/05353 it has been proposed to prepare 1,1,1,3,3-pentafluoropropane by reaction between 1,1-dichloro-2,2,2-tri-fluoroethane (HCFC-123) and dichlorodifluoromethane (CFC-12), followed by hydrogenation of the 1,1,1,3,3-pentafluoropropropene obtained. The yield of the first stage of this known process (synthesis of the 1,1,1,3,3-pentafluoroprop-2-ene intermediate) is, however, very low.

In application WO 95/04022 it has been proposed to prepare 1,1,1,3,3-pentafluoropropane by a three-stage process consisting, in a first stage, in the preparation of 1,1,1,3,3,3-hexachloropropane by reaction between tetrachloromethane and vinylidene chloride, in a second stage in the conversion of the hexachloropropane obtained to 1,1,1,3,3-pentafluoro-3-chloropropane by reaction with hydrogen fluoride and, in a third stage, in the reduction of the pentafluorochloropropane obtained to 1,1,1,3,3-pentafluoropropane by reaction with hydrogen. This process has the disadvantage of giving rise to large quantities of 1,1,1,3,3,3-hexafluoropropane during the second stage.

In application EP-A-611744 it has been proposed to prepare 1,1,1,3,3-pentafluoropropane by reaction between 1,1,1,3,3-pentafluoro-2,3-dichloropropane and hydrogen. The 1,1,1,3,3-pentafluoro-2,3-dichloropropane employed as raw material in this known process is not, however, a common product and cannot be easily prepared.

The objective of the present invention is to provide a process for the preparation of 1,1,1,3,3-pentafluoropropane which does not exhibit the disadvantages of the abovementioned known processes, which uses reactants that are commonly or easily accessible and which has a high yield, thus meeting industrial economic requirements.

The invention consequently relates to a process for the preparation of 1,1,1,3,3-pentafluoropropane, according to which 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

In the process according to the invention the hydrofluorination catalyst is advantageously chosen from the derivatives of metals of groups 3, 4, 5, 13, 14 and 15 of the Periodic Table of the elements (IUPAC 1988) and their mixtures (groups of the Periodic Table of the elements which were previously called IIIA, IVa, IVb, Va, Vb and VIb). The derivatives of the metals are intended to mean the hydroxides, oxides and the organic or inorganic salts of these metals, as well as their mixtures. Those particularly adopted are the titanium, tantalum, molybdenum, boron, tin and antimony derivatives. The catalyst is preferably chosen from the derivatives of metals of groups 14 (IVa) and 15 (Va) of the Periodic Table of the elements, and more particularly from tin and antimony derivatives. In the process according to the invention the preferred derivatives of the metals are the salts and these are preferably chosen from the halides and more particularly from chlorides, fluorides and chlorof-

2

luorides. Particularly preferred hydrofluorination catalysts according to the present invention are tin and antimony chlorides, fluorides and chlorofluorides, especially tin tetrachloride and antimony pentachloride. Antimony pentachloride is very particularly recommended.

In the case where the catalyst is selected from metal fluorides and chlorofluorides, these can be obtained from a chloride which is subjected to an at least partial fluorination. This fluorination may, for example, be carried out by means of hydrogen fluoride, before the catalyst is brought into contact with 1,1,1,3,3-pentachloropropane. In an alternative form, it may be carried out in situ, during the reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride.

The quantity of catalyst used can vary within wide limits. It is generally at least 0.001 mole of catalyst per mole of 1,1,1,3,3-pentachloropropane. It is preferably at least 0.01 mole of catalyst per mole of 1,1,1,3,3-pentachloropropane. In principle there is no upper limit to the quantity of catalyst used. For example, in a process carried out continuously in liquid phase, the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane may reach 1000. In practice, however, at most approximately 5 moles of catalyst are generally employed per mole of 1,1,1,3,3-pentachloropropane. Approximately 1 mole is preferably not exceeded. In a particularly preferred manner, approximately 0.5 moles of catalyst per mole of 1,1,1,3,3-pentachloropropane are generally not exceeded.

The molar ratio of hydrogen fluoride to the 1,1,1,3,3-pentachloropropane used is generally at least 5. The work is preferably done with a molar ratio of at least 8. The molar ratio of hydrogen fluoride to the 1,1,1,3,3-pentachloropropane used generally does not exceed 100. It preferably does not exceed 50.

The temperature at which the hydrofluorination is performed is generally at least 50° C. It is preferably at least 80° C. The temperature generally does not exceed 150° C. It preferably does not exceed 130° C. With antimony pentachloride as catalyst good results are obtained at a temperature of 100 to 120° C.

The process according to the invention is preferably carried out in liquid phase. In this case the pressure is chosen so as to keep the reaction mixture in liquid form. The pressure used varies as a function of the temperature of the reaction mixture. It is generally from 2 bar to 40 bar. The work is preferably carried out at a temperature and pressure at which, furthermore, the 1,1,1,3,3-pentafluoropropane produced is at least partially in gaseous form, which enables it to be easily isolated from the reaction mixture.

The process according to the invention may be carried out continuously or noncontinuously. It is to be understood that, in a noncontinuous process, the quantity of catalyst used is expressed in relation to the initial quantity of 1,1,1,3,3-pentachloropropane used and, in a continuous process, in relation to the stationary quantity of 1,1,1,3,3-pentachloropropane present in the liquid phase.

The residence time of the reactants in the reactor must be sufficient for the reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride to take place with an acceptable yield. It can easily be determined as a function of the operating conditions adopted.

The process according to the invention can be carried out in any reactor made of a material that is resistant to the temperature, the pressure and the reactants employed, especially to hydrogen fluoride. It is advantageous to separate the 1,1,1,3,3-pentafluoropropane and the hydrogen chloride from the reaction mixture as they are being formed and to keep in, or return to, the reactor the unconverted reactants,

US 6,730,817 B1

3

as well as the chlorofluoropropanes possibly formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane. To this end the process according to the invention is advantageously carried out in a reactor equipped with a device for drawing off a gas stream, this device consisting, for example, of a distillation column and a reflux condenser mounted above the reactor. By means of suitable control, this device makes it possible to draw off in vapour phase the 1,1,1,3,3-pentafluoropropane and hydrogen chloride which are produced while keeping in the reactor, in the liquid state, the unconverted 1,1,1,3,3-pentachloropropane and most of the hydrogen fluoride, as well as, where appropriate, most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.

The 1,1,1,3,3-pentachloropropane used in the process according to the invention can advantageously be obtained by reaction of vinyl chloride with tetrachloromethane, as described, for example, by M. Kotora et al., Journal of Molecular Catalysis, (1992), vol. 77, p. 51–60. It is thus possible to obtain 1,1,1,3,3-pentafluoropropane in two stages from easily accessible materials.

In a preferred alternative form the process according to the invention for the preparation of 1,1,1,3,3-pentafluoropropane includes a telomerization stage in which vinyl chloride and tetrachloromethane are reacted in the presence of a telomerization catalyst, so as to obtain 1,1,1,3,3-pentachloropropane, and the subsequent hydrofluorination stage in which the 1,1,1,3,3-pentachloropropane obtained in the telomerization stage is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

The telomerization catalyst may be chosen from the compounds of metals from groups 8 to 11 of the Periodic Table of the elements (IUPAC 1988) and their mixtures. Compounds of metals of groups 8 and 11 are preferred. Iron and copper compounds are adopted in particular, those of copper being very particularly preferred. Compounds of metals of groups 8 to 11 are intended to mean the organic and inorganic derivatives of these metals and their mixtures. The preferred derivatives are the inorganic salts, the chlorides being particularly preferred. Telomerization catalysts which are particularly preferred according to the present invention are cuprous chloride, cupric chloride and their mixtures. Very good results have been obtained with copper (I) chloride(cuprous chloride).

The quantity of telomerization catalyst used can vary within wide limits. It is generally at least 0.001 mole of catalyst per mole of vinyl chloride. It is preferably at least 0.005 moles of catalyst per mole of vinyl chloride. In a process carried out continuously in liquid phase the molar ratio of the catalyst to vinyl chloride in the reaction mixture can reach 1000. In a process carried out noncontinuously at most approximately 0.5 moles of catalyst are preferably employed, preferably not more than 0.2 moles of catalyst and, in a particularly preferred manner 0.1 mole or less of catalyst per mole of vinyl chloride used.

A cocatalyst can be used in the telomerization stage. Amines can be employed as cocatalyst, preferably in a concentration of 0.1 to 20 moles per mole of telomerization catalyst. Amines which may be mentioned as being usable as cocatalyst in the telomerization stage of the process according to the invention are alkanolamines, alkylamines and aromatic amines, for example ethanolamine, n-butylamine, n-propylamine, isopropylamine, benzylamine and pyridine.

The molar ratio of tetrachloromethane to the vinyl chloride used in the telomerization stage is generally at least 1.5. The work is preferably done with a molar ratio of at least 2. In principle there is no upper limit to the molar ratio of

4

tetrachloromethane to vinyl chloride. For example, in a process carried out continuously in liquid phase, the molar ratio of the stationary quantities of tetrachloromethane and vinyl chloride in the reaction mixture may reach 1000. In a process carried out noncontinuously at most approximately 50 moles, preferably at most 20 moles and, in a particularly preferred manner, at most 10 moles of tetrachloromethane are generally used per mole of vinyl chloride.

The temperature at which the telomerization of vinyl chloride with tetrachloromethane is performed is generally at least 25° C. It is preferably at least 70° C. In general the telomerization temperature does not exceed 200° C. It preferably does not exceed 160° C. With cuprous chloride as catalyst good results have been obtained at a temperature of 100 to 140° C., in particular at a temperature of 110 to 130° C.

The telomerization reaction is generally carried out in liquid phase, advantageously in the presence of a solvent. Solvents that can be employed in the telomerization stage are especially alcohols such as methanol, ethanol, isopropanol and tert-butanol, and nitriles, in particular acetonitrile and propionitrile. Nitriles are preferred. The molar ratio of the solvent to the telomerization catalyst generally does not exceed 1000. Good results have been obtained with a molar ratio of the solvent to the telomerization catalyst of 20 to 400.

In the process according to the invention the presence of a nitrile is particularly advantageous, especially when the telomerization catalyst is a chloride, most especially cuprous chloride. The invention consequently also relates to a process for the preparation of 1,1,1,3,3-pentachloropropane, in which vinyl chloride and tetrachloromethane are reacted in the presence of a chloride of a metal of groups 8 to 11 of the Periodic Table of the elements (IUPAC 1988) and of a nitrile, as defined, and in the conditions described above.

The examples hereinafter illustrate the invention without any limitation being implied.

EXAMPLE 1

Preparation of 1,1,1,3,3-pentachloropropane

4.43 moles of acetonitrile, 6.57 moles of tetrachloromethane, 0.11 mole of copper(I) chloride and 2.21 moles of vinyl chloride were introduced into a 1.5 l autoclave lined with a Teflon® fluorocarbon resin, equipped with a mechanical stirrer and a temperature probe. The autoclave was then immersed in a thermostated bath maintained at a temperature of 120° C. for 66 h with continuous stirring. After having reached 8.5 bar the autogenous pressure decreased, reaching 6 bar after 24 hours' reaction and 5.9 bar after 66 hours. The autoclave was then cooled and then the reaction mixture was distilled at reduced pressure. 380 g of 1,1,1,3,3-pentachloropropane were obtained, which represents a yield of 80% relative to the vinyl chloride used.

EXAMPLES 2–3

Preparation of 1,1,1,3,3-pentachloropropane

Acetonitrile (AcN), tetrachloromethane, copper(I) chloride and vinyl chloride (VC) were introduced into the autoclave described in Example 1 in the proportions reported in Table I. The conditions of reaction under autogenous pressure and the results obtained are also presented in Table 1.

US 6,730,817 B1

5

TABLE 1

| Example | 2 | 3 |
|---|---|---|
| VC/CCl$_4$/AcN/CuCl molar ratio | 1/6/2/0.07 | 1/3.1/2.2/0.03 |
| Reaction temperature | 120° C. | 115° C. |
| Reaction period | 36 h | 96 h |
| VC conversion (% of VC used) | 83% | 99% |
| Selectivity for 1,1,1,3,3-pentachloropropane (% of the VC converted transformed into 1,1,1,3,3-pentachloropropane | 91% | 85% |

EXAMPLE 4

Hydrofluorination of 1,1,1,3,3-pentachloropropane

0.21 moles of 1,1,1,3,3-pentachloropropane, 0.076 moles of antimony pentachloride and 10 moles of hydrogen fluoride were introduced into a 0.5 l autoclave made of Hastelloy B2 stainless steel, equipped with a bladed mechanical stirrer, a temperature probe and a dip pipe enabling liquid phase samples to be taken during the test. The autoclave was then immersed in a thermostated bath maintained at a temperature of 120° C. with continuous stirring for 21 hours. The pressure was controlled at 25 bar. A sample taken after 2 hours' reaction showed that more than 99 mol % of the 1,1,1,3,3-pentachloropropane used was already converted, including 66% to 1,1,1,3,3-pentafluoropropane. After 21 hours' reaction virtually all the 1,1,1,3,3-pentachloropropane used was converted, including 92 mol % to 1,1,1,3,3-pentafluoropropane and approximately 6% to intermediate chlorofluoropropanes formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane.

What is claimed is:

1. In a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst, the improvement which comprises carrying out the reaction at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and isolating and 1,1,1,3,3-pentafluoropropane from the reaction mixture by drawing off 1,1,1,3,3-pentafluoropropane and hydrogen chloride in a gaseous phase as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed.

2. The process of claim 1, which comprises conducting the reaction continuously in a liquid phase and maintaining a molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000.

3. The process of claim 2, wherein the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is greater than 0.5.

4. The process of claim 3 wherein from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

5. The process of claim 1 wherein the reaction is carried out at a temperature of approximately 50 to 150° C.

6. The process of claim 1 wherein the 1,1,1,3,3-pentachloropropane is prepared by reaction between vinyl chloride and tetrachloromethane.

6

7. The process of claim 1, wherein the hydrofluorination catalyst is selected from the group consisting of derivatives of metals of Groups IIIa, IVa, IVb, Va, Vb and VIb of the periodic table.

8. The process of claim 7, wherein the hydrofluorination catalyst is a derivative of a metal selected from the group consisting of titanium and tin.

9. The process of claim 7, wherein the pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

10. The process of claim 7, wherein the hydrofluorination catalyst is selected from the group consisting of tin and antimony chlorides, fluorides and chlorofluorides.

11. The process of claim 7, wherein the catalyst is antimony pentachloride.

12. In a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst, the improvement which comprises carrying out the reaction in a reactor equipped with a device for drawing off a gas stream at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and wherein said device is controlled (a) to draw off a gas stream comprising 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed thereby isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture (b) to keep in the reactor in the liquid state the unconverted 1,1,1,3,3-pentachloropropane, most of the hydrogen fluoride and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.

13. The process of claim 12, which comprises conducting the reaction continuously in a liquid phase and maintaining a molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000.

14. The process of claim 13, wherein the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is greater than 0.5.

15. The process of claim 12, wherein from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

16. The process of claim 12, wherein the reaction is carried out at a temperature of approximately 50 to 150° C.

17. The process of claim 12, wherein the 1,1,1,3,3-pentachloropropane is prepared by reaction between vinyl chloride and tetrachloromethane.

18. The process of claim 12, wherein the hydrofluorination catalyst is selected from the group consisting of derivatives of metals of Groups IIIa, IVa, IVb, Va, Vb and VIb of the periodic table.

19. The process of claim 18, wherein the hydrofluorination catalyst is a derivative of a metal selected from the group consisting of titanium and tin.

20. The process of claim 18, wherein the pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

21. The process of claim 18, wherein the hydrofluorination catalyst is selected from the group consisting of tin and antimony chlorides, fluorides and chlorofluorides.

22. The process of claim 18, wherein the catalyst is antimony pentachloride.

*    *    *    *    *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

PATENT NO.    : 6,730,817 B1                                    Page 1 of 1
DATED         : May 4, 2004
INVENTOR(S)   : Wilmet et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

<u>Title page,</u>
Item [*] Notice, should read:
-- Subject to any disclaimer,the term of this patent is extended or
Adjusted under 35 U.S.C. 154(b) by 749 days. --

Signed and Sealed this

Fifteenth Day of June, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 8

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY