IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOLVAY, S.A., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-557-SLR |
| v. | ) | |
| | ) | PUBLIC VERSION |
| HONEYWELL SPECIALTY MATERIALS LLC, | ) | |
| and HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**APPENDIX TO HONEYWELL INTERNATIONAL INC.'S OPPOSITIONS TO
SOLVAY'S FEBRUARY 18, 2008 MOTIONS FOR SUMMARY JUDGMENT**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Thomas C. Grimm (#1098)
Benjamin J. Schladweiler (#4601)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
*OF COUNSEL:*                                    tgrimm@mnat.com
bschladweiler@mnat.com
Robert G. Krupka, P.C.                           *Attorneys for Defendants*
Laura M. Burson
Amber T. Aubry
Jacob R. Buczko
KIRKLAND & ELLIS LLP
777 S. Figueroa Street, Suite 3400
Los Angeles, CA 90017
(213) 680-8400

Confidential Version Filed: March 17, 2008
Public Version Filed: March 24, 2008

# TABLE OF EXHIBITS

| Description | Exhibit |
|---|---|
| Complaint for Patent Infringement, September 7, 2006 | 1 |
| REDACTED | 2 |
| Excerpts from the Deposition of Melvin Garner, January 10, 2008 | 3 |
| REDACTED | 4 |
| REDACTED | 5 |
| REDACTED | 6 |
| REDACTED | 7 |
| REDACTED | 8 |
| REDACTED | 9 |
| REDACTED | 10 |
| REDACTED | 11 |
| REDACTED | 12 |
| REDACTED | 13 |
| REDACTED | 14 |
| REDACTED | 15 |
| REDACTED | 16 |
| REDACTED | 17 |

REDACTED                                                                                    18

Notice of Allowance, March 17, 2003 (HON0021546-HON00215547)                                19

Response to Official Action of February 9, 1999, June 9, 1999                               20
(HON0030817-HON0030825)

Final Rejection, August 24, 1999 (HON0030822-HON0030826)                                    21

Notice of Appeal and Response, February 24, 2000                                            22
(HON0030827-HON0030833)

Advisory Action, March 3, 2000 (HON0030844-HON0030845)                                      23

Office Action, May 31, 2000 (HON0030858-HON0030863)                                         24

Final Rejection, October 13, 2000 (HON0030877-HON0030880)                                   25

Amendment, August 30, 2000 (HON0030864-HON0030876)                                          26

Notice of Appeal, January 12, 2001 (HON0030881)                                             27

Appeal Brief, March 13, 2001 (HON0030882-HON0030891)                                        28

U.S. Patent and Trademark Office, Before the Board of                                       29
Patent Appeals and Interferences, Decision on Appeal,
January 30, 2003 (HON0030924-HON0030932)

Final Rejection, January 12, 2006                                                           30

United States Patent No. 6,730,817 ("the '817 patent")                                      31

United States Patent No. 5,574,192 ("the '192 patent")                                      32

United States Patent No. 5,763,706 ("the '706 patent")                                      33

REDACTED                                                                                    34

Letter from Solvay to Ms. Schneller, February 18, 2000                                      35
(HON0021454)

Excerpts from A.K. Barbour *et al.* - Advances in Fluorine Chemistry,                       36
Vol. 3 (1963)

Excerpts from Manual of Patent Examining Procedure                                          37

REDACTED                                                                38

Statutory Disclaimer Under 37 C.F.R. § 1.321(b)                         39
(HON0033987-HON0033991)

REDACTED                                                                40

REDACTED                                                                41

REDACTED                                                                42

REDACTED                                                                43

Excerpts from Plaintiff's Responses and Objections to Honeywell         44
International Inc.'s First Set of Requests for Admission Nos. 1-27,
September 17, 2007

Excerpts from Plaintiff's Response to Honeywell International Inc.'s     45
Second Set of Request for Admission Nos. 28-37, October 5, 2007

REDACTED                                                                46

REDACTED                                                                47

REDACTED                                                                48

REDACTED                                                                49

REDACTED                                                                50

REDACTED                                                                51

REDACTED                                                                52

September 4, 2001 Article, (HON0013468)                                 53

April/May 2006 Article, (S0008989-S0008993)                            54

REDACTED                                                                          55

Notification of Acceptance of '817 Patent Application, June 8, 1998             56
  (HON0030603-HON0030604)

REDACTED                                                                          57

REDACTED                                                                          58

REDACTED                                                                          59

REDACTED                                                                          60

REDACTED                                                                          61

REDACTED                                                                          62

REDACTED                                                                          63

REDACTED                                                                          64

REDACTED                                                                          65

REDACTED                                                                          66

REDACTED                                                                          67

REDACTED                                                                          68

European Patent EP0858440                                                        69

REDACTED                                                                          70

Continued Prosecution Application, April 25, 2000                               71
  (HON0030848-HON0030850)

REDACTED                                                                          72

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| SOLVAY, S.A. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | C. A. No. _____ |
| HONEYWELL SPECIALTY ) | |
| MATERIALS, LLC and ) | |
| HONEYWELL INTERNATIONAL INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

### Subject Matter Jurisdiction

1.   This is an action for patent infringement pursuant to 35 U.S.C. §271. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1338(a).

### Parties

2.   Plaintiff Solvay, S.A. ("Solvay") is a Belgian corporation with its principal place of business at Rue du Prince Albert, 33, B-1050, Brussels, Belgium.

3.   Defendant Honeywell International Inc. ("Honeywell") is a Delaware corporation with its principal place of business in Morristown, New Jersey.

4.   Defendant Honeywell Specialty Materials, LLC ("HSM") is a Delaware limited liability corporation with its principal place of business in Morristown, New Jersey. Defendant HSM is a subsidiary of defendant Honeywell.

## The Patent in Suit

5.      Solvay owns United States patent 6,730,817 ("the '817 patent") entitled

METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE issued on May 4,

2004 to Wilmet, et al. Pursuant to Local Rule 3.2, the '817 patent is appended hereto as

Exhibit A.

## Allegations of Infringement

6.      On information and belief, defendants make and sell certain halogenated

fluorocarbons which infringe the '817 patent.

7.      Solvay has given defendants written notice of infringement of the '817 patent.

8.      On information and belief, the infringement by defendants has been willful.

9.      Solvay has been damaged by such infringement and will continue to be damaged

by such infringement unless enjoined by the Court.

## Request for Relief

Plaintiff Solvay respectfully requests:

>       a.      a permanent injunction against continued infringement (35 U.S.C.
>               § 283),
>
>       b.      its damages for past infringement (35 U.S.C. § 284),
>
>       c.      increased and treble damages for willful infringement (35 U.S.C. §
>               284),
>
>       d.      its attorney fees (35 U.S.C. § 285),
>
>       e.      its costs (rule 54(d), Fed. R. Civ. P.), and
>
>       f.      any other relief appropriate under the circumstances.

2

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: _____

Arthur I. Neustadt, Esq.
Jean-Paul Lavalleye, Esq.
Tia D. Fenton, Esq.
OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.
1940 Duke St.
Alexandria, VA 22314
Tel.: (703) 413-3000
Fax: (703) 413-2220

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Hercules Plaza, 6th Floor
1313 N. Market Street
P.O. Box 951
Wilmington, DE 19899-0951
Tel.: (302) 984-6000
Fax: (302) 658-1192
rhorwitz@potteranderson.com
dmoore@potteranderson.com

Dated: September 7, 2006

*Attorneys for Plaintiff Solvay, S.A.*

749158

3

# EXHIBIT 2

## FULLY REDACTED

# EXHIBIT 3

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF DELAWARE

3     ---------------------------------------x

4     SOLVAY, S.A.,

5                          Plaintiff,

6                                     Civil Action No.

7              -against-              06-557-SLR

8

9     HONEYWELL SPECIALTY MATERIALS LLC

10    and HONEYWELL INTERNATIONAL, INC.,

11                          Defendants.

12    ---------------------------------------x

13                              January 10, 2008

14                              10:05 a.m.

15

16          Deposition of MELVIN GARNER, taken by

17    the Plaintiff, pursuant to Agreement, at the

18    offices of Kirkland & Ellis LLP, 153 East 53rd

19    Street, New York, New York, before David Levy,

20    CSR, a Notary Public of the State of New York.

21

22
```

1

EXCERPTS FROM THIS EXHIBIT ARE
CONFIDENTIAL AND HAVE BEEN REDACTED
IN THEIR ENTIRETY

# EXHIBIT 4

## FULLY REDACTED

# EXHIBIT 5

## FULLY REDACTED

# EXHIBIT 6

## FULLY REDACTED

# EXHIBIT 7

## FULLY REDACTED

# EXHIBIT 8

## FULLY REDACTED

# EXHIBIT 9

## FULLY REDACTED

# EXHIBIT 10

## FULLY REDACTED

# EXHIBIT 11

## FULLY REDACTED

# EXHIBIT 12

## FULLY REDACTED

# EXHIBIT 13

## FULLY REDACTED

# EXHIBIT 14

## FULLY REDACTED

# EXHIBIT 15

## FULLY REDACTED

# EXHIBIT 16

## FULLY REDACTED

# EXHIBIT 17

## FULLY REDACTED

# EXHIBIT 18

## FULLY REDACTED

# EXHIBIT 19

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231
www.uspto.gov

## NOTICE OF ALLOWANCE AND FEE(S) DUE

23416        7590        03/17/2003
CONNOLLY BOVE LODGE & HUTZ, LLP
1220 N MARKET STREET
P O BOX 2207
WILMINGTON, DE 19899

| EXAMINER |
| --- |
| PRICE, ELVIS O |

| ART UNIT | CLASS-SUBCLASS |
| --- | --- |
| 1621 | 570-167000 |

DATE MAILED: 03/17/2003

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO | CONFIRMATION NO |
| --- | --- | --- | --- | --- |
| 09/051,746 | 06/08/1998 | VINCENT WILMET | SLVAY3216.01 | 8363 |

TITLE OF INVENTION: METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- |
| nonprovisional | NO | $1300 | $0 | $1300 | 06/17/2003 |

THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT.
**PROSECUTION ON THE MERITS IS CLOSED.** THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS.
THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON
PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.

THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN **THREE MONTHS** FROM THE
MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. **THIS STATUTORY
PERIOD CANNOT BE EXTENDED.** SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE REFLECTS A CREDIT
FOR ANY PREVIOUSLY PAID ISSUE FEE APPLIED IN THIS APPLICATION. THE PTOL-85B (OR AN EQUIVALENT)
MUST BE RETURNED WITHIN THIS PERIOD EVEN IF NO FEE IS DUE OR THE APPLICATION WILL BE REGARDED AS
ABANDONED.

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current
SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown
above.

B. If the status is changed, pay the PUBLICATION FEE (if required)
and twice the amount of the ISSUE FEE shown above and notify the
United States Patent and Trademark Office of the change in status, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now
claiming SMALL ENTITY status, check the box below and enclose
the PUBLICATION FEE and 1/2 the ISSUE FEE shown above.

❑ Applicant claims SMALL ENTITY status.
See 37 CFR 1.27.

II. PART B - FEE(S) TRANSMITTAL should be completed and returned to the United States Patent and Trademark Office (USPTO) with
your ISSUE FEE and PUBLICATION FEE (if required). Even if the fee(s) have already been paid, Part B - Fee(s) Transmittal should be
completed and returned. If you are charging the fee(s) to your deposit account, section "4b" of Part B - Fee(s) Transmittal should be
completed and an extra copy of the form should be submitted.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to
Box ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of
maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

Page 1 of 4

PTOL-85 (REV. 04-02) Approved for use through 01/31/2004.

HON0021546

## PART B - FEE(S) TRANSMITTAL

**Complete and send this form, together with applicable fee(s), to:** **Mail** Box ISSUE FEE
Commissioner for Patents
Washington, D.C. 20231
**Fax** (703)746-4000

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 4 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and-or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Legibly mark-up with any corrections or use Block 1)

```
23416        7590      03/17/2x03
CONNOLLY BOVE LODGE & HUTZ, LLP
1220 N MARKET STREET
P O BOX 2207
WILMINGTON, DE 19899
```

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**

I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Box Issue Fee address above, or being facsimile transmitted to the USPTO, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 09/051,746 | 06/08/1998 | VINCENT WILMET | SLVAY3216.01 | 8363 |

TITLE OF INVENTION: METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE

| APPLN TYPE | SMALL ENTITY | ISSUE FEE | PUBLICATION FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|
| nonprovisional | NO | $1300 | $0 | $1300 | 06/17/2003 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| PRICE, ELVIS O | 1621 | 570-167000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47, Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list (1) the names of up to 3 registered patent attorneys or agents OR, alternatively, (2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1. _____

2. _____

3. _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. Inclusion of assignee data is only appropriate when an assignment has been previously submitted to the USPTO or is being submitted under separate cover. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE                                (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent)    ☐ individual   ☐ corporation or other private group entity   ☐ government

4a. The following fee(s) are enclosed:

☐ Issue Fee

☐ Publication Fee

☐ Advance Order - # of Copies _____

4b. Payment of Fee(s):

☐ A check in the amount of the fee(s) is enclosed.

☐ Payment by credit card. Form PTO-2038 is attached.

☐ The Commissioner is hereby authorized by charge the required fee(s), or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

Commissioner for Patents is requested to apply the Issue Fee and Publication Fee (if any) or to re-apply any previously paid issue fee to the application identified above.

_____ (Authorized Signature)            _____ (Date)

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, Washington, D.C. 20231 DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, Washington, DC 20231.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

TRANSMIT THIS FORM WITH FEE(S)

PTOL-85 (REV. 04-02) Approved for use through 01/31/2004. OMB 0651-0033    U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

# EXHIBIT 20

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Technology Center: 1621
Examiner: Alan Siegel

In re application of )

Vincent WILMET et al. )

Serial No. 09/051,746 )

Filing Date: June 8, 1998 ) **RESPONSE TO OFFICIAL**
) **ACTION OF 02/09/99**
For: METHOD FOR PREPARING )
    1, 1, 1, 3, 3-PENTAFLUOROPROPANE )
)
Attny Dkt 32232-144124 )
        (Formerly SLVAY 3216.01)) )

**Attention;     Application Processing Division**
                **Customer Correction Branch**

RESPONSE

June 9, 1999

Assistant Commissioner
  for Patents
Washington, D.C.  20231

Sir:

This paper is filed in reply to the February 9, 1999 Office Action.  A petition for

extension of time is filed under separate cover letter, with fee(s).  Should any additional

fee be required, please charge the same to our deposit account no. 19-3700, and advise us

accordingly.

Attached hereto is an excerpt from Kirk-Othmer volume 11 pages 499-515

(1994), relating to fluorinated aliphatic compounds.

HON0030817

## REMARKS

Reconsideration of the outstanding Office Action is respectfully solicited.

Applicants note that the USPTO renumbered the claims.

Applicants respectfully traverse the rejection of Claims 19-36 over Van Der Puy et al [US 5395997] in view of Decker et al [US 3862978].

Van der Puy relates to the production of hydrofluorocarbons of the formula

$$CF_3(CH_2CF_2)_nF$$

where $n = 1$ to 3. The process of forming the Van Der Puy hydrofluorocarbons comprises reacting at least one reactant selected from $CCl_3(CH_2CCl_2)_nCl$, $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$, in the presence of a fluorination catalyst, wherein HF is present in at least stoichiometric amounts per mole of reactant. Van der Puy describes the reaction of vinylidene chloride with carbon tetrachloride to give $CCl_3[(CH_2CCl_2)_nCl$ or carbon tetrachloride with vinylidene fluoride to give $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$.

Decker describes the reaction of a symmetrical alkene with a halogenated compound to form a product containing at least two halogen atoms [G and G'] and up to 4 halogen atoms. In the Examples, (1-bromo-3,3,3-trichloro-1-methylpropyl)benzene is produced from bromotrichloromethane and alpha-methyl styrene; 3-bromo-5,5,5-trichlorovaleronitrile is produced with bromotrichloromethane; 2-bromo-3-(trichloromethyl)norbornane is produced from 2-norbornene and bromotrichloromethane; and 1-chloro-2-(trichloromethyl)cyclohexane is produced from cyclohexene and carbon tetrachloride [Examples 1-4]. Carbon tetrachloride was apparently used in the remaining examples.

2

The references do not describe or suggest the claimed subject matter. The references do not describe the reactant or the product of the rejected claims. Moreover, the generic formula of Van der Puy, at, e.g., column 1, line 13, does not embrace the compounds recited in the claims. Whatever the number of carbon atoms in the Van der Puy generic formula, the number of fluorine atoms in the compounds is an even number, and never an odd number. By comparison, applicants' product contains 5 carbon atoms. Moreover, the reactants described at column 2, lines 17-18, require an even number of halogen atoms -- not an odd number of halogen atoms. There is no description in Van der Puy of how to make a halogenated organic compound with an odd number of halogen atoms.

Decker, on the other hand, excludes the possibility of making the 1,1,1,3,3-pentachloropropane. Firstly, Decker only describes the possibility of adding up to four halogen atoms to an olefin. By comparison, applicants' claims call for 5 halogen atoms. Moreover, Decker's formula for products requires a terminal $-C(R)_2-G'$ which means that one terminal carbon atoms can only contain one halogen atom, by virtue of the definition of G'. Decker differs from applicants' compound.

Thus, with respect to the differences between the two references and the claimed subject matter, the references do not describe the reactant of the claims, nor the products; in fact, by definition in each, the references exclude the product of the claim from their respective descriptions. This is underscored by the fact that, in the opinion of applicants' foreign representative, vinylidene compounds used by Van der Puy are not useful for making 1,1,1,3,3-pentachloropropane.

3

HON0030819

Attached hereto is an excerpt from Kirk-Othmer volume 11, pages 499-515 (1994), relating to fluorinated aliphatic compounds. The 1994 copyright date is about one year before the priority date of the instant application. The publication would have been used by one skilled in the art to know which hydrofluorocarbons are desirable. Kirk-Othmer does not mention 1,1,1,3,3-pentafluoropropane. Accordingly, on this record there is no motivation in the applied art to make 1,1,1,3,3-pentafluorpropane or to suggest its use as a blowing agent or propellant.

On this record the only description and motivation, independent factual inquiries, for the applicants' claims comes from applicants' disclosure, not from the prior art. This position is buttressed by the fact that the record does not describe the reactant or the product of the rejected claims. The position is emphasized by the fact that the disclosures of products in each of the applied references exclude the product of the claims and by the fact that the applied art is silent with respect to the utility of 1,1,1,3,3,-pentafluoropropane. In addition, the applied art does not enable the subject matter of the claims. Moreover, the applied art is silent with respect to claims 20-26 and 28-36, which relate to continuous reactions.

The record here provides no basis for a reasonable expectation of producing the process of the rejected claims. As noted above, the 1,1,1,3,3-pentachloropropane is structurally different from compounds fluorinated in Van der Puy, by one chlorine atom; it is structurally different from the compound of the comparative example 1 by exchange of a methyl group for a hydrogen; the compounds fluorinated in the examples of Van der Puy differ from the one in the comparative example by exchanging Cl for methyl. For said compounds, totally different behavior in fluorination reaction is observed.

4

Consequently, the behavior of 1,1,1,3,3-pentachloropropane in fluorination reaction was unpredictable over Van der Puy; hence Van der Puy provides no reasonable expectation of producing the process of the rejected claims.

Lastly, it is noted that, if the actual description of the two references to Van der Puy and Decker were combined, the literal combination would not produce the recitations of the rejected claims. Accordingly, it is believed that the grounds of rejection must be based on applicants' own disclosure, which violates of the language of Section 103(a).

Reconsideration and an early allowance are respectfully solicited.

Respectfully submitted,

Marina V. Schneller
Reg. No. 26,032

MVS:rei

VENABLE
P.O. Box 34385
Washington, D.C. 20043-9998
Telephone: (202) 962-4800
Telefax: (202) 962-8300

5

EXHIBIT 21



**UNITED STATES DEPARTMENT OF COMMERCE**
Patent and Trademark Office
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. |
|---|---|---|---|
| 09/051,746 | 06/08/98 | WILMET | SLVAY321601 |

HM22/0824

SPENCER & FRANK
1100 NEW YORK AVENUE NW
SUITE 300 EAST
WASHINGTON DC 20005-3955

| EXAMINER |
|---|
| SIEGEL, A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1621 | 10 |

DATE MAILED:    08/24/99

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

PTO-90C (Rev. 2/95)

1- File Copy

HON0030822

Application/Control Number: 09/051,746                                     Page 2

Art Unit: 1621

Claims 19-36 are again rejected under 35 U.S.C. 103(a) as being unpatentable over Van Der Puy et al in view of Decker et al for the reasons given in paper No. 6.

Applicants arguments have been carefully considered but are not deemed persuasive.

Applicants urge that the references "do not describe the reactant or the product of the rejected claims". However, the reactant of the instantly claimed process is analogous to that of the prior art. The vinylidene chloride of the prior art differs from the vinyl chloride of the instantly claimed process by one chloro substituent which carries through to the intermediate product and does not substantially affect the process. Both reactants are vinyl chlorides and one of ordinary skill in the art would expect them to react similarly. Furthermore, vinyl chloride is a well known material and one of ordinary skill in the art would have considered its use in the prior art process if the corresponding known intermediate was the desired product. The obtained intermediate of the prior art also has one more chloro substituent than the instantly claimed intermediate. However, the use of the instantly claimed intermediate in the prior art process would have been obvious to one of ordinary skill in the art because, as previously stated, it is a well known compound and there would have been a reasonable expectation that the instantly claimed known and useful product would have been produced. It is clear that utilizing reaction conditions which would replace six chlorine atoms on a chlorinated propane would be expected to replace five chlorine atoms on the corresponding less chlorinated propane.

Applicants urge that Decker does not produce 1,1,1,3,3-pentachloropropane. However, Decker discloses reactions wherein a halo alkene is reacted with a halo alkane to produce a longer

HON0030823

Application/Control Number: 09/051,746                                    Page 3

Art Unit: 1621

chain halo alkane. The chemistry of the Decker process is so similar to that of Van Der Puy that

one of ordinary skill in the art would have had a reasonable expectation that the catalyst disclosed

therein would function similarly in the Van Der Puy process.

Applicants cite Kirk-Othmer and urge that since 1,1,1,3,3-pentafluoropropane is not

mentioned therein that one of ordinary skill in the art would not find it "desirable". However, as

admitted in the instant application, 1,1,1,3,3-pentafluoropropane is a known and useful product.

Applicants urge that "in the opinion of applicants' foreign representative, vinylidene

compounds used by Van Der Puy are not useful for making 1,1,1,3,3-pentafluoropropane".

However, the instant rejection is not predicated upon the usefulness of vinylidene compounds for

making 1,1,1,3,3-pentafluoropropane.

**THIS ACTION IS MADE FINAL.**  Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until after

the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37

CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the mailing date

of this final action.

HON0030824

Application/Control Number: 09/051,746                              Page 4

Art Unit: 1621

Any inquiry concerning this communication or earlier communications from the examiner should be directed to A. Siegel whose telephone number is (703) 308-4692.

AMS
August 23, 1999

**Alan Siegel**
**Primary Examiner**
**Art Unit 1621**

| *Office Action Summary* | Application No. 09/051,746 | Applicant(s) Wilmet et al | | |
|---|---|---|---|---|
| | Examiner Alan Siegel | Group Art Unit 1621 | | |

Responsive to communication(s) filed on _____ .

☒ This action is **FINAL**.

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire ____3____ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) *19-36* _____ is/are pending in the application.

Of the above, claim(s) _____ is/are withdrawn from consideration.

☐ Claim(s) _____ is/are allowed.

☒ Claim(s) *19-36* _____ is/are rejected.

☐ Claim(s) _____ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☐ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is  ☐approved  ☐disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None  of the CERTIFIED copies of the priority documents have been

☐ received.

☐ received in Application No. (Series Code/Serial Number) _____ .

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: _____ .

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☐ Notice of References Cited, PTO-892

☒ Information Disclosure Statement(s), PTO-1449, Paper No(s). ___7___

☐ Interview Summary, PTO-413

☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

--- SEE OFFICE ACTION ON THE FOLLOWING PAGES ---

U.S. Patent and Trademark Office
PTO-326 (Rev. 9-95)                    **Office Action Summary**                    Part of Paper No. __10__

HON0030826

# EXHIBIT 22

*GP 1621*

*AF*

*#11*
*3/1/00*
*Mercer*

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Art Unit: 1621
Examiner: Alan Siegel

In re PATENT APPLICATION of:

| | | |
|---|---|---|
| Applicant(s): | Vincent WILMET, et al. | ) |
| Application No.: | 09/051,746 | ) |
| Filed: | June 8, 1998 | ) |
| For: | METHOD FOR PREPARING 1, 1, 1, 3, 3-PENTAFLUOROPROPANE | ) |
| Attorney Docket: | 32232-144124 (Formerly SLVAY 3216.01 | ) |

**NOTICE OF APPEAL**

February 24, 2000

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

Applicants hereby appeal to the Honorable Board of Appeals and Interferences from the final rejection of claims 19-36 in the final Office Action mailed August 24, 1999. This Notice of Appeal is being submitted within the response period set by the Action and is accompanied by a Notice of Appeal fee of $300.00. [Parenthetically, a petition for a three month extension with fee is filed concurrently with applicants' response to the final Office Action.] If a greater or lesser fee is required, please charge or credit Deposit Account Number 22-0261 accordingly and notify the undersigned.

Respectfully submitted,

Marina V. Schneller
Registration No. 26032
VENABLE
1201 New York Avenue, N.W., Suite 1000
Washington, D.C. 20005-3917
Telephone: (202) 926-4800
Telefax: (202) 962-8300

Address for U.S.P.T.O correspondence:
VENABLE
P.O. Box 34385
Washington, DC 20043-9998

02/25/2000 SLUXMB1 00000042 09051746
01 FC:119          300.00 BP

184807v1

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Group Art Unit: 1621
Examiner: Alan Siegel

In re application of

Vincent WILMET, et a

Serial No.: 09/051,746 )

Filing Date: June 8, 1998 )

For: METHOD FOR PREPARING )
1, 1, 1, 3, 3-PENTAFLUOROPROPANE )

Attny Dkt: 32232-144124 )
(Formerly SLVAY 3216.01) )

**RESPONSE**

February 24, 2000

Assistant Commissioner
 for Patents
Washington, D.C. 20231

Sir:

This paper is presented in response to the Office Action of August 24, 1999.

Applicants hereby respectfully petition for a three month extension of time. The requisite

fee is enclosed. Should an additional fee be required for any reason in conjunction with

the filing of this response, please charge Deposit Account 22-0261 and notify us

accordingly.

Attached hereto is a copy of a reference, **Advances in Fluoride Chemistry**,

Vol.3, p.180-183, 200-209).

HON0030828

## REMARKS

Applicants respectfully request reconsideration of the outstanding Office Action.

Specifically applicants respectfully traverse the rejection of the process claims at issue over VAN DER PUY in view of Decker. In applicants' view, the examiner's rejection of these claims over VAN DER PUY is based on the alleged 'analogy' between 1,1,1,3,3,3-hexachloropropane and 1,1,1,3,3,-pentachloropropane; an 'analogy' between vinyl chloride and vinylidene chloride, and an 'analogy' of reactivity 'expected' when using 1,1,1,3,3,-pentachloropropane with a catalyst and hydrogen fluoride. In applicants view, these issues of 'analogy' relate to a determination of the evidence of level of skill in the art, and this determination will be discussed in great detail below under the heading LEVEL OF SKILL.

Before that inquiry into LEVEL OF SKILL applicants discuss the content of the applied references.

SCOPE AND CONTENT OF THE APPLIED ART

Van der Puy relates to the production of hydrofluorocarbons of the formula

$$CF_3(CH_2CF_2)_nF$$

where n = 1 to 3. The process of forming the Van Der Puy hydrofluorocarbons comprises reacting at least one reactant selected from $CCl_3(CH_2CCl_2)_nCl$, $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$, in the presence of a fluorination catalyst, wherein HF is present in at least stoichiometric amounts per mole of reactant. Van der Puy describes the reaction of vinylidene chloride with carbon tetrachloride to give $CCl_3[(CH_2CCl_2)_nCl$ or carbon tetrachloride with vinylidene fluoride to give $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$.

Decker describes the reaction of a symmetrical alkene with a halogenated compound to form a product containing at least two halogen atoms [G and G'] and up to 4 halogen atoms. In the Examples, (1-bromo-3,3,3-trichloro-1-methylpropyl)benzene is produced from bromotrichloromethane and alpha-methyl styrene; 3-bromo-5,5,5-trichlorovaleronitrile is produced with bromotrichloromethane; 2-bromo-3-(trichloromethyl)norbornane is produced from 2-norbornene and bromotrichloromethane;

2

HON0030829

and 1-chloro-2-(trichloromethyl)cyclohexane is produced from cyclohexene and carbon tetrachloride [Examples 1-4]. Carbon tetrachloride was apparently used in the remaining examples.

DIFFERENCES BETWEEN THE APPLIED ART AND THE CLAIMS

The references do not describe or suggest the claimed subject matter. The references do not describe the reactant or the product of the rejected claims. Moreover, the generic formula of Van der Puy, at, e.g., column 1, line 13, does not embrace the compounds recited in the claims. Whatever the number of carbon atoms in the Van der Puy generic formula, the number of fluorine atoms in the compounds is an even number, and never an odd number. By comparison, applicants' product contains 5 halogen atoms. Moreover, the reactants described at column 2, lines 17-18, require an even number of halogen atoms -- not an odd number of halogen atoms. There is no description in Van der Puy of how to make a halogenated organic compound with an odd number of halogen atoms.

Decker, on the other hand, excludes the possibility of making the 1,1,1,3,3-pentachloropropane. Firstly, Decker only describes the possibility of adding up to four halogen atoms to an olefin. By comparison, applicants' claims call for 5 halogen atoms. Moreover, Decker's formula for products requires a terminal $-C(R)_2-G'$ which means that one terminal carbon atoms can only contain one halogen atom, by virtue of the definition of G'. Decker differs from applicants' compound.

Thus, with respect to the differences between the two references and the claimed subject matter, the references do not describe the reactant of the claims, nor the products; in fact, by definition in each, the references exclude the product of the claim from their respective descriptions.

LEVEL OF SKILL IN THE ART

On this record there is no motivation in the applied art to make 1,1,1,3,3-pentafluorpropane or to suggest its use as a blowing agent or propellant, as there is no description of the compound in the applied art. On this record, there is no motivation to use vinyl chloride for any purpose including applicants' process. Absent any motivation derivable from the applied art, the USPTO turns to 'expectation of success.' In view of

3

the description deficiencies, in applicants' view, the evidence does not establish a basis to assert 'expectation of success'.

It is applicants' understanding that the examiner's rejection of the claims over VAN DER PUY is based on the alleged analogy of 1,1,1,3,3,3-hexachloropropane and 1,1,1,3,3,-**penta**chloropropane, and, on the basis of that alleged analogy, the USPTO suggests that alleged analogy would convey a reasonable expectation of success when using 1,1,1,3,3,-**penta**chloropropane with a catalyst and hydrogen fluoride in analogy to VAN DER PUY. The record is devoid of evidence to support such an analogy. Moreover, applicants present a reference <u>Advances in Fluoride Chemistry</u>, Vol.3, p.180-183, 200-209) relating to the synthesis of 2,2-dihydrofluoropropanes, which directly disputes that inference of any analogy

With respect to claims 19-26 relating to the hydrofluorination step, the reference describes: The reference teaches (p. 207, 3rd paragraph) that 1,1,1,3,3,3-hexafluoro-propane which is produced in VAN DER PUY can be obtained with 85% yield by fluorination of 1,3-dibromo-1,1,3,3-tetrafluoropropane, which has the same substitution pattern as the 1,1,1,3,3,3-hexachloropropane in VAN DER PUY in presence of antimony catalyst at 100°C.

The reference teaches further (p. 207, 4th paragraph) that 1,1,1,3,3-pentafluoro-propane which is produced in the process of the invention is reportedly **not** observed when fluorinating of 1,3-dibromo-1,1,3,-trifluoropropane, which has the same substitution pattern as the 1,1,1,3,3-pentachloropropane in the process of the invention in presence of antimony catalyst at 125°C.

Thus the reference appears to develop the two following points:

1. That synthesizing 1,1,1,3,3-pentafluoropropane from a 1,1,1,3,3-pentahalopropane is, if it is possible at all, much more difficult than obtaining 1,1,1,3,3,3-hexafluoropropane from 1,1,1,3,3,3-halopropane.

2. That within the same 1,1,1,3,3,- -pentahalobutane the trihalomethyl group is fluorinated more easily and no fluorination at all is reported for the dihalomethyl group subjected to the same conditions.

The enclosed reference disputes the existence of the alleged analogy, between the 1,1,1,3,3,3-hexahexachloropropane fluorinated in VAN DER PUY and the 1,1,1,3,3-

4

HON0030831

pentachloropropane starting material used in the invention. Consequently, the instant invention does not appear to be derivable from the VAN DER PUY description.

Applicants note that Van der Puy is silent with respect to (renumbered) claims 20-22. Actually VAN DER PUY does not contain any suggestion even as to the catalyst/**hexa**chloropropane ratio to be maintained in a <u>continuous</u> process. Furthermore it does not contain any suggestion to draw off **hexa**fluoropropane and HC1, **as they are being formed**.

Concerning the telomerisation process, it is underscored that vinyl chloride is different from vinylidene chloride. As demonstrated above, substituting chlorine for hydrogen in an organic molecule may have a drastic impact on the reactivity of that molecule in a chemical reaction. No description in the prior art applied would justify the allegation that that the vinyl chloride in the process of the invention would be expected to behave analogously to the vinylidene chloride in the VAN DER PUY process.

On this record the only description and motivation, independent factual inquiries, for the applicants' claims comes from applicants' disclosure, not from the prior art. This position is buttressed by the fact that the record does not describe the reactant or the product of the rejected claims. The position is emphasized by the fact that the disclosures of products in each of the applied references exclude the product of the claims and by the fact that the applied art is silent with respect to the utility of 1,1,1,3,3,-pentafluoropropane. In addition, the applied art does not enable the subject matter of the claims. Moreover, the applied art is silent with respect to claims 20-26 and 28-36, which relate to continuous reactions.

The record here provides no basis for a reasonable expectation of producing the process of the rejected claims. As noted above, the 1,1,1,3,3-pentachloropropane is structurally different from compounds fluorinated in Van der Puy, by one chlorine atom; it is structurally different from the compound of the comparative example 1 by exchange of a methyl group for a hydrogen; the compounds fluorinated in the examples of Van der Puy differ from the one in the comparative example by exchanging Cl for methyl. For said compounds, totally different behavior in fluorination reaction is observed. Consequently, the behavior of 1,1,1,3,3-pentachloropropane in fluorination reaction was

5

HON0030832

unpredictable over Van der Puy; hence Van der Puy provides no reasonable expectation of producing the process of the rejected claims.

Lastly, it is noted that, if the actual description of the two references to Van der Puy and Decker were combined, the literal combination would not produce the recitations of the rejected claims. Accordingly, it is believed that the grounds of rejection must be based on applicants' own disclosure, which violates of the language of Section 103(a).

The Examiner is respectfully invited to call the undersigned concerning matters which would place the case in condition for allowance.

Reconsideration and an early allowance are respectfully solicited.

Respectfully submitted,

Marina V. Schneller
Reg. No. 26,032

MVS:ww

VENABLE
P.O. Box 34385
Washington, D.C. 20043-9998
Telephone: (202) 962-4800
Telefax: (202) 962-8300
184742v1

6

HON0030833

# EXHIBIT 23



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 09/051,746 | 06/08/98 | WILMET | V | SLVAY321601 |

HM22/0303

SPENCER & FRANK
1100 NEW YORK AVENUE NW
SUITE 300 EAST
WASHINGTON DC 20005-3955

| EXAMINER |
|---|
| SIEGEL, A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1621 | 13 |

DATE MAILED:
03/03/00

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

HON0030844

| | | Application No. 09/051,746 | Applicant(s) Wilmet et al | |
|---|---|---|---|---|
| ***Advisory Action*** | | Examiner **Alan Siegel** | Group Art Unit **1621** | |

THE PERIOD FOR RESPONSE: [check only a) or b)]

a) ☐ expires _____ months from the mailing date of the final rejection.

b) ☐ expires either three months from the mailing date of the final rejection, or on the mailing date of this Advisory Action, whichever is later. In no event, however, will the statutory period for the response expire later than six months from the date of the final rejection.

Any extension of time must be obtained by filing a petition under 37 CFR 1.136(a), the proposed response and the appropriate fee. The date on which the response, the petition, and the fee have been filed is the date of the response and also the date for the purposes of determining the period of extension and the corresponding amount of the fee. Any extension fee pursuant to 37 CFR 1.17 will be calculated from the date of the originally set shortened statutory period for response or as set forth in b) above.

☒ Appellant's Brief is due two months from the date of the Notice of Appeal filed on _____2/24/00_____ (or within any period for response set forth above, whichever is later). See 37 CFR 1.191(d) and 37 CFR 1.192(a).

Applicant's response to the final rejection, filed on _____ has been considered with the following effect, but is NOT deemed to place the application in condition for allowance:

☐ The proposed amendment(s):

☐ will be entered upon filing of a Notice of Appeal and an Appeal Brief.

☐ will not be entered because:

☐ they raise new issues that would require further consideration and/or search. (See note below).

☐ they raise the issue of new matter. (See note below).

☐ they are not deemed to place the application in better form for appeal by materially reducing or simplifying the issues for appeal.

☐ they present additional claims without cancelling a corresponding number of finally rejected claims.

NOTE: _____
_____
_____
_____

☐ Applicant's response has overcome the following rejection(s): _____
_____

☐ Newly proposed or amended claims _____ would be allowable if submitted in a separate, timely filed amendment cancelling the non-allowable claims.

☒ The affidavit, exhibit or request for reconsideration has been considered but does NOT place the application in condition for allowance because:
*the evidence presented after final ("Advances in Fluoride Chemistry") will not be entered and has not been considered because it is not directed to issues which were newly raised in the final rejection.*

☐ The affidavit or exhibit will NOT be considered because it is not directed SOLELY to issues which were newly raised by the Examiner in the final rejection.

☒ For purposes of Appeal, the status of the claims is as follows (see attached written explanation, if any):

Claims allowed: _____

Claims objected to: _____

Claims rejected: *19-36* _____

☐ The proposed drawing correction filed on _____ ☐has ☐has not been approved by the Examiner.

☐ Note the attached Information Disclosure Statement(s), PTO-1449, Paper No(s). _____ .

☐ Other

**ALAN SIEGEL**
**PRIMARY EXAMINER**
**ART UNIT 1621**

HON0030845

# EXHIBIT 24



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|---|
| 09/051,746 | 06/08/98 | | WILMET | V | SLVAY3216.01 |

HM22/0531

SPENCER & FRANK
1100 NEW YORK AVENUE NW
SUITE 300 EAST
WASHINGTON DC 20005-3955

| EXAMINER |
|---|
| SIEGEL,A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1621 | 17 |

DATE MAILED:
05/31/00

Please find below and/or attached an Office communication concerning this application or
proceeding.

Commissioner of Patents and Trademarks

HON0030858

Application/Control Number: 09/051,746                                Page 2

Art Unit: 1621

Claims 19-21 and 23-42 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Van Der Puy et al in view of Decker et al.

The claims are rejected for the reasons given in papers No. 6 and 10.

Van Der Puy et al disclose a process wherein carbon tetrachloride is reacted with

vinylidene chloride to produce 1,1,1,3,3,3-hexachloropropane. The reaction is conducted in the

presence of a copper catalyst (See Example 1). The resulting product is reacted with HF in the

presence of a catalyst which includes Sn, Ti and Ta (col. 2, lines 65+) at a temperature of 125 C

and a pressure of 400 psig (See Example 3). Thus, Van Der Puy et al disclose the instantly

claimed process except for the use of a different and analogous starting material. It would have

been obvious to one of ordinary skill in the art to utilize the starting material of the instantly

claimed process in the process of Van Der Puy et al because there would have been a reasonable

expectation of obtaining the corresponding analogous product, namely 1,1,1,3,3-

pentafluoropropane. This reasonable expectation would have motivated one of ordinary skill

because the expected analogous product is a known and useful compound.

Decker et al discloses the use of a copper and amine catalyst in a process similar to the

first step (Example 1) of Van Der Puy et al. In view of the similarity of the processes it would

have been obvious to one of ordinary skill in the art to use such a catalyst in the Van Der Puy

process.

Applicants present no new arguments for patentability and the arguments previously

presented were addressed as follows.

Application/Control Number: 09/051,746                                         Page 3

Art Unit: 1621

      Applicants urge that the references "do not describe the reactant or the product of the

rejected claims". However, the reactant of the instantly claimed process is analogous to that of the

prior art. The vinylidene chloride of the prior art differs from the vinyl chloride of the instantly

claimed process by one chloro substituent which carries through to the intermediate product and

does not substantially affect the process. Both reactants are vinyl chlorides and one of ordinary

skill in the art would expect them to react similarly. Furthermore, vinyl chloride is a well known

material and one of ordinary skill in the art would have considered its use in the prior art process

if the corresponding known intermediate was the desired product. The obtained intermediate of

the prior art also has one more chloro substituent than the instantly claimed intermediate.

However, the use of the instantly claimed intermediate in the prior art process would have been

obvious to one of ordinary skill in the art because, as previously stated, it is a well known

compound and there would have been a reasonable expectation that the instantly claimed known

and useful product would have been produced. It is clear that utilizing reaction conditions which

would replace six chlorine atoms on a chlorinated propane would be expected to replace five

chlorine atoms on the corresponding less chlorinated propane.

HON0030860

Application/Control Number: 09/051,746                                    Page 4

Art Unit: 1621

Applicants urge that Decker does not produce 1,1,1,3,3-pentachloropropane. However, Decker discloses reactions wherein a halo alkene is reacted with a halo alkane to produce a longer chain halo alkane. The chemistry of the Decker process is so similar to that of Van Der Puy that one of ordinary skill in the art would have had a reasonable expectation that the catalyst disclosed therein would function similarly in the Van Der Puy process.

Applicants cite Kirk-Othmer and urge that since 1,1,1,3,3-pentafluoropropane is not mentioned therein that one of ordinary skill in the art would not find it "desirable". However, as admitted in the instant application, 1,1,1,3,3-pentafluoropropane is a known and useful product.

Applicants urge that "in the opinion of applicants' foreign representative, vinylidene compounds used by Van Der Puy are not useful for making 1,1,1,3,3-pentafluoropropane". However, the instant rejection is not predicated upon the usefulness of vinylidene compounds for making 1,1,1,3,3-pentafluoropropane.

The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Claims 19-21 and 23-42 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

The recitation "group derivative of a metal" (claim 39) is indefinite as to the meaning of "group derivative" in the context used.

Application/Control Number: 09/051,746                              Page 5

Art Unit: 1621


    Claim 19 is indefinite I its entirety.


    Any inquiry concerning this communication or earlier communications from the examiner should be directed to A. Siegel whose telephone number is (703) 308-4692.


AMS
May 30, 2000

    **Alan Siegel**
    **Primary Examiner**
    **Art Unit 1621**

HON0030862

| **Office Action Summary** | Application No. 09/051,746 | Applicant(s) Wilmet et al | |
|---|---|---|---|
| | Examiner Alan Siegel | Group Art Unit 1621 | |

☒ Responsive to communication(s) filed on _4/21/00_ .

☒ This action is **FINAL**.

☐ Since this application is in condition for allowance except for formal matters, **prosecution as to the merits is closed** in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire _____3_____ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) _19-21 and 23-42_ is/are pending in the application.

☐ Of the above, claim(s) _____ is/are withdrawn from consideration.

☐ Claim(s) _____ is/are allowed.

☒ Claim(s) _19-21 and 23-42_ is/are rejected.

☐ Claim(s) _____ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☐ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is ☐approved ☐disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ ☐ All ☐ Some* ☐ None of the CERTIFIED copies of the priority documents have been

☐ received.

☐ received in Application No. (Series Code/Serial Number) _____ .

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: _____ .

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☐ Notice of References Cited, PTO-892

☒ Information Disclosure Statement(s), PTO-1449, Paper No(s). _16_

☐ Interview Summary, PTO-413

☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

--- *SEE OFFICE ACTION ON THE FOLLOWING PAGES* ---

U.S. Patent and Trademark Office
0-326 (Rev. 9-95)                    Office Action Summary                    Part of Paper No. _17_

HON0030863

# EXHIBIT 25



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address:   COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | | ATTORNEY DOCKET NO. |
|---|---|---|---|---|
| 09/051,746 | 06/08/98 | WILMET | V | SLVAY3216.01 |

HM22/1013

SPENCER & FRANK
1100 NEW YORK AVENUE NW
SUITE 300 EAST
WASHINGTON DC 20005-3955

| EXAMINER |
|---|
| SIEGEL, A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1621 | 19 |

DATE MAILED:   10/13/00

**Please find below and/or attached an Office communication concerning this application or proceeding.**

Commissioner of Patents and Trademarks

HON0030877

Application/Control Number: 09/051,746                                  Page 2

Art Unit: 1621

Claims 43-64 are rejected under 35 U.S.C. 103(a) as being unpatentable over Van Der

Puy et al in view of Decker et al.

The claims are rejected for the reasons given in papers No. 6, 10 and 17.

Applicants arguments have been carefully considered but are not deemed persuasive.

The Van Der Puy et al reference discloses a process wherein the reaction is conducted

under liquid phase conditions and wherein HCl and product are continuously removed in a gas

phase overhead stream (col. 3, lines 14-26). Applicants urge that this process is "entirely

different" from the instantly claimed process. It has been repeatedly pointed out that Van Der Puy

reacts an analogous starting material in a similar process to produce the corresponding analogous

product. Applicants have repeatedly disagreed with this position and an issue has clearly been

reached.

Applicants urge that Decker is "completely irrelevant". It is not "completely irrelevant" as

repeatedly pointed out in previous Office actions. Clearly an issue has been reached.

HON0030878

Application/Control Number: 09/051,746                                    Page 3

Art Unit: 1621

**THIS ACTION IS MADE FINAL.** Applicant is reminded of the extension of time

policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action. In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until after

the end of the THREE-MONTH shortened statutory period, then the shortened statutory period

will expire on the date the advisory action is mailed, and any extension fee pursuant to 37

CFR 1.136(a) will be calculated from the mailing date of the advisory action. In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the mailing date

of this final action.

Any inquiry concerning this communication or earlier communications from the examiner
should be directed to A. Siegel whose telephone number is (703) 308-4692.

AMS
October 10, 2000

**Alan Siegel**
**Primary Examiner**
**Art Unit 1621**

HON0030879

| **Office Action Summary** | Application No. 09/051,746 | Applicant(s) Wilmet et al |
|---|---|---|
| | Examiner Alan Siegel | Group Art Unit 1621 |

☒ Responsive to communication(s) filed on *8/30/00* .

☒ This action is FINAL.

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire _____ *3* _____ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

**Disposition of Claims**

☒ Claim(s) *43-64* _____ is/are pending in the application.

Of the above, claim(s) _____ is/are withdrawn from consideration.

☐ Claim(s) _____ is/are allowed.

☒ Claim(s) *43-64* _____ is/are rejected.

☐ Claim(s) _____ is/are objected to.

☐ Claims _____ are subject to restriction or election requirement.

**Application Papers**

☐ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is ☐approved ☐disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

**Priority under 35 U.S.C. § 119**

☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

    ☐ All ☐ Some* ☐ None   of the CERTIFIED copies of the priority documents have been

        ☐ received.

        ☐ received in Application No. (Series Code/Serial Number) _____ .

        ☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    *Certified copies not received: _____ .

☐ Acknowledgement is made of a claim for domestic priority under 35 U.S.C. § 119(e).

**Attachment(s)**

☐ Notice of References Cited, PTO-892

☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). _____

☐ Interview Summary, PTO-413

☐ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

--- *SEE OFFICE ACTION ON THE FOLLOWING PAGES* ---

HON0030880

EXHIBIT 26

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of

Vincent WILMET et al.

Serial No.      09/051,746

Filing Date     June 8, 1998

For      METHOD FOR PREPARING
         1, 1, 3, 3-PENTAFLUOROPROPANE

Group Art Unit:  1621

Examiner: A. SIEGEL

Attny Dkt: 32232-144124

August 30, 2000

RF   ·ED

SEP 01 2000

TECH CENTER 1600/2900

#18/C
9/7/00
Immun

### AMENDMENT

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

This paper is presented in response to the Office Action of May 31, 2000.

Please amend the application as follows:

### IN THE CLAIMS

Please cancel the claims 19-42 and substitute therefor the following claims:

-- 43. In a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst, the improvement which comprises carrying out the reaction at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and isolating and 1,1,1,3,3-pentafluoropropane from

12

HON0030864

the reaction mixture by drawing off 1,1,1,3,3-pentafluoropropane and hydrogen chloride in a gaseous phase as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed.--

-- 44. The process of Claim 43, which comprises conducting the reaction continuously in a liquid phase and maintaining a molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000. --

--45. The process of Claim 44, wherein the molar ratio of the catalyst to 1,1,1,3,3-pentachloroproprane is greater than 0.5.--

--46. The process of Claim 43 wherein from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloroproprane.--

--47. The process of Claim 43 wherein the reaction is carried out at a temperature of approximately 50 to 150° C.--

--48. The process of Claim 43 wherein the 1,1,1,3,3-pentachloroproprane is prepared by reaction between vinyl chloride and tetrachloromethane.--

--49. The process of Claim 43, wherein the hydrofluorination catalyst is selected from the group consisting of derivatives of metals of Groups IIIa, IVa, IVb, Va, Vb and VIb of the periodic table.--

2

09/051,746



8
--50. The process of Claim 49, wherein the hydrofluorination catalyst is a RECEIVED

SEP 01 2008

TECH CENTER 1600/2900
derivative of a metal selected from the group consisting of titanium and tin.--

9
--51. The process of Claim 49, wherein the pentachloropropane is reacted
with hydrogen fluoride in the presence of a hydrofluorination catalyst.--

10
--52. The process of Claim 49, wherein the hydrofluorination catalyst is
selected from the group consisting of tin and antimony chlorides, fluorides and
chlorofluorides.--

11
--53. The process of Claim 49, wherein the catalyst is antimony
pentachloride.--

12
--54. In a process for the preparation of 1,1,1,3,3-pentafluoropropane
comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the
presence of a hydrofluorination catalyst, the improvement which comprises carrying
out the reaction in a reactor equipped with a device for drawing off a gas stream at a
temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous
and wherein said device is controlled (a) to draw off a gas stream comprising
1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3-
pentafluoropropane and hydrogen chloride is being formed thereby isolating said
1,1,1,3,3-pentafluoropropane from the reaction mixture (b) to keep in the reactor in

3

14

09/051,746

the liquid state the unconverted 1,1,1,3,3-pentachloropropane, most of the hydrogen

fluoride and most of the products of partial fluorination of 1,1,1,3,3-

pentachloropropane.--

--55. The process of Claim 54, which comprises conducting the reaction

continuously in a liquid phase and maintaining a molar ratio of the catalyst to

1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000. --

--56. The process of Claim 55, wherein the molar ratio of the catalyst to

1,1,1,3,3-pentachloroproprane is greater than 0.5.--

--57. The process of Claim 54, wherein from 5 to 100 moles of hydrogen

fluoride are used per mole of 1,1,1,3,3-pentachloroproprane.--

--58. The process of Claim 54, wherein the reaction is carried out at a

temperature of approximately 50 to 150° C.--

--59. The process of Claim 54, wherein the 1,1,1,3,3-pentachloroproprane  is

prepared by reaction between vinyl chloride and tetrachloromethane.--

--60. The process of Claim 54, wherein the hydrofluorination catalyst is

selected from the group consisting of derivatives of metals of Groups IIIa, IVa, IVb,

Va, Vb and VIb of the periodic table.--

4



09/051,746

HON0030867

19
--61.    The process of Claim 60, wherein the hydrofluorination catalyst is a

derivative of a metal selected from the group consisting of titanium and tin.--

20
--62.    The process of Claim 60, wherein the pentachloropropane is reacted

with hydrogen fluoride in the presence of a hydrofluorination catalyst.--

21
--63.    The process of Claim 60, wherein the hydrofluorination catalyst is

selected from the group consisting of tin and antimony chlorides, fluorides and

chlorofluorides.--

22
--64.    The process of Claim 60, wherein the catalyst is antimony

pentachloride.--

## REMARKS

Reconsideration of the outstanding Office Action is respectfully solicited.

Applicants have canceled certain claims but do not disclaim the subject matter

thereof and reserve the right to file continuation/division application(s) based thereon.

New Claim 43 is based on prior Claim 19. Support for independent Claim 54 appears

at p.3, 1.34-p.4, 1.3. The remaining claims are based on the previously considered

claims. Claims 43-45 correspond to Claims 19-21; Claims 46 et seq are based on

prior claims 46 et seq.

Applicants note the rejection of prior claims under 35 USC 112 second

paragraph. The rejections are moot in view of cancellation of the claims rejected

under 35 USC 112.

5

09/051,746

Applicants respectfully traverse the rejections of claims under 35 USC 103 over Van Der Puy [hereinafter Van Der Puy '997 and Decker, as applied by the USPTO, and also consider the Van Der Puy reference [hereinafter Van Der Puy '192 cited in applicants' most recent Information Disclosure Statement thereafter.] The error in the art rejection is foreshadowed by the fact that the references alone and the references in combination do not describe the recitations in applicants' claims. The references applied by the USPTO do not describe or suggest the claimed subject matter. The references do not describe the reactant or the product of the rejected claims or the conditions.

Decker is completely irrelevant to the pending claims and to Van Der Puy '997. Since Decker reference is irrelevant to the Claims and since the Decker reference does not provide an expression, i.e., a description, to modify the Van Der Puy '997 reference disclosure for any purpose, the combination of the Decker reference with Van Der Puy does not follow logically to the person of ordinary skill who is neither motivated by the descriptions of 'the combination' nor imbued with an expectation of success to achieve the rejected claimed subject matter. Specifically, Decker excludes the possibility of making the 1,1,1,3,3-pentachloropropane.

Van Der Puy '997 is directed to an entirely different process and product from that claimed. Moreover, Van Der Puy '997 is directed to an entirely different process from that described in Decker. The Decker halogenation of olefins is distinct from that synthesis which is described in VanDerPuy '997. VANDERPUY '997 describes synthesis of 1,1,1,3,3,3-hexafluoropropane. Van der Puy relates to the production of hydrofluorocarbons of the formula

$$CF_3(CH_2CF_2)_nF$$

6

09/051,746



where $n = 1$ to 3. The process of forming the Van Der Puy '997 hydrofluorocarbons comprises reacting at least one reactant selected from $CCl_3(CH_2CCl_2)_nCl$, $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$, in the presence of a fluorination catalyst, wherein HF is present in at least stoichiometric amounts per mole of reactant. Van der Puy describes the reaction of vinylidene chloride with carbon tetrachloride to give $CCl_3[(CH_2CCl_2)_nCl$ or carbon tetrachloride with vinylidene fluoride to give $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$.

Moreover, the generic formula of Van der Puy '997, at, e.g., column 1, line 13, does not embrace the compounds recited in the claims. Whatever the number of carbon atoms in the Van der Puy generic formula, the number of fluorine atoms in the compounds is an even number, and never an odd number. By comparison, applicants' product contains 5 halogen atoms. Moreover, the reactants described at column 2, lines 17-18, require an even number of halogen atoms -- not an odd number of halogen atoms. There is no description in Van der Puy of how to make a halogenated organic compound with an odd number of halogen atoms.

Thus, not only does Van Der Puy '997 fail to describe the compound of the rejected claims, but also does Decker fails to describe that compound. Decker only describes the possibility of adding up to four halogen atoms to an olefin. By comparison, applicants' claims call for compounds with 5 halogen atoms. Moreover, Decker's formula for products requires a terminal $-C(R)_2-G'$ which means that one terminal carbon atoms can only contain one halogen atom, by virtue of the definition of G'. Decker's compound differs from applicants' compound. With respect to a process, Decker describes the reaction of a symmetrical alkene with a halogenated compound to form a product containing at least two halogen atoms [G and G'] and up

7

09/051,746

HON0030870

to 4 halogen atoms. In the Examples, (1-bromo-3,3,3-trichloro-1-methylpropyl)benzene is produced from bromotrichloromethane and alpha-methyl styrene; 3-bromo-5,5,5-trichlorovaleronitrile is produced with bromotrichloromethane; 2-bromo-3-(trichloromethyl)norbornane is produced from 2-norbornene and bromotrichloromethane; and 1-chloro-2-(trichloromethyl)cyclohexane is produced from cyclohexene and carbon tetrachloride [Examples 1-4]. Carbon tetrachloride was apparently used in the remaining examples.

The USPTO cites the Decker reference for description of the Decker catalyst. The Decker catalyst is not the subject of the applicants' claims. The Decker <u>catalysis</u> is distinctly different from that described in Van Der Puy '997 and from that recited in the rejected claims.

Both independent claims are limited to a hydrofluorination process of 1,1,1,3,3-pentachloropropane in presence of a catalyst <u>at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous</u>. It is submitted that in view of this limitation, 1,1,1,3,3-pentafluoropropane which has an atmospheric boiling point of +14° C is not analogous to 1,1,1,3,3,3-hexafluoropropane which has an atmospheric boiling point of -1° C.

Specifically applicants respectfully traverse the rejection of the process claims at issue over VAN DER PUY '997 in view of Decker. In applicants' view, the examiner's rejection of these claims over VAN DER PUY is based on the alleged 'analogy' between 1,1,1,3,3,3-hexachloropropane and 1,1,1,3,3,-**penta**chloropropane; an 'analogy' between vinyl chloride and vinylidene chloride, and an 'analogy' of reactivity 'expected' when using 1,1,1,3,3,-**penta**chloropropane with a catalyst and

8

09/051,746

hydrogen fluoride. In applicants view, these issues of 'analogy' relate to a determination of the evidence of level of skill in the art, and this determination has been previously discussed.

No motivation is provided by Van Der Puy '997 with Decker to make 1,1,1,3,3-pentafluorpropane or to suggest its use as a blowing agent or propellant, as there is no description of the compound in the applied art. Absent any motivation derivable from the applied art, the USPTO turns to 'expectation of success.' In view of the description deficiencies, in applicants' view, the evidence does not establish a basis to assert 'expectation of success'.

It is applicants' understanding that the examiner's rejection of the claims over VAN DER PUY '997 is based on the alleged analogy of 1,1,1,3,3,3-hexachloropropane and 1,1,1,3,3,-**penta**chloropropane, and, on the basis of that alleged analogy, the USPTO suggests that alleged analogy would convey a reasonable expectation of success when using 1,1,1,3,3,-**penta**chloropropane with a catalyst and hydrogen fluoride in analogy to VAN DER PUY. The record is devoid of evidence to support such an analogy. Moreover, applicants presented a reference Advances in Fluoride Chemistry, Vol.3, p.180-183, 200-209) relating to the synthesis of 2,2-dihydrofluoropropanes, which directly disputes that inference of any analogy.

The only description and motivation, independent factual inquiries, for the applicants' claims comes from applicants' disclosure, not from the applied prior art. This position is buttressed by the fact that the USPTO rejection does not describe the reactant or the product of the rejected claims. The position is emphasized by the fact that the disclosures of products in each of the applied references exclude the product of the claims and by the fact that the applied art is silent with respect to the utility of

9

09/051,746

HON0030872

1,1,1,3,3,-pentafluoropropane. In addition, the applied art does not enable the subject matter of the claims. Moreover, the applied art is silent with respect to claims 20-26 and 28-36, which relate to continuous reactions.

The record here provides no basis for a reasonable expectation of producing the process of the rejected claims. As noted above, the 1,1,1,3,3-pentachloropropane is structurally different from compounds fluorinated in Van der Puy, by one chlorine atom; it is structurally different from the compound of the comparative example 1 by exchange of a methyl group for a hydrogen; the compounds fluorinated in the examples of Van der Puy differ from the one in the comparative example by exchanging Cl for methyl. For said compounds, totally different behavior in fluorination reaction is observed. Consequently, the behavior of 1,1,1,3,3-pentachloropropane in fluorination reaction was unpredictable over Van der Puy '997; hence Van der Puy '997 provides no reasonable expectation of producing the process of the rejected claims.

Lastly, it is noted that, if the actual description of the two references to Van der Puy and Decker were combined, the literal combination would not produce the recitations of the rejected claims. Accordingly, it is believed that the grounds of rejection must be based on applicants' own disclosure, which violates of the language of Section 103(a).

The claims are now directed to a hydrofluorination process of 1,1,1,3,3-pentachloropropane to produce 1,1,1,3,3-pentafluoropropane under specific process conditions.

10

09/051,746

HON0030873

Both independent claims are limited to a hydrofluorination process of 1,1,1,3,3-pentachloropropane in presence of a catalyst <u>at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous</u>. It is submitted that in view of this limitation, 1,1,1,3,3-pentafluoropropane which has an atmospheric boiling point of +14° C is not analogous to 1,1,1,3,3,3-hexafluoropropane which has an atmospheric boiling point of -1° C.

Applicants note Van Der Puy '192 which was cited by applicants in the April 21, 2000 Information Disclosure. The instant claim 43 requires the reaction <u>at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous</u> and <u>isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture</u> by drawing off 1,1,1,3,3-pentafluoropropane and hydrogen chloride in a gaseous phase as each of said <u>1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed</u>. Example 3 of VANDERPUY '192 describes a hydrofluorination process of 1,1,1,3,3-pentachloropropane in presence of a catalyst wherein <u>hydrogen chloride</u> is periodically vented.

VANDERPUY '192 does not provide motivation:

(a)      to select carrying out the reaction at a temperature and under a pressure at which    1,1,1,3,3-pentafluoropropane is gaseous,

(b)      to draw off in vapour phase <u>1,1,1,3,3-pentafluoropropane</u> and hydrogen chloride as each    of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed.

11

09/051,746

HON0030874

In fact, as stated on p. 3, 1.13-15 of the application, the process of the invention enables 1,1,1,3,3-pentafluoropropane to be easily separated from the reaction mixture, which is an advantage as it makes it possible to retain or to return to the reactor the unconverted reactants and chlorofluoropropanes possibly formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane (see p. 3, 1.28-30).

This advantage is even more apparent in the second independent claim which is limited to a process wherein the reaction is carried out in a reactor equipped with a device for drawing off a gas stream which is controlled.

> (a)    to draw of a gas stream of 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed thereby   isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture.

> (b)    to keep in the reactor in the liquid state the unconverted 1,1,1,3,3-pentachloropropane, most of the hydrogen fluoride and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.

Feature (b) is not suggested in VANDERPUY '192.

The claimed process is particularly suitable for carrying out the manufacture of 1,1,1,3,3-pentafluoropropane in a continuous mode, as claimed in claim 44.

In sum, the inventive process provides specific instructions how to advantageously operate a process for the preparation of 1,1,1,3.3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride by using embodiments which are neither taught nor suggested in VANDERPUY '192.

Reconsideration and early allowance are respectfully solicited.

12

09/051,746

Should any additional fee be required, please charge the same to our deposit

account #22-0261, and advise us accordingly.

Respectfully submitted,

Marina V. Schneller
Reg. No. 26,032

MVS:pw

VENABLE
P.O. Box 34385
Washington, D.C. 20043-9998
Telephone: (202) 962-4800
Telefax: (202) 962-8300

DC2#237603

13

09/051,746

HON0030876

# EXHIBIT 27

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Group Art Unit: 1621
Examiner: A. Spiegel

In re Patent Application of

Applicants:        Vincent WILMET et al

Application No.:   09/051,746

Filed      :       June 8, 1998                          )
                                                         )    NOTICE
For        :       METHOD FOR PREPARING                  )    OF APPEAL
                   1, 1, 3, 3-PETAFLUOROPROPANE          )
                                                         )
Atty. Dkt.:        32232-144124                          )
                                                         )_____
                                                              **January 12, 2001**

Assistant Commissioner for Patents
Washington, D.C.  20231

Sir:

Applicants hereby appeal to the Honorable Board of Appeals and Interferences from the

final rejection of claims 43-64 in the final Office Action mailed October 13, 2000.  This Notice

of Appeal is being submitted within the response period set by the Action and is accompanied by

a Notice of Appeal check for the fee of $310.00.  If a greater or lesser fee is required, please

charge or credit Deposit Account No. 22-0261 and advise us accordingly.

01/16/2001 CVORACHA 00000069 09051746
01 FC:119                    310.00 OP

Respectfully submitted,

Marina V. Schneller
Reg. No. 26,032

VENABLE
P.O. Box 34385
Washington, D.C.  20043-9998
Telephone: (202) 962-4800
Telefax:  (202) 962-8300

#260162

HON0030881

EXHIBIT 28

AF#195
.1621
#21
3/16/01
American

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

_(stamp: P.E. MAR 13 2001 PATENT & TRADEMARK OFFICE)_

Group Art Unit: 1621
Examiner: A. SIEGEL

In re Patent application of:

| | | |
|---|---|---|
| Applicant: | Vincent WILMET et al. | ) |
| | | ) |
| Application No.: | 09/051,746 | ) |
| | | ) |
| Filing Date: | June 8, 1998 | ) |
| | | ) |
| Attny Dkt: | 32232-144124 | ) |
| | | ) |
| For: | METHOD FOR PREPARING | ) |
| | 1, 1, 3, 3-PENTAFLUOROPROPANE | ) |

**BRIEF ON APPEAL**

## RECEIVED

MAR 1 5 2001

TECH CENTER 1600/2900

March 13, 2001

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

This paper is presented pursuant to a timely filed Notice of Appeal. This BRIEF
is accompanied by the requisite fee.

### REAL PARTY IN INTEREST

The application is assigned to SOLVAY S.A.

### RELATED APPEALS AND INTERFERENCES

The undersigned is not aware of any appeals or interferences the outcome of
which would affect the proceedings of the instant appeal or of any appeals or
interferences the outcome of which would be directly affected by the outcome of the
instant appeal.

03/14/2001 CCHAU1   00000031 09051746
01 FC:120                   310.00 OP

1

## STATUS OF CLAIMS

All of the claims, Claims 43-64 are finally rejected over the applied art. These claims were presented in an AMENDMENT filed August 30, 2000 replacing Claims 19-42.

## STATUS OF AMENDMENTS

There are no unentered AMENDMENTS, as no claim amendments were presented after the October 13, 2000 Final Rejection, or in view thereof.

## SUMMARY OF INVENTION

The claims are directed to a hydrofluorination process of 1,1,1,3,3-pentachloropropane to produce 1,1,1,3,3-pentafluoropropane under specific process conditions. The 1,1,1,3,3-pentafluoropropane compound has an atmospheric boiling point of +14° C [Please see applicants' PRELIMINARY AMENDMENT.] Unlike the applied art, the claim requires a compound of five (5) fluorine atoms.

Both independent claims are limited to a hydrofluorination process of 1,1,1,3,3-pentachloropropane in presence of a catalyst <u>at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous.</u>

Appealed Independent Claims 43 and 54 are illustrative:

-- 43.  In a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst, the improvement which comprises carrying out the reaction at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and isolating and 1,1,1,3,3-pentafluoropropane from the reaction mixture by drawing off 1,1,1,3,3-pentafluoropropane and hydrogen chloride in a gaseous phase as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed.--

--54.   In a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst, the improvement which comprises carrying out the reaction in a reactor equipped with a device for drawing off a gas stream at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and

2

wherein said device is controlled (a) to draw off a gas stream comprising 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed thereby isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture (b) to keep in the reactor in the liquid state the unconverted 1,1,1,3,3-pentachloropropane, most of the hydrogen fluoride and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.--

Claims 20-26 and 28-36 relate to continuous reactions. Both independent claims are limited to a hydrofluorination process of 1,1,1,3,3-pentachloropropane in presence of a catalyst at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous. It is submitted that in view of this limitation, 1,1,1,3,3-pentafluoropropane which has an atmospheric boiling point of +14° C is not analogous to 1,1,1,3,3,3-hexafluoropropane which has an atmospheric boiling point of -1° C.

Moreover, as stated on p. 3, 1.13-15 of the application, the process of the claims enables 1,1,1,3,3-pentafluoropropane to be easily separated from the reaction mixture. This ease of separation which is an advantage as it makes it possible to retain or to recycle to the reactor the unconverted reactants and chlorofluoropropanes possibly formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane (see p. 3, 1.28-30).

This advantage is emphasized by the terms in independent claim 54 which is limited to a process wherein the reaction is carried out in a reactor equipped with a device for drawing off a gas stream which is controlled.

(a)     to draw of a gas stream of 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed thereby isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture...

(b)     to keep in the reactor in the liquid state the unconverted 1,1,1,3,3-pentachloropropane, most of the hydrogen fluoride and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.

This is quite distinct from Van Der Puy 5,574,192 (corresponding to WO 96/01797) submitted in the Information Disclosure Statement.

Van Der Puy 5,574,192 discloses a process for manufacturing 1,1,1,3,3-pentafluoropropane by fluorination of 1,1,1,3,3-pentachloropropane in the presence of

3

HON0030884

HF and antimony pentachloride; pressure is maintained in autoclave (at 300-4—psig) by periodically venting HCl-by product.

## ISSUES

Are the claims unpatentable, under 35 U.S.C. 103(a) over Van Der Puy et al. U.S. 5,395,997 in view of Decker et al. U.S. Patent No. 3, 862,978?

## GROUPING OF CLAIMS

· Claims 20-26, 28-36 and 44 are directed to continuous processes which are undescribed by the art.

## ARGUMENT

The United States Patent & Trademark Office [hereinafter USPTO] has maintained the same ground of rejection, under 35 U.S.C. 103(a), in Paper Nos. 6, 10 and 17: Van Der Puy et al. U.S. 5,395,997 in view of Decker et al. U.S. Patent No. 3, 862,978. The USPTO has taken the apparent position that what the prior art lacks in description can be satisfied by "analogy". In applicants' view, under the facts in the grounds of rejection at issue in this appeal, the term "analogy" mirrors the application of hindsight.

I    SCOPE AND CONTENT OF PRIOR ART

A.    Van Der Puy et al. U.S. 5,395,997 [hereinafter "Van Der Puy"].

Van Der Puy relates to the production of hydrofluorocarbons of the formula

$$CF_3(CH_2CF_2)_nF$$

where n = 1 to 3.

The number of halogen atoms is an even number. For example, Van Der Puy '997 describes synthesis of 1,1,1,3,3,3-hexafluoropropane.

The process of forming the Van Der Puy '997 hydrofluorocarbons comprises reacting at least one reactant selected from $CCl_3(CH_2CCl_2)_nCl$, $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$, in the presence of a fluorination catalyst, wherein HF is present in at least stoichiometric amounts per mole of reactant. Van Der Puy describes the reaction of

4

HON0030885

vinylidene chloride with carbon tetrachloride to yield $CCl_3[(CH_2CCl_2)_nCl$ or carbon tetrachloride with vinylidene fluoride to produce $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$. The reactants in Van Der Puy '997 contain an even number of halogen atoms.

B.    Decker et al. U.S. Patent No. 3, 862,978 [hereinafter "Decker"].

Decker only describes the possibility of adding up to four halogen atoms to an olefin. Specifically, Decker is directed to the reaction,

$$RC=CR + \quad X2CGG' \quad \Rightarrow \quad X2GCCR2CR2G',$$

in which R is not halogen but each of X and G and G' is halogen.

With respect to a process, Decker describes the reaction of a symmetrical alkene with a halogenated compound to form a product containing at least two halogen atoms [G and G'] and up to 4 halogen atoms. In the Examples, (1-bromo-3,3,3-trichloro-1-methylpropyl)benzene is produced from bromotrichloromethane and alpha-methyl styrene; 3-bromo-5,5,5-trichlorovaleronitrile is produced with bromotrichloromethane; 2-bromo-3-(trichloromethyl)norbornane is produced from 2-norbornene and bromotrichloromethane; and 1-chloro-2-(trichloromethyl)cyclohexane is produced from cyclohexene and carbon tetrachloride [Examples 1-4]. Carbon tetrachloride was apparently used in the remaining examples.

The catalyst used for the Decker catalysis comprises a composition of copper and an amine [column 2 lines 2 et seq.]

## II.    DIFFERENCES BETWEEN THE CLAIMS ON APPEAL AND THE APPLIED PRIOR ART

Applicants' claims call for compounds with five (5) halogen atoms.

Van Der Puy '997 does not describe either reactant or products with 5 halogen atoms or with an **odd** number of halogen atoms. Van Der Puy '997 discloses reactants containing an even number of halogen atoms and discloses products with an even number of halogen atoms. As noted above, Van Der Puy '997 describes and compounds of the genus

$$CF_3(CH_2CF_2)_nF$$

5

HON0030886

where n = 1 to 3. Thus, the generic formula of Van Der Puy '997, at, e.g., column 1, line 13, does not embrace the compounds recited in the claims. Whatever the number of carbon atoms in the Van Der Puy generic formula, the number of fluorine atoms in the compounds is an even number, and never an odd number and never 5.

Moreover, the Van Der Puy reactants described at column 2, lines 17-18, require an even number of halogen atoms -- not an odd number of halogen atoms. There is no description in Van Der Puy of how to make a **halogenated** organic compound with an odd number of halogen atoms.

Decker does not describe a compound containing an odd number of halogen atoms and does not describe a compound containing 5 halogen atoms. Decker's reaction scheme for product production results in a compound which can have at most four (4) halogen atoms. Decker's formula for products requires a terminal -C(R)$_2$-G' which means that one terminal carbon atoms can only contain one halogen atom, by virtue of the definition of G'. Decker's compound differs from applicants' compound.

The USPTO cites the Decker reference for description of the Decker catalyst.

### III.    LEVEL OF SKILL IN THE ART

*Van Der Puy '997 is directed to an entirely different process from that described in Decker. The Decker halogenation of olefins, by an addition reaction, is distinct from that synthesis which is described in Van Der Puy '997. Van Der Puy '997 describes synthesis of 1,1,1,3,3,3-hexafluoropropane. The Examiner uses that description to infer an analogy.*

1.    Applicants submit that there is no expressed motivation to undertake applicants' processes in the applied art and that no motivation can be implicit in the descriptions of the applied art, on this record, for the following reasons. Neither of the two references provides written description of the product of applicants' method or of the reactant which is used to make applicants' recited product. In the absence of written description of the compound which results from applicants' method and in the absence of a description of the reactant(s) of applicants' method, the combination of applied references does not provide enablement for the subject matter of the appealed claims.

HON0030887



In fact, whereas, applicants' claims call for production of a compound of an odd number of halogen atoms,--specifically, applicants' process produces a compound with five (5) halogen atoms, the two applied references each teach compounds [both reactants and products] with even numbers of halogen atoms. Literal combination of the descriptions of the two references does not yield the reactant or the product of the method at issue.

Whatever the number of carbon atoms in the Van Der Puy generic formula, the number of fluorine atoms in the compounds is an even number, and never an odd number. By comparison, applicants' product contains 5 halogen atoms.

Moreover, the Van Der Puy reactants described at column 2, lines 17-18, require an even number of halogen atoms -- not an odd number of halogen atoms. There is no description in Van Der Puy of how to make a halogenated organic compound with an odd number of halogen atoms.

In the Decker process, the maximum number of halogen atoms in the <u>exemplified</u> product compounds is four (4), by virtue of the process--addition of the halogenated reactant to a an olefinic double bond. Moreover, the generic formula of Van Der Puy '997, at, e.g., column 1, line 13, does not embrace the compounds recited in the claims, but also does Decker fails to describe that compound. Decker only describes the possibility of adding up to four halogen atoms to an olefin. By comparison, applicants' claims call for compounds with 5 halogen atoms. Moreover, Decker's formula for products requires a terminal -C(R)₂-G' which means that one terminal carbon atoms can only contain one halogen atom, by virtue of the definition of G'. Decker's compound differs from applicants' compound. With respect to a process, Decker describes the reaction of a symmetrical alkene with a halogenated compound to form a product containing at least two halogen atoms [G and G'] and up to 4 halogen atoms. In the Examples, (1-bromo-3,3,3-trichloro-1-methylpropyl)benzene is produced from bromotrichloromethane and alpha-methyl styrene; 3-bromo-5,5,5-trichlorovaleronitrile is produced with bromotrichloromethane; 2-bromo-3-(trichloromethyl)norbornane is produced from 2-norbornene and bromotrichloromethane; and 1-chloro-2-(trichloromethyl)cyclohexane is produced from cyclohexene and carbon tetrachloride [Examples 1-4]. Carbon tetrachloride was apparently used in the remaining examples.

7

HON0030888

The USPTO cites the Decker reference for description of the Decker catalyst. The Decker catalyst is not the subject of the applicants' claims. The Decker catalysis is distinctly different from that described in Van Der Puy '997 and from that recited in the rejected claims. No motivation is provided by Van Der Puy '997 with Decker to make 1,1,1,3,3-pentafluoropropane or to suggest its use as a blowing agent or propellant, as there is no description of the compound in the applied art. Absent any motivation derivable from the applied art, the USPTO turns to 'expectation of success.' In view of the description deficiencies, in applicants' view, the evidence does not establish a basis to assert 'expectation of success'.

2.      The applied art here provides no basis for a reasonable expectation of producing the process of the rejected claims. As noted above, the 1,1,1,3,3-pentachloropropane is structurally different from compounds fluorinated in Van Der Puy, by one chlorine atom; it is structurally different from the compound of the comparative Example 1 by exchange of a methyl group for a hydrogen; the compounds fluorinated in the examples of Van Der Puy differ from the one in the comparative example by exchanging Cl for methyl. For said compounds, totally different behavior in fluorination reaction is observed. Consequently, the behavior of 1,1,1,3,3-pentachloropropane in fluorination reaction was unpredictable over Van Der Puy '997; hence Van Der Puy '997 provides no reasonable expectation of producing the process of the rejected claims.

Decker is completely irrelevant to the pending claims and to Van Der Puy '997. Since Decker reference is irrelevant to the Claims and since the Decker reference does not provide an expression, i.e., a description, to modify the Van Der Puy '997 reference disclosure for any purpose, the combination of the Decker reference with Van Der Puy to arrive at the rejected claimed subject matter does not follow logically to the person of ordinary skill who is neither motivated by the descriptions of 'the combination' nor imbued with an expectation of success to achieve the rejected claimed subject matter.

Van Der Puy '997 is directed to an entirely different process and product from that claimed. Moreover, Van Der Puy '997 is directed to an entirely different process from that described in Decker. The Decker halogenation of olefins--**by the addition of a halogenated compound to a compound containing an olefinic double bond**--is distinct from that synthesis which is described in Van Der Puy '997. And Decker's

8

HON0030889

express description excludes producing products of 5 or more halogen atoms. Van Der Puy relates to the production of hydrofluorocarbons of the formula

$$CF_3(CH_2CF_2)_nF$$

where n = 1 to 3. By comparison to Decker, the process of forming the Van Der Puy '997 hydrofluorocarbons comprises reacting at least one reactant selected from $CCl_3(CH_2CCl_2)_nCl$, $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$, in the presence of a fluorination catalyst, wherein HF is present in at least stoichiometric amounts per mole of reactant. Van Der Puy describes the reaction of vinylidene chloride with carbon tetrachloride to give $CCl_3[(CH_2CCl_2)_nCl$ or carbon tetrachloride with vinylidene fluoride to give $CCl_3(CH_2CF_2)_nCl$ or $CCl_2[(CH_2CF_2)Cl]_2$.

Both independent claims are limited to a hydrofluorination process of 1,1,1,3,3-pentachloropropane in presence of a catalyst <u>at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous</u>. It is submitted that in view of this limitation, 1,1,1,3,3-pentafluoropropane which has an atmospheric boiling point of +14ºC is not analogous to 1,1,1,3,3,3-hexafluoropropane which has an atmospheric boiling point of -1º C. Claims 44-55 and 55-56 relate to continuous reactions. Both independent claims are limited to a hydrofluorination process of 1,1,1,3,3-pentachloropropane in presence of a catalyst <u>at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous</u>. It is submitted that in view of this limitation, 1,1,1,3,3-pentafluoropropane which has an atmospheric boiling point of +14º C is not analogous to 1,1,1,3,3,3-hexafluoropropane which has an atmospheric boiling point of -1º C.

3.    In applicants' view, the examiner's rejection of these claims over Van Der Puy is based on the alleged 'analogy' between 1,1,1,3,3,3-hexachloropropane and 1,1,1,3,3,-pentachloropropane; an 'analogy' between vinyl chloride and vinylidene chloride, and an 'analogy' of reactivity 'expected' when using 1,1,1,3,3,-pentachloropropane with a catalyst and hydrogen fluoride. In applicants view, these issues of 'analogy' relate to a determination of the evidence of level of skill in the art

The record is devoid of evidence to support the conclusion of such an analogies. Moreover, applicants presented a reference <u>Advances in Fluoride Chemistry</u>, Vol. 3, p.180-183, 200-209) relating to the synthesis of 2,2-dihydrofluoropropanes, which directly places in factual dispute that inference of any analogy.

9

HON0030890

In applicants' view, the express descriptions to not attain the levels of an 'obvious to try' standard of obviousness' and the 'obvious to try' standard does not constitute adequate grounds to establish prima facie obviousness. That is, the absence of description(s) in the applied references in the final rejection can not make it 'obvious to try.' In summary, it is applicants' position that 'analogy' is not the standard sanctioned by the case law for perfecting a prima facie Section 103(a) rejection.

The only description and motivation, independent factual inquiries, for the applicants' claims comes from applicants' disclosure, not from the applied prior art. This position is buttressed by the fact that the USPTO rejection does not describe the reactant or the product of the rejected claims. The position is emphasized by the fact that the disclosures of products in each of the applied references do not suggest the product of the claims and by the fact that the applied art is silent with respect to the utility of 1,1,1,3,3,-pentafluoropropane. In addition, the applied art does not enable the subject matter of the claims. Moreover, the applied art is silent with respect to Claims 40-55 and 55-56, which relate to continuous reactions.

Reconsideration and early allowance are respectfully solicited.

Should any additional fee be required, please charge the same to our Deposit Account No. 22-0261, and advise us accordingly.

Respectfully submitted,

Marina V. Schneller
Reg. No. 26,032

**VENABLE**
P.O. Box 34385
Washington, D.C.  20043-9998
Telephone: (202) 962-4800
Telefax:  (202) 962-8300

#263609

10

HON0030891

# EXHIBIT 29

The opinion in support of the decision being entered today was <u>not</u> written
for publication and is <u>not</u> binding precedent of the Board.

Paper No. 30

## UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE BOARD OF PATENT APPEALS AND INTERFERENCES

<u>Ex parte</u> VINCENT WILMET, FRANCINE JANSSENS, and
JEAN-PAUL SCHOEBRECHTS

Appeal No. 2002-1618
Application No. 09/051,746

MAILED

JAN 30 2003

ON BRIEF[1]

PAT. & T.M. OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

Before WINTERS, MILLS and GREEN, <u>Administrative Patent Judges.</u>

MILLS, <u>Administrative Patent Judge.</u>

### DECISION ON APPEAL

This is a decision on appeal under 35 U.S.C. § 134 from the examiner's final

rejection of claims 43-64 which are the claims on appeal in this application.

---

[1] This appeal was originally scheduled for oral hearing on January 9, 2003, but
the hearing was vacated by the Board, in its discretion, finding a hearing unnecessary.

1

HON0030924

Appeal No. 2002-1618
Application No. 09/051,746

Claim 43 is representative of the claims on appeal and reads as follows:

43.    In a process for the preparation of 1,1,1,3,3-pentafluoropropane
comprising reaction of 1,1,1,3,3- pentachloropropane with hydrogen
fluoride in the presence of a hydrofluorination catalyst, the improvement
which comprises carrying out the reaction at a temperature and under a
pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and isolating
and [sic] 1,1,1,3,3-pentafluropropane from the reaction mixture by drawing
off 1,1,1,3,3-pentafluoropropane and hydrogen chloride in a gaseous
phase as each of said 1,1,1,3,3-pentafluoropropane and hydrogen
chloride is being formed.

The reference relied upon by the examiner is:

Van Der Puy et al. (Van Der Puy)         5,395,997         Mar. 7, 1995

The reference relied upon by the appellants is:

M. Stacey, "The preparation of organic fluorine compounds by halogen exchange,"
Advances in Fluoride Chemistry, Vol. 3, pp. 180-183, 200-209 (1963)

Grounds of Rejection

Claims 43-64[2] stand rejected under 35 U.S.C. § 103(a) as obvious over Van Der

Puy.   We reverse this rejection.

---

[2]   The Answer, page 3, indicates that claims 20-26, 28-36 and 44 are rejected,
however, both appellants' Brief, page 2, and the final rejection (Paper No. 19) page 2,
indicate that claims 43-64 are the rejected claims.  We treat claims 43-64 as the
rejected claims and subject matter of this appeal.

HON0030925



Appeal No. 2002-1618
Application No. 09/051,746

## DISCUSSION

In reaching our decision in this appeal, we have given careful consideration to
the appellants' specification and claims, to the applied prior art references, and to the
respective positions articulated by the appellants and the examiner.

Rather than reiterate the conflicting viewpoints advanced by the examiner and
the appellants regarding the above-noted rejection, we make reference to the
Examiner's Answer for the examiner's complete reasoning in support of the rejection,
and to the appellants' Brief for the appellants' arguments thereagainst. As a
consequence of our review, we make the determinations which follow.

35 U.S.C. § 103

I. Claims 43-64 stand rejected under 35 U.S.C. § 103(a) as obvious over Van
Der Puy.

In rejecting claims under 35 U.S.C. § 103, the examiner bears the initial burden
of presenting a prima facie case of obviousness. See In re Rijckaert, 9 F.3d 1531,
1532, 28 USPQ2d 1955, 1956 (Fed. Cir. 1993). A prima facie case of obviousness is
established when the teachings from the prior art itself would appear to have suggested
the claimed subject matter to a person of ordinary skill in the art. In re Bell, 991 F.2d
781, 783, 26 USPQ2d 1529, 1531 (Fed. Cir. 1993). An obviousness analysis requires
that the prior art both suggest the claimed subject matter and reveals a reasonable

3

HON0030926

Appeal No. 2002-1618
Application No. 09/051,746

expectation of success to one reasonably skilled in the art. In re Vaeck, 947 F.2d 488,

493, 20 USPQ2d 1438, 1442 (Fed. Cir. 1991).

It is the examiner's position that (Answer, page 4):

> Van Der Puy et al[.] disclose a process wherein a starting material such as
> 1,1,1,3,3,3-hexachloropropane is reacted with HF in the presence of a
> catalyst to produce 1,1,1,3,3,3-hexafluoropropane (Example 3). Van Der
> Puy et al[.] further disclose that HCl and 1,1,1,3,3,3-hexafluoropropane
> product are vented, in other words removed as gaseous overhead, to
> control the pressure (col. 3, lines 15+).
>
> It would have been obvious to one of ordinary skill in the art to
> utilize 1,1,1,3,3-pentafluoropropane as starting material in the process of
> Van Der Puy to obtain the instant results of appellants. It is again noted
> that the use of 1,1,1,3,3,-pentochloropropane to produce 1,1,1,3,3-
> pentafluoropropane using the basic process of Van Der Puy is admitted to
> be well known in the art by the use of a jepson type claim by appellants.
> The only issue is the obviousness of using the method of gas phase
> recovery disclosed by Van Der Puy when substituting 1,1,1,3,3-
> pentachloropropane as starting material. Clearly, the same benefit of
> controlling the pressure would result regardless of the particular starting
> material used in the Van Der Puy process by recovering HCl by-product
> and the corresponding product by venting. Therefore, one of ordinary skill
> in the art would have been motivated to use 1,1,1,3,3-pentachloropropane
> starting material in the Van Der Puy process because it is known in the art
> to do so to produce the corresponding product utilizing the same
> chemistry, namely reaction with HF, and there would have been a
> reasonable expectation that the same result would be obtained by venting,
> namely the control of pressure.

To begin, we note that the statement of rejection indicates that the pending

claims are rejected in view of a single reference, Van Der Puy. Upon review of the

record, we do not find that the examiner has presented sufficient evidence to support a

prima facie case of obviousness. We find Van Der Puy alone to be insufficient evidence

of obviousness of the claimed process. Van Der Puy describes a process of preparing

4

HON0030927



Appeal No. 2002-1618
Application No. 09/051,746

hexafluoropropane, which is a different product from the product prepared by the

claimed process and employs different starting materials. Van Der Puy alone does not

enable a process for the production of 1,1,1,3,3-pentafluoropropane. In re Hoeksema,

399 F.2d 269, 274, 158 USPQ 596, 601 (CCPA 1968) [References relied upon to

support a rejection under 35 U.S.C. § 103 must provide an enabling disclosure, i.e.,

they must place the claimed invention in the possession of the public.] See also In re

Payne, 606 F.2d 303, 314, 203 USPQ 245, 255 (CCPA 1979); In re Brown, 51 CCPA

1254, 1259, 329 F.2d 1006, 1011, 141 USPQ 245, 249 (1964). An invention is not

"possessed" absent some known or obvious way to make it. Without more, in our view,

Van Der Puy alone does not support a prima facie case of obviousness.

II. Although not set forth in the statement of rejection, from the analysis

presented in the Examiner's Answer, the examiner appears to rely on the acknowledged

state of the prior art referred to in the preamble of the Jepson-type claims as well as

Van Der Puy as a basis for the rejection of the claims. A preamble is impliedly admitted

to be prior art when a Jepson claim is used, unless the preamble is the inventor's own

work. Reading & Bates Construction Co. v. Baker Energy Resources Corp., 748 F.2d

645, 649, 228 USPQ 1168, 1172 (Fed. Cir. 1984). Pentec, Inc. v. Graphic Controls

Corp., 776 F.2d 309, 315, 227 USPQ 766, 770 (CA FC 1985). Appellants' submission

of the claims in Jepson format is accepted as an admission that a process for the

preparation of 1,1,1, 3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-

5

Appeal No. 2002-1618
Application No. 09/051,746

pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination

catalyst, can be considered "prior art" for any purpose, including use as evidence of

obviousness under § 103. In re Nomiya, 509 F.2d 566, 570-571, 184 USPQ 607, 611

(CCPA 1975); In re Garfinkel, 437 F.2d 1000, 1004, 168 USPQ 659, 662 (1971); In re

Hellsund, 474 F.2d 1307, 1311, 177 USPQ 170, 173 (1973).

Therefore, for a thorough and complete review of the issues before us, we also

address the combination of admitted prior art in the preamble of the Jepson claim

before us with Van Der Puy. Here too, however, we find the examiner's case falls short.

The crux of the examiner's position is that an "analogy" exists between (1) the

process of preparing 1,1,1,3,3,3-hexafluoropropane by reacting  1,1,1,3,3,3-

hexachloropropane with hydrogen fluoride in the presence of a hydrofluorination

catalyst, and (2) the known process of preparing 1,1,1,3,3-pentafluoropropane by

reacting 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a

hydrofluorination catalyst. The appellants argue that persons of ordinary skill in the art

would not have employed the reaction conditions of Van Der Puy in the prior art process

of preparing 1,1,1,3,3- pentafluoropropane set forth in the preamble of the claim with a

reasonable expectation of success. Brief, page 8.

Appellants strenuously argue that, on the record before us, any such analogy is

inexact, or, in appellants' words, "[t]he record is devoid of evidence to support the

conclusion of such an analog[y]." Brief, page 9.

6

HON0030929

Appeal No. 2002-1618
Application No. 09/051,746

In our view, appellants have placed evidence of record which controverts any such "analogy" which may have been put forth by the examiner. Note, Paper No. 12, pages 4-5, where appellants provide a detailed explanation of <u>Advances in Fluoride Chemistry</u>, Vol. 3, p. 180-183, 200-209. See also, Brief, page 9. We also agree with appellants that the examiner has not come to grips with or rebutted this argument. See, Answer, page 5.

In view of the above, we find the examiner has failed to present sufficient evidence to support a <u>prima facie</u> case of obviousness.

After evidence or argument is submitted by the applicants in response to an obviousness rejection, "patentability is determined on the totality of the record, by a preponderance of evidence with due consideration to persuasiveness of the argument." <u>In re Oetiker</u>, 977 F.2d 1443, 1445, 24 USPQ2d 1443, 1444 (Fed. Cir. 1992); see <u>In re Piasecki</u>, 745 F.2d 1468, 1471-72, 223 USPQ 785, 787 (Fed. Cir. 1984) ("All evidence on the question of obviousness must be considered, both that supporting and that rebutting the <u>prima facie</u> case."). On balance, we believe that the totality of the evidence presented by the examiner and appellants weighs in favor of finding the claimed invention non-obvious. The rejection is reversed.

7

HON0030930

Appeal No. 2002-1618
Application No. 09/051,746

## CONCLUSION

The rejection of Claims 43-64 under 35 U.S.C. § 103(a) as obvious over Van Der

Puy alone, or Van Der Puy and the admitted prior art in the preamble of the Jepson

claim are reversed.

No time period for taking any subsequent action in connection with this appeal

may be extended under 37 CFR § 1.136(a).

## REVERSED

SHERMAN D. WINTERS )
Administrative Patent Judge )
 )
 )
DEMETRA J. MILLS ) BOARD OF PATENT
Administrative Patent Judge )
 )  APPEALS AND
 )
 ) INTERFERENCES
LORA M. GREEN )
Administrative Patent Judge )

8

HON0030931

Appeal No. 2002-1618
Application No. 09/051,746

CONNOLLY BOVE LODGE & HUTZ, LLP
1220 N Market Street
P.O. Box 2207
Wilmington, DE 19899

DJM/jlb

9

HON0030932

# EXHIBIT 30

 United States Patent and Trademark Office

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/444,610 | 05/23/2003 | Hsueh Sung Tung | H0005108 | 7217 |

7590     01/12/2006

Colleen D. Szuch, Esq.
Honeywell International Inc.
101 Columbia Road
Morristown, NJ 07962-2245

| EXAMINER |
|---|
| WITHERSPOON, SIKARL A |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1621 | |

DATE MAILED: 01/12/2006

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO-90C (Rev. 10/03)

S0023740

| | Application No. | Applicant(s) |
| --- | --- | --- |
| **Office Action Summary** | 10/444,610 | TUNG ET AL. |
| | **Examiner** | **Art Unit** | |
| | Sikari A. Witherspoon | 1621 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE 3 MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on *17 November 2005*.
2a) ☒ This action is FINAL.       2b) ☐ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) *1-13,15-25 and 27-32* is/are pending in the application.
   4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☒ Claim(s) *1-13,15-25 and 27-32* is/are rejected.
7) ☐ Claim(s) _____ is/are objected to.
8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.
10) ☐ The drawing(s) filed on _____ is/are: a) ☐ accepted or b) ☐ objected to by the Examiner.
   Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
   Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☐ All   b) ☐ Some * c) ☐ None of:
   1. ☐ Certified copies of the priority documents have been received.
   2. ☐ Certified copies of the priority documents have been received in Application No. _____.
   3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
   * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☐ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
   Paper No(s)/Mail Date *11/17/05*.
4) ☐ Interview Summary (PTO-413)
   Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application (PTO-152)
6) ☐ Other: _____.

U.S. Patent and Trademark Office
PTOL-326 (Rev. 7-05)          **Office Action Summary**          Part of Paper No./Mail Date 20051228

**S0023741**

Application/Control Number: 10/444,610                                    Page 2
Art Unit: 1621

## DETAILED ACTION

The examiner has considered applicants' amendment filed November 17, 2005

and the arguments therein.  Applicants' amendment was sufficient to overcome the

rejection of record under 35 U.S.C. 102 (a,e); however, the amendment has

necessitated a new rejection under 35 U.S.C. 103(a).  The rejection already of record

under 103(a) has been maintained and rewritten herein and modified according to the

amended claims.

### Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set
forth in section 102 of this title, if the differences between the subject matter sought to be patented and
the prior art are such that the subject matter as a whole would have been obvious at the time the
invention was made to a person having ordinary skill in the art to which said subject matter pertains.
Patentability shall not be negatived by the manner in which the invention was made.

Claims 1-9, 13, 18 and 27 rejected under 35 U.S.C. 103(a) as being

unpatentable over Wilmet et al (US 6,730,817) and further in view of VanDerPuy et al

(US 5,574,192).

Wilmet et al teach a process for the liquid phase hydrofluorination of 1,1,1,3,3-

pentachloropropane to 1,1,1,3,3-pentafluoropropane by reacting 0.21 moles of said

pentachloropropane with 10 moles of hydrogen fluoride (about a 48 to 1 ratio

HF:pentachloropropane), in the presence of antimony pentachloride as catalyst.  The

reaction is conducted at a temperature of 120° C, and a pressure of 25 bar, i.e., 363

Application/Control Number: 10/444,610                                    Page 3
Art Unit: 1621

psig (col. 5, lines 17-34). The reference also teaches carrying out the process
continuously or noncontinuously, and that the hydrogen chloride generated by the
reaction, and pentafluoropropane can be separated from the reaction mixture using a
device consisting of a distillation column and reflux condenser (col. 2, line 61 to col. 3,
line 14).

    The differences between Wilmet et al and the instant claims are that Wilmet et al
do not teach the continuous addition of chlorine to maintain the activity of the catalyst,
and they do not expressly teach recycling a portion of any unreacted HF to the
fluorination reactor.

    However, VanDerPuy et al teach a similar process wherein a hydrochlorocarbon
is fluorinated to produce a hydrofluorocarbon, using a pentavalent antimony catalyst.
The reference specifically teaches that chlorine may be continuously added to the
reactor to maintain the catalyst in the pentavalent state, i.e., the catalytically active
state, and, that HF can be recycled back to the fluorination reactor along with under-
fluorinated materials (col. 3, lines 1-38).

    In light of the combined reference teachings, it would have been obvious to a
person of ordinary skill in the art to add chlorine to the reactor in the process taught by
Wilmet et al, one being motivated to do so by the desire to maintain the catalyst
employed therein at the pentavalent state, as suggested by VanDerPuy et al. Recycling
of any unreacted HF or other starting material would have been obvious to a person of
ordinary skill for the purpose of conducting a more efficient process, especially when
operating such a process in a continuous mode.

**S0023743**

Application/Control Number: 10/444,610                                        Page 4
Art Unit: 1621

Claims 1-13, 15, 16, 18-21, and 27-30 are rejected under 35 U.S.C. 103(a) as
being unpatentable over Elshiekh et al (US 6,479,718) and further in view of
VanDerPuy et al (US 5,574,192).

Elsheikh et al teach a liquid phase process for producing 1,1-dichloro-2,2,2-
trifluoroethane by fluorination of perchloroethylene with hydrogen fluoride, wherein the
molar ratio of HF to perchloroethylene is 26 to 1, in the presence of antimony
pentafluoride as catalyst. The process is conducted at a temperature of 130° C, and a
pressure of 185 psig (col. 2, lines 25-30). The reference also teaches that in a
continuous process, by-product HCl can be removed by distillation (col. 2, lines 6-10).

The differences between Elshiekh et al and the instant claims are that Elshiekh et
al do not teach the continuous addition of chlorine to maintain the activity of the catalyst,
and they do not expressly teach recycling a portion of any unreacted HF to the
fluorination reactor. Also, Elshiekh et al do not expressly teach recovering the
hydrofluorocarbon by distillation, or liquid-vapor extraction.

However, VanDerPuy et al teach a process wherein a hydrochlorocarbon is
fluorinated to produce a hydrofluorocarbon, using a pentavalent antimony catalyst. The
reference specifically teaches that chlorine may be continuously added to the reactor to
maintain the catalyst in the pentavalent state, i.e., the catalytically active state, and, that
HF can be recycled back to the fluorination reactor along with under-fluorinated
materials (col. 3, lines 1-38).

In light of the combined reference teachings, it would have been obvious to a
person of ordinary skill in the art to add chlorine to the reactor in the process taught by

Application/Control Number: 10/444,610                          Page 5
Art Unit: 1621

Elshiekh et al, one being motivated to do so by the desire to maintain the catalyst

employed therein at the pentavalent state, as suggested by VanDerPuy et al. Recycling

of any unreacted HF or other starting material would have been obvious to a person of

ordinary skill for the purpose of conducting a more efficient process, especially when

operating such a process in a continuous mode.

       The reference clearly teaches recycling of by-products that may form, and

teaches removing by-product HCl from the reaction mixture by distillation. The

examiner takes the position that while silent with regard to removal of the

hydrofluorocarbon, it would have been obvious to a person of ordinary skill in the art to

siphon off the hydrofluorocarbon while distilling the by-product HCl, since the

hydrofluorocarbon is the desired compound.

       Claims 1-13, 15-25, and 27-32 are rejected under 35 U.S.C. 103(a) as being

unpatentable over Wilmet et al (US 6,362,383) and Tung et al (US 5,763,706) in

combination.

       Wilmet et al teach a process for the hydrofluorination of chlorinated

hydrocarbons; specifically, Wilmet et al teach a process wherein 1,1,1,3,3-

pentafluoropropane is made (along with other hydrofluorocarbons) by reacting 0.23 mol

1,1,1,3,3-pentachloropropane with 9 mol hydrogen fluoride (HF:pentachloropropane

ratio about 39:1), in the presence of titanium tetrachloride as catalyst. The reaction is

conducted at a temperature of 120° C, at a pressure of 25 bar, i.e., 363 psig, and

gaseous hydrogen chloride is introduced continuously to the reaction mixture

(example1, col. 7, line 50 to col. 8, line 2). The reference also has a broad teaching that the ratio of HF to hydrochlorocarbon is greater than or equal to 5 (col. 3, lines 45-54), and teaches that hydrogen chloride produced by the reaction, as well as hydrogen fluoride and partially fluorinated by-products can be separated, an recycled into the process (col. 4, line 59 to col. 5, line24).

The differences between Wilmet et al and the instant process are that Wilmet et al conduct their process with the continuous introduction of hydrogen chloride into the reaction mixture, while applicants do not recite such a limitation, and, Wilmet et al do not teach removing any unsaturated compounds present in the reaction mixture by photochlorination, and do not teach removing the hydrofluorocarbons produced, by extracting the HF/hydrofluorocarbon stream with sulfuric acid, as claimed herein.

Tung et al teach a process for preparing pentafluoropropane and/or hexafluoropropane by reacting pentachloropropane and/or hexachloropropane with hydrogen fluoride in the presence of a fluorination catalyst, optionally removing HCl produced, and recovering HF by liquid-vapor or liquid-liquid extraction. The process of recovering and separating HF and hydrofluorocarbon produced is conducted with a sulfuric acid absorber followed by a caustic or water scrubber; a photochlorination unit is then used to remove any unsaturates in the reaction stream (col. 3, line 25 to col. 4, line 30). Tung et al also teach adding chlorine to keep the catalyst active (col. 2, lines 61-67).

With regard to the first difference mention above, the examiner takes the position that since applicants' independent claims is open-ended, i.e., used the word,

"comprising", the step of continuously introducing hydrogen chloride to the reaction mixture, as taught by Wilmet et al, is not precluded from the instant claims. Applicants' dependent claim 14 recites the addition of chlorine to the reaction step, and therefore, the examiner purports that it would have been obvious to a person of ordinary skill in the art to employ elemental chlorine, hydrogen chloride, or any other chlorine source to the hydrofluorination reaction. One of ordinary skill in the art would have been motivated to do so by the desire to maintain the activity of the catalyst in order to, as suggested by Wilmet et al (col. 5, lines 25-36), increase the rate of conversion of the hydrochlorocarbon, and increase the selectivity of the reaction.

As stated above, Wilmet et al do not teach removing/separating the HF/hydrofluorocarbon by extraction with sulfuric acid, nor removal of unsaturated by-products by photochlorination. However, as stated above, Tung et al do teach such steps. The examiner therefore purports that it would have been obvious to a person of ordinary skill in the art combine the two reference teachings. One of ordinary skill in the art would have been motivated to combine the teachings by the desire to employ a known method of removing unsaturated compounds produced by such fluorination processes, i.e., by photochlorination, and for removing/separating HF and hydrofluorocarbon, i.e., by sulfuric acid extraction, since both processes teach the same reactants, and therefore arrive at similar products and by-products.

S0023747

Application/Control Number: 10/444,610                                Page 8
Art Unit: 1621

### *Response to Arguments*

Applicant's arguments filed November 17, 2005 have been fully considered but
they are not persuasive. With regard to the rejection over Wilmet ('383) and Tung et al,
the thrust of applicants' arguments is that Wilmet and Tung are not properly combinable
since Wilmet *requires* the addition of HCl, while Tung et al removes HCl, and according
to applicants, Tung et al Tung et al teach a lower HF to hydrochlorocarbon ratio.

The examiner respectfully disagrees with applicants' assertions. First, Wilmet et
al do not *require* the addition of HCl as alleged by applicants; rather, the addition of HCl
by Wilmet is a *preferred* embodiment (see abstract), since Wilmet et al found that by
adding HCl an increase in chlorohydrocarbon conversion rate and an increase in
selectivity to the hydrofluorocarbon compound are observed (col. 4, lines 21-31).
Wilmet et al provide two examples, one where HCl is added and one without the
addition of HCl, where, as expected, lower conversion and selectivity are observed.
However, a reference (or example) need not show optimal results, but only that a
specific reaction will occur.

Furthermore, Wilmet et al do teach a removal of by-product HCl during or at the
end of the first step of the two-step process (col. 4, lines 41-64). The examiner
contends that the chlorine present in some of the HCl whether produced as by-product
or added purposely by Wilmet et al would invariably act on the catalyst, oxidizing it to its
catalytically active state.

Regarding Tung et al, the examiner finds the molar ratio of HF to
hydrochlorocarbon immaterial with regard to the compatibility of the two references.

**S0023748**

Application/Control Number: 10/444,610                          Page 9
Art Unit: 1621

Tung et al state that the *preferred* ratio is from 4 to about 10, however, a person of

ordinary skill would recognize that that limitation is not critical given the disclosure of

Tung et al. Tung et al was cited to teach steps for recovering and separating HF and

hydrofluorocarbon produced with a sulfuric acid absorber followed by a caustic or water

scrubber, and for using a photochlorination unit remove any unsaturates in the reaction

stream. In this regard, the examiner contends that Tung et al is indeed combinable with

the fluorination process taught by Wilmet et al.


         Applicant's amendment necessitated the new ground(s) of rejection presented in

this Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP

§ 706.07(a). Applicant is reminded of the extension of time policy as set forth in 37

CFR 1.136(a).

         A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action. In the event a first reply is filed within

TWO MONTHS of the mailing date of this final action and the advisory action is not

mailed until after the end of the THREE-MONTH shortened statutory period, then the

shortened statutory period will expire on the date the advisory action is mailed, and any

extension fee pursuant to 37 CFR 1.136(a) will be calculated from the mailing date of

the advisory action. In no event, however, will the statutory period for reply expire later

than SIX MONTHS from the date of this final action.

S0023749

Application/Control Number: 10/444,610                    Page 10
Art Unit: 1621

Any inquiry concerning this communication or earlier communications from the examiner should be directed to Sikarl A. Witherspoon whose telephone number is 571-272-0649. The examiner can normally be reached on M-F 8:30-6:30.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's supervisor, Johann Richter can be reached on 571-272-0646. The fax phone number for the organization where this application or proceeding is assigned is 571-273-8300.

Information regarding the status of an application may be obtained from the Patent Application Information Retrieval (PAIR) system. Status information for published applications may be obtained from either Private PAIR or Public PAIR. Status information for unpublished applications is available through Private PAIR only. For more information about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Sikarl A. Witherspoon
Patent Examiner
Technology Center 1600

Johann Richter, Ph. D, Esq.
Supervisory Patent Examiner
Technology Center 1600

**S0023750**

EXHIBIT 31



US006730817B1

(12) **United States Patent**
Wilmet et al.

(10) Patent No.: **US 6,730,817 B1**
(45) Date of Patent: **May 4, 2004**

(54) **METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE**

(75) Inventors: **Vincent Wilmet**, Wavre (BE); **Francine Janssens**, Vilvoorde (BE); **Jean-Paul Schoebrechts**, Grez-Doiceau (BE)

(73) Assignee: **Solvay (Societe Anonyme)** (BE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/051,746**

(22) PCT Filed: **Oct. 4, 1996**

(86) PCT No.: **PCT/EP96/04315**

§ 371 (c)(1),
(2), (4) Date: **Jun. 8, 1998**

(87) PCT Pub. No.: **WO97/15540**

PCT Pub. Date: **May 1, 1997**

(30) **Foreign Application Priority Data**

Oct. 23, 1995    (FR) ............................... 95 12558

(51) Int. Cl.[7] ...................... **C07C 17/00**; C07C 17/08; C07C 19/08; C07C 17/266; C07C 21/18

(52) U.S. Cl. ........................... 570/167; 570/172

(58) Field of Search ...................... 570/167, 172

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,862,978 A * 1/1975 Decker et al. .............. 570/172

5,395,997 A * 3/1995 Van Der Puy et al. ..... 570/167
5,574,192 A 11/1996 VanDerPuy et al.

FOREIGN PATENT DOCUMENTS

| AU | 32843/95 | 4/1996 |
|----|----------|--------|
| EP | 0 522 639 | 1/1993 |
| EP | 0 611 744 | 8/1994 |
| EP | 0 703 205 | 3/1996 |
| EP | 0 729 932 | 9/1996 |
| WO | WO95/04021 | 2/1995 |
| WO | WO95/04022 | 2/1995 |
| WO | WO95/05353 | 2/1995 |
| WO | WO96/01797 | 1/1996 |

OTHER PUBLICATIONS

Kotora, Martin et al., "Addition of tetrachloromethane to halogenated ethenes catalyzed by transition metal complexes", *Journal of Molecular Catalysis*, vol. 77, pp. 51–60 (1992).

* cited by examiner

*Primary Examiner*—Johann Richter
*Assistant Examiner*—Elvis O. Price
(74) *Attorney, Agent, or Firm*—Connolly Bove Lodge & Hutz LLP

(57)    **ABSTRACT**

1,1,1,3,3-Pentafluoropropane is produced by reaction between 1,1,1,3,3-pentachloropropane and hydrogen fluoride in the presence of a hydrofluorination catalyst. The 1,1,1,3,3-pentachloropropane may advantageously be obtained by reaction between vinyl chloride and tetrachloromethane in the presence of a telomerization catalyst and of a nitrile.

22 Claims, No Drawings



DEPOSITION EXHIBIT
29
PENGAD 800-631-6989
Defendant

US 6,730,817 B1

1

## METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE

The present invention relates to a process for the preparation of 1,1,1,3,3-pentafluoropropane (HFC-245fa). It also relates more particularly to a process for the preparation of 1,1,1,3,3-pentafluoropropane from 1,1,1,3,3-pentachloropropane.

1,1,1,3,3-Pentafluoropropane is a possible substitute for wholly or partially halogenated chlorofluoro hydrocarbons (CFCs and HCFCs) suspected of having a detrimental effect on the ozone layer. In particular, it is found to be especially advantageous as a blowing agent for the preparation of expanded polymeric materials.

In application WO 95/05353 it has been proposed to prepare 1,1,1,3,3-pentafluoropropane by reaction between 1,1-dichloro-2,2,2-tri-fluoroethane (HCFC-123) and dichlorodifluoromethane (CFC-12), followed by hydrogenation of the 1,1,1,3,3-pentafluoroprop-2-ene obtained. The yield of the first stage of this known process (synthesis of the 1,1,1,3,3-pentafluoroprop-2-ene intermediate) is, however, very low.

In application WO 95/04022 it has been proposed to prepare 1,1,1,3,3-pentafluoropropane by a three-stage process consisting, in a first stage, in the preparation of 1,1,1, 3,3,3-hexachloropropane by reaction between tetrachloromethane and vinylidene chloride, in a second stage in the conversion of the hexachloropropane obtained to 1,1,1,3,3-pentafluoro-3-chloropropane by reaction with hydrogen fluoride and, in a third stage, in the reduction of the pentafluorochloropropane obtained to 1,1,1,3,3-pentafluoropropane by reaction with hydrogen. This process has the disadvantage of giving rise to large quantities of 1,1,1,3,3,3-hexafluoropropane during the second stage.

In application EP-A-417744 it has been proposed to prepare 1,1,1,3,3-pentafluoropropane by reaction between 1,1,1,3,3-pentafluoro-2,3-dichloropropane and hydrogen. The 1,1,1,3,3-pentafluoro-2,3-dichloropropane employed as raw material in this known process is not, however, a common product and cannot be easily prepared.

The objective of the present invention is to provide a process for the preparation of 1,1,1,3,3-pentafluoropropane which does not exhibit the disadvantages of the abovementioned known processes, which uses reactants that are commonly or easily accessible and which has a high yield, thus meeting industrial economic requirements.

The invention consequently relates to a process for the preparation of 1,1,1,3,3-pentafluoropropane, according to which 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

In the process according to the invention the hydrofluorination catalyst is advantageously chosen from the derivatives of metals of groups 3, 4, 5, 13, 14 and 15 of the Periodic Table of the elements (IUPAC 1988) and their mixtures (groups of the Periodic Table of the elements which were previously called IIIA, IVa, IVb, Va, Vb and VIb). The derivatives of the metals are intended to mean the hydroxides, oxides and the organic or inorganic salts of these metals, as well as their mixtures. Those particularly adopted are the titanium, tantalum, molybdenum, boron, tin and antimony derivatives. The catalyst is preferably chosen from the derivatives of metals of groups 14 (IVa) and 15 (Va) of the Periodic Table of the elements, and more particularly from tin and antimony derivatives. In the process according to the invention the preferred derivatives of the metals are the salts and these are preferably chosen from the halides and more particularly from chlorides, fluorides and chlorof-

2

luorides. Particularly preferred hydrofluorination catalysts according to the present invention are tin and antimony chlorides, fluorides and chlorofluorides, especially tin tetrachloride and antimony pentachloride. Antimony pentachloride is very particularly recommended.

In the case where the catalyst is selected from metal fluorides and chlorofluorides, these can be obtained from a chloride which is subjected to an at least partial fluorination. This fluorination may, for example, be carried out by means of hydrogen fluoride, before the catalyst is brought into contact with 1,1,1,3,3-pentachloropropane. In an alternative form, it may be carried out in situ, during the reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride.

The quantity of catalyst used can vary within wide limits. It is generally at least 0.001 mole of catalyst per mole of 1,1,1,3,3-pentachloropropane. It is preferably at least 0.01 mole of catalyst per mole of 1,1,1,3,3-pentachloropropane. In principle there is no upper limit to the quantity of catalyst used. For example, in a process carried out continuously in liquid phase, the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane may reach 1000. In practice, however, at most approximately 5 moles of catalyst are generally employed per mole of 1,1,1,3,3-pentachloropropane. Approximately 1 mole is preferably not exceeded. In a particularly preferred manner, approximately 0.5 moles of catalyst per mole of 1,1,1,3,3-pentachloropropane are generally not exceeded.

The molar ratio of hydrogen fluoride to the 1,1,1,3,3-pentachloropropane used is generally at least 5. The work is preferably done with a molar ratio of at least 8. The molar ratio of hydrogen fluoride to the 1,1,1,3,3-pentachloropropane used generally does not exceed 100. It preferably does not exceed 50.

The temperature at which the hydrofluorination is performed is generally at least 50° C. It is preferably at least 80° C. The temperature generally does not exceed 150° C. It preferably does not exceed 130° C. With antimony pentachloride as catalyst good results are obtained at a temperature of 100 to 120° C.

The process according to the invention is preferably carried out in liquid phase. In this case the pressure is chosen so as to keep the reaction mixture in liquid form. The pressure used varies as a function of the temperature of the reaction mixture. It is generally from 2 bar to 40 bar. The work is preferably carried out at a temperature and pressure at which, furthermore, the 1,1,1,3,3-pentafluoropropane produced is at least partially in gaseous form, which enables it to be easily isolated from the reaction mixture.

The process according to the invention may be carried out continuously or noncontinuously. It is to be understood that, in a noncontinuous process, the quantity of catalyst used is expressed in relation to the initial quantity of 1,1,1,3,3-pentachloropropane used and, in a continuous process, in relation to the stationary quantity of 1,1,1,3,3-pentachloropropane present in the liquid phase.

The residence time of the reactants in the reactor must be sufficient for the reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride to take place with an acceptable yield. It can easily be determined as a function of the operating conditions adopted.

The process according to the invention can be carried out in any reactor made of a material that is resistant to the temperature, the pressure and the reactants employed, especially to hydrogen fluoride. It is advantageous to separate the 1,1,1,3,3-pentafluoropropane and the hydrogen chloride from the reaction mixture as they are being formed and to keep in, or return to, the reactor the unconverted reactants,

HON0012184

3

4

as well as the chlorofluoropropanes possibly formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane. To this end the process according to the invention is advantageously carried out in a reactor equipped with a device for drawing off a gas stream, this device consisting, for example, of a distillation column and a reflux condenser mounted above the reactor. By means of suitable control, this device makes it possible to draw off in vapour phase the 1,1,1,3,3-pentafluoropropane and hydrogen chloride which are produced while keeping in the reactor, in the liquid state, the unconverted 1,1,1,3,3-pentachloropropane and most of the hydrogen fluoride, as well as, where appropriate, most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.

The 1,1,1,3,3-pentachloropropane used in the process according to the invention can advantageously be obtained by reaction of vinyl chloride with tetrachloromethane, as described, for example, by M. Kotora et al., Journal of Molecular Catalysis, (1992), vol. 77, p. 51–60. It is thus possible to obtain 1,1,1,3,3-pentafluoropropane in two stages from easily accessible materials.

In a preferred alternative form the process according to the invention for the preparation of 1,1,1,3,3-pentafluoropropane includes a telomerization stage in which vinyl chloride and tetrachloromethane are reacted in the presence of a telomerization catalyst, so as to obtain 1,1,1,3,3-pentachloropropane, and the subsequent hydrofluorination stage in which the 1,1,1,3,3-pentachloropropane obtained in the telomerization stage is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

The telomerization catalyst may be chosen from the compounds of metals from groups 8 to 11 of the Periodic Table of the elements (IUPAC 1988) and their mixtures. Compounds of metals of groups 8 and 11 are preferred. Iron and copper compounds are adopted in particular, those of copper being very particularly preferred. Compounds of metals of groups 8 to 11 are intended to mean the organic and inorganic derivatives of these metals and their mixtures. The preferred derivatives are the inorganic salts, the chlorides being particularly preferred. Telomerization catalysts which are particularly preferred according to the present invention are cuprous chloride, cupric chloride and their mixtures. Very good results have been obtained with copper (I) chloride(cuprous chloride).

The quantity of telomerization catalyst used can vary within wide limits. It is generally at least 0.001 mole of catalyst per mole of vinyl chloride. It is preferably at least 0.005 moles of catalyst per mole of vinyl chloride. In a process carried out continuously in liquid phase the molar ratio of the catalyst to vinyl chloride in the reaction mixture can reach 1000. In a process carried out noncontinuously at most approximately 0.5 moles of catalyst are preferably employed, preferably not more than 0.2 moles of catalyst and, in a particularly preferred manner 0.1 mole or less of catalyst per mole of vinyl chloride used.

A cocatalyst can be used in the telomerization stage. Amines can be employed as cocatalyst, preferably in a concentration of 0.1 to 20 moles per mole of telomerization catalyst. Amines which may be mentioned as being usable as cocatalyst in the telomerization stage of the process according to the invention are alkanolamines, alkylamines and aromatic amines, for example ethanolamine, n-butylamine, n-propylamine, isopropylamine, benzylamine and pyridine.

The molar ratio of tetrachloromethane to the vinyl chloride used in the telomerization stage is generally at least 1.5. The work is preferably done with a molar ratio of at least 2. In principle there is no upper limit to the molar ratio of

tetrachloromethane to vinyl chloride. For example, in a process carried out continuously in liquid phase, the molar ratio of the stationary quantities of tetrachloromethane and vinyl chloride in the reaction mixture may reach 1000. In a process carried out noncontinuously at most approximately 50 moles, preferably at most 20 moles and, in a particularly preferred manner, at most 10 moles of tetrachloromethane are generally used per mole of vinyl chloride.

The temperature at which the telomerization of vinyl chloride with tetrachloromethane is performed is generally at least 25° C. It is preferably at least 70° C. In general the telomerization temperature does not exceed 200° C. It preferably does not exceed 160° C. With cuprous chloride as catalyst good results have been obtained at a temperature of 100 to 140° C., in particular at a temperature of 110 to 130° C.

The telomerization reaction is generally carried out in liquid phase, advantageously in the presence of a solvent. Solvents that can be employed in the telomerization stage are especially alcohols such as methanol, ethanol, isopropanol and tert-butanol, and nitriles, in particular acetonitrile and propionitrile. Nitriles are preferred. The molar ratio of the solvent to the telomerization catalyst generally does not exceed 1000. Good results have been obtained with a molar ratio of the solvent to the telomerization catalyst of 20 to 400.

In the process according to the invention the presence of a nitrile is particularly advantageous, especially when the telomerization catalyst is a chloride, most especially cuprous chloride. The invention consequently also relates to a process for the preparation of 1,1,1,3,3-pentachloropropane, in which vinyl chloride and tetrachloromethane are reacted in the presence of a chloride of a metal of groups 8 to 11 of the Periodic Table of the elements (IUPAC 1988) and of a nitrile, as defined and in the conditions described above.

The examples hereinafter illustrate the invention without any limitation being implied.

EXAMPLE 1

Preparation of 1,1,1,3,3-pentachloropropane

4.43 moles of acetonitrile, 6.57 moles of tetrachloromethane, 0.11 mole of copper(I) chloride and 2.21 moles of vinyl chloride were introduced into a 1.5 l autoclave lined with a Teflon® fluorocarbon resin, equipped with a mechanical stirrer and a temperature probe. The autoclave was then immersed in a thermostated bath maintained at a temperature of 120° C. for 66 h with continuous stirring. After having reached 8.5 bar the autogenous pressure decreased, reaching 6 bar after 24 hours' reaction and 5.9 bar after 66 hours. The autoclave was then cooled and then the reaction mixture was distilled at reduced pressure. 380 g of 1,1,1,3,3-pentachloropropane were obtained, which represents a yield of 80% relative to the vinyl chloride used.

EXAMPLES 2–3

Preparation of 1,1,1,3,3-pentachloropropane

Acetonitrile (AcN), tetrachloromethane, copper(I) chloride and vinyl chloride (VC) were introduced into the autoclave described in Example 1 in the proportions reported in Table I. The conditions of reaction under autogenous pressure and the results obtained are also presented in Table I.

US 6,730,817 B1

5

TABLE 1

| Example | 2 | 3 |
|---|---|---|
| VC/CCl$_4$/AcN/CuCl molar ratio | 1/6/2/0.07 | 1/3.1/2.2/0.03 |
| Reaction temperature | 120° C. | 115° C. |
| Reaction period | 36 h | 96 h |
| VC conversion (% of VC used) | 83% | 95% |
| Selectivity for 1,1,1,3,3-pentachloropropane (% of the VC converted transformed into 1,1,1,3,3-pentachloropropane | 91% | 85% |

EXAMPLE 4

Hydrofluorination of 1,1,1,3,3-pentachloropropane

0.21 moles of 1,1,1,3,3-pentachloropropane, 0.076 moles of antimony pentachloride and 10 moles of hydrogen fluoride were introduced into a 0.5 l autoclave made of Hastelloy B2 stainless steel, equipped with a bladed mechanical stirrer, a temperature probe and a dip pipe enabling liquid phase samples to be taken during the test. The autoclave was then immersed in a thermostated bath maintained at a temperature of 120° C. with continuous stirring for 21 hours. The pressure was controlled at 25 bar. A sample taken after 2 hours' reaction showed that more than 99 mol % of the 1,1,1,3,3-pentachloropropane used was already converted, including 66% to 1,1,1,3,3-pentafluoropropane. After 21 hours' reaction virtually all the 1,1,1,3,3-pentachloropropane used was converted, including 92 mol % to 1,1,1,3,3-pentafluoropropane and approximately 6% to intermediate chlorofluoropropanes formed by incomplete fluorination of 1,1,1,3,3-pentachloropropane.

What is claimed is:

1. In a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst, the improvement which comprises carrying out the reaction at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture by drawing off 1,1,1,3,3-pentafluoropropane and hydrogen chloride in a gaseous phase as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed.

2. The process of claim 1, which comprises conducting the reaction continuously in a liquid phase and maintaining a molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000.

3. The process of claim 2, wherein the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is greater than 0.5.

4. The process of claim 3 wherein from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

5. The process of claim 1 wherein the reaction is carried out at a temperature of approximately 50 to 150° C.

6. The process of claim 1 wherein the 1,1,1,3,3-pentachloropropane is prepared by reaction between vinyl chloride and tetrachloromethane.

6

7. The process of claim 1, wherein the hydrofluorination catalyst is selected from the group consisting of derivatives of metals of Groups IIIa, IVa, IVb, Va, Vb and VIb of the periodic table.

8. The process of claim 7, wherein the hydrofluorination catalyst is a derivative of a metal selected from the group consisting of titanium and tin.

9. The process of claim 7, wherein the pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

10. The process of claim 7, wherein the hydrofluorination catalyst is selected from the group consisting of tin and antimony chlorides, fluorides and chlorofluorides.

11. The process of claim 7, wherein the catalyst is antimony pentachloride.

12. In a process for the preparation of 1,1,1,3,3-pentafluoropropane comprising reaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst, the improvement which comprises carrying out the reaction in a reactor equipped with a device for drawing off a gas stream at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and wherein said device is controlled (a) to draw off a gas stream comprising 1,1,1,3,3-pentafluoropropane and hydrogen chloride as each of said 1,1,1,3,3-pentafluoropropane and hydrogen chloride is being formed thereby isolating said 1,1,1,3,3-pentafluoropropane from the reaction mixture (b) to keep in the reactor in the liquid state the unconverted 1,1,1,3,3-pentachloropropane, most of the hydrogen fluoride and most of the products of partial fluorination of 1,1,1,3,3-pentachloropropane.

13. The process of claim 12, which comprises conducting the reaction continuously in a liquid phase and maintaining a molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000.

14. The process of claim 13, wherein the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is greater than 0.5.

15. The process of claim 12, wherein from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

16. The process of claim 12, wherein the reaction is carried out at a temperature of approximately 50 to 150° C.

17. The process of claim 12, wherein the 1,1,1,3,3-pentachloropropane is prepared by reaction between vinyl chloride and tetrachloromethane.

18. The process of claim 12, wherein the hydrofluorination catalyst is selected from the group consisting of derivatives of metals of Groups IIIa, IVa, IVb, Va, Vb and VIb of the periodic table.

19. The process of claim 18, wherein the hydrofluorination catalyst is a derivative of a metal selected from the group consisting of titanium and tin.

20. The process of claim 18, wherein the pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

21. The process of claim 18, wherein the hydrofluorination catalyst is selected from the group consisting of tin and antimony chlorides, fluorides and chlorofluorides.

22. The process of claim 18, wherein the catalyst is antimony pentachloride.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,730,817 B1                                    Page 1 of 1
DATED        : May 4, 2004
INVENTOR(S)  : Wilmet et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [*] Notice, should read:
-- Subject to any disclaimer, the term of this patent is extended or
Adjusted under 35 U.S.C. 154(b) by 749 days. --

Signed and Sealed this

Fifteenth Day of June, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*

HON0012187

# EXHIBIT 32



U 1551198

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

December 08, 2006

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *5,574,192*
ISSUE DATE: *November 12, 1996*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office



M. K. CARTER
Certifying Officer

DEPOSITION
EXHIBIT
Aft 202
12/14/07 SW

HON0026273

US005574192A

## United States Patent [19]

### VanDerPuy et al.

[11]  **Patent Number:**  **5,574,192**

[45]  **Date of Patent:**  **Nov. 12, 1996**

[54]  **PROCESS FOR THE MANUFACTURE OF 1,1,1,3,3-PENTAFLUOROPROPANE**

[75]  Inventors:  **Michael VanDerPuy; Alagappan Thenappan,** both of Cheektowaga, N.Y.

[73]  Assignee:  **AlliedSignal Inc.,** Morris County, N.J.

[21]  Appl. No.: **519,857**

[22]  Filed:  **Aug. 25, 1995**

#### Related U.S. Application Data

[63]  Continuation of Ser. No. 273,553, Jul. 11, 1994, abandoned.

[51]  Int. Cl.⁶ ............................................ C07C 17/08
[52]  U.S. Cl. ...................................... 570/167; 570/168
[58]  Field of Search .................................. 570/167, 168, 570/172

[56]  **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,560,838 | 7/1951 | Arnold | 260/653 |
| 2,942,036 | 6/1960 | Smith et al. | 260/653 |
| 4,078,007 | 3/1978 | Ferstandig | 260/653.7 |
| 4,967,024 | 10/1990 | Gumprecht et al. | 570/168 |
| 5,202,509 | 4/1993 | Laviron et al. | 570/167 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 684687 | 4/1964 | Canada . | |
| WO90/08754 | 8/1990 | European Pat. Off. . | |
| 522 639 A1 | 1/1993 | European Pat. Off. . | |
| 0522639 | 1/1993 | European Pat. Off. | 570/167 |
| 1418930 | 10/1968 | Germany . | |
| 1146463 | 3/1969 | United Kingdom . | |

#### OTHER PUBLICATIONS

"Selective Additions of Polyhalogenated Compounds to Chloro Substituted Ethenes Catalyzed by a Copper Complex,"— M. Kotora and M. Hajek 44(2) React. Kinct. Catal. Lett. 415(1991).

Henne, "The Use of Inorganic Fluorides", *Organic Reactions,* vol. 2, 53–63 (1944).

Boutevin, et al. "Monofunctional Vinyl Chloride Telomers . . . ", 18 Eur. Polym. J. 675 (1982) in 97 Chem. Abstr. 182966c (1982).

Knunyants, et al., Catalytic Hydrogenation of Perfluoro Olefins, 55 Chem. Abst. 349f (1961).

"Partial Fluorination of Tetrahydrofuran with Cobalt Trifluoride"— J. Burdon et al., J. Chem. Soc.(C), 1739–1746(1969).

A. L. Henne et al., Fluoroethanes and Fluoroethylenes 58 J.Am.Chem.Soc.889–90(1936).

"Free Radical Additions Involving Fluorine Compounds . . . "— Paul Tarrant et al., Addition of Dibromodifluoromethane to Fluoroölefins, 77 J.Am.Chem.Soc., 2783–87 (1955).

"Heat–transfer agents", 125031q, Chem. Abs., p. 144, vol., 114, 1991.

"Aliphatic Difluorides"— A. L. Henne, et al., J.Am.Chem-.Soc., pp. 938–940, vol. 61 (Apr. 1939).

"A New Fluorination Method"— A. L. Henne, J.Am.Chem-.Soc., pp. 1569–1571, Jul., 1938.

"Fluorinated Derivatives of Propane, II"— A. L. Henne et al., Fluorinated Derivatives of Propane, pp. 2491–2495, Oct., 1938.

"Fluorination of Organic Compounds with Anhydrous Hydrogen Fluoride. Part II. An Investigation of Antimony Pentachloride Catalysed Fluorinations"— W. B. Whalley, J.S.C.I., pp. 430–433, vol. 66, Dec., 1947.

Asscher, et al., "Chlorine Activation by Redox–transfer . . . ", J. Chem. Soc. (1961) pp. 2261–2264.

Belbachir, et al., "Telomerization of Vinylidene Chloride I . . . " 185 Makromol. Chem. 1583–1595 (1984).

EP 381986 A Abstract, 1989.

EP 414370 Abstract as cited in 114 Chem.Abstr. 206550K (1991).

Henne, et al, "Fluorinated Derivatives of Propane. II", pp. 2491–2495, Oct. 1938.

English Abstract to EP 522638 (1993).

English Abstract to DE 3,903,336 (1990) as cited in 114 Chem. Abstr. 832 36b, p. 51.

Chen et al., "Telomerizations of Vinylidene Fluoride . . . " 38(2) Huaxue Xuebao 175–84, (Apr., 1980).

Chen et al., 94 Chem.Abstr. 1741840 (1981).

*Primary Examiner*—Alan Siegel
*Attorney, Agent, or Firm*—Jay P. Friedenson; Michele G. Mangini

[57]  **ABSTRACT**

This invention is related to the preparation of hydrofluorocarbons (HFCs). Specifically, it relates to the fluorination of a compound of the formula:

$$CF_2Cl_{3-y}CH_2CHF_wCl_{2-w}$$

wherein w=0 or 1, and y=0–3, with hydrogen fluoride in the presence of a fluorination catalyst under conditions sufficient to produce a compound of the formula $CF_3CH_2CF_2H$.

$CF_3CH_2CF_2H$ or HFC 245fa may be used as a blowing agent, a propellant, and a heat transfer agent.

**31 Claims, No Drawings**

Copy provided by USPTO from the PIRS Image Database on 12/05/2006

HON0026274

5,574,192

**1**

## PROCESS FOR THE MANUFACTURE OF 1,1,1,3,3-PENTAFLUOROPROPANE

This application is a continuation of application Ser. No. 08/273,553 Filed Jul. 11, 1994, now abandoned.

### BACKGROUND OF THE INVENTION

This invention relates to a novel method of manufacturing 1,1,1,3,3-pentafluoropropane, $CF_3CH_2CF_2H$, which is referred to in the art as HFC-245fa. Specifically, the invention relates to the fluorination with hydrogen fluoride of a compound of the formula:

$$CF_3Cl_{3-y}CH_2CHF_wCl_{2-w}$$

wherein w=0, or 1, and y=0–3, in the presence of a fluorination catalyst to produce HFC-245fa.

HFC-245fa has physical properties, including a boiling point of about 14° C., which make it particularly attractive as a blowing agent. (See Ger. Often, DE 3,903,336, 1990 (EP 381,986 A)). It also has the ability to function as an aerosol propellant (U.S. Pat. No. 2,942,036 to Smith and Woolf) in a manner similar to trichlorofluoromethane, which is referred to in the an as CFC-11, and as a heat transfer agent. (Jpn. Kokai Tokyo Koho JP 02,272,086 in 114 Chemical Abstracts 25031q (1991)).

Traditionally, chlorofluorocarbons (CFCs) like CFC-11 and dichlorodifluoromethane (CFC-12) have been used as refrigerants, blowing agents and propellants. These materials, however, are believed to contribute to stratospheric ozone depletion. The fluorocarbon industry therefore has focused its attention on developing stratospherically safer alternatives to these materials. HFC-245fa is a candidate replacement material since it functions in substantially the same way as the CFCs but is zero ozone depleting. Because the demand for these and other low or zero ozone depleting materials will increase dramatically in the future, commercially viable processes for their preparation are needed.

Only two methods for manufacturing HFC-245fa which are not hydrofluorination reactions are reported in the art. However, these methods are not without their shortcomings. Knunyants, et at., *Catalytic Hydrogenation of Perfluoro Olefins*, 55 Chemical Abstracts 349f (1961), discloses the reduction of 1,1,1,3,3-pentafluoropropene to HFC-245fa. Because this process includes multiple steps; it is inefficient and uneconomical. Burdon, et at., *Partial Fluorination of Tetrahydrofuran with Cobalt Trifluoride*, J. Chem. Soc. (C), 1739 (1969), discloses the elemental fluorination of tetrahydrofuran to produce HFC-245fa. This process suffers the disadvantage that it produces a host of other by-products, thus reducing the yield of the desired product.

As far as hydrofluorination reactions are concerned, there are no such methods for the production of HFC-245fa reported in the art, let alone fluorination reactions which use 1,1,1,3,3-pentafluoropropane ($CCl_3CH_2CHCl_2$) as the starting material to produce HFC-245fa. Although the conversion of —$CCl_3$ groups to —$CF_3$ groups is well-known in the art, attempts to fluorinate terminal —$CHCl_2$ or —$CHClF$ groups to—$CHF_2$ groups in compounds having more than two carbons, (in particular compounds of the formula $RCH_2CHCl_2$ and $RCH_2CHFX$ wherein X is Cl or Br and R is an alkyl group having at least one carbon atom), have not been successful. See Henne, et al., *Fluoroethanes and Fluoroethylenes*, 58 J. Am. Chem. Soc. 889 (1936).

Tarrant, et al., *Free Radical Additions Involving Fluorine Compounds. IV. The Addition of Dibromodifluoromethane to Some Fluoroolefins*, 77 J. Am. Chem. Soc. 2783 (1955)

**2**

report the fluorination of compounds of the type $CF_2BrCH_2CHFBr$ with hydrogen fluoride (HF) in the presence of a Sb(V) salt catalyst, such as $SbCl_5$ and $TaF_5$. However, this method produced only a 14% yield of $CF_3CH_2CHFBr$ at 125° C., and only a modest improvement in yield at 170° C. Even at elevated temperatures, no HFC-245fa was produced.

### DESCRIPTION OF THE INVENTION

We have discovered that the drawbacks associated with the prior art processes for manufacturing 1,1,1,3,3-pentafluoropropane or HFC-245fa can be eliminated by the process of our invention. That is, we have discovered an efficient and economical means of manufacturing HFC-245fa on a commercial scale, which uses readily available raw materials and which produces HFC-245fa in high yield.

The invention relates to a process for manufacturing 1,1,1,3,3-pentafluoropropane comprising:

1 ) reacting a compound of the formula:

$$CF_3Cl_{3-y}CH_2CHF_wCl_{2-w}$$

wherein w=0 or 1, and y=0–3, with hydrogen fluoride in the presence of a fluorination catalyst under conditions sufficient to produce a compound of the formula $CF_3CH_2CF_2H$; and

2) optionally recovering a compound of the formula $CF_3CH_2CF_2H$.

The organic starting materials corresponding to the formula $CF_3Cl_{3-y}CH_2CHF_wCl_{2-w}$, wherein w=0 or 1, and y=0–3, include $CCl_3CH_2CHCl_2$, $CF_3CH_2CHCl_2$, $CFCl_2CH_2CHCl_2$, $CF_2ClCH_2CHCl_2$, $CFCl_2CH_2CHClF$, $CF_2ClCH_2CHFCl$, and $CF_3CH_2CHFCl$. The preferred starting material is $CCl_3CH_2CHCl_2$.

These materials are not commercially available. However, they may be prepared by any means well-known in the art. See, for example, B. Boutevin, et al., *Monofunctional Vinyl Chloride Telomers. I. Synthesis and Characterization of Vinyl Chloride Telomer Standards*, 18 Eur. Polym. J. 675 (1982) in 97 Chemical Abstracts 182966c (1982); and Kotora, et al., *Selective Additions of Polyhalogenated Compounds to Chloro Substituted Ethenes Catalyzed by a Copper Complex*, 44(2) React. Kinet. Catal. Lett. 415 (1991). See also the method disclosed in Examples 1 and 2 below. When $CCl_3CH_2CHCl_2$ is the starting material, it is preferably prepared according to the method provided in Example 1 below. Alternatively, $CCl_3CH_2CHCl_2$ may be prepared by the reduction of $CCl_3CH_2CCl_3$ (see Example 2) as well as by photochlorination of $CCl_3CH_2CH_2Cl$.

Any water in the HF will react with and deactivate the fluorination catalyst. Therefore, substantially anhydrous HF is preferred. By "substantially anhydrous" we mean that the HF contains less than about 0.05 weight % water and preferably contains less than about 0.02 weight % water. However, one of ordinary skill in the art will appreciate that the presence of water in the catalyst can be compensated for by increasing the amount of catalyst used. HF suitable for use in the reaction may be purchased from AlliedSignal Inc. of Morristown, N.J.

Based on reaction stoichiometry, the required mole ratio of HF to organics (i.e., $CF_3Cl_{3-y}CH_2F_wCl_{2-w}$) is 5-y-w (or the number of chlorine atoms in the organic starting material) to 1.0. HF is preferably used in an amount from about 1 to about 15 times the stoichiometric amount of HF to organics, and more preferably from about 6 to about 15 times the stoichiometric amount of HF to organics.

ClibPDF - www.fastio.com

Copy provided by USPTO from the PIRS Image Database on 12/05/2006

HON0026275

3

Fluorination catalysts useful in the process of the invention include: (I.) pentavalent antimony, niobium, arsenic and tantalum halides; (II.) pentavalent antimony, niobium, arsenic and tantalum mixed halides; and (III.) mixtures of pentavalent antimony, niobium, arsenic and tantalum halide catalysts. Examples of catalysts of group (I.) include antimony pentachloride and antimony pentafluoride. Examples of catalysts of group (II.) include $SbCl_2F_3$ and $SbBr2F_3$. Examples of catalysts of group (III.) include a mixture of antimony pentachloride and antimony pentafluoride.

Pentavalent antimony, niobium, arsenic and tantalum halides are commercially available, and mixed halides thereof are created in situ upon reaction with HF. Antimony pentachloride is preferred because of its low cost and availability. Pentavalent antimony mixed halides of the formula $SbCl_nF_{5-n}$ where n is 0 to 5 are more preferred. The fluorination catalysts used in this invention preferably have a purity of at least about 97%. Although the amount of fluorination catalyst used may vary widely, we recommend using from about 5 to about 50%, or preferably from about 10 to about 25% by weight catalyst relative to the organics.

It may be advantageous to periodically regenerate the catalyst due to the dissociation of the pentavalent catalyst over time. This may be accomplished by any means well known in the art. The catalyst may be regenerated, for example, by adding chlorine (in an amount of from about 1 to about 10 mole percent relative to the amount of pentavalent catalyst initially present in the reactor) to the combination stream comprised of organics of the formula $CF_yCl_3$-$_yCH_2CHF_xCl_{2-x}$, and the recycled stream comprised of under-fluorinated materials and HF. The chlorine, which is continuously added to the process of this invention when operating in a continuous mode (and periodically added when operating in a batch mode), oxidizes the catalyst from the trivalent to the pentavalent state. One of ordinary skill in the art can readily determine without undue experimentation the amount of chlorine to be added in order to optimize the use of the catalyst.

The temperature at which the fluorination reaction is conducted and the period of reaction will depend on the starting material and catalyst used. One of ordinary skill in the art can readily optimize the conditions of the reaction without undue experimentation to get the claimed results, but the temperature will generally be in the range of from about 50° to about 175° C., and preferably from about 115 ° to about 155° C., for a period of, for example, from about 1 to about 25 hours, and preferably from about 2 to about 8 hours.

Pressure is not critical. Convenient operating pressures range from about 1500 to about 5000 KPa, and preferably from about 1500 to about 2500 KPa.

The equipment in which the fluorination reaction is conducted is preferably made of corrosion resistant material such as Inconel or Monel.

HFC-245fa may be recovered from the mixture of unreacted starting materials, by-products, and catalyst by any means known in the art, such as distillation and extraction. As illustrated in Example 3, at the end of the heating period, i.e. the amount of time for complete reaction in batch mode operations, the fluorination reaction product and remaining HF may be vented through a valve on the autoclave head, which in turn is connected to an acid scrubber and cold traps to collect the product. Alternatively, unreacted HF and organics may be vented and condensed, and the HF layer recycled to the reactor. The organic layer can then be treated, i.e. washed with an aqueous base, to remove dissolved HF and distilled. This isolation procedure is particularly useful

4

for a continuous fluorination process. Under-fluorinated materials, such as $CF_3CH_2CHFCl$, may be recycled in subsequent runs.

In another embodiment, the invention relates to a process for the manufacture of 1,1,1,3,3-pentafluoropropane which comprises:

1. reacting $CCl_4$ and vinyl chloride in the presence of a telomerization catalyst under conditions sufficient to produce a compound of the formula $CCl_3CH_2CHCl_2$;

2. reacting a compound of the formula $CCl_3CH_2CHCl_2$ with hydrogen fluoride in the presence of a fluorination catalyst under conditions sufficient to produce a compound of the formula $CF_3CH_2CF_2H$; and

3. optionally recovering a compound of the formula $CF_3CH_2CF_2H$.

The telomerization of vinyl chloride by reaction with carbon tetrachloride to produce $CCl_3CH_2CHCl_2$ is known in the art. See, for example, B. Boutevin, et al., *Monofunctional Vinyl Chloride Telomers. I. Synthesis and Characterization of Vinyl Chloride Telomer Standards*, 18 Eur. Polym. J. 675 (1982) in 97 Chemical Abstracts 182966c (1982); and Kotora, et al., *Selective Additions of Polyhalogenated Compounds to Chloro Substituted Ethenes Catalyzed by a Copper Complex*, 44(2) React. Kinet. Catal. Lett. 415 (1991).

The starting materials for the telomerization reaction, i.e. carbon tetrachloride and vinyl chloride, are available from commercial sources. The molar ratio of $CCl_4$ to vinyl chloride is about 0.5:10, preferably about 1:8 (in order to minimize the formation of higher telomers), and most preferably about 1:5.

The telomerization of vinyl chloride can be initiated by any commercially available catalyst known in the art to be useful in initiating and catalyzing the telomerization of carbon tetrachloride and vinyl chloride. Suitable catalysts include, but are not limited to, organic peroxides, metallic salts, and metal carbonyls. Copper and iron salt catalysts, such as cuprous chloride (CuCl), cuprous iodide (CUI), and iron chloride ($FeCl_2$), are preferred. The amount of catalyst used in the telomerization reaction is at least about 0.1 to about 50 mmol, and preferably about 1 to about 20 mmol per mole of organics (i.e., $CCl_3CH_2CHCl_2$).

An amine co-catalyst, such as an alkanol amine, alkyl amine, and aromatic amine, may optionally be used in order to allow for the use of milder conditions in the telomerization process. Examples of suitable amine co-catalysts include ethanol amine, butyl amine, propyl amine, benzylamine, and pyridine. 2-propylamine is the most preferred co-catalyst. Such co-catalysts are commercially available. When a co-catalyst is used, it should be used in an amount from about 1 to about 10 moles per mole of catalyst, i.e., e.g. copper salt.

In order to dissolve the catalyst, a solvent, which is inert to the reactants and the desired product, may be used in the telomerization reaction. Suitable solvents include, but are not limited to, commercially available acetonitrile, dimethylsulfoxide, dimethylformamide, tetrahydrofuran, isopropanol, and tertiary butanol. Acetonitrile is preferred because of ease of handling and stability. The amount of solvent used ranges from about 5 times the amount of catalyst used on a mole basis to about 80 percent of the total volume of the total telomerization reaction mixture (i.e., solvent, catalyst, co-catalyst, carbon tetrachloride, vinyl chloride), and more preferably between about 10 to 50 times the mount of catalyst used on a mole basis.

The temperature at which the telomerization reaction is conducted and the period of reaction will depend on the catalyst selected, the presence of a co-catalyst, and the

Copy provided by USPTO from the PIRS Image Database on 12/05/2006

HON0026276

5,574,192

5

solubility of the catalyst system in the solvent. One of ordinary skill in the art can readily optimize the conditions of the reaction without undue experimentation to get the claimed results but the temperature will generally be in the range of from about 25° to about 225° C., preferably from about 50° to about 150° C. The period of reaction will generally range from about 3 to about 72 hours, preferably from about 10 to about 24 hours.

Pressure is not critical.

Preferably the telomerization reaction is conducted in a conventional apparatus, such as an autoclave made of corrosion resistant materials such as Teflon and glass.

Preferably, the telomerization product is recovered from by-products, solvent, catalyst and co-catalyst prior to the fluorination reaction to substantially eliminate the production of by-products in the fluorination step. The telomerization product may be recovered by any means well known in the art such as distillation and extraction. Optionally, the telomerization product may be further purified by additional distillation.

Due to the toxicity of vinyl chloride, other procedures for preparing $CCl_3CH_2CHCl_2$ may be employed. See Example 2 (reduction of $CCl_3CH_2CCl_3$). Alternatively, $CCl_3CH_2CCl_3$ may be prepared according to the well-known telomerization reaction of vinylidene chloride with carbon tetrachloride.

## EXAMPLE 1

### Preparation of $CCl_3CH_2CHCl_2$ from $CCl_4$ and $CH_2$=CHCl

A 600-mL monel autoclave equipped with mechanical stirrer was charged with 1 g CuCl, 156.6 g $CCl_4$ and 75 mL acetonitrile. The contents were cooled in an ice bath, and the autoclave was closed and evacuated briefly. 36.7 g of vinyl chloride was then added, and the contents stirred and heated to 135° C. for 16 hours. The volatile materials were removed by distillation at atmospheric pressure. Distillation at 23 mm Hg resulted in 90.0 g (71% yield based on vinyl chloride added) of a colorless liquid. The identity of this liquid was confirmed via proton nuclear magnetic resonance ("NMR") to be $CCl_3CH_2CHCl_2$ (boiling point 72°–74° C. $^1H$ NMR (CDCl$_3$): $\delta6.15$ (t, 1H), 3.7 (d, 2H)).

## EXAMPLE 2

### Preparation of $CCl_3CH_2CHCl_2$ by reduction of $CCl_3CH_2CCl_3$

A 600-mL monel autoclave equipped with mechanical stirrer was charged with 199.9 g $CCl_3CH_2CCl_3$, 199.5 g isopropanol, and 4 g CuI. The autoclave was closed and evacuated briefly. The contents were heated to 120°–125° C. for 16 hours. The volatile materials, including by-product isopropyl chloride, were removed by rotary evaporation, leaving 200 g of residue. Analysis on a Varian gas chromatograph having a packed column ("GC Analysis") indicated $CCl_3CH_2CHCl_2$ and $CCl_3CH_2CCl_3$ in a ratio of about 1:2, respectively. Distillation at 29 mmHg resulted in 107.9 g of starting material (boiling point from about 105° to 107° C.), and 36.9 g (46% yield) of $CCl_3CH_2CHCl_2$ (boiling point from about 85° to 90° C.).

6

## EXAMPLE 3

### Fluorination of $CCl_3CH_2CHCl_2$ with HF/SbCl$_5$

A 600-mL monel autoclave equipped with mechanical stirrer was charged with 8.7 g SbCl$_5$ and cooled to –27° C. The autoclave was then evacuated and charged with 49.8 g of anhydrous HF. The contents were cooled to –40° C., and 44 g $CCl_3CH_2CHCl_2$ was added. The reactor was then connected to a packed column/condenser assembly. The condenser was maintained at –20° C. The reaction mixture was heated to 135° C. over 2.25 hours and maintained at that temperature for an additional 2 hours. During this heating period, the pressure in the autoclave was maintained from about 1965 to 2655 KPa (300–400 psig) by periodically venting pressure (HCl by-product) in excess of 2655 KPa (400 psig). Venting was done from the top of the condenser to a cold aqueous KOH scrubber which was connected to a –78° C. cold trap. The reactor was then completely vented to the cold trap. 18.5 g of a colorless liquid were collected. The identity of this liquid was determined by GC analysis to be 84% $CF_3CH_2CHF_2$ (corresponding to a yield of 57%) and 11% $CF_3CH_2CHClF$.

## EXAMPLE 4

### Fluorination of $CF_3CH_2CHCl_2$ with HF/SbF$_5$

The experiment described in Example 3 was repeated except that $CF_3CH_2CHCl_2$ was used as the starting material. To the apparatus described in Example 3 was charged 8.2 g SbF$_5$, 41 g HF, and 37 g $CF_3CH_2CHCl_2$. (The $CF_3CH_2CHCl_2$ was obtained via the room temperature photochlorination of commercially available $CF_3CH_2CH_2Cl$.) This mixture was heated with stirring to about 130°–135° C. for 4.5 hours at a maximum operating pressure of 3450 KPa. 18.1 g (corresponding to a yield of 57%) of a colorless liquid were recovered. GC analysis identified the material as 94% pure HFC-245fa.

## EXAMPLE 5

### Fluorination of $CF_3CH_2CHCl_2$ with HF/SbCl$_5$ at 150°–160° C. and Low Operating Pressure

The experiment described in Example 3 was repeated except that $CF_3CH_2CHCl_2$ was used as the starting material. To the apparatus described in Example 3 was charged 9.5 g SbCl$_5$, 47.9 g HF, and 34.6 g $CF_3CH_2CHCl_2$. This mixture was heated with stirring to about 150°–160° C. for 3.5 hours and maintained at that temperature for an additional 2 hours. The maximum operating pressure, controlled by periodic venting of by-product HCl, was 1280 KPa. GC analysis of the crude reaction product indicated that it contained 71% HFC-245fa.

As illustrated by the above-described Examples, HFC-245fa is produced in high yield without the use of high temperatures or pressures and without using large quantities of expensive catalysts.

What is claimed is:

1. A process for the manufacture of 1,1,1,3,3-pentafluoropropane which comprises:

a) reacting a compound of the formula:

$$CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$$

wherein w=0 or 1, and y=0–3, with hydrogen fluoride in the presence of a fluorination catalyst under condi-

ClibPDF - www.fastio.com

Copy provided by USPTO from the PIRS Image Database on 12/05/2006

5,574,192

7

tions sufficient to produce a compound of the formula $CF_3CH_2CF_2H$.

2. The process of claim 1 wherein the fluorination catalyst is selected from the group consisting of pentavalent antimony halide, pentavalent niobium halide, pentavalent arsenic halide, pentavalent tantalum halide; pentavalent antimony mixed halide, pentavalent niobium mixed halide, pentavalent arsenic mixed halide, pentavalent tantalum mixed halide, and mixtures thereof.

3. The process of claim 2 wherein the fluorination catalyst is a pentavalent antimony halide.

4. The process of claim 2 wherein the fluorination catalyst has the formula $SbCl_nF_{5-n}$, where n is 0 to 5.

5. The process of claim 2 wherein said compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$ is selected from the group consisting of $CCl_3CH_2CHCl_2$, $CF_3CH_2CHCl_2$, $CFCl_2CH_2CHCl_2$, $CF_2ClCH_2CHCl_2$, $CFCl_2CH_2CHClF$, $CF_2ClCH_2CHFCl$, and $CF_3CH_2CHFCl$.

6. The process of claim 4 wherein said compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$ is selected from the group consisting of $CCl_3CH_2CHCl_2$, $CF_3CH_2CHCl_2$, $CFCl_2CH_2CHCl_2$, $CF_2ClCH_2CHCl_2$, $CFCl_2CH_2CHClF$, $CF_2ClCH_2CHFCl$, and $CF_3CH_2CHFCl$.

7. The process of claim 5 wherein said compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$ is $CCl_3CH_2CHCl_2$.

8. The process of claim 6 wherein said compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$ is $CCl_3CH_2CHCl_2$.

9. The process of claim 8 wherein said $CCl_3CH_2CHCl_2$ is prepared by: reacting $CCl_4$ and vinyl chloride in the presence of a telomerization catalyst under conditions sufficient to produce a compound of the formula $CCl_3CH_2CHCl_2$.

10. The process of claim 5 wherein said reaction is conducted at a temperature of from about 50° to about 175° C.

11. The process of claim 10 wherein said reaction is conducted at a temperature of from about 115° to about 155° C.

12. The process of claim 9 wherein said reaction is conducted at a temperature of from about 115° to about 155° C.

13. The process of claim 10 wherein said reaction is conducted for a period of from about 1 to about 25 hours.

14. The process of claim 13 wherein said reaction is conducted for a period of from about 2 to about 8 hours.

15. The process of claim 12 wherein said reaction is conducted for a period of from about 2 to about 8 hours.

16. The process of claim 13 wherein the amount of HF used is about 1 to about 15 times the stoichiometric amount of HF to said compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$.

8

17. The process of claim 16 wherein the amount of HF used is about 6 to about 15 times the stoichiometric amount of HF to said compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$.

18. The process of claim 15 wherein the amount of HF used is about 6 to about 15 times the stoichiometric amount of HF to said compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$.

19. The process of claim 16 wherein said fluorination catalyst is present in an mount of from about 5 to about 50% by weight relative to the amount of compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$ present.

20. The process of claim 19 wherein said fluorination catalyst is present in an amount of from about 10 to about 25% by weight relative to the amount of compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$ present.

21. The process of claim 18 wherein said fluorination catalyst is present in an amount of from about 10 to about 25% by weight relative to the amount of compound of the formula $CF_yCl_{3-y}CH_2CHF_wCl_{2-w}$ present.

22. The process of claim 1 further comprising the step of recycling underfluorinated materials.

23. The process of claim 19 further comprising the step of recycling underfluorinated materials.

24. The process of claim 21 further comprising the step of recycling underfluorinated materials.

25. The process of claim 1 wherein the $CF_3CH_2CF_2H$ is recovered.

26. The process of claim 22 wherein the $CF_3CH_2CF_2H$ is recovered.

27. The process of claim 24 wherein the $CF_3CH_2CF_2H$ is recovered.

28. The process of claim 27 wherein said $CF_3CH_2CF_2H$ is recovered by distillation.

29. A process for the manufacture of 1,1,1,3,3-pentafluoropropane which comprises:

a) reacting $CCl_4$ and vinyl chloride under conditions sufficient to produce a compound of the formula $CCl_3CH_2CHCl_2$; and

b) reacting a compound of the formula $CCl_3CH_2CHCl_2$ with hydrogen fluoride in the presence of a fluorination catalyst to produce a compound of the formula $CF_3CH_2CF_2H$.

30. The process of claim 29 wherein said $CCl_3CH_2CHCl_2$ is recovered prior to step b.

31. The process of claim 30 wherein $CF_3CH_2CF_2H$ is recovered.

*  *  *  *  *

ClibPDF - www.fastio.com

Copy provided by USPTO from the PIRS Image Database on 12/05/2006

# EXHIBIT 33



U 1643192

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

**August 03, 2007**

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *5,763,706*
ISSUE DATE: *June 09, 1998*

By Authority of the

**Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office**

**P. SWAIN**
**Certifying Officer**

DEPOSITION
EXHIBIT
AH 203
12/14/07 SW

HON0033117

US005763706A

# United States Patent [19]

## Tung et al.

| [11] | Patent Number: | 5,763,706 |
|---|---|---|
| [45] | Date of Patent: | Jun. 9, 1998 |

[54] **PROCESS FOR THE MANUFACTURE OF 1,1,1,3,3-PENTAFLUOROPROPANE AND 1,1,1,3,3-HEXAFLUOROPROPANE**

[75] Inventors: **Hsueh Sung Tung**, Getzville; **Daniel Christopher Merkel**, West Seneca, both of N.Y.; **Zenart Joseph Dziadyk**, Lancaster, Canada; **Clayton Herbert Carson**, Clarence Center; **Hang Thanh Pham**, Amherst, both of N.Y.

[73] Assignee: **AlliedSignal Inc.**, Morristown, N.J.

[21] Appl. No.: **675,020**

[22] Filed: **Jul. 3, 1996**

[51] Int. Cl.⁶ .................................................. C07C 17/08
[52] U.S. Cl. .................................................. 570/167
[58] Field of Search .................................................. 570/167

[56] **References Cited**

U.S. PATENT DOCUMENTS

5,574,192  11/1996  VanDerPuy et al. .................. 570/167

5,616,819  4/1997  Boyce et al. .......................... 570/167
5,659,093  8/1997  Takubo et al. ........................ 570/167

FOREIGN PATENT DOCUMENTS

684687      4/1964   Canada .
WO 95/04022  2/1995   WIPO .

Primary Examiner—Paul F. Shaver
Attorney, Agent, or Firm—Jay P. Friedenson

[57]                **ABSTRACT**

An integrated manufacturing process for producing HFC-245fa, HFC-236fa or a mixture thereof by reaction of HCC-240fa, HCC-230 or a mixture thereof with HF. HCC-240fa, HCC-230 or a mixture thereof is reacted with hydrogen fluoride in a liquid phase in the presence of a fluorination catalyst. Optionally, produced HCl is removed by distillation. HF present is thereafter recovered by liquid-vapor extraction. Unsaturated compounds are then removed by photochlorination and HFC-245fa, HFC-236fa or a mixture thereof is obtained by distillation.

**27 Claims, 1 Drawing Sheet**

HON0033118

# U.S. Patent

### Jun. 9, 1998

# 5,763,706



**FIGURE 1**

ClibPDF - www.fastio.com

Copy provided by USPTO from the PIRS Image Database on 08/02/2007

HON0033119

5,763,706

## 1

### PROCESS FOR THE MANUFACTURE OF 1,1,1,3,3-PENTAFLUOROPROPANE AND 1,1,1,3,3,3-HEXAFLUOROPROPANE

#### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the preparation of hydrofluorocarbons. More particularly, the invention pertains to a method for the preparation of 1,1,1,3,3-pentafluoropropane (HFC-245fa) and 1,1,1,3,3,3-hexafluoropropane (HFC-236fa) or a mixture thereof. Specifically, the invention concerns an integrated manufacturing process for producing HFC-245fa, HFC-236fa or a mixture thereof by the reaction of 1,1,1,3,3-pentachloropropane (HCC-240fa), 1,1,1,3,3,3-hexachloropropane (HCC-230) or a mixture thereof with hydrogen fluoride.

2. Description of the Prior Art

Recently, there has been widespread concern that chlorofluorocarbons might be detrimental to the Earth's ozone layer. As a result, there is a worldwide effort to use halocarbons which contain fewer chlorine substituents. In this regard, 1,1,1,3,3-pentafluoropropane and 1,1,1,3,3,3-hexafluoropropane are hydrofluorocarbons having zero ozone depletion potential, and are being considered as replacements for chlorofluorocarbons in foams, refrigeration and other systems. The production of hydrofluorocarbons, i.e. compounds containing only carbon, hydrogen and fluorine has been the subject of interest to provide environmentally desirable products for use as solvents, foam blowing agents, refrigerants, cleaning agents, aerosol propellants, heat transfer media, dielectrics, fire extinguishing compositions and power cycle working fluids. It is known in the art to produce hydrofluorocarbons (HFC's) by reacting hydrogen fluoride with various hydrochlorocarbon compounds. Such HFC's are not only considered to be much more environmentally advantageous than hydrochlorofluorocarbons (HCFC's) or chlorofluorocarbons (CFC's) because they are non-ozone depleting, but also is they are also non-flammable and non-toxic as compared to the chlorine containing compounds. HFC-245fa itself is well known in the art as described in U.S. Pat. No. 2,942,036, Canadian 684,687, EP 381 986A, JP 02,272,086 and WO 95/04022. HFC-236fa is known from U.S. Pat. No. 5,395,997. All of the foregoing patents are incorporated herein by reference. However, it has been a problem in the art to conduct an economical process for the continuous preparation of HFC-245fa and HFC-236fa. It has now been found that HFC-245fa or HFC-236fa may be continuously and economically produced in than integrated manufacturing process by the reaction of HCC-240fa or HCC-230 with hydrogen fluoride. The HCC-240fa, HCC-230 or mixtures thereof and HF are first reacted in a liquid phase catalytic reaction, HCl is then optionally removed by distillation, HF is recovered, preferably by liquid-vapor or liquid-liquid extraction and then optionally recycled. Unsaturates are thereafter removed by photochlorination and HFC-245fa, HFC-236fa or a mixture thereof is obtained by distillation.

#### SUMMARY OF THE INVENTION

The invention provides a process for the preparation of fluoropropanes which comprises

(a) reacting a compound selected from the group consisting of 1,1,1,3,3-pentachloropropane; 1,1,1,3,3,3-hexachloropropane and mixtures thereof with hydrogen fluoride in the presence of a fluorination catalyst;

(b) optionally removing HCl produced by step (a); and

## 2

(c) recovering HF present after step (b).

Preferably the process comprises the subsequent further steps of

(d) removing unsaturated compounds present after step (c) by photochlorination; and

(e) recovering 1,1,1,3,3-pentafluoropropane; 1,1,1,3,3,3-hexafluoropropane or a mixture thereof from the result of step (d) by distillation.

The invention also comprises a process for the preparation of fluoropropanes which comprises

(a) reacting a compound selected from the group consisting of 1,1,1,3,3-pentachloropropane; 1,1,1,3,3,3-hexachloropropane and mixtures thereof with hydrogen fluoride in a liquid phase in the presence of a fluorination catalyst;

(b) optionally removing HCl produced by step (a) by distillation; and

(c) recovering HF present after step (b) by liquid-vapor or liquid—liquid extraction;

(d) optionally removing unsaturated compounds present after step (c) by photochlorination; and

(e) recovering 1,1,1,3,3-pentafluoropropane; 1,1,1,3,3,3-hexafluoropropane or a mixture thereof from the result of step (d) by distillation.

#### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a schematic view of a reaction sequence according to the present invention.

#### DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

In the practice of the present invention, a fluorination catalyst, preferably a liquid phase catalyst is charged to a fluorination reactor prior to heating of the reactor. Useful fluorination catalysts non-exclusively include transition metal halides, Group IVb metal halides and Group Vb metal halides and mixtures thereof. Such non-exclusively include chrome halides, $SbCl_5$, $SbCl_3$, $TaCl_5$, $SnCl_4$, $NbCl_5$, $TiCl_4$, $MoCl_6$ and mixtures thereof. The reactor according to this invention may be any suitable fluorination reaction vessel but it should be constructed from materials which are resistant to the corrosive effects of hydrogen fluoride such as Hastalloy, Inconel, Monel and fluoropolymer-lined vessels. FIG. 1 shows the reaction of HF and HCC-240fa in the production of HFC-245fa, however alternatively, HCC-230 would be substituted for HCC-240 in the production of HFC-236fa or a mixture of HCC-230 and HCC-240 substituted to form a mixture of HFC-245fa and HFC 236fa. As seen in FIG. 1, HCC-240 and HF are simultaneously fed to the reactor. This is done after the reactor reaches the desired temperature. The reactor is run at a preferred temperature ranging from about 60° to about 140° C.; more preferably from about 70° to about 120° C. and most preferably from about 80° to about 110° C. The HF to HCC-240fa or HCC-230 mole ratio preferably ranges from about 4 to about 10; more preferably from about 5 to about 9 and most preferably from about 5.5 to about 8. Reactor pressure is preferably maintained at from about 50 to about 300 psig; more preferably from about 100 to about 275 psig and most preferably from about 125 to about 260 psig. A chlorine feed is optional, but preferred to keep the catalyst active. A chlorine feed is especially advantageous when antimony chloride is used as catalyst. For every pound of $SbCl_5$ catalyst, about 0.06 to about 0.2 lb. of chlorine is fed to the reactor. Chlorine can be charged in either a batch or continuous mode.

ClibPDF - www.fastio.com

Copy provided by USPTO from the PIRS Image Database on 08/02/2007

5,763,706

3

Optionally, but preferably, a top catalyst stripper is used such that most of the unreacted HF and catalyst is refluxed back to the reactor. The catalyst stripper is a packed pipe equipped with a condenser and this step is conducted by adjusting the temperature of the condenser to a range of from about 20° C. to about 100° C.

The effluent from the catalyst stripper is then optionally, but preferably, fed to an HCl distillation column to remove relatively pure HCl from the reaction mixture exiting the catalyst stripper. The pressure of the HCl column is preferred to match that of the reactor.

The essentially HCl free organic/HF mixture exiting the HCl column is optionally fed to a distillation column (not shown in FIG. 1) to remove heavy reaction products before the resulting mixture enters a sulfuric acid absorber. The pressure of this column is preferably maintained at from about 200 psig or less, more preferably from about 150 psig or less and most preferably from about 100 psig or less. The overhead of the distillation column contains HFC-245fa or HFC-236fa, volatile by-products as impurities and unreacted HF. The bottom cuts of the distillation column contains recyclable and non-recyclable heavies. The recyclable heavies are recycled back to the step (a) reactor. The non-recyclable heavies are disposed of.

The process then performs a step (c) of recovering HF present after step (b). This is preferably conducted by vapor-liquid or liquid—liquid extraction. This is preferably performed with a sulfuric acid absorber followed by a caustic or water scrubber. The mixture of fluorocarbons resulting from step (b) is in admixture with hydrogen fluoride. The HFC and HF may be separated by adding sulfuric acid to the HFC/HF mixture. This forms a phase rich in HFC and phase rich in the hydrogen fluoride and sulfuric acid. Sulfuric acid is preferably added such that the weight ratio of sulfuric acid to hydrogen fluoride ranges from about 1:1 to about 10:1. More preferably the weight ratio ranges from about 1:1 to about 8:1 and most preferably from about 2:1 to about 4:1. Preferably the extraction is conducted at a temperature of from about −20° C. to about 100° C., more preferably from about −10° C. to about 60° C., and most preferably from about 0° C. to about 40° C. The reaction is usually conducted at normal atmospheric pressure, however, higher or lower pressure conditions may be used by those skilled in the art. Pressure is preferably about 100 psig or less; more preferably about 50 psig or less, and most preferably about 20 psig or less.

The sulfuric acid/HF mixture from the sulfuric acid absorber is fed to a HF recovery column (not shown in FIG. 1). The HF and sulfuric acid may then be recycled. That is, the HF may be recirculated to the step (a) starting reaction for the formation of the HFC-245fa or HFC-236fa and the sulfuric acid may be recycled for use in the extraction step(c). The organic portion of the mixture exiting the sulfuric acid absorber is optionally fed into a distillation column (not shown in FIG. 1) to remove light products which are recycled.

Upon adding the sulfuric acid to the mixture of fluorocarbon and HF, two phases form. An upper phase is formed which is rich in organics and a lower phase which is rich in HF/sulfuric acid. By the term "rich" is meant, the phase contains more than 50% of the indicated component in that phase, and preferably more than 80% of the indicated component in that phase. The extraction efficiency of the fluorocarbon can range from about 90% to about 99%. After the separation of the phases, one removes the upper phase rich in the organics from the lower phase rich in the

4

hydrogen fluoride and sulfuric acid. One may optionally repeat the extraction by adding more sulfuric acid. Preferably one thereafter separates the hydrogen fluoride and sulfuric acid from the removed lower phase.

Alternatively the sulfuric acid absorber may be replaced by a HF/water azeotrope absorber. The HF/water azeotrope weight ratio is preferably maintained at about 42% HF and 58% water. HF is extracted and recycled back to the reactor in the same manner as in the sulfuric acid.

The HFC-245fa or HFC-236fa stream exiting either the light column or the sulfuric acid absorber is fed to a caustic or water scrubber for removal of acidity. Such a scrubber is well known in the art and conventionally comprises a caustic scrubbing with aqueous NaOH or KOH under conditions sufficient to neutralize residual acidity.

A photochlorination unit is then used to remove unsaturates in the HFC-245fa or HFC-236fa stream. This is done by adding chlorine to the stream to react with unsaturates in the presence of UV light. Photochlorination of unsaturates is itself well known in the art. The mole ratio of $Cl_2$/total unsaturates is preferably about 5 or less, more preferably about 4 or less, and most preferably about 3 or less. Pressure is not critical, although it is preferably operated under atmospheric or subatmospheric pressure. Temperature is preferably about 60° C. or less, more preferably about 40° C. or less and most preferably about 15° C. or less. UV light preferably has a wavelength of less than about 400 nanometers. The stream is exposed to the UV light for a time and at an energy level sufficient to reduce unsaturates to less than about 500 ppm.

HFC-245fa or HFC-236fa is then recovered in a step (e) by distillation of the intermediate resulting from step (d). Distillation can be a batch or continuous distillation. In the batch mode, one distillation column is sufficient. In a continuous mode, two distillation columns may be required, one to remove light distillates and the other to remove heavies. Pressure of the distillation(s) is preferred to run at about 200 psig or less, more preferably about 150 psig or less and most preferably about 100 psig or less.

The HFC-245fa or HFC-236fa produced has a purity of at least about 99.5%. The reactions of the present invention may be conducted in either a batch or continuous mode of operation, however, continuous operation is preferred.

The following non-limiting examples serve to illustrate the invention.

EXAMPLE 1

400 lbs. of antimony pentachloride catalyst is charged into a 50 gallon reactor. The reactor temperature is raised to 95° C. 605 lbs./day of HCC-240, 332 lbs./day of HF and 36 lbs./day of chlorine are fed to the reactor continuously. The reactor pressure is maintained at about 150 psig. The product stream contains HFC-245fa, HF, HCl and organic by-products including 1,3,3,3-tetrafluoropropene, 1-chloro-3,3,3-trifluoropropene, and 1-chloro-1,3,3,3-tetrafluoropropene. About 504 lbs./day of HCl is removed from the product stream by low temperature distillation. The HCl free product stream is then fed to a sulfuric acid absorber to extract excess HF and to recycle HF back to the reactor. The effluent of the absorber is fed to a acid scrubber to remove trace amounts of HF. The HF-free product stream is then fed to a photochlorinator. Chlorine is added to remove the unsaturates in the presence of UV light. The excess chlorine is removed by aqueous wash by using caustic and sodium sulfite. The chlorine-free effluent is then dried and fed to a final distillation. The HFC-245fa produced

ClibPDF - www.fastio.com

Copy provided by USPTO from the PIRS Image Database on 08/02/2007

HON00033121

5,763,706

5

6

has high quality (99.5% purity) and about 300 lbs./day is produced. The single pass yield is about 80%. The yield with recycle of heavies and lights is greater than 90%.

## EXAMPLE 2

Example 1 is repeated except a distillation column is added after the HCl column and before the sulfuric acid absorber. This column is used to remove the heavies from the crude product stream exiting the HCl column. About 50% of the heavies are recyclable and are recycled back to the reactor. The light product mixture exiting the top of the heavies column is fed back to the sulfuric acid absorber. The HFC-245fa produced is greater than 300 lbs./day.

## EXAMPLE 3

Example 2 is repeated except an additional distillation column is added between the caustic scrubber and the sulfuric acid absorber to remove and recycle light intermediates. The bottoms of this distillation column is fed to the caustic scrubber. The HFC-245fa produced is greater than 300 lbs./day.

## EXAMPLE 4

Example 1 is repeated except a distillation column is added before the photochlorinator and after the caustic scrubber to remove and recycle the light by-products. The bottom of this distillation column is fed to the photochlorinator. The HFC-245fa produced is greater than 300 lbs./day.

## EXAMPLE 5

Example 1 is repeated except the sulfuric acid absorber is replaced by HF/water azeotrope absorber. The BF/water azeotrope weight ratio is maintained at about 42% HF and 58% water. HF is extracted and recycled back to the reactor in the same manner as in the sulfuric acid.

## EXAMPLE 6

A 2.5 gallon PTFE-lined reactor is charged with 5 lbs. HF and 1.2 lbs. antimony pentachloride catalyst. 6.2 lbs. of 1,1,1,3,3-hexachloropropane are charged into the reactor. The reactor temperature is brought to 92° C. and pressure is controlled at less than 240 psig. Hourly samples are taken during the batch run. After 7 hours the reaction is complete and the yield of HFC-236fa is approximately 88%.

## EXAMPLE 7

Example 1 is repeated except the organic feed is changed from HCC-240 (1,1,1,3,3-pentachloropropane) to HCC-230 (1,1,1,3,3,3-hexachloropropane). The reaction is conducted at 95° C. The yield of HFC-236fa is 90%.

What is claimed is:

1. A process for the preparation of fluoropropanes which comprises (a) reacting a compound selected from the group consisting of 1,1,1,3,3-pentachloropropane; 1,1,1,3,3,3-hexachloropropane and mixtures thereof with hydrogen fluoride in the presence of a fluorination catalyst;

(b) optionally removing HCl produced by step (a); and

(c) recovering HF present after step (b).

2. The process of claim 1 further comprising the subsequent steps of: (d) removing unsaturated compounds present after step (c) by photochlorination; and (e) recovering 1,1,1,3,3-pentafluoropropane; 1,1,1,3,3,3-hexafluoropropane or a mixture thereof from the result of step (d) by distillation.

3. The process of claim 1 wherein step (a) is conducted in a liquid phase.

4. The process of claim 1 wherein the fluorination catalyst is selected from the group consisting of transition metal halides, Group IVb metal halides and Group Vb metal halides and mixtures thereof.

5. The process of claim 1 wherein the fluorination catalyst is selected from the group consisting of chrome halides, SbCl$_5$, SbCl$_3$, TaCl$_5$, SnCl$_4$, NbCl$_5$, TiCl$_4$, MoCl$_5$ and mixtures thereof.

6. The process of claim 1 wherein step (a) is conducted at a temperature of from about 60° to about 140° C.

7. The process of claim 1 wherein step (a) is conducted at a pressure of from about 50 to about 300 psig.

8. The process of claim 1 wherein chlorine feed to reaction step (a) in an amount sufficient to maintain the catalytic activity of the catalyst.

9. The process of claim 1 wherein the HF to HCC-240fa mole ratio ranges from about 4 to about 10.

10. The process of claim 1 further comprising an additional step after step (a) and before step (b), wherein any unreacted hydrogen fluoride and catalyst in the reaction product resulting from step (a) is removed and recycled to the step (a) reaction.

11. The process of claim 1 wherein step (b) is conducted by distillation.

12. The process of claim 1 further comprising an additional step after step (b) and before step (c), comprising distilling the product resulting from step (b) to produce an overhead of the distillation column comprising 1,1,1,3,3-pentafluoropropane; 1,1,1,3,3,3-hexafluoropropane or a mixture thereof, hydrogen fluoride, unsaturated compounds and other impurities.

13. The process of claim 11 wherein the additional distilling step after step (b) and before step (c) is conducted at a pressure of from about 200 psig or less.

14. The process of claim 1 wherein step (c) is conducted by liquid-vapor extraction.

15. The process of claim 13 wherein step (c) is conducted by adding sulfuric acid to the product resulting after step (b) and then separating therefrom a mixture of sulfuric acid and HF from a reaction mass balance comprising 1,1,1,3,3-pentafluoropropane; 1,1,1,3,3,3-hexafluoropropane or a mixture thereof, unsaturated compounds and other impurities.

16. The process of claim 15 comprising the step of removing residual acids from said reaction mass balance after step (c).

17. The process of claim 16 wherein the step of removing residual acids from said reaction mass balance after step (c) is conducted with a caustic scrubber or a water scrubber.

18. The process of claim 15 further comprising separating sulfuric acid and HF from the mixture of sulfuric acid and HF.

19. The process of claim 18 further comprising recycling HF recovered from step (c) back to step (a).

20. The process of claim 2 wherein step (d) is conducted with chlorine in a mole ratio of Cl$_2$ to total unsaturated compounds is about 5 or less.

21. The process of claim 2 wherein the the step (e) distillation is conducted at about 200 psig or less.

22. The process of claim 1 wherein 1,1,1,3,3-pentafluoropropane produced.

23. The process of claim 1 wherein 1,1,1,3,3,3-hexafluoropropane produced.

24. The process of claim 1 wherein a mixture of 1,1,1,3,3-pentafluoropropane and 1,1,1,3,3,3-hexafluoropropane is produced.

5,763,706

**7**

25. The process of claim 1 wherein steps (a) through (c) are conducted in a continuous mode.

26. The process of claim 2 wherein steps (a) through (e) are conducted in a continuous mode.

27. A process for the preparation of fluoropropanes which comprises

(a) reacting a compound selected from the group consisting of 1,1,1,3,3-pentachloropropane; 1,1,1,3,3,3-hexachloropropane and mixtures thereof with hydrogen fluoride in a liquid phase in the presence of a fluorination catalyst;

**8**

(b) optionally removing HCl produced by step (a) by distillation; and

(c) recovering HF present after step (b) by liquid-vapor or liquid—liquid extraction;

(d) optionally removing unsaturated compounds present after step (c) by photochlorination; and

(e) recovering 1,1,1,3,3-pentafluoropropane; 1,1,1,3,3,3-hexafluoropropane or mixtures thereof from the result of step (d) by distillation.

*    *    *    *    *

ClibPDF - www.fastio.com

Copy provided by USPTO from the PIRS Image Database on 08/02/2007

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO   : 5,763,706
DATED         : June 9, 1998
INVENTOR(S) : Tung et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 1, line 39, delete "is".

Column 3, line 19, delete "HIFC-245fa" and substitute therefor -- HFC-245fa --.

Column 3, line 50, delete "BF" and substitute therefor -- HF --.

Column 3, line 65, delete "$^{99}$%" and substitute therefor -- 99% --.

Column 5, line 35, delete "BF/water" and substitute therefor -- HF/water --.

Signed and Sealed this

Eighth Day of February, 2000

Attest:

Q. TODD DICKINSON

*Attesting Officer*                    *Commissioner of Patents and Trademarks*

ClibPDF - www.fastio.com

Copy provided by USPTO from the PIRS Image Database on 08/02/2007

HON0033124

# EXHIBIT 34

## FULLY REDACTED

# EXHIBIT 35

HON0021454

```
*************************************************************************
*                                                                      *
*       THIS IS THE CONTINUATION OF A PREVIOUSLY INTERRUPTED MESSAGE    *
*                    PLEASE SEE INFORMATION BELOW                       *
*                                                                      *
*************************************************************************
*                                                                      *
*                   Last page transmitted was    4                     *
*                    Entire message is   10  pages                     *
*                 Transmission resumes with page   5                   *
*                                                                      *
*                  Reduced copy of page 1 appears below                *
*                                                                      *
*************************************************************************
```

18.FEV.2000  16:43    SOLVAY MOH DCR 32 2 X645933                 N2940    F.1-10



## SOLVAY
DIRECTION CENTRALE RECHERCHE & TECHNOLOGIE
INTELLECTUAL ASSETS MANAGEMENT

VENABLE
Attorneys at Law
1201 New York Avenue, N.W.
Suite 1000
USA - WASHINGTON, D.C. 20005-3917
(Etats-Unis)

DCRT-IAM-PI/SMR:CLB

Brussels, 18 February, 2000

VIA FACSIMILE – 10 p.

Dear Mrs. Schneller,

Y/ref. : 32232-144124
O/ref. : S 95/43 – PJA – USA

We thank you for your letter dated September 20, 1999 and your subsequent reminders. Hereafter you find our instructions concerning the final rejection from the USPTO dated August 24, 1999. Please file the answer before February 24, 2000 to avoid the application becoming abandoned.

We would like to focus on claims 19- 26 relating to the hydrofluorination step:

We understand that the examiner's rejection of those claims over VAN DER PUY is based on the alleged analogy of 1,1,1,3,3,3-hexachloropropane and 1,1,1,3,3,3-pentachloro-propane, which would convey a reasonable expectation of success when using 1,1,1,3,3,3-pentachloropropane with a catalyst and hydrogen fluoride in analogy to VAN DER PUY.

We submit a prior art reference (Advances in Fluorine Chemistry, Vol.3, p.180-183, 200-209) relating to the synthesis of 2,2-dihydrofluoropropanes.

The reference teaches (p. 207, 4th paragraph) that 1,1,1,3,3,3-hexafluoropropane which is produced in VAN DER PUY can be obtained with 85% yield by fluorination of 1,3-dibromo-1,1,3,3-tetrafluoropropane, which has the same substitution pattern as the 1,1,1,3,3,3-hexachloropropane in VAN DER PUY in presence of antimony catalyst at 100°C.

SOLVAY S.A. ... Bruxelles ... T.V.A. BE 403 091 220 ...

02/18/00  FRI 10:54  [TX/RX NO 8110]

# EXHIBIT 36

.ISHERS) LTD.

CA) LTD.

TRALIA) LTD.

ADA) LTD.
ie, 6
ZEALAND) LTD.
treet

onsin Avenue, 14

# CONTENTS

|  | PAGE |
|---|---|
| EFFECTS OF ADJACENT PERFLUOROALKYL GROUPS ON CARBONYL REACTIVITY ...    ...    ...    ...    ...<br>H. P. Braendlin, Ph.D. and E. T. McBee, Ph.D.    ... | 1 |
| PERFLUOROALKYL DERIVATIVES OF THE ELEMENTS    ...<br>H. C. Clark, Ph.D.    ...    ...    ...    ... | 19 |
| MECHANISMS OF FLUORINE DISPLACEMENT ...    ...    ...<br>R. E. Parker, Ph.D.    ...    ...    ...    ...    ... | 63 |
| NITROGEN FLUORIDES AND THEIR INORGANIC DERIVATIVES<br>C. B. Colburn, Ph.D. | 92 |
| THE ORGANIC FLUOROCHEMICALS INDUSTRY    ...    ...<br>J. M. Hamilton, Jr., Ph.D. | 117 |
| THE PREPARATION OF ORGANIC FLUORINE COMPOUNDS BY HALOGEN EXCHANGE ...    ...    ...    ...    ...<br>A. K. Barbour, Ph.D., L. J. Belf, Dip.Chem.Eng. and<br>M. W. Buxton, Ph.D.    ...    ...    ...    ... | 181 |
| INDEX    ...    ...    ...    ...    ...    ...    ... | 271 |

(047.1)
(047.1)

mited

an Press, Bath

0716844

1, 1949)
7, 1951)

7, 1956)

# THE PREPARATION OF ORGANIC FLUORINE COMPOUNDS BY HALOGEN EXCHANGE

A. K. BARBOUR, L. J. BELF and M. W. BUXTON

*Imperial Smelting Corporation Limited, Avonmouth*

7)

)

551,573

Sept. 3,

946)

55)
5)

6)
6)
ept. 16,

lov. 10,

May 17,

June 11,

Mar. 22,

1)

| Introduction | ... | ... | ... | ... | ... | ... | ... | 182 |
|---|---|---|---|---|---|---|---|---|
| Reagents for Fluorination by Halogen Exchange | ... | ... | ... | ... | 183 |
|   Anhydrous hydrogen fluoride | ... | ... | ... | ... | ... | 183 |
|   Antimony trifluoride | ... | ... | ... | ... | ... | ... | 185 |
|   Antimony chlorofluoride (or bromofluoride) | ... | ... | ... | 185 |
|   Antimony pentafluoride | ... | ... | ... | ... | ... | 186 |
|   Alkali metal fluorides | ... | ... | ... | ... | ... | 186 |
|   Argentous fluoride | ... | ... | ... | ... | ... | ... | 187 |
|   Mercurous fluoride | ... | ... | ... | ... | ... | ... | 187 |
|   Mercuric fluoride | ... | ... | ... | ... | ... | ... | 187 |
|   Other reagents | ... | ... | ... | ... | ... | ... | 188 |
| Preparation of Fluoroalkanes | ... | ... | ... | ... | ... | 188 |
|   Fluoromethanes | ... | ... | ... | ... | ... | ... | 188 |
|     Perhalogenomethanes containing chlorine and fluorine | ... | 188 |
|     Perhalogenomethanes containing fluorine and bromine or iodine | ... | ... | ... | ... | ... | 192 |
|     Fluorohalogenomethanes containing one hydrogen atom | ... | 193 |
|     Fluorohalogenomethanes containing two or three hydrogen atoms | ... | ... | ... | ... | ... | 194 |
|   Fluoroethanes | ... | ... | ... | ... | ... | ... | 194 |
|     Preparation of compounds of formula $CX_3$–R | ... | ... | 194 |
|     Preparation of compounds of formula $CHX_2$–R | ... | ... | 199 |
|     Preparation of compounds of formula $CH_2X$–R | ... | ... | 200 |
|   Fluoropropanes | ... | ... | ... | ... | ... | ... | 201 |
|     Orientation rules | ... | ... | ... | ... | ... | 201 |
|     Preparation of compounds of formula $R–CX_2$–R′ | ... | ... | 202 |
|     Preparation of compounds of formula R–CHX–R′ | ... | ... | 206 |
|     Preparation of compounds of formula $R–CH_2$–R′ | ... | ... | 207 |
|   Fluorobutanes | ... | ... | ... | ... | ... | ... | 209 |
|     Preparation of fluoroperhalogenobutanes | ... | ... | 209 |
|     Preparation of compounds of formula $R–CX_2–CH_2$–R′ | ... | 211 |
|     Preparation of compounds of formula $R–CHX–CH_2$–R′ | ... | 212 |
|     Preparation of compounds of formula $R–CX_2$–CHX–R′ | ... | 213 |
|     Preparation of compounds of formula $R–CX_2–CX_2$–R′ | ... | 213 |
|     Preparation of compounds of formula $R–CH_2–CH_2$–R′ | ... | 214 |
|     Branched-chain fluorobutanes | ... | ... | ... | 215 |
|   Fluoropentanes | ... | ... | ... | ... | ... | ... | 215 |
|     Straight-chain | ... | ... | ... | ... | ... | 215 |
|     Branched-chain | ... | ... | ... | ... | ... | 216 |
|     Cyclic | ... | ... | ... | ... | ... | ... | 217 |
|   Fluorohexanes | ... | ... | ... | ... | ... | ... | 217 |
|     Straight-chain | ... | ... | ... | ... | ... | 217 |
|     Cyclic | ... | ... | ... | ... | ... | ... | 218 |
|   Fluoroheptanes | ... | ... | ... | ... | ... | ... | 220 |
|   Fluoro-octanes | ... | ... | ... | ... | ... | ... | 221 |
|   Higher Fluoroalkanes | ... | ... | ... | ... | ... | 222 |

ORGANIC FLUORINE COMPOUNDS BY HALOGEN EXCHANGE

anhydrous hydrogen fluoride (AHF), of approximately 99 per cent purity. The product is marketed in mild steel cylinders, or tank cars for larger quantities.

AHF is cheap and easily handled. It has been used extensively for fluorination of organic halides by exchange, either alone, or more often in conjunction with antimony or mercury salts.

In general, AHF alone will cause substitution of only very reactive halogen atoms such as benzylic halogen atoms. For example, benzotrichloride is converted into benzotrifluoride under mild conditions[415,617]. Similarly, AHF will effect substitution by fluorine of the chlorine atoms in diphenyldichloromethane[470], and triphenylchloromethane[471]; the last substitution occurs at room temperature. Again, when pentachloroethylbenzene is heated with AHF under pressure, the chlorine atoms of the $-CCl_2$–group are readily exchanged, while the less-reactive chlorine atoms of the $-CCl_3$ group are incompletely exchanged[441].

Less-reactive halogen atoms, such as those in a halogeno-alkane, require more vigorous conditions for replacement to occur with AHF. Thus, carbon tetrachloride reacts with AHF at 450°/3000 p.s.i. to give trichlorofluoromethane[96]. Again, pentachloroethane, heated with AHF at 225°/500 p.s.i., gives only a monofluoro-ethane[86,244,668]. The somewhat more reactive halogens in 1,1,1-trichloroethane can, however, be exchanged completely using AHF under vigorous conditions[86,259].

Exchange with anhydrous hydrogen fluoride in the presence of catalysts is the most widely used method for preparing organic fluorine compounds. The reaction may be carried out either in the liquid-phase, in which case antimony salts are used as catalyst or fluorine carrier, or in the vapour-phase, when a mixture of AHF and the vapour of the organic halide is passed over a heated catalyst, usually consisting of a metal halide on an inert support.

The liquid-phase reaction is used extensively both as a laboratory method and for the industrial production of fluorine compounds, especially for the preparation of aliphatic chlorofluoro-compounds. The catalyst used is antimony trifluoride together with a small quantity of chlorine or bromine which converts a part of the antimony into the pentavalent state, thereby increasing its activity. This catalyst is mixed with the organic halide and AHF, which supplies the fluorine for the exchange. The reactants are heated in a metal vessel, usually made of mild steel and able to withstand moderate pressures. It is often arranged to bleed off the hydrogen chloride and organic fluoride by equipping the vessel with a fractionating column. Typical examples of laboratory-scale equipment for conducting fluorinations of this type have been described[5,81]. This process is used for the industrial preparation of trichlorofluoromethane and dichlorodifluoromethane from carbon tetrachloride, and of trichlorotrifluoroethane and dichlorotetrafluoroethane from hexachloroethane (see the sections on fluoromethanes and fluoroethanes, and Dr Hamilton's article on pages 117–80).

Vapour-phase fluorination of organic halides using AHF is sometimes used as an alternative to the liquid-phase reaction, for example as an industrial process for preparing the fluoro-methanes and -ethanes used as refrigerants and aerosol propellants. The catalyst usually consists of one of the halides of iron, chromium, vanadium or nickel mounted on a support such as activated

ORGANIC FLUORINE COMPOUNDS BY HALOGEN EXCHANGE

Mercuric fluoride is a powerful fluorinating agent. Unlike argentous and mercurous fluoride it does not cause elimination of hydrogen halide from an organic halide. Furthermore, the whole of its fluorine is available for exchange. It has found extensive application for the further fluorination of a compound which has been treated and partly fluorinated by a less active fluorinating agent. This observation applies especially to the fluorination of halogeno-alkanes. For example, halogeno-alkanes containing a $-CHCl_2$ group are slowly converted to $-CHClF$ by $SbF_3/Cl_2$, but complete fluorination to $-CHF_2$ is often difficult with this reagent. There are many examples, however, illustrating the ability of mercuric fluoride to fluorinate a $-CHCl_2$ group in halogeno-alkanes completely[48,189,203,259,274,285,316]. Again, halogeno-alkanes containing the group $-CBrF_2$ or $-CClF_2$ are often difficult to fluorinate further by means of antimony fluorides, but may be completely fluorinated using mercuric fluoride[49,183,189,259,274,308,311,317,318,335,346]. Single halogen atoms in halogeno-alkanes are replaced by fluorine using mercuric fluoride[48,299].

### OTHER REAGENTS

There are a number of inorganic fluorides which cause replacement of hydrogen atoms and saturation of double bonds in organic compounds, in addition to exchanging halogen atoms present, by fluorine atoms. Argentic, cobaltic and manganic fluorides are important examples of this type of reagent. They will not be considered in detail here as their preparation and applications have been reviewed recently[18], but examples of their use as halogen exchange reagents will be given in the following sections.

## PREPARATION OF FLUOROALKANES

### FLUOROMETHANES

#### Perhalogenomethanes containing Chlorine and Fluorine

The perhalogenomethanes are of considerable and rapidly-growing industrial importance. Dichlorodifluoromethane and trichlorofluoromethane are widely used as refrigerants and aerosol propellants, while the more highly fluorinated compounds, $CClF_3$ and $CF_4$, are used to some extent as specialized low-temperature refrigerants. Because of this industrial interest, a large patent literature has accumulated on the preparation of these compounds, both by the fluorination of carbon tetrachloride:

$$2CCl_4 + 3HF \rightarrow CCl_2F_2 + CCl_3F + 3HCl$$

and by processes based on alternative starting materials. In this section a comprehensive but necessarily superficial review is presented of the literature pertaining to the preparation of $CCl_2F_2$ and $CCl_3F$; a more detailed account is given by Dr J. M. Hamilton in his article on the Organic Fluorochemicals Industry (pages 117–80).

Substitution of fluorine atoms for chlorine atoms in carbon tetrachloride still provides the basis for all industrial processes for the production of these compounds. Such processes may be divided into two general types, viz: liquid-phase and vapour-phase.

# EXHIBIT 37

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

Original Eighth Edition, August 2001
Latest Revision September 2007



## U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

Rev. 6, Sept. 2007

**2004**                    MANUAL OF PATENT EXAMINING PROCEDURE

desires to have the U.S. Patent and Trademark Office consider after a patent has issued, such person may file a request for >*ex parte*< reexamination of the patent (see 37 CFR 1.510 and MPEP § 2209 through § 2220). >For a request for *inter partes* reexamination, see 37 CFR 1.913 and MPEP § 2609 through § 2620.<

## 2004    Aids to Compliance With Duty of Disclosure [R-2]

While it is not appropriate to attempt to set forth procedures by which attorneys, agents, and other individuals may ensure compliance with the duty of disclosure, the items listed below are offered as examples of possible procedures which could help avoid problems with the duty of disclosure. Though compliance with these procedures may not be required, they are presented as helpful suggestions for avoiding duty of disclosure problems.

1. Many attorneys, both corporate and private, are using letters and questionnaires for applicants and others involved with the filing and prosecution of the application and checklists for themselves and applicants to ensure compliance with the duty of disclosure. The letter generally explains the duty of disclosure and what it means to the inventor and assignee. The questionnaire asks the inventor and assignee questions about

— the origin of the invention and its point of departure from what was previously known and in the prior art,

— possible public uses and sales,

— prior publication, knowledge, patents, foreign patents, etc.

The checklist is used by the attorney to ensure that the applicant has been informed of the duty of disclosure and that the attorney has inquired of and cited material prior art.

The use of these types of aids would appear to be most helpful, though not required, in identifying prior art and may well help the attorney and the client avoid or more easily explain a potentially embarrassing and harmful "fraud" allegation.

2. It is desirable to ask questions about inventorship. Who is the proper inventor? Are there disputes or possible disputes about inventorship? If there are

questions, call them to the attention of the U.S. Patent and Trademark Office.

3. It is desirable to ask questions of the inventor about the disclosure of the best mode. Make sure that the best mode is described. See MPEP § 2165 - § 2165.04.

4. It is desirable for an attorney or agent to make certain that the inventor, especially a foreign inventor, recognizes his or her responsibilities in signing the oath or declaration. See 37 CFR 1.69(a).

*37 CFR 1.69. Foreign language oaths and declarations.*

(a) Whenever an individual making an oath or declaration cannot understand English, the oath or declaration must be in a language that such individual can understand and shall state that such individual understands the content of any documents to which the oath or declaration relates.

*****

Note MPEP § 602.06 for a more detailed discussion.

5. It is desirable for an attorney or agent to carefully evaluate and explain to the applicant and others involved the scope of the claims, particularly the broadest claims. Ask specific questions about possible prior art which might be material in reference to the broadest claim or claims. There is some tendency to mistakenly evaluate prior art in the light of the gist of what is regarded as the invention or narrower interpretations of the claims, rather than measuring the art against the broadest claim with all of its reasonable interpretations. It is desirable to pick out the broadest claim or claims and measure the materiality of prior art against a reasonably broad interpretation of these claims.

6. It may be useful to evaluate the materiality of prior art or other information from the viewpoint of whether it is the closest prior art or other information. This will tend to put the prior art or other information in better perspective. See *Semiconductor Energy Laboratory Co. v. Samsung Electronics Co.*, 204 F.3d 1368, 1374, 54 USPQ2d 1001, 1005 (Fed. Cir. 2000) ("A withheld reference may be highly material when it discloses a more complete combination of relevant features, even if those features are before the patent examiner in other references." (citations omitted)). However, 37 CFR 1.56 may still require the submission of prior art or other information which is not as close as that of record.

7. Care should be taken to see that prior art or other information cited in a specification or in an information disclosure statement is properly described and that the information is not incorrectly or incompletely characterized. It is particularly important for an attorney or agent to review, before filing, an application which was prepared by someone else, e.g., a foreign application. It is also important that an attorney or agent make sure that foreign clients, including foreign applicants, attorneys, and agents understand the requirements of the duty of disclosure, and that the U.S. attorney or agent review any information disclosure statements or citations to ensure that compliance with 37 CFR 1.56 is present. See *Semiconductor Energy Laboratory Co. v. Samsung Electronics Co.*, 204 F.3d 1368, 54 USPQ2d 1001 (Fed. Cir. 2000). During prosecution patentee submitted an untranslated 29-page Japanese reference as well as a concise explanation of its relevance and an existing one-page partial English translation, both of which were directed to less material portions of the reference. The untranslated portions of the Japanese reference "contained a more complete combination of the elements claimed [in the patent] than anything else before the PTO." 204 F.3d at 1374, 54 USPQ2d at 1005. The patentee, whose native language was Japanese, was held to have understood the materiality of the reference. "The duty of candor does not require that the applicant translate every foreign reference, but only that the applicant refrain from submitting partial translations and concise explanations that it knows will misdirect the examiner's attention from the reference's relevant teaching." 204 F.3d at 1378, 54 USPQ2d at 1008. See also *Gemveto Jewelry Co. v. Lambert Bros., Inc.*, 542 F. Supp. 933, 216 USPQ 976 (S.D.N.Y. 1982) wherein a patent was held invalid or unenforceable because patentee's foreign counsel did not disclose to patentee's United States counsel or to the Office prior art cited by the Dutch Patent Office in connection with the patentee's corresponding Dutch application. The court stated, 542 F. Supp. at 943, 216 USPQ at 985:

> Foreign patent attorneys representing applicants for U.S. patents through local correspondent firms surely must be held to the same standards of conduct which apply to their American counterparts; a double standard of accountability would allow foreign attorneys and their clients to escape responsibility for fraud or inequitable conduct merely by withholding from the local correspondent information unfavorable to patentability and claiming ignorance of United States disclosure requirements.

8. Care should be taken to see that inaccurate statements or inaccurate experiments are not introduced into the specification, either inadvertently or intentionally. For example, stating that an experiment "was run" or "was conducted" when in fact the experiment was not run or conducted is a misrepresentation of the facts. No results should be represented as actual results unless they have actually been achieved. Paper >or prophetic< examples should not be described using the past tense. *>Hoffman-La Roche, Inc. v. Promega Corp.*, 323 F.3d 1354, 1367, 66 USPQ2d 1385, 1394 (Fed. Cir. 2003); see also< MPEP § 608.01(p) and § 707.07(l). Also, misrepresentations can occur when experiments which were run or conducted are inaccurately reported in the specification, e.g., an experiment is changed by leaving out one or more ingredients. See *Steierman v. Connelly*, 192 USPQ 433 (Bd. Pat. Int. 1975); 192 USPQ 446 (Bd. Pat. Int. 1976).

9. Do not rely on the examiner of a particular application to be aware of other applications belonging to the same applicant or assignee. It is desirable to call such applications to the attention of the examiner even if there is only a question that they might be "material to patentability" of the application the examiner is considering. >See *Dayco Prod., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1365-69, 66 USPQ2d 1801, 1806-08 (Fed. Cir. 2003) (contrary decision of another examiner reviewing substantially similar claims is 'material'; copending application may be 'material' even though it cannot result in a shorter patent term, when it could affect the rights of the patentee to assign the issued patents).< It is desirable to be particularly careful that prior art or other information in one application is cited to the examiner in other applications to which it would be material. Do not assume that an examiner will necessarily remember, when examining a particular application, other applications which the examiner is examining, or has examined. **>A "lapse on the part of the examiner does not excuse the applicant."< *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1576, 228 USPQ 32, 35 (Fed. Cir. 1985)**>; see also MPEP § 2001.06(b).<

10. When in doubt, it is desirable and safest to submit information. Even though the attorney, agent, or

**2004**                    MANUAL OF PATENT EXAMINING PROCEDURE

applicant doesn't consider it necessarily material, someone else may see it differently and embarrassing questions can be avoided. The court in *U.S. Industries v. Norton Co.*, 210 USPQ 94, 107 (N.D. N.Y. 1980) stated "In short, the question of relevancy in close cases, should be left to the examiner and not the applicant." See also *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 22 USPQ2d 1025 (Fed. Cir. 1992).

11. It may be desirable to submit information about prior uses and sales even if it appears that they may have been experimental, not involve the specifically claimed invention, or not encompass a completed invention. See *Hycor Corp. v. The Schlueter Co.*, 740 F.2d 1529, 1534-37, 222 USPQ 553, 557-559 (Fed. Cir. 1984). See also *LaBounty Mfg., Inc. v. U.S. Int'l Trade Comm'n*, 958 F.2d 1066, 22 USPQ2d 1025 (Fed. Cir. 1992).

12. Submit information promptly. An applicant, attorney, or agent who is aware of prior art or other information and its significance should submit same early in prosecution, e.g., before the first action by the examiner, and not wait until after allowance. Potentially material information discovered late in the prosecution should be immediately submitted. That the issue fee has been paid is no reason or excuse for failing to submit information. See *Elmwood Liquid Products, Inc. v. Singleton Packing Corp.*, 328 F. Supp. 974, 170 USPQ 398 (M.D. Fla. 1971).

13. It is desirable to avoid the submission of long lists of documents if it can be avoided. Eliminate clearly irrelevant and marginally pertinent cumulative information. If a long list is submitted, highlight those documents which have been specifically brought to applicant's attention and/or are known to be of most significance. See *Penn Yan Boats, Inc. v. Sea Lark Boats, Inc.*, 359 F. Supp. 948, 175 USPQ 260 (S.D. Fla. 1972), *aff'd*, 479 F.2d 1338, 178 USPQ 577 (5th Cir. 1973), *cert. denied*, 414 U.S. 874 (1974). But cf. *Molins PLC v. Textron Inc.*, 48 F.3d 1172, 33 USPQ2d 1823 (Fed. Cir. 1995).

14. Watch out for continuation-in-part applications where intervening material information or documents may exist; particularly watch out for foreign patents and publications related to the parent application and dated more than 1 year before the filing date of the CIP. These and other intervening documents may be material information. See *In re Ruscetta*, 255 F.2d 687, 690-91, 118 USPQ 101, 104 (CCPA 1958); *In re van *>Langenhoven<*, 458 F.2d 132, 173 USPQ 426 (CCPA 1972); *Chromalloy American Corp. v. Alloy Surfaces Co.*, 339 F. Supp. 859, 173 USPQ 295 (D. Del. 1972).

15. Watch out for information that might be deemed to be prior art under 35 U.S.C. 102(f) and (g).

Prior art under 35 U.S.C. 102(f) may be available under 35 U.S.C. 103. See *OddzOn Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1401, 43 USPQ2d 1641, 1644 (Fed. Cir. 1997)(35 U.S.C. "102(f) is a prior art provision for purposes of § 103"); *Dale Electronics v. R.C.L. Electronics*, 488 F.2d 382, 386, 180 USPQ 225, 227 (1st. Cir. 1973); and *Ex parte Andresen*, 212 USPQ 100, 102 (Bd. App. 1981).

Note also that evidence of prior invention under 35 U.S.C. 102(g) may be available under 35 U.S.C. 103, such as in *In re Bass*, 474 F.2d 1276, 177 USPQ 178 (CCPA 1973).

Note 35 U.S.C. 103(c) disqualifies 35 U.S.C. 102(f)/103 or 102(g)/103 prior art which was, at the time the second invention was made, owned by or subject to an obligation of assignment to, the person who owned the first invention. Further note that 35 U.S.C. 103(c) disqualifies 35 U.S.C. 102(e)/103 prior art for applications filed on or after November 29, 1999. See MPEP § 706.02(l) - § 706.02(l)(2).

16. Watch out for information picked up by the inventors and others at conventions, plant visits, in-house reviews, etc. See, for example, *Dale Electronics v. R.C.L. Electronics*, 488 F.2d 382, 386-87, 180 USPQ 225, 228 (1st Cir. 1973).

17. Make sure that all of the individuals who are subject to the duty of disclosure, such as spelled out in 37 CFR 1.56, are informed of and fulfill their duty.

18. Finally, if information was specifically considered and discarded as not material, this fact might be recorded in an attorney's file or applicant's file, including the reason for discarding it. If judgment might have been bad or something might have been overlooked inadvertently, a note made at the time of evaluation might be an invaluable aid in explaining that the mistake was honest and excusable. Though such records are not required, they could be helpful in recalling and explaining actions in the event of a question of "fraud" or "inequitable conduct" raised at a later time.

# EXHIBIT 38

## FULLY REDACTED

# EXHIBIT 39

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| In re: | Tung et al. | U.S. Patent No.: | 7,214,839 |
| Appl. No.: | 10/444,610 | Filed: | May 23, 2003 |
| | | Issue Date: | May 8, 2007 |

For:     METHOD OF MAKING
         HYDROFLUOROCARBONS

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### TRANSMITTAL FOR STATUTORY DISCLAIMER
### UNDER 37 C.F.R. 1.321(b)

Submitted herewith is a disclaimer of the entire term of the above-identified

patent by the assignee pursuant to 37 C.F.R. 1.321(b).

The U.S. Patent and Trademark Office is hereby authorized to charge the fee of

$130.00 under 37 C.F.R. 1.20(d), and any other fees necessary to allow consideration and

entry of the statutory disclaimer, to the assignee's deposit account number 01-1125.

Respectfully submitted,

*Scott D. Jacobson*
Registration No. 42,689
Honeywell International Inc.
101 Columbia Road, Solvay Building
Morristown, NJ  07962

---

CERTIFICATION OF FACSIMILE TRANSMISSION
I hereby certify that this paper is being facsimile transmitted to the U.S. Patent and Trademark Office to
Fax No. (571) 273-8300 on the date shown below.

JULIANNE  HOLLAND

December 13, 2007
Date

---

**HON0033987**

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re:        Tung et al.
Appl. No.:    10/444,610                              Patent No.: 7,214,839
Filed:        May 23, 2003                            Issue Date: May 8, 2007
For:          METHOD OF MAKING HYDROFLUOROCARBONS

Certificate of Correction Branch
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**DISCLAIMER OF ENTIRE TERM OF PATENT**
**UNDER 35 U.S.C. § 253 AND 37 C.F.R. § 1.321(b)**

Sir:

The assignee of record of U.S. Patent No. 7,214,839 ("the '839 patent"), Honeywell International Inc., hereby disclaims the entire term of the '839 patent to the public.

Honeywell International Inc. was assigned the '839 patent from the inventors in an assignment that was recorded in the United States Patent and Trademark Office on May 23, 2003, at **Reel 014112, Frame 0105.**

This disclaimer is being made because it has come to the assignee's attention that certain incorrect statements were made regarding assignee's U.S. Patent Nos. 5,574,192 ("the '192 patent", also referred to below as "VanDerPuy") and 5,763,706 ("the '706 patent", also referred to below as "Tung, et al") during the prosecution of the application leading to the '839 patent. These statements were made in good faith with no deceptive intent. During proceedings in a case pending in the U.S. District Court in Delaware, the assignee became aware of the incorrect nature of these statements. Accordingly, the assignee wishes to notify the USPTO of these incorrect statements, retract them to correct the public record, and expressly disclaim the entire term of the patent that was issued as a result of them.

A.    Representative statements regarding the '192 patent made during prosecution of the '839 patent

By way of example, in the April 3, 2006 Response to the Second and Final Office Action it was stated:

> To begin, VanDerPuy fails to teach the removal of HCl in a continuous process. The only mention of any HCl removal in VanDerPuy's disclosure is in Example 5, where HCl is *periodically* vented. During such a periodic venting of HCl, the process would be operating in a batch mode. Further, as stated in VanDerPuy in

HON0033988

In re: Tung et al.
Appl. No.: 10/444,610
Filed: May 23, 2003
Page 2

col. 3, lines 31-35, chlorine is only continuously added while in continuous mode, but is *periodically added* when the process is operating in a batch mode. Thus, the only embodiment of VanDerPuy where HCl is removed is during a *batch mode*, where chlorine is then also added periodically, *not continuously*. VanDerPuy's only embodiment including a continuous addition of chlorine would not include the removal of HCl, thereby teaching away from Wilmet '817 and the present claims. (Emphasis in original).

These same arguments were repeated in assignee's Appeal Brief:

First, VanDerPuy, et al fails to teach the present step (d), which requires removal of *any* HCl produced by a reaction of the present step (a). The only mention of any HCl removal in VanDerPuy, et al's disclosure is in Examples 3 and 5 where an HCl by-product is *periodically* vented, during the venting of pressure in excess of 2655 Kpa. It should be noted that in Example 3 the hydrogen fluoride to hydrochlorocarbon mole ratio would be 12.5:1, which is well below the presently required ratio at least about 15:1. In addition, during such a periodic venting of HCl, the process would be operating in a batch mode. Importantly, in these examples, only a periodic venting to relieve pressure is mentioned, rather than a required removal of any produced HCl.

&ast;          &ast;          &ast;

VanDerPuy, et al show continuously adding chlorine, but does not show *removing any HCl* produced by step (a). (Emphasis in original).

These statements, and others to the same effect, are incorrect. Persons skilled in the art understand that the '192 patent discloses and enables a process that includes the continuous removal of HCl as a reaction product. The statements made to the contrary are inaccurate.

B.    Representative statements regarding the '706 patent made during prosecution of the '839 patent

In the November 17, 2005 Amendment, the response stated:

Although Tung, et al show a chlorine feed, Tung, et al is not properly combinable with Wilmet, et al because Tung, et al teach a lower HF:HCC mole ratio of 4-10 rather than 15 more as presently claimed.

Later, in the April 3, 2006 response, it was stated:

Furthermore, as previously stated, Tung teaches a HF:HCC mole ratio of 4-10, rather than 15:1 or more, as presently claimed. The Examiner asserts that this limitation of Tung is not critical. However, there is no teaching anywhere in Tung

HON0033989

In re: Tung et al.
Appl. No.: 10/444,610
Filed: May 23, 2003
Page 3

> that offers a motivation for one skilled in the art to look outside this mole ratio of 4-10, to a much higher ratio of 15:1 or more.

The response continued in the later-filed Appeal Brief:

> Furthermore, Tung, et al teaches a HF:HCC mole ratio of 4-10, that is 4:1 to 10:1, rather than the presently required ratio of 15:1 in the present claims. The Examiner takes the position that this limitation of Tung, et al is not critical. However, there is *no* teaching anywhere in Tung, et al that offers a motivation for one skilled in the art to look outside this mole ratio of 4-10, much less to the much higher ratio of 15:1 or more. (Emphasis in original).

Assignee notes that these arguments regarding the '706 patent are incorrect and were mistaken. The following Examiner's response to the statement in the November 17, 2005 Amendment was correct (Response by Examiner, dated 1-12-2006):

> Regarding Tung et al, the examiner finds the molar ratio of HF to hydrochlorocarbon immaterial with regard to the compatibility of the two references. Tung et al state that the *preferred* ratio is from 4 to about 10, however, a person of ordinary skill would recognize that that limitation is not critical given the disclosure of Tung et al. (Emphasis in original).

The assignee also notes that the disclosure and many of the claims of the '706 are not limited to the preferred mole ratio referenced in the '706 patent specification.

C.    Representative statements comparing the '192 patent with the '817 patent made during prosecution of the '839 patent

Misstatements regarding comparisons between the '192 patent and the '817 patent were also made, e.g.:

> VanDerPuy, et al show continuously adding chlorine, but does not show removing any HCl produced by step (a). It is therefore submitted that one skilled in the art would not have combined VanDerPuy, et al with Wilmet, et al '817 in an effort to devise a continuous process with a continuous addition of chlorine and a removal of any HCl formed. One skilled in the art would not have any selection criteria at hand to combine the features of Wilmet et al and VanDerPuy, et al to hypothetically form the instant invention. The processes of Wilmet, et al and VanDerPuy, et al are simply incompatible with each other such that they are not combinable due to conflicting process requirements. (Substitute Appeal Brief 09-22-06).

These statements regarding the '192 and '817 patents are inaccurate in that persons skilled in the art understand that the '192 patent discloses the continuous removal of HCl as a reaction product and as a continuous process.

HON0033990

In re: Tung et al.
Appl. No.: 10/444,610
Filed:  May 23, 2003
Page 4

Accordingly, the assignee hereby disclaims to the public the entire term of U.S. Patent

No. 7,214,839 pursuant to 35 U.S.C. § 253 and 37 C.F.R. § 1.321(b).

Respectfully submitted,

Scott D. Jacobson
Registration No. 42,689
Honeywell International Inc.
101 Columbia Road, Solvay Building
Morristown, NJ  07962
Tel. (973) 455-2013

---

CERTIFICATION OF FACSIMILE TRANSMISSION
I hereby certify that this paper is being facsimile transmitted to the U.S. Patent and Trademark Office to
Fax No. (571) 273-8300 on the date shown below.

JULIANNE  HOLLAND

December 13, 2007
Date

---

HON0033991

# EXHIBIT 40

## FULLY REDACTED

# EXHIBIT 41

## FULLY REDACTED

# EXHIBIT 42

## FULLY REDACTED

# EXHIBIT 43

## FULLY REDACTED

# EXHIBIT 44

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| SOLVAY, S.A. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-557-SLR |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| HONEYWELL SPECIALTY | ) | |
| MATERIALS, LLC and | ) | |
| HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Defendants. | ) | |

**SOLVAY'S RESPONSES AND OBJECTIONS TO
DEFENDANT HONEYWELL INTERNATIONAL INC.'S
FIRST SET OF REQUESTS FOR ADMISSION NOS. 1-27**

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Plaintiff Solvay,

S.A. ("Solvay") responds to defendant Honeywell International Inc.'s ("Honeywell's") first set

of requests for admission nos. 1-27 as follows.

## GENERAL OBJECTIONS AND QUALIFICATIONS

1.    Solvay has not yet completed its investigation, collection of information,

discovery and analysis relating to this action. These responses are based on information known

and available to Solvay at this time. Solvay reserves the right to modify, change, or supplement

its responses and to produce additional evidence at trial.

2.    Solvay reserves all objections to the use of its answers. All such objections may

be interposed by Solvay at the time of trial or as otherwise required by the rules or order of the

Court.

3.    Insofar as an answer by Solvay may be deemed to be a waiver of any privilege or

right, such waiver shall be deemed to be a limited waiver with respect to that particular answer

only.

Subject to and without waiver of its objections, Solvay acknowledges that it does not intend to assert that any invention claimed in the '817 patent was reduced to practice in the United States prior to October 23, 1995.

**Request for Admission No. 6:**

SOLVAY will not assert in this case that Jean-Paul Schoebrechts is an inventor of any invention claimed in the '817 PATENT.

**Response to Request for Admission No. 6:**

Solvay objects to Honeywell's definition of "SOLVAY" to the extent that it purports to include numerous other individuals and entities besides Solvay, S.A. Solvay responds solely on behalf of plaintiff Solvay, S.A. Solvay further objects to Honeywell's definition of "the '817 PATENT" because it purports to include as part of that definition not only U.S. Patent No. 6,730,817 but also "all continuation and/or divisional applications," as well as "all underlying patent applications." Thus, the definition as applied is irrelevant, overly broad and unduly burdensome. Solvay further objects on the ground that the request assumes that Solvay will, or is required to, "assert" something regarding whether a particular individual is an inventor of any claims, and no such assertion is necessary.

Subject to and without waiver of its objections, Solvay denies this request. If this becomes an issue in this case, then Solvay may assert that Jean-Paul Schoebrechts is an inventor of the '817 patent.

**Request for Admission No. 7:**

The '192 PATENT discloses a process for making 1,1,1,3,3-pentafluoropropane comprising the reaction of 1,1,1,3,3,-pentachloropropane with hydrogen fluoride in the presence of a hydrofluorination catalyst.

**Response to Request for Admission No. 7:**

Solvay objects to this request on the ground that it seeks an expert opinion on an ultimate legal issue concerning the scope of the '192 patent.

Subject to and without waiver of its objections, Solvay acknowledges that, as set forth in the '192 patent, the '192 patent discloses a "method of manufacturing 1,1,1,3,3-pentafluoropropane" that includes, as disclosed in Example 3 thereof, a reaction of 1,1,1,3,3,-pentachloropropane and hydrogen fluoride in the presence of a fluorination catalyst. Solvay specifically denies that the '192 patent invalidates any claim of the '817 patent.

**Request for Admission No. 8:**

The disclosure in the '192 PATENT has a priority DATE earlier than October 23, 1995.

Subject to and without waiver of its objections, Solvay acknowledges that its claim for monetary relief in this case is for a reasonable royalty for Honeywell's infringement of the '817 patent, in addition to any other legal or equitable remedy available to it.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Arthur I. Neustadt
Jean-Paul Lavalleye
Barry J. Herman
John F. Presper
OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.
1940 Duke St.
Alexandria, VA 22314
Tel.:  (703) 413-3000

Dated:  September 17, 2007
819363 / 30651

By: */s/ Richard L. Horwitz*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, Delaware 19801
    Tel:  (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Plaintiff Solvay, S.A.*

16

## CERTIFICATE OF SERVICE

I, Richard L. Horwitz, hereby certify that on September 17, 2007, a true and

correct copy of the within document was caused to be served on the attorney(s) of record

at the following addresses as indicated:

### VIA HAND DELIVERY

Thomas C. Grimm
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
tgrimm@mnat.com
lpolizoti@mnat.com

### VIA ELECTRONIC MAIL

Thomas C. Grimm
Leslie A. Polizoti
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
tgrimm@mnat.com
lpolizoti@mnat.com

Robert G. Krupka
Laura M. Burson
Helen Hong
Kirkland & Ellis LLP
777 S. Figueroa Street, Suite 3400
Los Angeles, CA  90017
service-solvay@kirkland.com

/s/ Richard L. Horwitz
Richard L. Horwitz

775114 / 30651

# EXHIBIT 45

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

SOLVAY, S.A.                                       )
                                                   )
        Plaintiff,                          )
                                                   )        C.A. No. 06-557-SLR
        v.                                  )
                                                   )        **JURY TRIAL DEMANDED**
HONEYWELL SPECIALTY                                )
MATERIALS, LLC and                                 )
HONEYWELL INTERNATIONAL INC.,                      )
                                                   )
        Defendants.                         )

### SOLVAY'S RESPONSES AND OBJECTIONS TO
### DEFENDANT HONEYWELL INTERNATIONAL INC.'S
### SECOND SET OF REQUESTS FOR ADMISSION NOS. 28-37

Pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure, Plaintiff Solvay, S.A. ("Solvay") responds to defendant Honeywell International Inc.'s ("Honeywell's") second set of requests for admissions 28-37 as follows:

### GENERAL OBJECTIONS AND QUALIFICATIONS

1.    Solvay has not yet completed its investigation, collection of information, discovery and analysis relating to this action. These responses are based on information known and available to Solvay at this time. Solvay reserves the right to modify, change, or supplement its responses and to produce additional evidence at trial.

2.    Solvay reserves all objections to the use of its answers. All such objections may be interposed by Solvay at the time of trial or as otherwise required by the rules or order of the Court.

3.    Insofar as an answer by Solvay may be deemed to be a waiver of any privilege or right, such waiver shall be deemed to be a limited waiver with respect to that particular answer only.

an interpretation of the claim terms identified in this Request.

Subject to and without waiver of its objections, Solvay denies this request. Claim 1 of U.S. Patent No. 6,730,817 covers processes in which 245fa and HCl are drawn off as each is being formed. Claim 1 covers such processes in which one or more starting materials are fed to the reactor at one time or in which one or more starting materials are fed to the reactor on an ongoing basis.

**REQUEST FOR ADMISSIONS NO. 30**

Claim 1 of the '817 PATENT includes a non-continuous process.

**Response to Request for Admissions No. 30**

Solvay objects to Honeywell's definition of "the '817 PATENT" because it purports to include as part of that definition not only U.S. Patent No. 6,730,817 but also "all continuation and/or divisional applications," as well as "all underlying patent applications." Thus, the definition as applied is irrelevant, overly broad and unduly burdensome. Solvay further objects to this request because it is not clear what "non-continuous" or "including a non-continuous process" means in this context. Solvay also objects to this request on the ground that it seeks an expert opinion on an ultimate legal issue concerning the meaning of certain claim terms that are recited in U.S. Patent No. 6,730,817, and is thus not a proper Rule 36 request. The interpretation of claim terms is a matter of law exclusively for the Court pursuant to *Markman v. Westview, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), and the Court has not yet made such an interpretation of the claim terms identified in this Request.

Subject to and without waiver of its objections, Solvay denies this request. Claim 1 of U.S. Patent No. 6,730,817 covers processes in which 245fa and HCl are drawn off as each is being formed. Claim 1 covers such processes in which one or more starting materials are fed to

the reactor at one time or in which one or more starting materials are fed to the reactor on an ongoing basis.

## REQUEST FOR ADMISSIONS NO. 31

Claim 12 of the '817 PATENT is not limited to a continuous process.

## Response to Request for Admissions No. 31

Solvay objects to Honeywell's definition of "the '817 PATENT" because it purports to include as part of that definition not only U.S. Patent No. 6,730,817 but also "all continuation and/or divisional applications," as well as "all underlying patent applications." Thus, the definition as applied is irrelevant, overly broad and unduly burdensome. Solvay further objects to this request because it is not clear what "continuous" means in this context. Solvay also objects to this request on the ground that it seeks an expert opinion on an ultimate legal issue concerning the meaning of certain claim terms that are recited in U.S. Patent No. 6,730,817, and is thus not a proper Rule 36 request. The interpretation of claim terms is a matter of law exclusively for the Court pursuant to *Markman v. Westview, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), and the Court has not yet made such an interpretation of the claim terms identified in this Request.

Subject to and without waiver of its objections, Solvay denies this request. Claim 12 of U.S. Patent No. 6,730,817 covers processes in which 245fa and HCl are drawn off as each is being formed. Claim 12 covers such processes in which one or more starting materials are fed to the reactor at one time or in which one or more starting materials are fed to the reactor on an ongoing basis.

## REQUEST FOR ADMISSIONS NO. 32

Claim 12 of the '817 PATENT includes a batch process.

7

**Response to Request for Admissions No. 32**

Solvay objects to Honeywell's definition of "the '817 PATENT" because it purports to include as part of that definition not only U.S. Patent No. 6,730,817 but also "all continuation and/or divisional applications," as well as "all underlying patent applications." Thus, the definition as applied is irrelevant, overly broad and unduly burdensome. Solvay further objects to this request because it is not clear what "batch process" or "including a batch process" means in this context. Solvay also objects to this request on the ground that it seeks an expert opinion on an ultimate legal issue concerning the meaning of certain claim terms that are recited in U.S. Patent No. 6,730,817, and is thus not a proper Rule 36 request. The interpretation of claim terms is a matter of law exclusively for the Court pursuant to *Markman v. Westview, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), and the Court has not yet made such an interpretation of the claim terms identified in this Request.

Subject to and without waiver of its objections, Solvay denies this request. Claim 12 of U.S. Patent No. 6,730,817 covers processes in which 245fa and HCl are drawn off as each is being formed. Claim 12 covers such processes in which one or more starting materials are fed to the reactor at one time or in which one or more starting materials are fed to the reactor on an ongoing basis.

**REQUEST FOR ADMISSIONS NO. 33**

Claim 12 of the '817 PATENT includes a non-continuous process.

**Response to Request for Admissions No. 33**

Solvay objects to Honeywell's definition of "the '817 PATENT" because it purports to include as part of that definition not only U.S. Patent No. 6,730,817 but also "all continuation and/or divisional applications," as well as "all underlying patent applications." Thus, the

8

physical properties, including a boiling point of about 14°C., which make it particularly

attractive as a blowing agent."


POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Arthur I. Neustadt
Jean-Paul Lavalleye
Barry J. Herman
John F. Presper
OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.
1940 Duke St.
Alexandria, VA 22314
Tel.: (703) 413-3000

By: */s/ David E. Moore*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, Delaware 19801
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

Dated: October 5, 2007
823799 / 30651

*Attorneys for Plaintiff Solvay, S.A.*

12

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on October 5, 2007, a true and correct copy of the

within document was caused to be served on the attorney(s) of record at the following addresses

as indicated:

## VIA HAND DELIVERY

Thomas C. Grimm
Benjamin J. Schladweiler
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
tgrimm@mnat.com
bschladweiler@mnat.com

## VIA ELECTRONIC MAIL

Thomas C. Grimm                        Robert G. Krupka
Benjamin J. Schladweiler               Laura M. Burson
Morris, Nichols, Arsht & Tunnell       Helen Hong
1201 North Market Street               Kirkland & Ellis LLP
P.O. Box 1347                          777 S. Figueroa Street, Suite 3400
Wilmington, DE  19899                  Los Angeles, CA  90017
tgrimm@mnat.com                        service-solvay@kirkland.com
bschladweiler@mnat.com

                                       /s/ David E. Moore
                                       David E. Moore

775114 / 30651

# EXHIBIT 46

## FULLY REDACTED

# EXHIBIT 47

## FULLY REDACTED

# EXHIBIT 48

## FULLY REDACTED

# EXHIBIT 49

## FULLY REDACTED

# EXHIBIT 50

## FULLY REDACTED

# EXHIBIT 51

## FULLY REDACTED

# EXHIBIT 52

## FULLY REDACTED

EXHIBIT 53

| x| |
|---|

## September 2001

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

Embargo : September 4 at 5:30 PM (Brussels time)

# Further development in Fluorinated Specialties
# Industrialization of Solkane ® 365mfc

Solvay Fluor – one of the main suppliers of fluorine chemicals – announces its decision to build a plant in Tavaux (France) for the large-scale production of Solkane ® 365mfc, a new insulating and blowing agent having no effect on the ozone layer. The plant will have a capacity of 15,000 tons per year and be operational by the end of 2002.

In March 2000, Solvay Fluor was the first in the world to put this new type of product on the market, from a pilot plant with a capacity of several hundred tons per year. This industrialization decision was taken after intensive trials together with potential customers and on the basis of the results of two life cycle assessments supervised and checked by outside experts (TÜV-Nord/Technical Control Association, Germany). These demonstrated that in several applications, Solkane ® 365mfc is more eco-efficient than alternative solutions tested.

*"This decision further illustrates Solvay's willingness to increase its presence in high-growth Specialties. We expect demand for Solkane® 365mfc to grow rapidly as this new product, having no effect on ozone depletion, will be the material of choice for polyurethane foams to replace HCFCs from the beginning of 2003"* said E. Piepho, General Manager of Solvay Fluor.

The hydrofluorocarbon (HFC) Solkane ® 365mfc is an insulating and blowing agent for polyurethane foams, widely used as insulation in residential and industrial buildings and cold stores. Solkane ® 365mfc also shows potential as a component in high-performing solvent formulations.

**Solvay Fluor** is a wholly owned subsidiary of Solvay S.A., with installations in Europe, NAFTA and Namibia (raw materials). Its sales have doubled over the last 5 years, reaching about EUR 350 million in 2000. Major acquisitions like Hoechst's refrigeration business in 1996, as well as Norfluor (Mexico) and Chemtech (USA) in 2000, were key steps in the development of the fluorinated specialties. Details are also available at www.solvay-fluor.com.

**Solvay** is an international chemicals and pharmaceuticals group with headquarters in Brussels. It employs about 32,000 people in 50 countries. In 2000 its consolidated sales amounted to EUR 8.9 billion generated by its four activity sectors: Chemicals, Plastics, Processing and Pharmaceuticals. Solvay is listed on the Euronext 100 index of top European companies. Details are available at www.solvay.com.

***For further information, please contact:***
SOLVAY S.A. Headquarters
*Martial Tardy,*
Corporate Press Officer
*Tel : +32 2 509 72 30, Fax : +32 2 509 72 40*
*E-mail : martial.tardy@solvay.com*

Confidential - Outside Litigation Counsel's Eyes Only
Pursuant to D. Del. L.R. 26.2

EXHIBIT 54

## blowing agent update

# Blowing agent mark(
## HCFCs disappear: expe

By Liz White, UT staff

Now that hydrochlorofluorocarbons (HCFCs) have been phased out in the developed world, makers of polyurethane foam are faced with a diverse array of possible blowing agents— some might say a bewildering choice.

This followed the earlier CFC (chlorofluorocarbon) ban in developed nations— in response to the Montreal Protocol, designed to limit damage to the ozone layer.

The chart (right) from Arkema gives an idea of the complexity of the situation and how it varies around the globe.

With the CFC ban, the industry developed HCFCs such as HCFC-141b, which was a drop-in replacement for CFCs.

But with the 141b ban—in the US at the start of 2003 and in Europe and Japan at the beginning of 2004—the industry had to grapple with a range of hydrofluorocarbon gases offered by the suppliers, with no one obvious universal candidate.

Here the various approaches now used in blowing polyurethane foam are described by the major suppliers.    **UT**



North America
01/2003 HCFC-141b ban
(USA)
→ HCFC-142b/22
→ HFC-134a, HFC-245fa

How ... ind ... sponding to the Montreal Protocol—Arkema

Central & Sth America
→ ↘ CFC-11
→ HCFC-141b

Africa & Mid East
→ ↘ HCFC-141b

Australia & NZ
HCFCs quotas
→ HFC-134a

→ HCFC-141b → HFC-134a, HFC-365mfc

Source: Arkema

No drop-in replacement for HCFC 141b for rigid foams

### About this article

In the US, Honeywell has been making and selling HFC-245fa since 2003 (see p.23).

In Europe, Solvay Fluor has struggled to make sufficient of its HFC-365mfc, but will be at full production by mid-2006 (see p.26). Solvay also gives an overview of why HFCs are still vital in some uses of rigid foam.

Arkema offers HFC-134a, 365mfc and 227ea and a new hydrochlorocarbon, as described here. Antonio Paranhos Neto, Arkema's business manager for fluorochemicals, supplied the valuable data on the size of the blowing agents market across the world, shown on these two pages.

Hydrocarbons such as pentanes are already in wide use, and other hydrocarbons such as Ecomate (p.24) and methylal (p.29) are also being used.    **UT**

# From HCFCs to HFCs

By Vincent Enaux, Research Scientist, Arkema, CRRA Centre de Recherches Rhone-Alpes, Lyon, France

The first transition of blowing agents, from CFCs to HCFCs, in the rigid polyurethane foams industry to meet the Montreal Protocol requirements was a big challenge.

HCFC-141b was chosen as a good polyvalent alternative to existing technology.

Except for some formulation modifications, this product was ready to use, without flash point and provided acceptable final foam properties, whatever the application. Its high price pushed some continuous panels producers to invest in explo-

sion-proof equipment to be able to use pentane isomers.

Despite meeting this challenge there was more to come. Under the Montreal Protocol, HCFCs were banned after January 2004 in Europe. This has led to a much harder difficult situation, without any polyvalent candidate.

In fact, HFCs-134a, 365mfc, 227ea and 245fa (all except 245a available from Arkema) coexist with pentane isomers (n, iso- or cyclo-pentane). None of these is an ozone-depleting substance.

Pentane-based foams have acceptable properties for classical applications but using them requires investment in explosion-proof equipment which is only affordable by firms with a high turnover.

HFCs are used in more demanding applications in terms of thermal insulation and/or fire rating: they are mainly used in medium to small capacity discontinuous units.

Among the HFCs, HFC-134a is a non-flammable low-cost HFC which provides a

| Comparison of blowing agents available on European market | | | | | | | |
|---|---|---|---|---|---|---|---|
| | HFC-365mfc/ 227ea** | HFC-365mfc/ 227ea** | HFC-134a | HFC-245fa | Cyclo-pentane | Iso-pentane | N-pen-tane | Transcend |
| Formula | $CF_3CH_2CF_2CH_2/$ $CF_3CHFCF_3$ | $CF_3CH_2CF_2CH_2/$ $CF_3CHFCF_3$ | $C_2H_2F_4$ | $CF_3CH_2CF_2H$ | $C_5H_{10}$ | $(CH_3)_2CHC_2H_5$ | $C_5H_{12}$ | $C_2H_2Cl_2$ |
| MW (g/mol) | 149.4 | 150.5 | 102 | 134 | 70 | 72 | 72 | 97 |
| Boiling Point (°C) | 30 | 23 | -25.4 | 15.3 | 49 | 28 | 36 | 48 |
| Lambda gas at 25 °C (mW/mK) | 10.7 | 11.2 | 14.2 | 12.2 | 12 | 15 | 15 | 10.6 |
| Flash point (°C), ASTM D3828 | None | None | None | None | -37 | <-40 | <-40 | -12°C |
| GWP (100 years) | 1030 | 1150 | 1300 | 760 | 11 | - | - | <11 |

* 7 % ea. ** 13 % ea                    Source: Arkema

S00008989

## blowing agent update



West European blowing agent demand 2005 - Arkema's estimate

| Table 2 ROW demand evolution for blowing agents for XPS and PU to 2010, tonnes (ROW=S America, Africa,Asia incl Japan, Middle East) | | | | | |
|---|---|---|---|---|---|
| | 2003 | 2005 | 2006 | 2008 | 2010 |
| 141b | 35000 | 26000 | 26500 | 28100 | 30000 |
| 142b | 5000 | 5300 | 5450 | 5800 | 6200 |
| 134a | 1000 | 1000 | 1050 | 1150 | 1250 |
| 365mfc | 500 | 2000 | 3000 | 3300 | 3700 |
| 245fa | 500 | 2000 | 2000 | 2500 | 2500 |
| pentanes | 20000 | 28000 | 29000 | 30600 | 32500 |
| all BA | 62000 | 61150 | 64300 | 67000 | 68927 |
| | | | | | Source Arkema |

| Table 1 European Union demand evolution for blowing agents for XPS and PU to 2010, tonnes | | | | | |
|---|---|---|---|---|---|
| | 2003 | 2005 | 2006 | 2008 | 2010 |
| 141b | 25000 | 2000 | 2000 | 1000 | |
| 142b | 500 | 500 | 500 | 500 | |
| 134a | 4250 | 5250 | 5500 | 5500 | 6000 |
| 365mfc | 1000 | 5800 | 7000 | 8000 | 8000 |
| 245fa | 100 | 1500 | 1500 | 2000 | 2000 |
| pentanes | 11500 | 27000 | 27800 | 29500 | 31000 |
| all BA | 42350 | 42050 | 44300 | 46500 | 47000 |
| | | | | | Source Arkema |

very high blowing power and helps suppress flammability of formulated polyols. Its use is limited by its low boiling point and low solubility in most typical polyols.

HFC-365mfc is not used alone because of flammability, but blends with HFC-227ea are available on the market (with 7 or 13 percent of HFC-227ea). These liquid blends are very well accepted in the market today.

Today, the choice is so big that, processors need specialised know-how to adapt



**Evolution of 141b and HFC demand in North America to 2010 (Arkema)**

blowing systems to specific applications This is in addition to the formulating expertise users need in selecting surfactants, polyols and fire retardants.

Arkema has reacted to this situation by introducing its Transcend additive technology and offering a unique customer service both in Europe (at CRRA ) and at King of Prussia (US).

The target today is to help key customers to find a compromise between regulations, costs and application properties to help the PU market to remain stable against other potential polymeric insulation foams like XPS.

Transcend — chemically trans-1,2-dichloroethylene — can be considered a low global-warming-potential, low lightly flammable backbone for our future formulations developments. This product has been shown to be valuable in several applications with benefits mainly in integral skin and in pentane-based foams with high fire ratings. **UT**

gral skin and in pentane-based foams with high fire ratings. **UT**

---

Honeywell investing in PUs as energy saving becomes vital

# Good growth in insulation

**H**oneywell launched its Enovate HFC-245fa blowing agent from its Geismar, Louisiana plant in 2002 and began selling it in 2003 in substantial amounts in the US.

Enovate, designed to replace HCFC-141b, was initially focused on appliance OEMs in North America, but since then "we have moved into spray, in the US and Europe plus Asia, and poured foams," said Ken Gayer, global business manager for foam blowing agents.

Now Honeywell is shipping globally, Gayer said, adding that there is spare capacity left in the plant: "it was designed for the global market."

Appliance makers in the US have given Honeywell "positive feedback" saying the blowing agent has helped them meet the US 'Energy Star' rating system — which is at least 15 percent above Federal Department of Energy standards.

In spray foam, "we see a lot of growth via systems houses, for new residential construction," where high-end home builders are looking for more efficiency, Gayer commented.

"Once a builder gets educated about spray foam they become religious about it," he said, emphasising that it is not only energy saving but also reduces noise.

Spray foam competes with all rigid insulation materials in residential roofing and commercial, as well as industrial segments, "we have put marketing resources into each," Gayer said.

In Europe, appliance makers have largely gone to hydrocarbons, but spray foam is a target market in Europe, said

Gayer. Also Honeywell has had a lot of enquiries from Asia-Pacific and is shipping some 245fa there, Gayer said.

Size and growth potential of the Asian market is attractive, especially where 141b is phased out, such as in Japan, but even in China and Korea, 245fa adds a unique role, with marine contractors and water heater makers interested, he said.

In Japan appliance makers have also switched to hydrocarbons, and have moved manufacture offshore, to Thailand, Vietnam etc, Gayer commented.

There are opportunities for spray foam in Japan especially in commercial construction, he said.

Gayer sees potential for a lot of growth for spray foam for residential buildings in the US, and also for roofing. "The business picked up in 2005, [and] roofing began to kick in too," he said.

So Honeywell has a bullish outlook for insulation foam, with its value in energy savings. The group is making continued progress with industry partners, in communicating foam's benefits and so expect to see growth.

Also, Honeywell is working with companies such as BaySystems and with BASF, Huntsman and NCFI: "We see a growing coalition of the willing, passionate about PU foam," Gayer commented.

At UTECH EUROPE 2006, Paul Sanders, Honeywell's marketing manager for foam in Europe, gave Urethanes Technology an overview of the blowing agent position in Europe.

Sanders said Honeywell is investing heavily in the PU sector, because it is such

S0008990

## blowing agent update

a growth market. Some of this growth is driven by regulations such as the European directive on building performance, he added.

The blowing agent suppliers are also affected by regulations such as the F-gas (fluorine-containing gas) directive, Sanders added. But he sees the latter as having had, "a very positive effect:" It has "taken away a lot of ambiguity." The EU has decided "that it is OK to use F-gases if significant benefits accrue in GWP," Sanders said.

Energy costs have had a great impact on fuel bills across the world, and "clearly there is a big emphasis towards saving energy: currently some 40 percent of energy input into buildings is lost through poor insulation," Sanders pointed out.

The EU's directive on performance of buildings is driving member countries towards better building codes, Sanders said

In Spain, for example, building codes have remained unchanged since 1979, so that, "an awful lot of buildings are not well insulated," he said.

"We're trying to position spray foam in Spain as an effective solution," for renovating roofs, Sanders said.

It can simply be sprayed on top of an existing roof with no renovation or making good needed in advance, he added. And "There are lots of uninsulated flat roofs in Spain," Sanders commented.

"The best way to tackle $CO_2$ emissions is to do this," he added. Spray foam forms, "a continuous, moisture-resistant impermeable surface,"making it a strong marketable package to end users," Sanders added.

HFCs are used in spray foam because they give the highest lambda values while being non-flammable — which is essential in this use, he added.

Spain is by far the largest market in Europe for spray foam, although it is starting to be used elsewhere, Sanders said.

Central/eastern Europe also have high potential for use of spray foam, since the building stock lacks insulation, Sanders commented. The metal panel market is a very good one for building renovation, with PIR's higher lambda values allowing thinner panels, he said.

There is "a fantastic opportunity in commercial roofing, for warehouses and offices with flat or slightly sloping roofs," Sanders said. Half a day's spraying gives a perfectly insulated roof, he said.

In the UK, the Loss Prevention Council has the highest specifications for fire resistance in Europe, said Sanders, adding that he hears that insurance companies across



**At the centre of the blowing agent issue: this year's ozone 'hole' over Antarctica hit 10 000 sq miles.**

Europe are driving the fire issue at present, rather than the regulators.

It is important that the industry promotes the high energy efficiency and good fire resistance of PU foams, said Sanders. Mineral wool is promoted as a natural product, he added, and, "We need to sell the benefits of our product," he emphasised.

The US is the largest user of Enovate, with Europe second and Asia third, although here will be growth in all three in future, he added. HFCs are

widely used in Asia—245 365 and 134, Sanders said.

Countries such as Russia, Turkey and Romania, Bulgaria— the EU accession countries, are still using 141b, said Sanders. And Turkey has a big systems house, which may use Enovate to sell systems back into Europe, Sanders added. The whole of North Africa is still using 141b, he said.

Also, in the Middle East, construction in Dubai, "has gone absolutely crazy," Sanders said, pointing out that where there was desert five years ago, there are now huge tourist complexes.

In all these regions, "everyone is mindful of the future, and the future is not 141b" Sanders said.    UT

Global foam blowing solutions in a changing world

# Keeping up with change

By BOC Special Products

$E$volution in the polyurethane industry continues at an increasing pace, making the challenges in 2006 greater than ever.

Global growth for products such as rigid insulation board looks set to continue, driven by the demands of major public building projects across the world.

Builders look to the PU industry to deliver products that comply with ever-more stringent environmental legislation while costing no more than less 'eco friendly' materials used in the past. In such an environment, a key concern remains the choice of foam blowing agent.

As environmental issues come to the fore, it is crucial that the PU and PIR markets are proactive in providing solutions that meet ever 'greener' criteria.

Making the right choice of foam blowing agent for board product can help architects and planners gain approvals for key projects. This increasingly requires proof of energy efficiency, through increased thermal efficiency and reduced carbon emissions.

BOC has a portfolio of products tailored to the differing specifications demanded by the global market. Through strategic relationships with a number of global producers of hydrocarbons, fluorocarbon and next-generation blowing agents, BOC has built a range of products that enable formulators to customise their requirements for blends of a range of blowing agents.

BOC has ready availability of product— with 1200 tonnes of pentane storage

| Comparison of blowing agents (BOC plc). | | | | | |
|---|---|---|---|---|---|
| Compound | Gas (25°C) mW/m.K | BPt, °C | Group | Flammable | Relative cost |
| Ecomate | 10.7 | 31.5 | New | Y | £ |
| HCFC-141b | 10.1 | 32 | HCFC | Y | ££ |
| Cyclopentane | 12.6 | 49 | HC | Y | £ |
| Iso-pentane | 13.8 | 28 | HC | Y | £ |
| n-pentane | 14.6 | 36 | HC | Y | £ |
| HFC-245fa | 12.2 | 15 | HFC | N | £££££ |
| HFC-365 | 10.6 | 40 | HFC | Y | £££ |
| $CO_2$ | 16.3 | NA | K | N | £ |

in the UK— and a team of technical and engineering advisors to assist with design, risk assessment, engineering and project management of a pentane or Ecomate installation.

Safety in storage, transport and handling of all special products is also vital. BOC offers on-site safety audits of customers' processes, safety seminars and training for employees.

BOC's foam-blowing unit— part of BOC's Special Products business— relies on BOC's extensive processing, distribution and customer service infrastructure.

### Pentanes

Hydrocarbons continue to be the natural successors to HCFC-141b and have the lowest global warming potential (GWP) of any agent used in mass-produced insulation.

Pentanes are used extensively by major producers of domestic appliances, rigid flexible faced foam and Factory Mutual-approved composite panels in Europe. These have zero ozone depletion potential (ODP), good foam insulation values, good performance in the foam matrix, and are cost competitive.

Pentanes have adapted well to these technologies, with the quality of the finished product equal to that of the HFC-blown foam. The cost of converting from

S0008991

## blowing agent update

HCFC-141b to a hydrocarbon is very favourable, especially when users take into account the higher cost of HFC blowing agents. The long-term environmental viability of HFC blowing agents is being scrutinised by EU environmental committees.

### Ecomate

Ecomate is a revolutionary liquid blowing agent, chemically methyl formate, that can contribute positively to the greening of our built environment.

Ecomate has zero ODP, zero GWP, contains no volatile organic compounds, and is USA SNAP approved (SNAP is the Significant New Alternatives Policy of the US Environmental Protection Agency).

Ecomate gives foams which have lambda values similar to those of hydrofluorocarbon-blown foams.

Additional advantages of using Ecomate are that there are minimal or even no equipment, facility or production changes, and that it is cost competitive. **UT**

---

Why are HFCs essential to make high duty rigid PU foam?

# HFCs a must in some uses

By Solvay Fluor GmbH

Rigid insulation foams such as polyurethane are high-performance insulation materials. Most foam producaers in industrialised countries currently use hydrocarbons (HC) or carbon dioxide (waterblowing) as foaming agents.

They restrict hydrofluorocarbons largely to essential uses, which need the highest safety, flameproofing or the best quality insulation, as listed in the box at the top of p. 28

The very low vapour thermal conductivity of HFCs produces foams with outstanding insulation performance, and Solkane 365mfc has the best gas phase lambda of all HFC foaming agents available.

Following the phase-out of ozone-damaging hydrochlorofluorocarbons in Europe, Japan and the US, HFCs are the very last generation of high-performance cell gases.

The environmental profile is a key factor for market acceptance. HFCs provide foams with outstanding insulation properties, which is an environmental benefit. When emitted to the atmosphere, however, they contribute to global warming.

Cell gases with high molecular size such as HFCs remain in the closed cells of rigid polyurethane foams or extruded polystyrene (XPS) foams for decades and are not emitted to the atmosphere.

To weigh the environmental benefits and loads, various bodies have carried out two life cycle assessments and a life cycle climate performance study of HFCs in typical PU foam applications. These studies confirm that HFC-blown foams have equal or even better life-cycle environmental performance than foams blown with hydrocarbons or CO₂/water.

HFCs in critical applications cut CO₂ emissions far in excess of that needed to counter any global warming they produce if emitted to the atmosphere. One kilo of Solkane 365mfc used in insulating foam typically saves around 1000 kg CO₂ emission during the lifetime of about 25 years.

Responsible use of HFCs for rigid insulation foams is thus a vital tool to combat climate change.

### HFC Blends

As a single HFC cannot match all the outstanding technical properties of the previous HCFCs, Solvay has evaluated HFC-blends. This work has shown that Solkane 365mfc blends can be high-performance foaming agents, opening up a wide area of different uses requiring different properties.

The foam market has shown great interest in Solvay's Solkane 365/227 blends (ratios 93/17 and 87/13), introduced in 2000. These boil at 24°C (87/13) and 30°C (93/7). Both blends exhibit good compatibility with most PU formulations.

---

## Polyurethanes technologist

Location: East Sussex

Remuneration: Competitive base salary plus bonus share options

Company: A young dynamic company with a unique patented, branded materials technology which is being targeted at the Sports, Medical, Automotive, Security and Industrial markets. The core technology is based on polyurethanes and siloxanes and has a large further development potential.

Responsibilities

- Development of new formulations in response to market requirements at the bench and dispensing machine scales.

- Providing materials formulation assistance to contract manufacturers during prototype manufacture, and in trouble shooting.

- Assisting with customer interactions related to product definition.

Candidate profile
Education: HND/Degree level in chemistry or Polymer Science.
Experience: 5+ years PU formulating and manufacturing development.
Desirable personal characteristics: Initiative, flexibility, enthusiasm, team player.

Please e-mail CV to: applyforthejob@gmail.com

---

## Availability of 365mfc

Solvay Fluor, one of the world's leading suppliers of fluorine chemicals, developed Solkane 365mfc to commercial production in only 7 years. Unfortunately, Solkane 365mfc was in short supply during the start-up of HCFC replacement in 2004.

Solvay was forced into this situation by a lack of the key precursor material and was able to utilise less than half of the designed capacity of 15 kilotonnes per annum.

The overall demand for HFCs in the EU market is estimated to be around 9ktpa.

In 2005 Solvay had to limit supply to contracted partners only. Moreover plans to expand production of the key precursor were delayed for more than a year. Availability is now expected to approach full design capacity at the end of the first half of 2006. **UT**

S0008992

```
                                                                        P.  1

    x   x   x   RAPPORT DE RESULTAT DE LA COMMUNICATION ( 22. JUN. 2006 15:27 ) x   x   x

                                                    ENTETE FAX  SOLVAY NOH DCRT-IAM

 TRANSMIS/MEMORISE : 22. JUN. 2006 15:24
 FICH MODE            OPTION          ADRESSE                    RESULT.    PAGE
 ---------------------------------------------------------------------------------
 041  TX MEMORISEE                    000495118572146            OK         4/4



 ---------------------------------------------------------------------------------
     CAUSE  DE  L'ERREUR
         E-1)  RACCROCHE  OU  ERREUR  DE  LIGNE      E-2)  OCCUPE
         E-3)  PAS  DE  REPONSE                      E-4)  PAS UN  TELECOPIEUR
```

## blowing agent update

# Blowing agent market fragments as HCFCs disappear: expertise is essential

By Liz White, UT staff

Now that hydrochlorofluorocarbons (HCFCs) have been phased out in the developed world, makers of polyurethane foam are faced with a diverse array of possible blowing agents—some might say a bewildering choice.

This followed the earlier CFC (chlorofluorocarbon) ban in developed nations—in response to the Montreal Protocol, designed to limit damage to the ozone layer.

The chart (right) from Arkema gives an idea of the complexity of the situation and how it varies around the globe.

With the CFC ban, the industry developed HCFCs such as HCFC-141b, which was a drop-in replacement for CFCs.

But with the 141b ban—in the US at the start of 2003 and in Europe and Japan at the beginning of 2004—the industry had to grapple with a range of hydrofluorocarbon gases offered by the suppliers, with no one obvious universal candidate.

Here the various approaches now used in blowing polyurethane foam are described by the major suppliers. UT

### About this article





How the global industry is responding to the Montreal Protocol—Arkema

No drop-in replacement for HCFC 141b for rigid foams

# From HCFCs to HFCs

By Vincent Enaux, Research Scientist, Arkema, CRRA Centre de Recherches Rhône-Alpes, Lyon, France

The first transition of blowing agents, from CFCs to HCFCs, in the rigid polyurethane foams industry to meet the Montreal Protocol requirements was a big challenge.

HCFC-141b was chosen as a good polyvalent alternative to existing technology.

Except for some formulation modifications, this product was ready to use, without flash point and provided acceptable final foam properties, whatever the application. Its high price pushed some continuous panels producers to invest in explo-

sion-proof equipment to be able to use pentane isomers.

Despite meeting this challenge there was more to come. Under the Montreal Protocol, HCFCs were banned after January 2004 in Europe. This has led to a much more difficult situation, without any polyvalent candidate.

In fact, HFCs-134a, 365mfc, 227ea and 245fa (all except 245a available from Arkema) coexist with pentane isomers (n, iso- or cyclo-pentane). None of these is an ozone-depleting substance.

Pentane-based foams have acceptable properties for classical applications but using them requires investment in explosion-proof equipment which is only affordable by firms with a high turnover.

HFCs are used in more demanding applications in terms of thermal insulation and/or fire rating: they are mainly used in medium to small capacity discontinuous units.

Among the HFCs, HFC-134a is a non-flammable low-cost HFC which provides a

| Comparison of blowing agents available on European market | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | HFC-365mfc/ 227ea* | HFC-365mfc/ 227ea** | HFC-134a | HFC-245fa | Cyclo-pentane | Iso-pentane | N-pen-tane | Transcend |
| Formula | $CF_3CH_2CF_2CH_2/$ $CF_3CHFCF_3$ | $CF_3CH_2CF_2CH_2/$ $CF_3CHFCF_3$ | $C_2H_2F_4$ | $CF_3CH_2CF_2H$ | $C_5H_{10}$ | $(CH_3)_2CHC_2H_5$ | $C_5H_{12}$ | $C_5H_5Cl_2$ |
| MW (g/mol) | 149.4 | 150.5 | 102 | 134 | 70 | 72 | 72 | 97 |
| Boiling Point (°C) | 30 | 23 | -25.4 | 15.3 | 49 | 28 | 36 | 48 |
| Lambda gas at 25 °C (mW/m/K) | | | | | | | | |
| Flash point (°C), ASTM D3828 | 10.7 | 11.2 | 14.2 | 12.2 | 12 | 15 | 15 | 10.6 |
| GWP (100 years) | None 1030 | None 1150 | None 1300 | None 760 | -37 11 | <40 - | <40 - | -12°C <11 |
| * 7 % ea, ** 13 % ea | | | | | | | | |

Source: Arkema

S0008993

# EXHIBIT 55

## FULLY REDACTED

EXHIBIT 56

| | | UNITED STATES DEPARTMENT OF COMMERCE |
|---|---|---|
| | | Patent and Trademark Office |
| | | Address: ASSISTANT COMMISSIONER FOR PATENTS |
| | | Washington, D.C. 20231 |

*09/051,746*

| U.S. APPLICATION NO. | | FIRST NAMED APPLICANT | ATTY. DOCKET NO. |
|---|---|---|---|
| 09/051,746 | WILMET | V | SLVAY321601 |

| | | INTERNATIONAL APPLICATION NO. |
|---|---|---|

| | 5621 | PCT/EP96/04315 |
|---|---|---|

SPENCER & FRANK
1100 NEW YORK AVENUE NW
SUITE 300 EAST
WASHINGTON DC 20005-3955

| I.A. FILING DATE | PRIORITY DATE |
|---|---|
| 10/04/96 | 10/23/95 |

DATE MAILED:    06/17/98

## NOTIFICATION OF ACCEPTANCE OF APPLICATION UNDER 35 U.S.C. 371 AND 37 CFR 1.494 OR 1.495

1. The applicant is hereby advised that the United States Patent and Trademark Office in its capacity as ☐ a Designated Office (37 CFR 1.494), ☑ an Elected Office (37 CFR 1.495), has determined that the above identified international application has met the requirements of 35 U.S.C. 371, and is **ACCEPTED** for national patentability examination in the United States Patent and Trademark Office.

2. The United States Application Number assigned to the application is shown above and the relevant dates are:

*08 June 1998*
35 U.S.C. 102(e) DATE

*08 June 1998*
DATE OF RECEIPT OF
35 U.S.C. 371 REQUIREMENTS

A Filing Receipt (PTO-103X) will be issued for the present application in due course. **THE DATE APPEARING ON THE FILING RECEIPT AS THE "FILING DATE" IS THE DATE ON WHICH THE LAST OF THE 35 U.S.C. 371(C) REQUIREMENTS HAS BEEN RECEIVED IN THE OFFICE. THIS DATE IS SHOWN ABOVE.** *The filing date of the above identified application is the international filing date of the international application (Article 11(3) and 35 U.S.C. 363).* Once the Filing Receipt has been received, send all correspondence to the Group Art Unit designated thereon.

3. ☐ A request for immediate examination under 35 U.S.C. 371(f) was received on _____ and the application will be examined in turn.

4. The following items have been received:
   ☑ U.S. Basic National Fee.
   ☑ Copy of the international application in:
     ☑ a non-English language.
     ☐ English.
   ☑ Translation of the international application into English.
   ☑ Oath or Declaration of inventors(s) for DO/EO/US.
   ☐ Copy of Article 19 amendments. ☐ Translation of Article 19 amendments into English.
     The Article 19 amendments ☐ have ☑ have not been entered.
   ☐ The International Preliminary Examination Report in English and its Annexes, if any.
   ☑ Copy of the Annexes to the International Preliminary Examination Report (IPER).
     ☑ Translation of Annexes to the IPER into English.
     The Annexes ☐ have ☑ have not been entered.
   ☑ Preliminary amendment(s) filed *20 APR 1998* and _____.
   ☐ Information Disclosure Statement(s) filed _____ and _____.
   ☑ Assignment document.
   ☐ Power of Attorney and/or Change of Address.
   ☐ Substitute specification filed _____.
   ☐ Statement Claiming Small Entity Status.
   ☑ Priority Document.
   ☑ Copy of the International Search Report ☑ and copies of the references cited therein.
   ☐ Other: _____

Applicant is reminded that any communication to the United States Patent and Trademark Office must be mailed to the address given in the heading and include the U.S. application no. shown above. (37 CFR 1.5)

*Anita Johnson*
Telephone: (703) 305-3661

FORM PCT/DO/EO/903 (December '97)

HON0030603

DO/EO WORKSHEET

U.S. Appl. No. 09/05/746                    International Appl No. PP916/0413/5

Application filed by: ☐   20 months   ☑   30 months

INTERNATIONAL APPLICATION PAPERS IN THE APPLICATION FILE:
☑ International application (RECORD COPY)          ☐ Request form PCT/RO/101
☐ Article 19 amendments                            ☐ PCT/IB/302
☑ PCT/IB/331                                        ☑ PCT/ISA/210-Search Report
☑ PCT/IPEA/409 IPER (PCT/IPEA/416 on front)        ☑ Search Report references
☑ Annexes to 409                                   ☐ Other _____
☑ Priority document(s) No. /
☐ INTERNATIONAL APPLICATION ON DOUBLE SIDED PAPER (COPIES MADE)

RECEIPTS FROM THE APPLICANT: (other than checked above)
☑ Basic National Fee (paid or authorized to charge)     ☑ Preliminary amendment(s) filed
   Translation of international application as filed:        20 APR 98
   ☑ Description
   ☑ Claims                                              ☐ Information Disclosure Statement
   ☐ Words in the drawing figure(s)                      ☑ Assignment document
   ☐ Article 19 amendments                               ☐ Power of attorney/Change of address
   ☑ Annexes to 409                                      ☐ Substitute specification
☑ Oath / Declaration                                     ☐ Verified small status claim
☐ DNA diskette                                           ☐ Other _____

Notes:




| | |
|---|---|
| 35 U.S.C. 371 - Receipt of Request (PTO-1390)  20 APR 98 | WIPO Publication Publication No. WO 97/15540 |
| Date acceptable oath / declaration received  08 Jun 98 | |
| Date complete 35 U.S.C 371 requirements met | Publication Date May 5, 1997 |
| 102(e) Date | |
| Date of completion of DO/EO 906 - Notification of Missing 102(e) Requirements | Publication Language French |
| Date of completion of DO/EO 907 - Notification of Acceptance for 102(e) date | Not Published ☐ U.S. only |
| Date of completion of DO/EO 911 - Application accepted under 35 U.S.C. 1.11 | Designated ☐ EP request |
| Date of completion of DO/EO 905 - Notification of Missing Requirements | Screening/done by: Francine Young PCT International Division |
| Date of completion of DO/EO 916 - Notification of Defective Response | |
| Date of completion of DO/EO 903 - Notification of Acceptance | |
| Date of completion of DO/EO 909 - Notification of Abandonment | |

May 1993

# EXHIBIT 57

## FULLY REDACTED

EXHIBIT 58
FULLY REDACTED

# EXHIBIT 59
## FULLY REDACTED

# EXHIBIT 60
## FULLY REDACTED

# EXHIBIT 61
## FULLY REDACTED

# EXHIBIT 62
## FULLY REDACTED

# Exhibit 63
## Fully Redacted

# EXHIBIT 64
## FULLY REDACTED

# EXHIBIT 65
## FULLY REDACTED

# EXHIBIT 66
## FULLY REDACTED

# EXHIBIT 67
## FULLY REDACTED

# EXHIBIT 68
## FULLY REDACTED

EXHIBIT 69



(19) Europäisches Patentamt

European Patent Office

Office européen des brevets

(11)  **EP 0 858 440 B1**

(12)  **FASCICULE DE BREVET EUROPEEN**

(45) Date de publication et mention de la délivrance du brevet:
**09.01.2002  Bulletin 2002/02**

(51) Int Cl.⁷: **C07C 17/20**, C07C 17/278, C07C 19/08, C07C 19/01

(21) Numéro de dépôt: **96934532.1**

(22) Date de dépôt: **04.10.1996**

(86) Numéro de dépôt international:
**PCT/EP96/04315**

(87) Numéro de publication internationale:
**WO 97/15540 (01.05.1997 Gazette 1997/19)**

(54)  **PROCEDE POUR LA PREPARATION DE 1,1,1,3,3-PENTAFLUOROPROPANE**

VERFAHREN ZUR HERSTELLUNG VON 1,1,1,3,3-PENTAFLUORPROPAN

METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE

(84) Etats contractants désignés:
**AT BE CH DE DK ES FI FR GB GR IE IT LI LU MC NL PT SE**
Etats d'extension désignés:
**SI**

(30) Priorité: **23.10.1995  FR 9512558**

(43) Date de publication de la demande:
**19.08.1998  Bulletin 1998/34**

(73) Titulaire: **SOLVAY (Société Anonyme)**
**1050 Bruxelles (BE)**

(72) Inventeurs:
• **WILMET, Vincent**
**B-1301 Wavre (BE)**

• **JANSSENS, Francine**
**B-1800 Vilvoorde (BE)**
• **SCHOEBRECHTS, Jean-Paul**
**B-5980 Grez-Doiceau (BE)**

(74) Mandataire: **Jacques, Philippe et al**
**Solvay S.A. Département Propriété Industrielle**
**310, rue de Ransbeek**
**1120 Bruxelles (BE)**

(56) Documents cités:
**EP-A- 0 522 639       EP-A- 0 703 205**
**EP-A- 0 729 932       WO-A-95/04021**
**WO-A-96/01797**

Il est rappelé que: Dans un délai de neuf mois à compter de la date de publication de la mention de la délivrance du brevet européen, toute personne peut faire opposition au brevet européen délivré, auprès de l'Office européen des brevets. L'opposition doit être formée par écrit et motivée. Elle n'est réputée formée qu'après paiement de la taxe d'opposition. (Art. 99(1) Convention sur le brevet européen).

**EP 0 858 440 B1**

**EP 0 858 440 B1**

**Description**

[0001]    La présente invention se rapporte à un procédé pour la préparation de 1,1,1,3,3-pentafluoropropane (HFC-245fa). Elle concerne plus particulièrement un procédé de préparation du 1,1,1,3,3-pentafluoropropane au départ de 1,1,1,3,3-pentachloropropane.

[0002]    Le 1,1,1,3,3-pentafluoropropane est un substitut possible des hydrocarbures chlorofluorés entièrement ou partiellement halogénés (CFCs et HCFCs), suspectés d'avoir un effet néfaste sur la couche d'ozone. Il s'avère notamment particulièrement intéressant comme agent gonflant pour la préparation de matériaux polymériques expansés.

[0003]    Dans la demande WO 95/05353, on a proposé de préparer du 1,1,1,3,3-pentafluoropropane par réaction entre du 1,1-dichloro-2,2,2-trifluoroéthane (HCFC-123) et du dichlorodifluorométhane (CFC-12), suivi de l'hydrogénation du 1,1,1,3,3-pentafluoroprop-2-ène obtenu. Le rendement de la première étape de ce procédé connu (synthèse du 1,1,1,3,3-pentafluoroprop-2-ène intermédiaire) est toutefois très faible.

[0004]    Dans la demande WO 95/04022, on a proposé de préparer du 1,1,1,3,3-pentafluoropropane par un procédé en trois étapes, consistant, dans une première étape, en la préparation de 1,1,1,3,3-hexachloropropane par réaction entre du tétrachlorométhane et du chlorure de vinylidène, dans une deuxième étape, en la conversion de l'hexachloropropane obtenu en du 1,1,1,3,3-pentafluoro-3-chloropropane par réaction avec du fluorure d'hydrogène et, dans une troisième étape, en la réduction du pentafluorochloropropane obtenu en 1,1,1,3,3-pentafluoropropane par réaction avec de l'hydrogène. Ce procédé présente le désavantage de générer des quantités importantes de 1,1,1,3,3,3-hexafluoropropane lors de la deuxième étape.

[0005]    Dans la demande EP-A-611744, on a proposé de préparer du 1,1,1,3,3-pentafluoropropane par réaction entre du 1,1,1,3,3-pentafluoro-2,3-dichloropropane et de l'hydrogène. Le 1,1,1,3,3-pentafluoro-2,3-dichloropropane utilisé comme matière première des procédés connu n'est toutefois pas un produit courant et il ne peut pas être aisément préparé.

[0006]    La présente invention a pour but de fournir un procédé pour la préparation du 1,1,1,3,3-pentafluoropropane qui ne présente pas les inconvénients des procédés connus mentionnés ci-dessus, qui met en oeuvre des réactifs couramment ou aisément accessibles et qui présente un rendement élevé, répondant ainsi aux exigences économiques de l'industrie.

[0007]    L'invention concerne dès lors un procédé pour la préparation de 1,1,1,3,3-pentafluoropropane, selon lequel on fait réagir du 1,1,1,3,3-pentachloropropane avec du fluorure d'hydrogène en présence d'un catalyseur d'hydrofluoration.

[0008]    Les demandes de brevets WO 96/01797, EP 703 205 et EP 722 932 font partie de l'état de la technique en vertu de l'article 54(3) CBE.

[0009]    Dans le procédé selon l'invention, le catalyseur d'hydrofluoration est avantageusement choisi parmi les dérivés des métaux des groupes 3, 4, 5, 13, 14 et 15 du tableau périodique des éléments (IUPAC 1988) et leurs mélanges (groupes du tableau périodique des éléments anciennement dénommés IIIa, IVa, IVb, Va, Vb et VIb). On entend par dérivés des métaux, les hydroxydes, les oxydes et les sels organiques et inorganiques de ces métaux ainsi que leurs mélanges. On retient particulièrement les dérivés du titane, du tantale, du molybdène, du bore, de l'étain et de l'antimoine. De préférence, le catalyseur est choisi parmi les dérivés des métaux des groupes 14 (IVa) et 15 (Va) du tableau périodique des éléments, et plus particulièrement parmi les dérivés de l'étain et de l'antimoine. Dans le procédé selon l'invention, les dérivés préférés des métaux sont les sels et ceux-ci sont de préférence choisis parmi les halogénures, et plus particulièrement parmi les chlorures, les fluorures et les chlorofluorures. Des catalyseurs d'hydrofluoration particulièrement préférés selon la présente invention sont les chlorures, les fluorures et les chlorofluorures d'étain et d'antimoine, notamment le tétrachlorure d'étain et le pentachlorure d'antimoine. Le pentachlorure d'antimoine est tout particulièrement recommandé.

[0010]    Dans le cas où le catalyseur est sélectionné parmi les fluorures et les chlorofluorures métalliques, ceux-ci peuvent être obtenus au départ d'un chlorure que l'on soumet à une fluoration au moins partielle. Cette fluoration peut par exemple être réalisée au moyen de fluorure d'hydrogène, préalablement à la mise en contact du catalyseur avec le 1,1,1,3,3-pentachloropropane. En variante, elle peut être réalisée in situ, au cours de la réaction du 1,1,1,3,3-pentachloropropane avec le fluorure d'hydrogène.

[0011]    La quantité de catalyseur mise en oeuvre peut varier dans de larges limites. Elle est généralement d'au moins 0,001 mole de catalyseur par mole de 1,1,1,3,3-pentachloropropane. De préférence, elle est d'au moins 0,01 mole de catalyseur par mole de 1,1,1,3,3-pentachloropropane. En principe, il n'y a pas de limite supérieure à la quantité de catalyseur mise en oeuvre. Par exemple, dans un procédé réalisé en continu en phase liquide, le rapport molaire entre le catalyseur et le 1,1,1,3,3-pentachloropropane peut atteindre 1000. En pratique toutefois, on utilise généralement au maximum environ 5 moles de catalyseur par mole de 1,1,1,3,3-pentachloropropane. De préférence, on ne dépasse pas environ 1 mole. De manière particulièrement préférée, on ne dépasse pas environ 0,5 mole de catalyseur par mole de 1,1,1,3,3-pentachloropropane.

[0012]    Le rapport molaire entre le fluorure d'hydrogène et le 1,1,1,3,3-pentachloropropane mis en oeuvre est géné-

EP 0 858 440 B1

ralement d'au moins 5. De préférence, on travaille avec un rapport molaire d'au moins 8. Le rapport molaire entre le fluorure d'hydrogène et le 1,1,1,3,3-pentachloropropane mis en oeuvre ne dépasse en général pas 100. De préférence, il ne dépasse pas 50.

[0013]    La température à laquelle s'effectue l'hydrofluoration est généralement d'au moins 50 °C. De préférence, elle est d'au moins 80 °C. La température ne dépasse en général pas 150 °C. De préférence, elle ne dépasse pas 130 °C. Avec du pentachlorure d'antimoine comme catalyseur, de bons résultats sont obtenus à une température de 100 à 120 °C.

[0014]    Le procédé selon l'invention est de préférence réalisé en phase liquide. Dans ce cas, la pression est choisie de manière à maintenir le milieu réactionnel sous forme liquide. La pression mise en oeuvre varie en fonction de la température du milieu réactionnel. Elle est généralement de 2 bar à 40 bar. De manière préférée, on travaille à une température et à une pression auxquelles, en outre, le 1,1,1,3,3-pentafluoropropane produit est au moins partiellement sous forme gazeuse, ce qui permet de le séparer aisément du milieu réactionnel.

[0015]    Le procédé selon l'invention peut être mis en oeuvre de manière continue ou discontinue. Il est entendu que la quantité de catalyseur mise en oeuvre est exprimée, dans un procédé discontinu, par rapport à la quantité initiale de 1,1,1,3,3-pentachloropropane mise en oeuvre et, dans un procédé continu, par rapport à la quantité stationnaire de 1,1,1,3,3-pentachloropropane présent dans la phase liquide.

[0016]    Le temps de séjour des réactifs dans le réacteur doit être suffisant pour que la réaction du 1,1,1,3,3-penta-chloropropane avec le fluorure d'hydrogène se réalise avec un rendement acceptable. Il peut être déterminé aisément en fonction des conditions opératoires retenues.

[0017]    Le procédé selon l'invention peut être réalisé dans tout réacteur construit en un matériau résistant à la tem-pérature, à la pression et aux réactifs utilisés, notamment au fluorure d'hydrogène. Il est avantageux de séparer du milieu réactionnel le 1,1,1,3,3-pentafluoropropane et le chlorure d'hydrogène au fur et à mesure qu'ils se forment et de maintenir ou de renvoyer dans le réacteur les réactifs non transformés, ainsi que les chlorofluoropropanes éven-tuellement formés par fluoration incomplète du 1,1,1,3,3-pentachloropropane. A cet effet, le procédé selon l'invention est avantageusement réalisé dans un réacteur équipé d'un dispositif de soutirage d'un courant gazeux, ce dispositif consistant par exemple en une colonne de distillation et un condenseur de reflux surmontant le réacteur. Ce dispositif permet, par un réglage adéquat, de soutirer en phase gazeuse le 1,1,1,3,3-pentafluoropropane et le chlorure d'hydro-gène produits, tout en maintenant à l'état liquide dans le réacteur le 1,1,1,3,3-pentachloropropane et la majeure partie du fluorure d'hydrogène non transformés, ainsi que, le cas échéant, la majeure partie des produits de fluoration partielle du 1,1,1,3,3-pentachloropropane.

[0018]    Le 1,1,1,3,3-pentachloropropane mis en oeuvre dans le procédé selon l'invention peut avantageusement être obtenu par réaction du chlorure de vinyle avec du tétrachlorométhane, comme décrit par exemple par Kotora M. et al, Journal of Molecular Catalysis, (1992), vol. 77, p. 51-60. Il est ainsi possible d'obtenir le 1,1,1,3,3-pentafluoropropane en deux étapes, au départ de produits aisément accessibles.

[0019]    Dans une variante préférée, le procédé selon l'invention de préparation du 1,1,1,3,3-pentafluoropropane com-prend une étape de télomérisation dans laquelle on fait réagir du chlorure de vinyle et du tétrachlorométhane en pré-sence d'un catalyseur de télomérisation, de manière à obtenir du 1,1,1,3,3-pentachloropropane, et une étape ultérieure d'hydrofluoration dans laquelle le 1,1,1,3,3-pentachloropropane obtenu dans l'étape de télomérisation est soumis à l'hydrofluoration avec du fluorure d'hydrogène, en présence d'un catalyseur d'hydrofluoration.

[0020]    Le catalyseur de télomérisation peut être choisi parmi les composés des métaux des groupes 8 à 11 du tableau périodique des éléments (IUPAC 1988) et leurs mélanges. Les composés des métaux des groupes 8 et 11 sont préférés. On retient particulièrement les composés du fer et du cuivre, ceux du cuivre étant tout particulièrement préférés. On entend par composés des métaux des groupes 8 à 11, les dérivés organiques et inorganiques de ces métaux ainsi que leurs mélanges. Les dérivés préférés sont les sels inorganiques, les chlorures étant particulièrement préférés. Des catalyseurs de télomérisation particulièrement préférés selon la présente invention sont le chlorure cui-vreux, le chlorure cuivrique et leurs mélanges. De très bons résultats ont été obtenus avec le chlorure de cuivre (I) (chlorure cuivreux).

[0021]    La quantité de catalyseur de télomérisation mise en oeuvre peut varier dans de larges limites. Elle est géné-ralement d'au moins 0,001 mole de catalyseur par mole de chlorure de vinyle. De préférence, elle est d'au moins 0,005 mole de catalyseur par mole de chlorure de vinyle. Dans un procédé réalisé en continu en phase liquide, le rapport molaire entre le catalyseur et le chlorure de vinyle dans le milieu réactionnel peut atteindre 1000. Dans un procédé réalisé en discontinu, on utilise généralement au maximum environ 0,5 mole de catalyseur, de préférence pas plus de 0,2 mole de catalyseur et, de manière particulièrement préférée, 0,1 mole ou moins de catalyseur par mole de chlorure de vinyle mis en oeuvre.

[0022]    Un co-catalyseur peut être mis en oeuvre dans l'étape de télomérisation. Des amines peuvent être utilisées comme co-catalyseur, de préférence à une concentration de 0,1 à 20 moles par mole de catalyseur de télomérisation. Comme amines utilisables comme co-catalyseur dans l'étape de télomérisation du procédé selon l'invention, on peut citer les alcanolamines, les alkylamines et les amines aromatiques, par exemple l'éthanolamine, la n-butylamine, la

EP 0 858 440 B1

n-propylamine, l'isopropylamine, la benzylamine et la pyridine.

[0023]    Le rapport molaire entre le tétrachlorométhane et le chlorure de vinyle mis en oeuvre dans l'étape de télo-
mérisation est généralement d'au moins 1,5. De préférence, on travaille avec un rapport molaire d'au moins 2. En
principe, il n'y a pas de limite supérieure au rapport molaire entre le tétrachlorométhane et le chlorure de vinyle. Par
exemple, dans un procédé réalisé en continu en phase liquide, le rapport molaire entre les quantités stationnaires de
tétrachlorométhane et de chlorure de vinyle dans le milieu réactionnel peut atteindre 1000. Dans un procédé réalisé
en discontinu, on met généralement en oeuvre au maximum environ 50 moles, de préférence au maximum 20 moles
et, de manière particulièrement préférée, au maximum 10 moles de tétrachlorométhane par mole de chlorure de vinyle.
[0024]    La température à laquelle s'effectue la télomérisation du chlorure de vinyle par le tétrachlorométhane est
généralement d'au moins 25 °C. De préférence, elle est d'au moins 70 °C. La température de télomérisation ne dépasse
en général pas 200 °C. De préférence, elle ne dépasse pas 160 °C. Avec du chlorure cuivreux comme catalyseur, de
bons résultats sont obtenus à une température de 100 à 140 °C, en particulier à une température de 110 à 130 °C.
[0025]    La réaction de télomérisation est généralement réalisée en phase liquide, avantageusement en présence
d'un solvant. Des solvants utilisables dans l'étape de télomérisation sont notamment des alcools, tels que le méthanol,
l'éthanol, l'isopropanol et le tert-butanol et des nitriles, en particulier l'acétonitrile et le propionitrile. Les nitriles sont
préférés. Le rapport molaire entre le solvant et le catalyseur de télomérisation ne dépasse en général pas 1000. De
bons résultats ont été obtenus avec un rapport molaire entre le solvant et le catalyseur de télomérisation de 20 à 400.
[0026]    Dans le procédé selon l'invention, la présence d'un nitrile est particulièrement avantageuse, spécialement
lorsque le catalyseur de télomérisation est un chlorure, tout spécialement le chlorure cuivreux.
[0027]    Les exemples ci-après illustrent l'invention de manière non limitative.

Exemple 1 - Préparation du 1,1,1,3,3-pentachloropropane

[0028]    Dans un autoclave de 1,5 l, revêtu d'une résine fluorocarbonée TEFLON®, équipé d'un agitateur mécanique
et d'une sonde de température, on a introduit 4,43 moles d'acétonitrile, 6,57 moles de tétrachlorométhane, 0,11 mole
de chlorure de cuivre (I) et 2,21 moles de chlorure de vinyle. L'autoclave a ensuite été plongé dans un bain thermos-
tatisé, maintenu à une température de 120°C, pendant 66 h sous agitation continue. Après avoir atteint 8,5 bar, la
pression autogène a diminué, atteignant 6 bar après 24 heures de réaction et 5,9 bar après 66 heures. L'autoclave a
alors été refroidi, puis le milieu réactionnel a été distillé sous pression réduite. 380 g de 1,1,1,3,3-pentachloropropane
ont été obtenus, ce qui représente un rendement de 80 % par rapport au chlorure de vinyle mis en oeuvre.

Exemples 2-3 - Préparation du 1,1,1,3,3-pentachloropropane

[0029]    Dans l'autoclave décrit à l'exemple 1, on a introduit de l'acétonitrile (AcN) du tétrachlorométhane, du chlorure
de cuivre (I) et du chlorure de vinyle (VC) dans les proportions rapportées au tableau I. Les conditions de réaction
sous pression autogène et les résultats obtenus sont également présentés au tableau I.

TABLE I

| exemple | 2 | 3 |
|---|---|---|
| rapport molaire VC/CCl$_4$/AcN/CuCl | 1/6/2/0,07 | 1/3,1/2,2/0,03 |
| Température de réaction | 120 °C | 115 °C |
| Durée de réaction | 36 h | 96 h |
| Conversion du VC (% de VC mis en oeuvre) | 83 % | 99 % |
| Sélectivité en 1,1,1,3,3-pentachloropropane (% du VC converti transformé en 1,1,1,3,3-pentachloropropane) | 91 % | 85 % |

Exemple 4 - hydrofluoration du 1,1,1,3,3-pentachloropropane

[0030]    Dans un autoclave de 0,5 l en acier inoxydable HASTELLOY B2, équipé d'un agitateur mécanique à pâles,
d'une sonde de température et d'un tube plongeant permettant d'effectuer des prélèvements en phase liquide en cours
d'essai, on a introduit 0,21 mole de 1,1,1,3,3-pentachloropropane, 0,076 mole de pentachlorure d'antimoine et 10
moles de fluorure d'hydrogène. L'autoclave a ensuite été plongé dans un bain thermostatisé, maintenu à une tempé-

**EP 0 858 440 B1**

rature de 120°C sous agitation continue pendant 21 heures. La pression a été régulée à 25 bar. Un prélèvement réalisé après 2 heures de réaction a montré que plus de 99 % molaire du 1,1,1,3,3-pentachloropropane mis en oeuvre était déjà transformé, dont 66 % en 1,1,1,3,3-pentafluoropropane. Après 21 heures de réaction, quasi tout le 1,1,1,3,3-pentachloropropane mis en oeuvre était transformé, dont 92 % molaire en 1,1,1,3,3-pentafluoropropane et environ 6 % en chlorofluoropropanes intermédiaires, formés par fluoration incomplète du 1,1,1,3,3-pentachloropropane.


**Revendications**


**Revendications pour les Etats contractants suivants : AT, CH, DK, GR, IE, LI, LU, MC, PT, SE**

1.  Procédé pour la préparation de 1,1,1,3,3-pentafluoropropane selon lequel on fait réagir du 1,1,1,3,3-pentachloro-propane avec du fluorure d'hydrogène en présence d'un catalyseur d'hydrofluoration et on sépare du milieu réac-tionnel le 1,1,1,3,3-pentafluoropropane et le chlorure d'hydrogène au fur et à mesure qu'ils se forment.

2.  Procédé selon la revendication 1, dans lequel on effectue la réaction en continu dans une phase liquide où on maintient un rapport molaire entre le catalyseur et le 1,1,1,3,3-pentachloropropane de 0,001 à 1000.

3.  Procédé selon la revendication 2, dans lequel on maintient un rapport molaire entre le catalyseur et le 1,1,1,3,3-pen-tachloropropane supérieur à 0,5.

4.  Procédé selon une quelconque des revendications 1 à 3 dans lequel on effectue la réaction à une température et sous une pression auxquelles le 1,1,1,3,3-pentachloropropane est gazeux et on soutire en phase gazeuse le 1,1,1,3,3-pentafluoropropane et le chlorure d'hydrogène.

5.  Procédé selon une quelconque des revendications 1 à 4, dans lequel le catalyseur d'hydrofluoration est choisi parmi les dérivés du titane, du tantale, du molybdène, du bore, de l'étain et de l'antimoine.

6.  Procédé selon une quelconque des revendications 1 à 5, dans lequel le catalyseur mis en oeuvre est le penta-chlorure d'antimoine.

7.  Procédé selon l'une quelconque des revendications 1 à 6, dans lequel on met en oeuvre de 5 à 100 moles de fluorure d'hydrogène par mole de 1,1,1,3,3-pentachloropropane.

8.  Procédé selon l'une quelconque des revendications 1 à 7, dans lequel on réalise la réaction à une température de 50 à 150 °C et à une pression de 2 à 40 bar.

9.  Procédé selon l'une quelconque des revendications 1 à 8, dans lequel le 1,1,1,3,3-pentachloropropane mis en oeuvre est préparé par réaction entre du chlorure de vinyle et du tétrachlorométhane.

10. Procédé pour la préparation de 1,1,1,3,3-pentafluoropropane selon lequel on fait réagir du 1,1,1,3,3-pentachloro-propane avec du fluorure d'hydrogène en présence d'un catalyseur d'hydrofluoration choisi parmi les dérivés des métaux des groupes IIIa, IVa, IVb et VIb du tableau périodique des éléments et leurs mélanges.

11. Procédé selon la revendication 10 dans lequel le catalyseur d'hydrofluoration est choisi parmi les dérivés du titane, du molybdène, du bore et de l'étain


**Revendications pour l'Etat contractant suivant : FI**

1.  Procédé pour la préparation de 1,1,1,3,3-pentafluoropropane selon lequel on fait réagir du 1,1,1,3,3-pentachloro-propane avec du fluorure d'hydrogène en présence d'un catalyseur d'hydrofluoration.

2.  Procédé selon la revendication 1, dans lequel on effectue la réaction en continu dans une phase liquide où on maintient un rapport molaire entre le catalyseur et le 1,1,1,3,3-pentachloropropane de 0,001 à 1000.

3.  Procédé selon la revendication 2, dans lequel on maintient un rapport molaire entre le catalyseur et le 1,1,1,3,3-pen-

EP 0 858 440 B1

tachloropropane supérieur à 0,5.

4.  Procédé selon une quelconque des revendications 1 à 3 dans lequel on effectue la réaction à une température et sous une pression auxquelles le 1,1,1,3,3-pentafluoropropane est gazeux et on soutire en phase gazeuse le 1,1,1,3,3-pentafluoropropane et le chlorure d'hydrogène au fur et à mesure qu'ils se forment.

5.  Procédé selon une quelconque des revendications 1 à 4, dans lequel le catalyseur d'hydrofluoration est choisi parmi les dérivés des métaux des groupes IIIa, IVa, IVb, Va, Vb et VIb du tableau périodique des éléments et leurs mélanges.

6.  Procédé selon une quelconque des revendications 1 à 5, dans lequel le catalyseur d'hydrofluoration est choisi parmi les chlorures, les fluorures et les chlorofluorures d'étain et d'antimoine.

7.  Procédé selon une quelconque des revendications 1 à 6, dans lequel le catalyseur mis en oeuvre est le penta-chlorure d'antimoine.

8.  Procédé selon l'une quelconque des revendications 1 à 7, dans lequel on met en oeuvre de 5 à 100 moles de fluorure d'hydrogène par mole de 1,1,1,3,3 -pentachloropropane.

9.  Procédé selon l'une quelconque des revendications 1 à 8, dans lequel on réalise la réaction à une température de 50 à 150 °C et à une pression de 2 à 40 bar.

10. Procédé selon l'une quelconque des revendications 1 à 9, dans lequel le 1,1,1,3,3-pentachloropropane mis en oeuvre est préparé par réaction entre du chlorure de vinyle et du tétrachlorométhane.


**Revendications pour les Etats contractants suivants : BE, DE, ES, FR, GB, IT, NL**

1.  Procédé pour la préparation de 1,1,1,3,3-pentafluoropropane selon lequel on fait réagir du 1,1,1,3,3-pentachloro-propane avec du fluorure d'hydrogène en présence d'un catalyseur d'hydrofluoration en continu dans une phase liquide où on maintient un rapport molaire entre le catalyseur et la quantité stationnaire de 1,1,1,3,3-pentachloro-propane présent dans la phase liquide de 0,001 à 1000.

2.  Procédé selon la revendication 1, dans lequel on maintient un rapport molaire entre le catalyseur et le 1,1,1,3,3-pen-tachloropropane supérieur à 0,5.

3.  Procédé selon la revendication 1 ou 2 dans lequel on effectue la réaction à une température et sous une pression auxquelles le 1,1,1,3,3-pentafluoropropane est gazeux et on soutire en phase gazeuse le 1,1,1,3,3-pentafluoro-propane et le chlorure d'hydrogène au fur et à mesure qu'ils se forment.

4.  Procédé selon une quelconque des revendications 1 à 3, dans lequel le catalyseur d'hydrofluoration est choisi parmi les chlorures, les fluorures et les chlorofluorures d'étain et d'antimoine.

5.  Procédé selon une quelconque des revendications 1 à 4, dans lequel le catalyseur mis en oeuvre est le penta-chlorure d'antimoine.

6.  Procédé selon l'une quelconque des revendications 1 à 5, dans lequel on met en oeuvre de 5 à 100 moles de fluorure d'hydrogène par mole de 1,1,1,3,3-pentachloropropane.

7.  Procédé selon l'une quelconque des revendications 1 à 6, dans lequel on réalise la réaction à une température de 50 à 150 °C et à une pression de 2 à 40 bar.

8.  Procédé selon l'une quelconque des revendications 1 à 7, dans lequel le 1,1,1,3,3-pentachloropropane mis en oeuvre est préparé par réaction entre du chlorure de vinyle et du tétrachlorométhane.

EP 0 858 440 B1

**Patentansprüche**

**Patentansprüche für folgende Vertragsstaaten : AT, CH, DK, GR, IE, LI, LU, MC, PT, SE**

1.  Verfahren zur Herstellung von 1,1,1,3,3-Pentafluorpropan, wonach man 1,1,1,3,3-Pentachlorpropan in Anwesenheit eines Hydrofluorierungskatalysators mit Fluorwasserstoff umsetzt und aus dem Reaktionsmilieu das 1,1,1,3,3-Pentafluorpropan und den Chlorwasserstoff in dem Maße abtrennt, wie sie sich bilden.

2.  Verfahren nach Anspruch 1, worin die Umsetzung kontinuierlich in einer flüssigen Phase vorgenommen wird, in der ein Molverhältnis zwischen dem Katalysator und dem 1,1,1,3,3-Pentachlorpropan von 0,001 bis 1.000 aufrechterhalten wird.

3.  Verfahren nach Anspruch 2, worin ein Molverhältnis zwischen dem Katalysator und dem 1,1,1,3,3-Pentachlorpropan von über 0,5 aufrechterhalten wird.

4.  Verfahren nach einem der Ansprüche 1 bis 3, worin die Umsetzung bei einer Temperatur und unter einem Druck ausgeführt wird, bei denen das 1,1,1,3,3-Pentafluorpropan gasförmig ist und das 1,1,1,3,3-Pentafluorpropan und der Chlorwasserstoff in gasförmiger Phase abgenommen werden.

5.  Verfahren nach einem der Ansprüche 1 bis 4, worin der Hydroflurierungskatalysator unter den Derivaten von Titan, Tantal, Molybdän, Bor, Zinn und Antimon ausgewählt wird.

6.  Verfahren nach einem der Ansprüche 1 bis 5, worin der eingesetzte Katalysator Antimonpentachlorid ist.

7.  Verfahren nach einem der Ansprüche 1 bis 6, worin 5 bis 100 Mol Fluorwasserstoff pro Mol 1,1,1,3,3-Pentachlorpropan eingesetzt werden.

8.  Verfahren nach einem der Ansprüche 1 bis 7, worin die Umsetzung bei einer Temperatur von etwa 50 bis 150°C und bei einem Druck von 2 bis 40 bar ausgeführt wird.

9.  Verfahren nach einem der Ansprüche 1 bis 8, worin das eingesetzte 1,1,1,3,3-Pentachlorpropan durch Umsetzung von Vinylchlorid mit Tetrachlormethan hergestellt wird.

10. Verfahren zur Herstellung von 1,1,1,3,3-Pentafluorpropan, wonach man 1,1,1,3,3-Pentachlorpropan in Anwesenheit eines Hydrofluorierungskatalysators mit Fluorwasserstoff umsetzt, welcher Katalysator unter den derivaten von Metallen der Gruppen IIIa, IVa, IVb und VIb des Periodensystems der Elemente und unter deren Gemischen ausgewählt wird.

11. Verfahren nach Anspruch 10, worin der Hydrofluorierungskatalysator unter den Verbindungen von Titan, Molybdän, Bor und Zinn ausgewählt wird.

**Patentansprüche für folgenden Vertragsstaat : FI**

1.  Verfahren zur Herstellung von 1,1,1,3,3-Pentafluorpropan, wonach man 1,1,1,3,3-Pentachlorpropan in Anwesenheit eines Hydrofluorierungskatalysators mit Fluorwasserstoff umsetzt.

2.  erfahren nach Anspruch 1, worin die Umsetzung kontinuierlich in einer flüssigen Phase vorgenommen wird, in der man zwischen dem Katalysator und dem 1,1,1,3,3-Pentachlorpropan ein Molverhältnis von 0,001 bis 1000 aufrechterhält.

3.  Verfahren nach Anspruch 2, worin man ein Molverhältnis zwischen dem Katalysator und dem 1,1,1,3,3-Pentachlorpropan von über 0,5 aufrechterhält.

4.  Verfahren nach einem der Ansprüche 1 bis 3, worin die Umsetzung bei einer Temperatur und unter einem Druck ausgeführt wird, bei denen das 1,1,1,3,3-Pentafluorpropan gasförmig ist und das 1,1,1,3,3-Pentafluorpropan und der Chlorwasserstoff in der Gasphase in dem Maße abgenommen werden, wie sie sich bilden.

7

EP 0 858 440 B1

5.  Verfahren nach einem der Ansprüche 1 bis 4, worin der Hydrofluorierungskatalysator unter den Derivaten von Metallen der Gruppen IIIa, IVa, IVb, Va, Vb und VIb des Periodensystems der Elemente und unter deren Gemischen ausgewählt wird.

6.  Verfahren nach einem der Ansprüche 1 bis 5, worin der Hydrofluorierungskatalysator unter den Chloriden, Fluoriden und Chlorfluoriden von Zinn und Antimon ausgewählt wird.

7.  Verfahren nach einem der Ansprüche 1 bis 6, worin der eingesetzte Katalysator das Antimonpentachlorid ist.

8.  Verfahren nach einem der Ansprüche 1 bis 7, worin 5 bis 100 Mol Fluorwasserstoff pro Mol 1,1,1,3,3-Pentachlorpropan eingesetzt werden.

9.  Verfahren nach einem der Ansprüche 1 bis 8, worin die Umsetzung bei einer Temperatur von ungefähr 50 bis 150°C und bei einem Druck von 2 bis 40 bar ausgeführt wird.

10. Verfahren nach einem der Ansprüche 1 bis 9, worin das eingesetzte 1,1,1,3,3-Pentachlorpropan durch Umsetzung von Vinylchlorid mit Tetrachlormethan hergestellt wird.


**Patentansprüche für folgende Vertragsstaaten : BE, DE, ES, FR, GB, IT, NL**

1.  Verfahren zur Herstellung von 1,1,1,3,3-Pentafluorpropan, wonach man 1,1,1,3,3-Pentachlorpropan in Anwesenheit eines Hydrofluorierungskatalysators kontinuierlich in einer flüssigen Phase mit Fluorwasserstoff umsetzt, in welcher Phase ein Molverhältnis zwischen dem Katalysator und der in der flüssigen Phase vorliegenden stationären Menge an 1,1,1,3,3-Pentachlorpropan von 0,001 bis 1000 aufrechterhalten wird.

2.  Verfahren nach Anspruch 1, worin ein Molverhältnis zwischen dem Katalysator und dem 1,1,1,3,3-Pentachlorpropan von über 0,5 aufrechterhalten wird.

3.  Verfahren nach Anspruch 1 oder 2, worin die Umsetzung bei einer Temperatur und unter einem Druck ausgeführt wird, bei denen das 1,1,1,3,3-Pentafluorpropan gasförmig ist und das 1,1,1,3,3-Pentafluorpropan und der Chlorwasserstoff in der Gasphase in dem Maße abgezogen werden, wie sie sich bilden.

4.  Verfahren nach einem der Ansprüche 1 bis 3, worin der Hydrofluorierungskatalysator unter den Chloriden, Fluoriden und den Chlorfluoriden von Zinn und Antimon ausgewählt wird.

5.  Verfahren nach einem der Ansprüche 1 bis 4, worin der eingesetzte Katalysator das Antimonpentachlorid ist.

6.  Verfahren nach einem der Ansprüche 1 bis 5, worin 5 bis 100 Mol Fluorwasserstoff pro Mol 1,1,1,3,3-Pentachlorpropan eingesetzt werden.

7.  Verfahren nach einem der Ansprüche 1 bis 6, worin die Umsetzung bei einer Temperatur von etwa 50 bis 150°C und bei einem Druck von 2 bis 40 bar ausgeführt wird.

8.  Verfahren nach einem der Ansprüche 1 bis 7, worin das eingesetzte 1,1,1,3,3-Pentachlorpropan durch Umsetzung von Vinylchlorid mit Tetrachlormethan hergestellt wird.


**Claims**


**Claims for the following Contracting States : AT, CH, DK, GR, IE, LI, LU, MC, PT, SE**

1.  Process for the preparation of 1,1,1,3,3-pentafluoropropane, according to which 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst and the 1,1,1,3,3-pentafluoropropane and the hydrogen chloride are separated from the reaction mixture as they are being formed.

2.  Process according to Claim 1, in which the reaction is carried out continuously in a liquid phase where a molar

EP 0 858 440 B1

ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000.

3.  Process according to claim 2, in which the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is maintained superior to 0.5.

4.  Process according to any one of Claims 1 at 3, in which the reaction is carried out at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and in which 1,1,1,3,3-pentafluoropropane and hydrogen chloride are drawn off in a gaseous phase as they are being formed.

5.  Process according to any one of Claims 1 to 4 in which the hydrofluorination catalyst is chosen from tin and antimony chlorides, fluorides and chlorofluorides.

6.  Process according to any one of Claims 1 to 5, in which the catalyst used is antimony pentachloride.

7.  Process according to any one of Claims 1 to 6, in which from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

8.  Process according to any one of Claims 1 to 7, in which the reaction is carried out at a temperature of approximately 50 to 150°C and at a pressure of 2 to 40 bar.

9.  Process according to any one of Claims 1 to 8, in which the 1,1,1,3,3-pentachloropropane used is prepared by reaction between vinyl chloride and tetrachloromethane.

10. Process for the preparation of 1,1,1,3,3-pentafluoropropane according to which 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst selected from the derivatives of metals of group IIIa, IVa, IVb and VIb of the periodical table of elements and their mixtures.

11. Process according to claim 10, wherein the hydrofluorination catalyst is selected from the derivatives of titanium, molybdene, boron and tin.


**Claims for the following Contracting State : FI**

1.  Process for the preparation of 1,1,1,3,3-pentafluoropropane, according to which 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

2.  Process according to Claim 1, in which the reaction is carried out continuously in a liquid phase where a molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000.

3.  Process according to claim 2, in which the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is maintained superior to 0.5.

4.  Process according to any one of Claims 1 at 2, in which the reaction is carried out at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and in which 1,1,1,3,3-pentafluoropropane and hydrogen chloride are drawn off in a gaseous phase as they are being formed.

5.  Process according to any one of Claims 1 to 4, wherein the hydrofluorination catalyst is selected from the derivatives of metals of groups IIIa, IVa, IVb, Va, Vb and VIb of the periodic table of the elements and their mixtures.

6.  Process according to any one of Claims 1 to 5, in which the hydrofluorination catalyst is chosen from tin and antimony chlorides, fluorides and chlorofluorides.

7.  Process according to any one of Claims 1 to 6, in which the catalyst used is antimony pentachloride.

8.  Process according to any one of Claims 1 to 7, in which from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

9.  Process according to any one of Claims 1 to 8, in which the reaction is carried out at a temperature of approximately

9

**EP 0 858 440 B1**

50 to 150°C and at a pressure of 2 to 40 bar.

10. Process according to any one of Claims 1 to 9, in which the 1,1,1,3,3-pentachloropropane used is prepared by reaction between vinyl chloride and tetrachloromethane.

**Claims for the following Contracting States : BE, DE, ES, FR, GB, IT, NL**

1. Process for the preparation of 1,1,1,3,3-pentafluoropropane, according to which 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst, continuously in a liquid phase where a molar ratio of the catalyst to the stationary concentration of 1,1,1,3,3-pentachloropropane in the liquid phase from 0.001 to 1000 is maintained.

2. Process according to claim 1, in which the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is maintained superior to 0.5.

3. Process according to Claim 1 or 2, in which the reaction is carried out at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and in which 1,1,1,3,3-pentafluoropropane and hydrogen chloride are drawn off in a gaseous phase as they are being formed.

4. Process according to any one of Claims 1 to 3, in which the hydrofluorination catalyst is chosen from tin and antimony chlorides, fluorides and chlorofluorides.

5. Process according to any one of Claims 1 to 4, in which the catalyst used is antimony pentachloride.

6. Process according to any one of Claims 1 to 5, in which from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

7. Process according to any one of Claims 1 to 6, in which the reaction is carried out at a temperature of approximately 50 to 150°C and at a pressure of 2 to 40 bar.

8. Process according to any one of Claims 1 to 7, in which the 1,1,1,3,3-pentachloropropane used is prepared by reaction between vinyl chloride and tetrachloromethane.

10

# EXHIBIT 70
## FULLY REDACTED

# EXHIBIT 71



PATENT APPLICATION **RECEIVED**

APR 2 5 2000

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE     TECH CENTER 1600/2900

In re the Application of:

Vincent WILMET et al.                                     Group Art Unit:  1621

Application No.  New Continued Prosecution Application     Examiner:  A. Siegel
                 of U.S. Patent Application No. 09/051,746

Filed:  June 8, 1998                                       Attorney Dkt. 32232-144124

For:    METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE

### PRELIMINARY AMENDMENT

Assistant Commissioner for Patents
Washington, D.C. 20231

Sir:

    Please amend the above-identified application as follows:

**IN THE CLAIMS**:

    Please amend claim 19 as follows:

    19.    (Amended)  A process for the preparation of 1,1,1,3,3-pentafluoropropane,
[according to which] wherein 1,1,1,3,3-pentachloropropane hydrofluorination catalyst, under
conditions of temperature and pressure at which 1,1,1,3,3-pentafluoropropane is gaseous; and
wherein 1,1,1,3,3-pentafluoropropane are drawn off in the gaseous phase as they are being
formed.

HON0030848

Please add claims 37-42 as follows:

--37.  The process of claim 19, wherein the hydrofluorination catalyst is selected from the group consisting of derivatives of metals of Groups IIIa, IVa, IVb and VIb of the periodic table. --

--38.  The process of claim 19, wherein the hydrofluorination catalyst is a derivative of a metal selected from the group consisting of titanium and tin.--

--39.  A process for the preparation of 1,1,1,3,3-pentafluoropropane, wherein 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst which is selected form the group consisting of a group derivative of a metal fo Groups IIIa, IVa, IVb and VIb of the periodic table.--

--40.  The process of claim 39, wherein the hydrofluorination catalyst is a derivative of a metal selected from the group consisting of titanium and tin. --

--41.  The process of claim 27, wherein said reaction is conducted with the presence of a telomerization catalyst. --

--42.  The process of claim 41, wherein the telomerization catalyst is Copper (I) chloride or an organic copper compound. --

Please cancel claim 22.

## REMARKS

Claims 19-21 and 23-42 are pending in this application.  By this Amendment, claim 19 is amended (to include claim 22), claim 22 is canceled without prejudice or disclaimer and claims 37-42 are added.  No new matter is contained in the amendments.  Claims 37-40 are supported by page 2 of the specification.  Claims 41-42 are based on claims 31-32.

An early examination is respectfully solicited.

2

HON0030849



A Supplemental Information Disclosure Statement is filed concurrently herewith under separate cover letter.

Respectfully submitted,

Marina V. Schneller
Registration No. 26,032

VENABLE
1201 New York Avenue, N.W.
Suite 1000
Washington, DC 20005-3917
Telephone: (202) 962-4800
Telefax : (202) 962-8300

Date:  April 21, 2000
#196901

3

HON0030850

# EXHIBIT 72
## FULLY REDACTED