## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| SOLVAY, S.A. | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 06-557-SLR |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| HONEYWELL SPECIALTY | ) | **PUBLIC VERSION** |
| MATERIALS, LLC and | ) | |
| HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Defendants. | ) | |

## SOLVAY'S REPLY BRIEF IN SUPPORT OF ITS MOTION
## FOR SUMMARY JUDGMENT OF NO INEQUITABLE CONDUCT

OF COUNSEL:

Arthur I. Neustadt
Jean-Paul Lavalleye
Barry J. Herman
Michael E. McCabe, Jr.
John F. Presper
OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.
1940 Duke St.
Alexandria, VA 22314
Tel.: (703) 413-3000

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Plaintiff Solvay, S.A.*

Dated: March 28, 2008
Public Version Dated: April 4, 2008
858824 / 30651

# TABLE OF CONTENTS

Page

I.   SUMMARY OF ARGUMENT ........................................................................................1

II.  ARGUMENT ..............................................................................................................1

    A.   There is no genuine issue as to any material fact that Solvay did not
        intentionally mischaracterize the '192 patent to the PTO........................................1

    B.   There is no genuine issue as to any material fact that Solvay did not
        intentionally withhold from the PTO portions of the treatise
        "Advances in Fluorine Chemistry".........................................................................6

III. CONCLUSION..............................................................................................................10

i

# TABLE OF AUTHORITIES

Page

## Cases

*Akron Polymer Container Corp. v. Exxel Container, Inc.*,
    148 F.3d 1380 (Fed. Cir. 1998)......................................................................... 7

*Akzo N.V. v. U.S. Int'l Trade Comm'n*,
    808 F.2d 1471 (Fed. Cir. 1986)......................................................................... 3

*FMC Corp. v. Manitowoc Co., Inc.*,
    835 F.2d 1411 (Fed. Cir. 1987)......................................................................... 7

*J.P. Stevens & Co. v. Lex Tex, Ltd.*,
    747 F.2d 1553 (Fed. Cir. 1984)......................................................................... 7

*Kimberly-Clark Corp. v. Johnson & Johnson*,
    745 F.2d 1437 (Fed. Cir. 1984)......................................................................... 7

*In re Lee*,
    277 F.3d 1338 (Fed. Cir. 2002)......................................................................... 4

*Molins PLC v. Textron, Inc.*,
    48 F.3d 1172 (Fed. Cir. 1995)....................................................................... 2, 8

*Monsanto Co. v. Mycogen Plant Science, Inc.*,
    61 F.Supp. 2d 133 (D. Del. 1999)..................................................................... 7

*Nordberg, Inc. v. Telsmith, Inc.*,
    82 F.3d 394 (Fed. Cir. 1996)............................................................................. 7

*Semiconductor Energy Lab. v. Samsung Electronics*,
    204 F.3d 1368 (Fed. Cir. 2000)...................................................................... 2, 3

*The Liposome Co., Inc. v. Vestar, Inc.*,
    C.A. No. 92-332-RRM, 1994 U.S. Dist. LEXIS 19325
    (D. Del. Dec. 20, 1994)..................................................................................... 3

*Therma-Tru Corp. v. Peachtree Doors, Inc.*,
    44 F.3d 988 (Fed. Cir. 1995)............................................................................. 7

## **Statutes**

37 C.F.R. §1.56 (1983) ............................................................................................. 8

## **Other**

Manual for Patent Examining Procedure 2001.01 (Rev. 2 - May 2004) .................................. 8

## I.    SUMMARY OF ARGUMENT

Honeywell asserts that Solvay intentionally mischaracterized the '192 patent during

prosecution of the '817 patent. However, Solvay correctly characterized the '192 patent, and,

further, (1) Honeywell characterized the '192 patent in a similar fashion during the prosecution

of a Honeywell patent, (2) Honeywell is now trying to disown its previous characterization of the

'192 patent by asserting that its outside counsel is not technically competent despite the fact that

he has filed an estimated 800 patent applications on Honeywell's behalf, (3) the examiner

considered the '192 patent and initialed the PTO form 1449 indicating this consideration, (4) the

examiner had full opportunity to review the '192 patent to make his own determination

concerning its disclosure and (5) Honeywell relies upon a Federal Circuit decision involving a

foreign language reference where the examiner had no opportunity to make his own

determination concerning its disclosure in contrast to the English language of the '192 patent.

Honeywell also asserts that Solvay intentionally withheld from the PTO portions of the

treatise "Advances in Fluorine Chemistry" which Solvay referred to during the prosecution of

the '817 patent. However, apart from the fact that the assertedly withheld portions of this treatise

are not material, Honeywell fails to identify any particular individual at Solvay or any outside

patent prosecution attorney that had knowledge of these supposedly withheld portions and had

any intent to withhold them from the PTO in connection with the prosecution of the '817 patent.

## II.    ARGUMENT

### A.    There is no genuine issue as to any material fact that Solvay Did Not Intentionally Mischaracterize The '192 Patent To The PTO

Honeywell asserts that Solvay, in arguments it made to the PTO during prosecution of the

'817 patent, mischaracterized a prior art reference, U.S. Patent No. 5,574,192 (the "'192 patent").

This assertion is baseless.

Honeywell does not dispute that Solvay submitted the '192 patent to the PTO, and that the patent examiner initialed form 1449, indicating his consideration of the '192 patent. (Exhibit 1 hereto; *see also* D.I. 117, Ex. 1). Absent proof to the contrary, it is assumed that the examiner considered the '192 patent. *See Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1184 (Fed. Cir. 1995). Honeywell offers no proof to the contrary but, rather, only argues that the examiner's initials are meaningless. (D.I. 173 at 15 n.4).

Honeywell relies exclusively on *Semiconductor Energy Lab. v. Samsung Elecs.*, 204 F.3d 1368, 1378 (Fed. Cir. 2000) ("*SEL*") to support its inequitable conduct theory, arguing that, despite the examiner's consideration of the '192 patent, Solvay deceived the examiner as to its import. (D.I. 173 at 18-19). However, *SEL* is inapposite to the present case. In *SEL*, the patentee submitted to the PTO a prior art reference consisting of a 29-page patent application in Japanese, a one-page partial translation of the reference focusing on its less material passages, and a concise statement directed to such less material passages. The Federal Circuit ruled that such activities "effectively failed to disclose the [prior art] reference to the PTO." *SEL*, 204 F.3d at 1377. The basis for the *SEL* decision was that, because the reference was in a foreign language (Japanese), the examiner's understanding of the reference was limited to the concise statement that was provided by the applicant. *Id.* at 1377-1378. Thus, "the desirability of the examiner securing a full translation was masked by the affirmatively misleading concise statement and one-page translation." *Id.* at 1378.

The present case bears no resemblance to *SEL*. The '192 patent was in English -- since it is a United States patent -- so the examiner could read and understand it in its entirety. In fact, the same examiner who examined the application which issued as the '192 patent, Alan Siegel, considered the '192 patent as a prior art reference during prosecution of the '817 patent. (D.I.

117, Ex. 5 (face of '192 patent)). As a matter of law, no issue exists as to whether the examiner could or did understand the '192 patent.

The inapplicability of *SEL* is further demonstrated by the fact that the basis for its holding was that the patentee, through its actions, "effectively failed to disclose the [prior art] reference to the PTO." *Id.* at 1377. Here, there is no question but that the '192 patent was disclosed to the PTO and considered by Examiner Siegel.

Further, as detailed in Solvay's opening brief (D.I. 116 at 9), *Akzo N.V. v. U.S. Int'l Trade Comm'n*, 808 F.2d 1471 (Fed. Cir. 1986) is applicable here. Here, as in *Akzo*, Examiner Siegel was free to accept or reject Solvay's statements concerning the '192 patent. *See also The Liposome Co., Inc. v. Vestar, Inc.*, C.A. No. 92-332-RRM, 1994 U.S. Dist. LEXIS 19325, at *81 (D. Del. Dec. 20, 1994) (alleged "misdescription" of a reference not a material misstatement of fact and did not violate PTO duty of candor).

Significantly, as set forth in Solvay's opening brief (D.I. 116 at 7-8), Solvay's statements to the PTO concerning the disclosure of '192 patent are consistent with Honeywell's own statement to the PTO concerning this patent. More particularly, during prosecution of Honeywell's U.S. Patent 7,214,839 ("the '839 patent"), Honeywell characterized the '192 patent to the PTO in the same way - emphasizing that (1) the '192 examples disclose a batch process, not a continuous process; and (2) the '192 patent does not disclose continuous HCl removal. (D.I. 116 at 3-4). It strains credulity to the utmost for Honeywell to assert that Solvay deceived the examiner by describing the '192 patent in the same way that Honeywell described this patent.

Honeywell further asserts that Solvay must have mischaracterized the '192 patent because "[i]t would have been impossible for a person of ordinary skill in the art to have reviewed the '192 patent and to not have understood that the '192 patent also discloses a

3

continuous process." (D.I. 173 at 19). Again, however, the facts, including Honeywell's own prior conduct, directly contradict Honeywell's assertion.

As set forth in Solvay's opening brief (D.I. 116 at 8), the PTO (Examiner Siegel and the Board of Appeals) reviewed the '192 patent and understood that it did not disclose a continuous process,[1] as did Solvay's expert, Dr. Dolbier, Honeywell's expert, ███████,[2] and Honeywell itself during prosecution of its '839 patent.

In an attempt to further distance itself from its highly pertinent statements to the PTO concerning the '192 patent, Honeywell asserts that it "took [the step of filing a disclaimer of the '839 patent] after learning that its outside patent counsel (not a fluorocarbon engineer) made incorrect statements regarding the '192 patent's disclosure during prosecution of the '839 patent." (D.I. 173 at 20-21). The implication of this assertion is that Honeywell's outside counsel Richard Roberts, who prosecuted the application which issued as the '839 patent, did not understand the technology and filed responses without Honeywell's consent or knowledge. However, the facts do not support this dubious assertion.

First, Roberts has been outside counsel for Honeywell since ████, and has prepared and filed an estimated ██ patent applications on its behalf. ████████████████████████ ████████. It is his practice to send Honeywell a ███████████████. (*Id.* at 66:10-19). He

---

[1] Both Examiner Siegel and the Board of Appeals are presumed to be skilled in the art. *See In re Lee*, 277 F.3d 1338, 1345 (Fed. Cir. 2002).

[2] In its opposition brief, Honeywell accuses Solvay of mischaracterizing ███████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████

has no recollection of Honeywell ever informing him ███████████████████. (*Id.* at

18:11-17). It strains credulity to believe that Honeywell would entrust ███ of its patent

applications to an attorney who was technically unqualified.

Second, Honeywell's assertion in its disclaimer that its statements concerning the '192

and '706 patents were "incorrect and mistaken" is contradicted by the facts. Specifically, in its

disclaimer, Honeywell asserted that it had made "certain incorrect statements regarding

[Honeywell's] U.S. Patent Nos. 5,574,192 [ ] and 5,763,706 [ ]," and that during the course of

this litigation it "became aware of the incorrect nature of these statements." (D.I. 117, Ex. 9, at

HON0033989-90). With specific reference to the '706 patent, Honeywell asserted that its

characterization of the '706 patent as disclosing a HF: HCC-240fa ratio of 4-10, and as not

motivating one skilled in the art to look outside this ratio, was "incorrect and mistaken." (*Id.*).

However, outside the context of this litigation, Honeywell was fully aware that the '706

patent was limited to a HF: HCC-240fa ratio of 4-10. In the "Background of the Invention"

section of the '839 patent, Honeywell distinguished the '706 patent from the '839 patent, stating

that the '706 patent:

> *employs a relatively low molar ratio of hydrogen fluoride to HCC-240fa* or HCC-230fa. This technique produces a disadvantageously large amounts of high boiling point by-products and a lower than desired catalyst life. *It has now been found that by the use of a large HF to hydrochlorocarbon (organic feed) ratio, of at least about 15:1* in the liquid phase, the reaction can reduce high boiling point by-product formation and also prolong catalyst life. *This is opposed to the prior art teaching to use organic-rich, HF-lean conditions.*

(D.I. 117, Ex. 6 at col. 1, lines 43-58) (emphasis added). Thus, Honeywell filed the '839 patent

to seek patent protection for higher HF to hydrochlorocarbon (that is, HCC) ratios of at least

about 15:1 – ratios which were "opposed" to the lower prior art HF:HCC ratios in the '706 patent.

When the '839 patent application was filed in 2003, Honeywell knew that the '706 patent

disclosed HF: HCC-240fa ratios of only 4-10. Honeywell's disclaimer should be recognized for what it is - nothing more than a litigation-driven attempt to disown its previous (correct) statements which are so disadvantageous to Honeywell in this case.

Honeywell further asserts that Solvay supposedly believed that the '817 claims were "covered" by the foreign equivalent to the '192 patent, thereby supposedly providing "overwhelming evidence" that Solvay intentionally mischaracterized the '192 patent to the PTO. (D.I. 173 at 1). Specifically, Honeywell points to Solvay documents from 1997 to support this assertion. (D.I. 173 at 20). However, Honeywell's assertion is based on the premise that the claims pending in 1997 were of the same scope as the '817 claims. This premise is erroneous. The broadest independent claim in Solvay's application in 1997 (claim 18) was merely directed to a process for making HFC-245fa by reacting HCC-240fa with HF in the presence of a hydrofluorination catalyst. (Exhibit 3 hereto, '817 patent prosecution history, at HON0021369). Significantly, claim 18 did not contain all of the other limitations in claim 1 of the '817 patent which distinguish it from the '192 patent.

As set forth above, Honeywell's opposition brief fails to create any genuine issue of material fact with respect to the '192 patent. Accordingly, summary judgment in favor of Solvay is appropriate.

**B.    There is no genuine issue as to any material fact that Solvay did not intentionally withhold from the PTO portions of the treatise "Advances in Fluorine Chemistry"**

Honeywell asserts that Solvay "disingenuously argues in its opening brief that Honeywell cannot demonstrate deceptive intent because it has not identified any specific person with knowledge of the Hamilton chapter or the Barbour chapter. This, however, is not the legal

6

standard. Rather, Honeywell must demonstrate knowledge chargeable to the 'applicant,' which is a general collective term." (D.I. 173 at 23). However, Honeywell's assertion is baseless.

It is black letter law that a threshold finding of both materiality and intent must be established for an inequitable conduct inquiry to proceed. *See J.P. Stevens & Co. v. Lex Tex, Ltd.*, 747 F.2d 1553, 1560 (Fed. Cir. 1984), *cert. denied*, 474 U.S. 822 (1985) ("Once the thresholds of materiality and intent are established, the court must balance them and determine as a matter of law whether the scales tilt to a conclusion that inequitable conduct occurred."); *Akron Polymer Container Corp. v. Exxel Container, Inc.*, 148 F.3d 1380, 1384 (Fed. Cir. 1998) ("Without a factual basis to establish a threshold level of deceitful intent, the inequitable conduct analysis is at an end. . . .").

It is also black letter law that "[a]pplicant must be chargeable with knowledge of the existence of the prior art or information, for it is impossible to disclose the unknown." *FMC Corp. v. Manitowoc Co., Inc.,* 835 F.2d 1411, 1415 (Fed. Cir. 1987); *Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 397 (Fed. Cir. 1996) ("[T]he applicant's *actual* knowledge of the reference's existence must be proved."). Knowledge of a reference by an individual may not be presumed. *Kimberly-Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1449-50 (Fed. Cir. 1984) (describing such a presumption as "absurd"). If such specific knowledge does not exist, no intent to deceive can exist. *Therma-Tru Corp. v. Peachtree Doors, Inc.*, 44 F.3d 988, 996 (Fed. Cir. 1995) ("There can not have been culpable intent in withholding information that the inventor did not have."). No duty exists to disclose information that is unknown. *Monsanto Co. v. Mycogen Plant Science, Inc.*, 61 F. Supp.2d 133, 195 (D. Del. 1999).

Thus, under applicable law, if Honeywell cannot identify a specific individual who had knowledge of the Hamilton chapter or page 184 of the Barbour chapter, Honeywell cannot make

the required threshold showing of intent, and its inequitable conduct assertion must fail as a matter of law.[3]

Even the sole case upon which Honeywell relies contradicts its assertion. *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 n.6 (Fed. Cir. 1995) holds that "[u]nder PTO rules, the duty to disclose information material to patentability rests on the inventor, on each attorney or agent who prepares or prosecutes an application and on every other ***individual*** who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee, or with anyone to whom there is an obligation to assign the application. *See* 37 C.F.R. § 1.56 (1983)." (Emphasis added). Thus, the duty of disclosure under rule 56 applies to individuals and is not a vague "general" duty. [4]

During this litigation, Honeywell deposed every individual involved in the prosecution of the '817 patent. Nowhere in any of this testimony is there any indication that any of these individuals was aware of the Hamilton chapter or page 184 of the Barbour chapter, or that any of these individuals knew or believed that these chapters were material to the patentability of the '817 patent. Because Honeywell fails to identify a specific individual who had knowledge of these chapters, Honeywell has failed to make the required threshold showing of intent and its inequitable conduct assertion must fail as a matter of law.

---

[3] Solvay disputes Honeywell's assertion that the Hamilton chapter and page 184 of the Barbour chapter are material. However, because Honeywell cannot prove the required element of intent, and thus, cannot prove inequitable conduct, no discussion of the lack of materiality of these two references is necessary.

[4] The Manual for Patent Examining Procedure ("MPEP") states in this regard that it is "clear that the duty [to disclose under Rule 56] applies only to individuals, not to organizations. For instance, the duty of disclosure would not apply to a corporation or institution as such." (MPEP 2001.01 (Rev. 2 – May 2004) at 2000-2) (Exhibit 4 hereto).

Honeywell further asserts that it should not have to identify specific individuals at Solvay who supposedly "intentionally withheld" from the PTO portions of the treatise "Advances in Fluorine Chemistry" because Solvay supposedly prevented Honeywell from obtaining discovery on this issue. (D.I. 173 at 2-3, 23). Specifically, Honeywell asserts that "Solvay refused to produce [a] Solvay document – which would identify the person at Solvay who knew about ['Advances in Fluorine Chemistry'] – under claim of privilege." (D.I. 173 at 3). █████

███████████████████████████████████████████████

███████████

███████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

As set forth above, Honeywell's opposition brief fails to create any genuine issues of material fact with respect to the Hamilton chapter and page 184 of the Barbour chapter. Accordingly, summary judgment in favor of Solvay is appropriate.

## III.    CONCLUSION

For the foregoing reasons as well as the reasons set forth in Solvay's opening brief, this

Court should enter summary judgment in Solvay's favor on Honeywell's counterclaim and

affirmative defense of inequitable conduct.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Arthur I. Neustadt
Jean-Paul Lavalleye
Barry J. Herman
Michael E. McCabe, Jr.
John F. Presper
OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.
1940 Duke St.
Alexandria, VA 22314
Tel.: (703) 413-3000

Dated:  March 28, 2008
Public Version Dated: April 4, 2008
857874 / 30651

By:  /s/ David E. Moore
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, Delaware 19801
    Tel:  (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

*Attorneys for Plaintiff Solvay, S.A.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on April 4, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I hereby certify that on April 4, 2008, the attached document was Electronically Mailed to the following person(s):

Thomas C. Grimm
Benjamin J. Schladweiler
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
tgrimm@mnat.com
bschladweiler@mnat.com

Robert G. Krupka
Laura M. Burson
Helen Hong
Kirkland & Ellis LLP
777 S. Figueroa Street, Suite 3400
Los Angeles, CA 90017
service-solvay@kirkland.com

By:   /s/ David E. Moore
          Richard L. Horwitz
          David E. Moore
          Potter Anderson & Corroon LLP
          Hercules Plaza, 6th Floor
          1313 N. Market Street
          P.O. Box 951
          Wilmington, DE 19899-0951
          (302) 984-6000
          rhorwitz@potteranderson.com
          dmoore@potteranderson.com

799366 / 30651

# EXHIBIT 1

Sheet 1 of 1

| Form PTO-1449<br>(REV. 8-83) | US Dept. of Commerce<br>PATENT & TRADEMARK OFFICE | | ATTY DOCKET NO.<br>32232-144124 | | APPLICATION NO.<br>09/051,746 | | |
|---|---|---|---|---|---|---|---|
| INFORMATION DISCLOSURE STATEMENT | | | | | | | |
| (Use several sheets if necessary) | | | APPLICANT(S)<br>Vincent WILMET et al. | | | | |
| | | | FILING DATE<br>June 8, 1998 | | | | |

U.S. PATENT DOCUMENTS

| EXAMINER<br>INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUB<br>CLASS |
|---|---|---|---|---|---|---|
| (initialed) | | 5,574,192 | 11/1996 | VANDERPUY et al. | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUB<br>CLASS |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

OTHER DOCUMENTS (Including Author, Title, Date, Pertinent Pages, etc.)

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

| EXAMINER  A Siegel | DATE CONSIDERED  5/30/00 |
|---|---|

Examiner:    Initial if citation considered, whether or not citation is in conformance with M.P.E.P. 609; draw line through citation if not in conformance and not considered.   Include copy of this form with next communication to applicant.

#196921

HON0021463

# EXHIBIT 2

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 3

10 ... PCT/PTO 2 0 APR 1998
## 09/051746

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent Application of

| | | |
|---|---|---|
| Applicant(s) | : Vincent WILMET et al. | ) |
| Appln. No. | : PCT/EP96/04315 | ) |
| Filed | : October 4, 1996 | ) |
| National Stage Entry | : concurrently | ) |
| For | : METHOD FOR PREPARING 1,1,1,3,3-PENTAFLUOROPROPANE | ) |
| Attorney Docket | : SLVAY 3216.01 | ) |

PRELIMINARY AMENDMENT

April 20, 1998

Assistant Commissioner for Patents
Washington, D.C. 20231

Attention: PCT-DO/US

Sir:

Please amend the above-identified application as follows:

IN THE CLAIMS:

Cancel all of the claims and substitute therefor:

-- 18.    A  process  for  the  preparation  of  1,1,1,3,3-pentafluoropropane, according to which 1,1,1,3,3-pentachloropropane is  reacted  with  hydrogen  fluoride  in  the  presence  of  a hydrofluorination catalyst.

19.   The  process of Claim 18, wherein the reaction is carried out continuously in a liquid phase with a molar ratio of the catalyst to 1,1,1,3-pentachloropropane maintained from 0.001 to 1000.

21
~~20~~.    The process of Claim 19, wherein the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is maintained greater than 0.5.

22
~~21~~.    The process of Claim 19, wherein the reaction is carried out at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and wherein 1,1,1,3,3-pentafluoropropane and hydrogen chloride are drawn off in a gaseous phase as they are being formed.

23.
~~22~~.    The process of Claim 19, wherein the hydrofluorination catalyst is chosen from tin and antimony chlorides, fluorides and chlorofluorides.

24.
~~23~~.    The process of Claim 19, wherein the catalyst used is antimony pentachloride.

25
~~24~~.    The process of Claim 19, wherein from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

26
~~25~~.    The process of Claim 19, wherein the reaction is carried out at a temperature of approximately 50 to 150°C and at a pressure of 2 to 40 bar.

- 2 -                    (PCT/EP96/04315)

HON0021370

*Rule*
*126*     27
26. The process of Claim 19, wherein the 1,1,1,3,3-pentachloropropane used is prepared by reaction between vinyl chloride and tetrachloromethane.

*O'*
*Cont'd*     28
27. A process for the preparation of 1,1,1,3,3-pentachloropropane usable especially for preparing 1,1,1,3,3-pentafluoropropane, in which vinyl chloride and tetrachloromethane are reacted continuously in the presence of telomerization catalyst chose from copper compounds.

29
28. The process of Claim 27, wherein the reaction is operated in a reaction mixture in which the molar ratio of the catalyst to vinyl chloride is maintained from 0.001 to 1000.

30
29. The process of Claim 27, wherein the reaction is operated in a reaction mixture in which the molar ratio of tetrachloromethane to vinyl chloride is maintained from 1.5 to 1000.

31
30. The process of Claim 27, wherein the telomerization catalyst is an organic copper compound.

32
31. The process of Claim 27, wherein the telomerization catalyst is a copper chloride, preferably copper (I) chloride.

- 3 -          (PCT/EP96/04315)

HON0021371

33.   The process of Claim 27, wherein the telomerization reaction is carried out in the presence of a solvent.

34.   The process of Claim 32, wherein the solvent is a nitrile, preferably acetonitrile or propionitrile.

35.   The process of Claim 27, wherein the telomerization reaction is carried out in the presence of a co-catalyst.

36.   The process of Claim 34, wherein the co-catalyst is an amine. --

## R E M A R K S

The claims have been replaced by a set of new claims, all of which are free of multiple claim dependency.

Respectfully submitted,

George H. Spencer
Registration No. 18,038
SPENCER & FRANK
Suite 300 East
1100 New York Avenue, N.W.
Washington, DC 20005-3955
Telephone:  (202) 414-4000
Telefax  :  (202) 414-4040

GHS:ur

- 4 -        (PCT/EP96/04315)

HON0021372

SLVAY 3216.01
(Article 34)

- 8 -

## CLAIMS

1 - Process for the preparation of 1,1,1,3,3-pentafluoropropane, according to which 1,1,1,3,3-pentachloropropane is reacted with hydrogen fluoride in the presence of a hydrofluorination catalyst.

2 - Process according to Claim 1, in which the reaction is carried out continuously in a liquid phase with a molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane maintained from 0.001 to 1000.

3 - Process according to claim 2, in which the molar ratio of the catalyst to 1,1,1,3,3-pentachloropropane is maintained superior to 0.5.

4 - Process according to any one of Claims 1 to 3, in which the reaction is carried out at a temperature and under a pressure at which 1,1,1,3,3-pentafluoropropane is gaseous and in which 1,1,1,3,3-pentafluoropropane and hydrogen chloride are drawn off in a gaseous phase as they are being formed.

5 - Process according to any one of Claims 1 to 4, in which the hydrofluorination catalyst is chosen from tin and antimony chlorides, fluorides and chlorofluorides.

6 - Process according to any one of Claims 1 to 5, in which the catalyst used is antimony pentachloride.

7 - Process according to any one of Claims 1 to 6, in which from 5 to 100 moles of hydrogen fluoride are used per mole of 1,1,1,3,3-pentachloropropane.

8 - Process according to any one of Claims 1 to 7, in which the reaction is carried out at a temperature of approximately 50 to 150°C and at a pressure of 2 to 40 bar.

9 - Process according to any one of Claims 1 to 8, in which the 1,1,1,3,3-pentachloropropane used is prepared by reaction between vinyl chloride and tetrachloromethane.

10 - Process for the preparation of 1,1,1,3,3-pentachloropropane usable especially for preparing 1,1,1,3,3-pentafluoropropane using a process according to one of Claims 1 to 9, in which vinyl chloride and tetrachloromethane are reacted

HON0021373

- 9 -

continuously in the presence of a telomerization catalyst chosen from copper compounds.

11 - Process according to Claim 10, in which the reaction is operated in a reaction mixture in which the molar ratio of the catalyst to vinyl chloride is maintained from 0.001 to 1000.

12 - Process according to Claim 10 or 11 in which the reaction is operated in a reaction mixture in which the molar ratio of tetrachloromethane to vinyl chloride is maintained from 1.5 to 1000.

13 - Process according to any one of Claims 10 to 12, in which the telomerization catalyst is an organic copper compound.

14 - Process according to any one of Claims 10 to 12, in which the telomerization catalyst is a copper chloride, preferably copper(I) chloride.

15 - Process according to any one of Claims 9 to 14, in which the telomerization reaction is carried out in the presence of a solvent.

16 - Process according to Claim 15, in which the solvent is a nitrile, preferably acetonitrile or propionitrile.

17 - Process according to any one of Claims 9 to 14, in which the telomerization reaction is carried out in the presence of a co-catalyst.

18 - Process according to Claim 17 in which the co-catalyst is an amine.

HON0021374

# EXHIBIT 4

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

### Original Eighth Edition, August 2001
### Latest Revision May 2004



## U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

Rev. 2, May 2004

(d) Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor.

(e) In any continuation-in-part application, the duty under this section includes the duty to disclose to the Office all information known to the person to be material to patentability, as defined in paragraph (b) of this section, which became available between the filing date of the prior application and the national or PCT international filing date of the continuation-in-part application.

37 CFR 1.56 defines the duty to disclose information to the Office.

## 2001.01    Who Has Duty To Disclose

*37 CFR 1.56.  Duty to disclose information material to patentability.*

*****

(c) Individuals associated with the filing or prosecution of a patent application within the meaning of this section are:

(1) Each inventor named in the application;

(2) Each attorney or agent who prepares or prosecutes the application; and

(3) Every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.

*****

Individuals having a duty of disclosure are limited to those who are "substantively involved in the preparation or prosecution of the application." This is intended to make clear that the duty does not extend to typists, clerks, and similar personnel who assist with an application.

The word "with" appears before "the assignee" and "anyone to whom there is an obligation to assign" to make clear that the duty applies only to individuals, not to organizations. For instance, the duty of disclosure would not apply to a corporation or institution as such. However, it would apply to individuals within the corporation or institution who were substantively involved in the preparation or prosecution of the application, and actions by such individuals may affect the rights of the corporation or institution.

## 2001.03    To Whom Duty of Disclosure Is Owed    [R-2]

37 CFR 1.56(a) states that the "duty of candor and good faith" is owed "in dealing with the Office" and that all associated with the filing and prosecution of a

patent application have a "duty to disclose to the Office" material information. This duty "in dealing with" and "to" the Office extends, of course, to all dealings which such individuals have with the Office, and is not limited to representations to or dealings with the examiner. For example, the duty would extend to proceedings before the Board of Patent Appeals and Interferences and the Office of the * Commissioner for Patents.

## 2001.04    Information    Under    37    CFR 1.56(a)  [R-2]

*37 CFR 1.56.  Duty to disclose information material to patentability.*

(a) A patent by its very nature is affected with a public interest. The public interest is best served, and the most effective patent examination occurs when, at the time an application is being examined, the Office is aware of and evaluates the teachings of all information material to patentability. Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned. Information material to the patentability of a claim that is cancelled or withdrawn from consideration need not be submitted if the information is not material to the patentability of any claim remaining under consideration in the application. There is no duty to submit information which is not material to the patentability of any existing claim. The duty to disclose all information known to be material to patentability is deemed to be satisfied if all information known to be material to patentability of any claim issued in a patent was cited by the Office or submitted to the Office in the manner prescribed by §§ 1.97(b)-(d) and 1.98. However, no patent will be granted on an application in connection with which fraud on the Office was practiced or attempted or the duty of disclosure was violated through bad faith or intentional misconduct. The Office encourages applicants to carefully examine:

(1) Prior art cited in search reports of a foreign patent office in a counterpart application, and

(2) The closest information over which individuals associated with the filing or prosecution of a patent application believe any pending claim patentably defines, to make sure that any material information contained therein is disclosed to the Office.

*****

The language of 37 CFR 1.56 (and 37 CFR 1.555) has been modified effective March 16, 1992 to emphasize that there is a duty of candor and good faith which is broader than the duty to disclose material information. 37 CFR 1.56 further states that "no

# EXHIBIT 5

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 6

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY