IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOLVAY, S.A., | ) | |
| | ) | |
| Plaintiff and Counterclaim | ) | |
| Defendant, | ) | C.A. No. 06-557-SLR |
| | ) | |
| v. | ) | **PUBLIC VERSION** |
| | ) | |
| HONEYWELL SPECIALTY MATERIALS LLC, | ) | |
| and HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Defendants and Counterclaim | ) | |
| Plaintiffs. | ) | |

**HONEYWELL INTERNATIONAL INC.'S MOTION FOR
LEAVE TO FILE A SUPPLEMENTAL BRIEF IN SUPPORT
OF HONEYWELL'S (i) MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY AND (ii) OPPOSITION TO SOLVAY'S SUMMARY
JUDGMENT MOTION OF NO INVALIDITY UNDER 35 U.S.C. §§ 102(G)
AND 103 BASED ON COMMERCIAL SUPPRESSION (D.I. 175)**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Thomas C. Grimm (#1098)
Benjamin J. Schladweiler (#4601)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
tgrimm@mnat.com
bschladweiler@mnat.com
*Attorneys for Defendants*

OF COUNSEL:

Robert G. Krupka, P.C.
Laura M. Burson
Amber T. Aubry
Jacob R. Buczko
KIRKLAND & ELLIS LLP
777 S. Figueroa Street, Suite 3400
Los Angeles, CA  90017
(213) 680-8400

Confidential Version Filed: May 22, 2008
Public Version Filed: June 10, 2008

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SOLVAY, S.A., | ) | |
| | ) | |
| Plaintiff and Counterclaim | ) | |
| Defendant, | ) | C.A. No. 06-557-SLR |
| | ) | |
| v. | ) | **PUBLIC VERSION** |
| | ) | |
| HONEYWELL SPECIALTY MATERIALS LLC, | ) | |
| and HONEYWELL INTERNATIONAL INC., | ) | |
| | ) | |
| Defendants and Counterclaim | ) | |
| Plaintiffs. | ) | |

**HONEYWELL INTERNATIONAL INC.'S MOTION FOR
LEAVE TO FILE A SUPPLEMENTAL BRIEF IN SUPPORT
OF HONEYWELL'S (i) MOTION FOR SUMMARY JUDGMENT
OF INVALIDITY AND (ii) OPPOSITION TO SOLVAY'S SUMMARY
JUDGMENT MOTION OF NO INVALIDITY UNDER 35 U.S.C. §§ 102(G)
AND 103 BASED ON COMMERCIAL SUPPRESSION (D.I. 175)**

Defendant Honeywell International Inc. ("Honeywell") hereby moves for leave to

file a supplemental brief in support of its (i) "Motion for Summary Judgment of Invalidity"

(D.I. 134), and (ii) "Opposition to Solvay's Summary Judgment Motion of No Invalidity Under

35 U.S.C. §§ 102(G) and 103 Based on Commercial Suppression" (D.I. 175).

The supplemental brief is necessary because Solvay recently produced new

documents after all briefing was completed, after the hearing on these motions was concluded,

and long after the close of discovery.  Specifically, on Friday, May 9, 2008, Solvay's attorneys

placed into a UPS package almost 800 pages of documents improperly withheld based on a claim

of privilege that this Court ruled improper on January 16, 2008 (D.I. 111), knowing that those

documents would not be received by Honeywell's lawyers until **_after_** the scheduled May 12,

2008 hearing on Honeywell's and Solvay's cross motions for summary judgment.  The newly

produced documents contradict Solvay's arguments and directly bear upon the pending cross

motions for summary judgment on invalidity issues.   For example, among the previously withheld documents is a September 29, 1997 internal Solvay memorandum (S0024312-14) that conclusively rebuts Solvay's argument that the asserted § 102(g) prior art was concealed.

Honeywell seeks leave to address these newly produced documents in a supplemental brief.  Honeywell's proposed supplemental brief is attached hereto as Exhibit A.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Thomas C. Grimm*

_____
Thomas C. Grimm (#1098)
Benjamin J. Schladweiler (#4601)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
tgrimm@mnat.com
bschladweiler@mnat.com
 *Attorneys for Defendants*

OF COUNSEL:

Robert G. Krupka, P.C.
Laura M. Burson
Amber T. Aubry
Jacob R. Buczko
KIRKLAND & ELLIS LLP
777 S. Figueroa Street, Suite 3400
Los Angeles, CA  90017
(213) 680-8400

May 22, 2008
2340412

## **RULE 7.1.1 CERTIFICATION**

Pursuant to the District of Delaware Local Rule 7.1.1, counsel for Honeywell conferred with counsel for Solvay regarding the instant Motion and Solvay opposes the Motion.


*/s/ Thomas C. Grimm*

_____
Thomas C. Grimm (#1098)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SOLVAY, S.A.,                                    )
                                                 )
            Plaintiff and Counterclaim           )
            Defendant,                            )
                                                 )
      v.                                          )          C.A. No. 06-557-SLR
                                                 )
HONEYWELL SPECIALTY MATERIALS LLC,               )
and HONEYWELL INTERNATIONAL INC.,                )
                                                 )
            Defendants and Counterclaim          )
            Plaintiffs.                           )

## ORDER

At Wilmington, this _____ day of May, 2008, having considered Honeywell's

Motion for Leave to File a supplemental brief in support of its (i) "Motion for Summary

Judgment of Invalidity" (D.I. 134), and (ii) "Opposition to Solvay's Summary Judgment Motion

of No Invalidity Under 35 U.S.C. §§ 102(G) and 103 Based on Commercial Suppression"

(D.I. 175);

IT IS HEREBY ORDERED THAT Honeywell may file and serve its

supplemental brief.

                                    _____
                                              United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2008, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will send notification of such filing to all registered recipients.

I also certify that on June 10, 2008, I caused to be served true and correct copies of the foregoing document on the following in the manner indicated below:

**BY E-MAIL**

Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street, P.O. Box 951
Wilmington, DE  19899-0951

**BY E-MAIL**

Arthur I. Neustadt
Jean-Paul Lavalleye
Barry J. Herman
Jeffrey B. McIntyre
Michael E. McCabe, Jr.
John F. Presper
Stefan Uwe Koschmieder
Tia D. Fenton
OBLON, SPIVAK, MCCLELLAND, MAIER
   & NEUSTADT, P.C.
1940 Duke Street
Alexandria, VA  22314


*/s/ Thomas C. Grimm*
_____
Thomas C. Grimm (#1098)
tgrimm@mnat.com

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

SOLVAY, S.A.,                                          )
                                                       )
          Plaintiff and Counterclaim                   )
          Defendant,                                   )          C.A. No. 06-557-SLR
                                                       )
     v.                                                )          PUBLIC VERSION
                                                       )
HONEYWELL SPECIALTY MATERIALS LLC,                     )
and HONEYWELL INTERNATIONAL INC.,                      )
                                                       )
          Defendants and Counterclaim                  )
          Plaintiffs.                                  )

**SUPPLEMENTAL BRIEF IN SUPPORT OF
HONEYWELL'S (i) MOTION FOR SUMMARY
JUDGMENT OF INVALIDITY (D.I. 134), AND
(ii) OPPOSITION TO SOLVAY'S SUMMARY JUDGMENT
MOTION OF NO INVALIDITY UNDER 35 U.S.C. §§ 102(G)
AND 103 BASED ON COMMERCIAL SUPPRESSION (D.I. 175)**

                                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                        Thomas C. Grimm (#1098)
                                        Benjamin J. Schladweiler (#4601)
                                        1201 N. Market Street
                                        P.O. Box 1347
                                        Wilmington, DE  19899-1347
OF COUNSEL:                             (302) 658-9200
                                        tgrimm@mnat.com
Robert G. Krupka, P.C.                  bschladweiler@mnat.com
Laura M. Burson                         *Attorneys for Defendants*
Amber T. Aubry
Jacob R. Buczko
KIRKLAND & ELLIS LLP
777 S. Figueroa Street, Suite 3400
Los Angeles, CA  90017
(213) 680-8400

May 22, 2008

On Friday, May 9, 2008, Solvay's attorneys placed into a UPS package almost 800 pages of documents improperly withheld based on a claim of privilege that this Court ruled improper on January 16, 2008 (D.I. 111), knowing that those documents would not be received by Honeywell's lawyers until ***after*** the scheduled hearing on Honeywell's and Solvay's cross motions for summary judgment on invalidity issues before this Court on Monday, May 12, 2008. Those motions largely turn on a single issue: has Solvay shown that certain 102(g) prior art was "abandoned, suppressed or concealed." The documents Solvay belatedly produced directly contradict Solvay's attorney's statements at the hearing that the Russian scientists concealed the putative invention of the '817 patent in suit. Those documents prove that the Russian scientists did not conceal the '817 invention, and Solvay's attorneys knew that they did not conceal it when Solvay's counsel (Mr. Neustadt) made the contrary statement to the Court during oral argument on May 12.[1] The documents include                     REDACTED

REDACTED

Thus, Solvay's lawyers are, and have been, aware of conclusive evidence showing that the 102(g) art on which the pending cross motions are based was not "abandoned, suppressed or concealed." The newly produced documents confirm that the Court should grant Honeywell's summary judgment motion of invalidity and deny Solvay's motion.

\*       \*       \*

---

[1]    Solvay's knowledge of these facts during prosecution of the '817 patent application – and Solvay's concealment of them from the patent examiner – raise additional issues of inequitable conduct (which is the subject of another pending summary judgment motion). Honeywell will seek leave to explore this newly revealed concealment if this case is not disposed of based on the pending summary judgment motion of noninfringement.

The parties filed cross-motions for summary judgment with respect to invalidity of Solvay's '817 patent, based upon § 102(g) prior art.    (D.I. 121, 134)    Under 35 U.S.C. § 102(g), a patent is invalid if "the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it."    In their motions, both parties agree that, nearly nine months before the priority date of the '817 Patent,    REDACTED

REDACTED

(D.I. 135 at 2, 10-11; D.I. 171.)  Solvay does not dispute this point.

Instead, Solvay argues that Honeywell's work should not qualify as prior art under § 102(g) because it was derived from work performed by a group of Russian scientists (at a facility called RSCAC) who worked with Honeywell.  (D.I. 171 at 1.)  Solvay also argues in its briefs that the prior invention should not qualify as prior art because it was somehow "abandoned, suppressed or concealed" by Honeywell.  (*Id*.)

In response, Honeywell relied upon the decision of this Court in *Tyler Refrigeration Corp. v. Kysor Indus. Corp.*, 601 F. Supp. 590 (D. Del. 1985), explaining that an invention practiced in the United States qualifies as § 102(g) prior art, even if that invention was the result of foreign instruction.    (D.I. 135 at 13-14; D.I. 193 at 6-9.)    Honeywell also demonstrated that it disclosed the 102(g) prior art immediately upon perfecting it, negating any suggestion of concealment.  (D.I. 193 at 9-10.)  These arguments are set forth in the existing briefing.

But at the May 12, 2008 hearing before this Court, Solvay advanced a new theory, to which Honeywell had no opportunity to reply (because of time limitations).  At the hearing, Solvay argued for the first time that ***the Russian scientists*** (not Honeywell) concealed the § 102(g) prior art.  Solvay argued, "[t]he Russians did conceal the invention.  They were

obligated under their contract with Honeywell to conceal the invention." (Ex. F at 109:7-9.) *See also id.* at 112:7-10 ("the Russians, of course, couldn't tell anyone, because under their contract with Honeywell, they were restricted from doing so").

Solvay's new argument is both factually wrong and legally specious. The contract to which Solvay's counsel referred was entered into ***before*** the Russians invented[2] the '817 patent process. Thus, a fortiori, it could not evidence any intent to conceal something that did not yet exist. In addition, to rebut § 102(g) prior art, Solvay was required to make a *prima facie* showing of concealment. *Flex-Rest, LLC v. Steelcase, Inc.*, 455 F.3d 1351, 1359 (Fed. Cir. 2006) ("Because [the patentee] did not offer any evidence indicating a designed intent to withhold the KBS device from the public, we conclude that there is not sufficient evidence to support a jury instruction regarding intentional suppression or concealment."). Even if the Russian scientists had certain confidentiality obligations during the development phase, that does not mean they "concealed" the invention when their work was complete. "Because work is 'secret' does not necessarily mean that it has been 'abandoned, suppressed or concealed.'" *E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1436 n.5 (Fed. Cir. 1988).

The documents recently produced by Solvay conclusively show that the Russian scientists did ***not conceal*** their work, and Solvay's counsel knew that when Mr. Neustadt stated otherwise to the Court during the May 12, 2008 hearing. After the hearing[3]—and long after the close of discovery—Solvay produced approximately 800 pages of previously withheld

---

[2]     According to the agreed facts for these cross motions only.

[3]     Solvay's production letter (Exh. A) is dated Friday, May 9, 2008, but the production was only received by Honeywell after the May 12 hearing. (Exh. E.) Solvay did not alert Honeywell to this production before or during the May 12 hearing.

documents.  (Exh. A.)  Among these documents is a                    REDACTED

REDACTED

Contrary to Solvay's representations at the hearing, the 1997 Memo makes it clear that the

Russian scientists did not "conceal" their work.

       In addition,                                  REDACTED

obviating any further discussion about whether the § 102(g) prior

art was "concealed" *by anyone*.  Under settled Federal Circuit precedent, "proof negating

suppression or concealment is not limited to activities occurring within the United States."

*Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1036 (Fed. Cir. 2001).  Thus, a Russian

patent application qualifies as proof negating concealment.  Furthermore,       REDACTED

REDACTED

REDACTED                                 .[4]  (Exhs. C, D.)  In other words, the Russian

scientists disclosed the § 102(g) prior art nearly one and a half years before Solvay's October

1995 priority date.  *Cf. Apotex USA*, 254 F.3d at 1040 (even if a prior inventor suppressed or

concealed the process for a period of time after it reduced it to practice, there is no concealment

or suppression as long as prior art inventor "resumed activity" before patentee's priority date).

Contrary to Solvay's representations, there can be no concealment under § 102(g).

Solvay's intentional withholding of the 1997 Memo, and production in a manner

that assured Honeywell's attorneys would not learn of it until ***after*** the May 12 hearing, is

troubling—especially given Solvay's representations to the Court at the May 12, 2008 hearing.

Solvay's counsel was aware of its 1997 Memo before the hearing—the document was included

on Solvay's privilege log.  Solvay avoided repeated requests to produce the document, and

Solvay's counsel decided to produce it in a manner that assured Honeywell's counsel would not

learn of it until after that hearing.  Shortly before the hearing, Solvay placed the 1997 Memo in a

UPS package so that the document was en route to Honeywell's counsel during the hearing.

(Ex. E.)  At the hearing, Solvay proceeded to make representations that were directly contrary to

the 1997 Memo:

| Solvay's Representations to the Court | Statements from the Withheld 1997 Memo |
| --- | --- |
| "The Russians did conceal the invention.  They were obligated under their contract with Honeywell to conceal the invention."  (Ex. F at 109:7-9.) | REDACTED |

---

[4]                          REDACTED             Mr. Barabanov, who is one of the named
inventors of the Russian '430 patent.  (Exhs. B, D, E.)

| | |
|---|---|
| "[T]he Russians, of course, couldn't tell anyone, because under their contract with Honeywell, they were restricted from doing so." (Ex. F at 112:7-10.) | REDACTED<br><br>(Exh. B at S0024312.) |

At the hearing, Solvay even sought to distinguish the *Tyler* case by arguing that "in Tyler, you did have a public disclosure, because they [the foreign inventor] had publicly disclosed it in printed publications in Japan." (Ex. F. at 119:15-17.)  But Solvay's 1997 Memo confirms that, as in *Tyler*,                                         REDACTED


\*       \*       \*

      In summary, there is no evidence that the Russian scientists (or anyone else) "abandoned, suppressed or concealed" the § 102(g) prior art.  On the contrary,    REDACTED

REDACTED


Honeywell respectfully requests that the Court grant its summary judgment motion and deny Solvay's motion.

                 MORRIS, NICHOLS, ARSHT & TUNNELL LLP


|  |  |
|---|---|
| OF COUNSEL: | _____<br>Thomas C. Grimm (#1098)<br>Benjamin J. Schladweiler (#4601) |
| Robert G. Krupka, P.C.<br>Laura M. Burson<br>Amber T. Aubry<br>Jacob R. Buczko<br>KIRKLAND & ELLIS LLP<br>777 S. Figueroa Street, Suite 3400<br>Los Angeles, CA  90017<br>(213) 680-8400 | 1201 N. Market Street<br>P.O. Box 1347<br>Wilmington, DE  19899-1347<br>(302) 658-9200<br>tgrimm@mnat.com<br>bschladweiler@mnat.com<br>*Attorneys for Defendants* |

May 22, 2008
2340419

- 6 -

EXHIBIT A





ATTORNEYS AT LAW

May 9, 2008

*Via UPS Overnight Delivery*

Jacob Buczko, Esq.
Kirkland & Ellis LLP
Los Angeles Office
777 South Figueroa Street
Los Angeles, CA  90017-5800

Re:  Solvay v. Honeywell

Dear Jacob,

     With reference to your April 7 letter, enclosed please find (1) a CD containing PDF copies of Solvay's production documents numbered S0024059 – S0024847; and (2) an index that cross-references each of these produced documents with their corresponding entry on Solvay's privilege log.

     Regards,

     OBLON, SPIVAK, McCLELLAND,
     MAIER & NEUSTADT, P.C.

     *Michael McCabe*

     Michael E. McCabe, Jr.

Enclosures as stated

# Index of Solvay Documents Produced on 5/9/08

| Privilege Log Entry No. | Production Number(s) |
|---|---|
| 0016 | S0024059 |
| 0112 | S0024060-24062 |
| 0113 | S0024063-24066 |
| 0169 | S0024067-24069 |
| 0188 | S0024070-24071 |
| 0189 | S0024072 |
| 0301 | S0024073-24075 |
| 0309 | S0024076-24081 |
| 0352 | S0024082 |
| 0461 | S0024083-24085 |
| 0540 | S0024086 |
| 0543 | S0024087 |
| 0546 | S0024088 |
| 0678 | S0024089 |
| 0808 | S0024090 |
| 0812 | S0024091-24092 |
| 0814 | S0024093 |
| 0913 | S0024094-24113 |
| 0915 | S0024114-24122 |
| 1074 | S0024123-24127 |
| 1101 | S0024128 |
| 1102 | S0024129 |
| 1171 | S0024130-24131 |
| 1174 | S0024132-24142 |
| 1195 | S0024143-24154 |
| 1239 | S0024155-24156 |
| 1264 | S0024157 |
| 1269 | S0024158 |
| 1353 | S0024159-24181 |
| 1357 | S0024182-24202 |
| 1365 | S0024203 |
| 1399 | S0024204 |
| 1440 | S0024205-24206 |
| 1442 | S0024207 |
| 1458 | S0024208-24209 |
| 1514 | S0024210-24254 |
| 1517 | S0024255-24275 |
| 1533 | S0024276-24311 |
| 1538 | S0024312-24314 |
| 1540 | S0024315-24351 |
| 1544 | S0024352-24354 |
| 1548 | S0024355-24363 |
| 1549 | S0024364-24366 |

| Privilege Log Entry No. | Production Number(s) |
| --- | --- |
| 1550 | S0024367 |
| 1552 | S0024368-24369 |
| 1567 | S0024370-24410 |
| 1616 | S0024411 |
| 1618 | S0024412-24413 |
| 1619 | S0024414-24416 |
| 1621 | S0024417-24418 |
| 1629 | S0024419 |
| 1630 | S0024420 |
| 1649 | S0024421-24442 |
| 1653 | S0024443-24453 |
| 1654 | S0024454-24477 |
| 1662 | S0024478 |
| 1674 | S0024479 |
| 1677 | S0024480 |
| 1678 | S0024481-24483 |
| 1680 | S0024484-24490 |
| 1684 | S0024491-24517 |
| 1685 | S0024518 |
| 1686 | S0024519-24522 |
| 1687 | S0024523-24524 |
| 1689 | S0024525-24526 |
| 1690 | S0024527 |
| 1692 | S0024528-24530 |
| 1693 | S0024531-24532 |
| 1694 | S0024533 |
| 1695 | S0024534 |
| 1696 | S0024535-24539 |
| 1697 | S0024540-24564 |
| 1698 | S0024565 |
| 1699 | S0024566 |
| 1700 | S0024567-24609 |
| 1701 | S0024610 |
| 1702 | S0024611-24618 |
| 1703 | S0024619-24642 |
| 1704 | S0024643-24674 |
| 1705 | S0024675-24679 |
| 1706 | S0024680-24689 |
| 1727 | S0024690-24727 |
| 1781 | S0024728-24828 |
| 1790 | S0024829-24843 |
| 1806 | S0024844-24845 |
| 1634 | S0024846 |

| Privilege Log Entry No. | Production Number(s) |
|---|---|
| 1635 | S0024847 |

# EXHIBIT B

## FULLY REDACTED

# EXHIBIT C

(19) **RU** (11) **2 065 430** (13) **C1**

(51) МПК⁶

**C 07 C 19/08, 17/20**

РОССИЙСКОЕ АГЕНТСТВО
ПО ПАТЕНТАМ И ТОВАРНЫМ ЗНАКАМ

(12) **ОПИСАНИЕ ИЗОБРЕТЕНИЯ К ПАТЕНТУ РОССИЙСКОЙ ФЕДЕРАЦИИ**

(21), (22) Заявка: 94019408/04, 26.05.1994

(46) Дата публикации: 20.08.1996

(56) Ссылки: Патент США N 2942036, кп. 570-176, 1934.

(71) Заявитель:
Российский научный центр "Прикладная химия"

(72) Изобретатель: Виноградов Д.В.,
Хомутов В.А., Барабанов В.Г.

(73) Патентообладатель:
Российский научный центр "Прикладная химия"

(54) СПОСОБ ПОЛУЧЕНИЯ 1,1,1,3,3-ПЕНТАФТОРПРОПАНА

(57) Реферат:

Изобретение относится к способу получения 1,1,1,3,3-пентафторпропана (хладон - 245fa), являющегося озонобезопасным хладоном, который может быть использован в качестве хладоагента, пролелента, вспенивающего агента и растворителя. Техническая задача, решаемая изобретением, - повышение выхода целевого продукта, упрощение процесса производства 1,1,1,3,3-пентафторпропана и расширение сырьевой базы. Данная задача решается путем взаимодействия 1,1,1,3,3-пентахлорпропана с фтороводородом при температуре процесса 50-160°С и давлении 5-25 кгс/см$^2$ в присутствии катализатора, состоящего из смеси пятихлористой сурьмы и фтороводорода в мольном соотношении $SbCl_5/HF$ от 1-70 до 1-1,8 и при нагрузке на катализатор 0,08-1 кг 1,1,1,3,3-пентахлорпропана/кг $SbCl_5$ х час. 2 табл.

R U 2 0 6 5 4 3 0 C 1

R U 2 0 6 5 4 3 0 C 1

-1-

S0001490



(19) **RU** (11) **2 065 430** (13) **C1**

(51) Int. Cl.$^6$

**C 07 C 19/08, 17/20**

**RUSSIAN AGENCY
FOR PATENTS AND TRADEMARKS**

(12) ## ABSTRACT OF INVENTION

(21), (22) Application: 94019408/04, 26.05.1994

(46) Date of publication: 20.08.1996

(71) Applicant:
Rossijskij nauchnyj tsentr "Prikladnaja khimija"

(72) Inventor: Vinogradov D.V.,
Khomutov V.A., Barabanov V.G.

(73) Proprietor:
Rossijskij nauchnyj tsentr "Prikladnaja khimija"

(54) METHOD FOR PRODUCTION OF 1,1,1,3,3-PENTAFLUOROPROPANE

(57) Abstract:

FIELD: production of cooling agent. SUBSTANCE: method is carried out by interaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride. The process takes place at 50-160 C and pressure 5-25 kgf/cm$^2$ in the presence of catalyst. Said catalyst contains antimony pentachloride and hydrogen fluoride, their molar ratio $SbCL_5/HF$ being (1:70)-(1:1.8). Capacity of said catalyst is 0.08-1 kg of 1,1,1,3,3-pentachloropropane per 1 kg of $SbCL_5$ per hour. EFFECT: increases yield of desired product, simplifies the process. 2 tbl

R U 2 0 6 5 4 3 0 C 1

R U 2 0 6 5 4 3 0 C 1

S0001491

Изобретение относится к способу получения 1,1,1,3,3-пентафторпропана (хладон 245fa), являющегося озонобезопасным хладоном, который может быть использован в качестве хладагента, пропеллента, вспенивающего агента и растворителя.

Известен способ получения 1,1,1,3,3-пентафторпропана реакцией 1,1,1,3,3-пентафтор-2,2,3-трихлорпропана с водородом (см. патент США N 2942036). Недостатком способа является дефицитность хлорфторорганического сырья, большой расход водорода (требуется 1,5-4 моля водорода на 1 моль сырья) и проблема его дальнейшей утилизации, высокие температуры, вызывающие коррозию оборудования, невысокий выход целевого продукта (до 60%).

Способа получения 1,1,1,3,3-пентафторпропана путем фторирования 1,1,1,3,3-пентахлорпропана фтороводородом на сурьмяном катализаторе не выявлено.

Техническая задача, решаемая изобретением, повышение выхода целевого продукта, упрощение процесса производства 1,1,1,3,3-пентафторпропана и расширение сырьевой базы.

Данная задача решается путем взаимодействия 1,1,1,3,3-пентахлорпропана с фтороводородом при температуре процесса 50-160°С и давлении 5-25 кгс/см$^2$ в присутствии катализатора, состоящего из смеси пятихлористой сурьмы и фтороводорода в мольном соотношении SbCl$_5$/HF от 1-70 до 1-1,8 и при нагрузке на катализатор 0,08-1 кг 1,1,1,3,3-пентахлорпропана/кг SbCl$_5$ x час.

Техническая сущность изобретения заключается в проведении процесса получения 1,1,1,3,3-пентафторпропана фторированием 1,1,1,3,3-пентахлорпропана фтороводородом в присутствии катализатора, представляющего собой смесь SbCl$_5$ и HF при условиях, указанных выше.

Как показали анализы содержимого реактора, катализатор представляет собой соединения, имеющие брутто-формулу SbF$_{3,2}$Cl$_{1,8}$  SbF$_{4,1}$Cl$_{0,9}$, что достигается использованием избытка фтороводорода. Такой катализатор обладает высокой фторирующей активностью, что обеспечивает замещение всех 5 атомов хлора в молекуле 1,1,1,3,3-пентахлорпропана на фтор.

Показано, что более предпочтительным является подача в 1,1,1,3,3-пентахлорпропана в смесь SbCl$_5$ и HF, чем подача HF в смесь SbCl$_5$ и 1,1,1,3,3-пентахлорпропана, так как в последнем случае имеет место разложение хлорорганического сырья с образованием смолы. Повышение давления способствует увеличению выхода целевого продукта за счет лучшей конденсации непрореагировавших промежуточных продуктов в обратном холодильнике и возврат их обратно в реактор.

Пример 1. Синтез 1,1,1,3,3-пентафторпропана проводили на установке, которая состояла из реактора вместимостью 40 л, обогреваемого паром, снабженного обратным холодильником с площадью теплообмена 0,025 м, охлаждаемого рассолом с температурой -20

-40°С. Газообразные продукты реакции поступали в обратный холодильник на дистилляцию; конденсирующиеся продукты стекали в реактор. Газы, выходящие из холодильника, поступали в сборник, охлаждаемый рассолом с температурой -40°С. Несконденсировавшиеся газы, содержащие в основном HCl, направлялись на водную адсорбцию. После окончания реакции содержимое реактора переконденсировалось в охлаждаемый сборник, после чего содержимое которого пропускалось через адсорбер, заполненный Al$_2$O$_3$, и затем продукт собирался и анализировался.

В реактор загружали 35 кг (0,12 кмоль) SbCl$_5$ и 22,5 г (0,1 кмоль) 1,1,1,3,3-пентахлорпропана. Содержимое реактора разогревали до 80°С и затем по сифону подавали фтороводород со скоростью 5 кг/час всего подали 20 кг (1 кмоль). В реакторе поддерживали давление 10 кгс/см$^2$. Выход продукта составлял 20% Органическая фаза, слитая из реактора, являлась смолообразным продуктотм, хроматографический анализ которого показал наличие более 20 веществ.

Пример 2. Использовалось то же оборудование, что и в примере 1, но в реактор загружали 35 кг (0,12 кмоль) SbCl$_5$ и через сифон 20 кг (1 кмоль) HF. Давление поддерживали 10 кгс/см$^2$. Содержимое разогревали до 80°С и затем по сифону подавали 1,1,1,3,3-пентахлорпропан со скоростью 5 кг/час всего подали 22,5 кг (0,1 кмоль). Выход целевого продукта составил 55% Смола в реакторе отсутствовала.

Примеры 3.-7. Использовалось оборудование и загрузка компонтов как и в примере 2, но опыты велись при ряде температур и давлении 20 кгс/см$^2$. Результаты опытов показаны в табл.1.

Пример 8. Использовано оборудование как и в примере 2, но с целью увеличения выхода продукта над реактором устанавливалась насадочная колонна высотой 3 м и диаметром 200 мм, снабженная дефлегматором с площадью теплообмена 0,25 м$^2$, охлаждаемым рассолом с температурой -20 -40°С. Процесс велся с непрерывной подачей HF со скоростью 2,3 кг/час и 1,1,1,3,3-пентахлорпропана со скоростью 5 кг/час. Температура процесса составляла 120 °С, давление 210 кг/см$^2$. Выход продукта составил 95%

Пример 9. То же, что и в примере 8, но 1.1.1.3.3-пентахлорпропан (ТХП) подавали со скоростью 10 кг/час, HF 4,6 кг/час. Выход составил 95%

Примеры 10-14. То же, что и в примере 8, но опыты велись при температуре 100°С и давлении 20 кгс/см$^2$ и при различных соотношениях SbCl$_5$ и HF. Результаты представлены в табл.2. ТТТ1 ТТТ2

## Формула изобретения:

Способ получения 1,1,1,3,3-пентафторпропана на основе полихлорпропана, отличающийся тем, что в качестве полихлорпропана используют 1,1,1,3,3-пентахлорпропан, который подвергают взаимодействию с фтороводородом в присутствии катализатора, состоящего из смеси пятихлористой сурьмы с

-3-

RU 2065430 C1

RU 2065430 C1

фтороводородом при молярном соотношении SbCl$_5$ HF 1:70 1,8, при нагрузке на катализатор 0,08 1,00 кг

1,1,1,3,3-пентахлорпропана/кг SbCl$_5$·ч при 50 160°C и 5 25 кгс/см$^2$ с последующим выделением целевого продукта.

5

10

15

20

25

30

35

40

45

50

55

60

RU 2065430 C1

RU 2065430 C1

-4-

S0001493

Т а б л и ц а 1

Влияние температуры ведения процесса на состав продуктов синтеза и выход целевого продукта

| № при-мера | Температура, °C | Состав продуктов синтеза по-сле отделения HCl и HF, % массовые | Выход целевого продукта, % |
|---|---|---|---|
| 3 | 50 | $CF_3 - CH = CCl_2$    (1)  −0,2<br>$CF_3 - CH_2 - CHF_2$    (2)  −49,4<br>$CF_3 - CH_2 - CHClF$    (3)  −35,0<br>$CF_3 - CH_2 - CHCl_2$    (4)  −15,0<br>другие    (5)  −0,4 | 30 |
| 4 | 80 | (1)  − 0,5<br>(2)  − 85,5<br>(3)  − 10,2<br>(4)  − 3,2<br>(5)  − 0,6 | 70 |
| 5 | 100 | (1)  − 0,7<br>(2)  − 87,8<br>(3)  − 8,6<br>(4)  − 2,1<br>(5)  − 0,8 | 82 |
| 6 | 120 | (1)  − 1,2<br>(2)  92,0<br>(3)  − 4,4<br>(4)  − 1,1<br>(5)  − 1,3 | 90 |
| 7 | 160 | (1)  − 4,6<br>(2)  − 91,3<br>(3)  − 1,8<br>(4)  − 0,3<br>(5)  − 2,1 | 81 |

Т а б л и ц а 2

Влияние соотношения $SbCl_5/HF$ на состав продуктов синтеза и выход целевого продукта

| № прим. | Загрузки | | | Соотноше-ние $SbCl_5/HF$ | Состав, % мас. | Выход, % | Нагрузка кг ТХП/кг $SbCl_5$ час |
|---|---|---|---|---|---|---|---|
| | Наим. | кг. | кмоль | | | | |
| 10 | $SbCl_5$<br>HF | 5<br>28 | 0,02<br>1,4 | 1/70 | 1−0,05<br>2−71,25<br>3−18,1<br>4−10,4<br>5−0,3 | 53 | 1,0 |
| 11 | $SbCl_5$<br>HF | 15<br>23 | 0,05<br>1,15 | 1/23 | 1−0,7<br>2−94,3<br>3−3,1<br>4−1,3<br>5−0,6 | 80 | 0,33 |

RU 2065430 C1

-5-

**S0001494**

Продолжение табл. 2

| № прим. | Загрузки | | | Соотноше-ние SbCl$_5$/HF | Состав, % мас. | Выход, % | Нагрузка кг ТХП/кг SbCl$_5$ час |
|---------|----------|------|--------|---------|--------|-------|---------|
|         | Наим.    | кг.  | кмоль  |         |        |       |         |
| 12 | SbCl$_5$ HF | 35 20 | 0,12 1,0 | 1/8,3 | 1–0,8 2–97,2 3–1,0 4–0,1 5–0,9 | 95 | 0,14 |
| 13 | SbCl$_5$ HF | 45 11 | 0,15 0,55 | 1/3,7 | 1–1,2 2–96,5 3–1,1 4–0,1 5–1,1 | 82 | 0,11 |
| 14 | SbCl$_5$ HF | 60 7 | 0,20 0,35 | 1/1,8 | 1–1,8 2–94,8 3–1,2 4–0,1 5–2,1 | 51 | 0,08 |

RU 2065430 C1

RU 2065430 C1

-6-

S0001495

# EXHIBIT D

[In every margin: RU 2065430 C1]

[Seal:] Russian Agency for Patents and Trademarks

(19)**RU** (11)**2 065 430** (13)**C1**
(51)IPC⁶ **C 07 C 19/08, 17/20**

(12) **ABSTRACT OF INVENTION FOR PATENT OF THE RUSSIAN FEDERATION**

| | |
|---|---|
| (21), (22) Application: 94019408/04, 05/26/1994 | (71)Applicant: |
| (46) Date of publication: 08/20/1996 | Russian Scientific Center Prikladnaya khimiya |
| (56) References: US Patent No. 2942036, cl. 570-176, 1934. | (72)Inventor: Vinogradov D. V., Khomutov V. A., Barabanov V. G. |
| | (73) Proprietor: Russian Scientific Center Prikladnaya khimiya |

(54) METHOD FOR PRODUCTION OF 1,1,1,3,3-PENTAFLUOROPROPANE

(55)Abstract:

    The invention involves a method of producing 1,1,1,3,3-pentafluoropropane (Chladon-245fa) that is ozone-safe Chladon and can be used as a cooling agent, propellant, foaming agent and solvent. The technical task of the invention is to increase the yield of the target product, simplify the production of 1,1,1,3,3,-pentafluoropropane and expand the raw material base. This is solved through the interaction between 1,1,1,3,3-pentachloropropane and hydrogen fluoride at 50-160°C and pressure 5-25 kgf/cm² in the presence of a catalyst consisting of a mixture of antimony pentachloride and hydrogen fluoride in a molar ratio of $SbCl_5$/HF from 1-170 to 1-1.8 and with load on the catalyst of 0.08-1 kg of 1,1,1,3,3-pentachloropropane $SbCl_5$ per hour. 2 tables.

**S0001490**

[In every margin: RU 2065430 C1]

[Seal:] Russian Agency for Patents and Trademarks

(19)**RU** (11)**2 065 430** (13)**C1**
(51)IPC⁶ **C 07 C 19/08, 17/20**

(12) **ABSTRACT OF INVENTION**

| (21), (22) Application: 94019408/04, 05/26/1994 | (71)Applicant: |
| | Russian Scientific Center Prikladnaya khimiya |
| (46) Date of publication: 08/20/1996 | (72) Inventor: Vinogradov D. V., Khomutov V. A., Barabanov V. G. |
| | (73) Proprietor: |
| | Russian Scientific Center Prikladnaya khimiya |

(54) METHOD FOR PRODUCTION OF 1,1,1,3,3-PENTAFLUOROPROPANE

(57)Abstract:

FIELD: production of cooling agent.

SUBSTANCE: method is carried out by interaction of 1,1,1,3,3-pentachloropropane with hydrogen fluoride. The process takes place at 50-160°C and pressure 5-25 kgf/cm² in the presence of catalyst. Said catalyst contains antimony pentachloride and hydrogen fluoride, their molar ratio $SbCl_5$/HF being (1:70)-(1:1:8). Capacity of said catalyst is 0.08-1 kg of 1,1,1,3,3-pentachloropropane per 1 kg of $SbCl_5$ per hour. EFFECT: increases yield of desired product, simplifies the process. 2 tables.

**S0001491**

The invention involves a method of producing 1,1,1,3,3-pentafluoropropane (Chladon-245fa) that is ozone-safe Chladon and can be used as a cooling agent, propellant, foaming agent and solvent.

There is a known method of producing 1,1,3,3,-pentafluoropropane by a reaction between 1,1,3,3,-pentafluorine-2,2,3-trichloropropane and hydrogen (see US patent No. 2942036). A shortcoming of the method is the shortage of chlorofluorine organic raw material, the high consumption of hydrogen (1.5-4 moles of hydrogen per 1 mole of raw material are required) and the problem of its further recovery, high temperatures that corrode the equipment and low yield of the target product (up to 60%).

No method has been found for producing 1,1,1,3,3-pentafluoropropane by fluorination of 1,1,1,3,3-pentachloropropane on an antimony catalyst.

The technical task to be solved by the invention is to increase the yield of the target product, simplify the production process of 1,1,1,3,3-pentafluoropropane and expand the raw material base.

This task is solved through interaction between 1,1,1,3,3-pentachloropropane with hydrogen fluoride at temperature 50-160°C and pressure 5-25 $kgf/cm^2$ in the presence of a catalyst consisting of a mixture of antimony pentachloride and hydrogen fluoride in a molar ratio of $SbCl_5$/HF from 1-70 to 1-1.8 and with load on the catalyst 0.08-1 kg 1,1,1,3,3-pentachloropropane/kg $SbCl_5$ per hour.

The technical essence of the invention is to produce 1,1,1,3,3-pentafluoropropane by fluorination of 1,1,1,3,3-pentachloropropane by hydrogen fluoride in the presence of a catalyst that is a mixture of $SBCl_5$ and HF under the aforementioned conditions.

As indicated by analyses of the reaction vessel contents, the catalyst is compounds that have an empirical formula of $SbF_{3.2}Cl_{1.8}$, $SbF_{4.1}Cl_{0.9}$ which is achieved by using surplus hydrogen fluoride. This catalyst has high fluorination activity to ensure substitution of all 5 atoms of chlorine in the molecule of 1,1,1,3,3-pentachloropropane by fluorine.

It was demonstrated that feed of 1,1,3,3-pentachloropropane into the mixture of $SbCl_5$ and HF is preferable to feed of HF into a mixture of $SbCl_5$ and 1,1,1,3,3-pentachloropropane since in the latter case the chlorine-organic raw material breaks down forming a resin. The higher pressure increases the yield of the target product due to better condensation of the unreacted intermediate products in the reflux condenser and their return back to the reaction vessel.

Example 1. Synthesis of 1,1,1,3,3-pentafluoropropane was conducted on a unit that consisted of a 40-liter steam-heated reaction vessel equipped with a reflux condenser with heat exchange area of 0.025 m cooled by a brine at temperature -20 - -40°C. The gaseous reaction products entered the reflux condenser for distillation; the condensing products drained into the reaction vessel. The gases emanating from the condenser entered a collector cooled by brine with temperature -40°C. The uncondensed gases primarily containing HCl were sent for water adsorption. After the end of the reaction, the reaction vessel contents were re-condensed into a coolable collector, then the contents were passed through an adsorber filled with $Al_2O_3$ and then the product was collected and analyzed.

A total of 35 kg (0.12 mole) of $SbCl_5$ and 22.5 g (0.1 mole) of 1,1,1,3,3-pentachloropropane were loaded into the reaction vessel. The reaction vessel contents were heated to 80°C and then fluoride hydrocarbon was siphoned in at a rate of 5 kg/h for

a total of 20 kg (1 kmole). Pressure of 10 kgf/cm$^2$ was maintained in the reaction vessel. The product yield was 20%. The organic phase drained from the reaction vessel was a resinous product whose chromatographic analysis indicated the presence of over 20 substances.

Example 2. The same equipment as in example 1 was used, but 35 kg (0.12 kmole) of SbCl$_5$ were loaded into the reaction vessel and 20 kg (1 kmole) of HF were siphoned in. Pressure was maintained at 10 kfg/cm$^2$. The contents were heated to 80°C and then 1,1,1,3,3-pentachloropropane was siphoned in at a rate of 5 kg/h for a total of 22.5 kg (0.1 kmole). The target product yield was 55%. There was no resin in the reaction vessel.

Examples 3-7. The equipment and loading of components were the same as in example 2, but the experiments were conducted with a range of temperatures and pressure 20 kgf/cm$^2$. The results of the experiments are shown in Table 1.

Example 8. The same equipment was used as in example 2, but in order to increase the product yield a packed column, 3 m high and 200 mm in diameter, was installed above the reaction vessel and it was equipped with a dephlegmator with heat exchange area 0.25 m$^2$, cooled brine with temperature -20 - -40°C. The process was conducted with continuous HF feed at a rate of 2.3 kg/h and 1,1,1,3,3,-pentachloropropane at a rage of 5 kg/h. The process temperature was 120°C, pressure 210 kg/cm$^2$. The product yield was 95%.

Example 9. The same as in example 8, but 1,1,1,3,3,3-pentachloropropane (TCP) was fed at a rate of 10 kg/h, HF at 4.6 kg/h. The yield was 95%.

Examples 10-14. The same as in example 8, but the experiments were conducted at temperature 100°C and pressure 20 kgf/cm$^2$ and with various ratios of SbCl$_5$ and HF. The results are presented in Table 2. TT1 TT2.

**Patent Claims:**

The method of producing 1,1,1,3,3-pentafluoropropane based on polychloropropane is distinguished by the fact that 1,1,1,3,3-pentachloropropane is used as the polychloropropane and it interacts with hydrogen fluoride in the presence of a catalyst consisting of a mixture of antimony pentachloride and

**S0001492**

hydrogen fluoride with molar ratio $SbCl_5$ and HF 1:70 - 1.8, with load on the catalyst 0.08 - 1.00 kg 1,1,1,3,3-pentachloropropane $SbCl_5$ per hour at 50 - 160°C and 5 – 25 $kgf/cm^2$ with subsequent release of the target product.

**S0001493**

TABLE 1. IMPACT OF PROCESS TEMPERATURE ON COMPOSITION OF
SYNTHESIS PRODUCTS AND YIELD OF TARGET PRODUCT

| No. of example | Temperature, °C | Composition of synthesis products after separation of HCl and HF, % by mass | Yield of target product, % |
|---|---|---|---|
| 3 | 50 | $CF_3$-CH=$CCl_2$ (1) – 0.2<br>$CF_3$-$CH_2$-$CHF_2$ (2) -49.4<br>$CF_3$-$CH_2$-CHClF (3) -35.0<br>$CF_3$-$CH_2$-$CHCl_2$ (4) -15.0<br>others (5) -0.4 | 30 |
| 4 | 80 | (1) – 0.5<br>(2) – 85.5<br>(3) – 10.2<br>(4) – 3.2<br>(5) – 0.6 | 70 |
| 5 | 100 | (1) – 0.7<br>(2) – 87.8<br>(3) – 8.6<br>(4) – 2.1<br>(5) – 0.8 | 82 |
| 6 | 120 | (1) – 1.2<br>(2) – 92.0<br>(3) – 4.4<br>(4) – 1.1<br>(5) – 1.3 | 90 |
| 7 | 160 | (1) – 4.6<br>(2) – 91.3<br>(3) – 1.8<br>(4) – 0.3<br>(5) – 2.1 | 81 |

TABLE 2. IMPACT OF SbCl$_5$/HF RATIO ON COMPOSITION OF SYNTHESIS
PRODUCTS AND YIELD OF TARGET PRODUCT

| No. of example | Loads | | | Ratio SbCl$_5$/HF | Composition, % by mass | Yield, % | Load, kg TCP/kg SbCl$_5$/h |
|---|---|---|---|---|---|---|---|
| | Name | kg | kmole | | | | |
| 10 | SbCl$_5$<br>HF | 5<br>28 | 0.02<br>1.4 | 1/70 | 1 – 0.05<br>2 – 71.25<br>3 – 18.1<br>4 – 10.4<br>5 – 0.3 | 53 | 1.0 |
| 11 | SbCl$_5$<br>HF | 15<br>23 | 0.05<br>1.15 | 1/23 | 1 – 0.7<br>1 – 94.3<br>3 – 3.1<br>4 – 1.3<br>5 – 0.6 | 80 | 0.33 |

**S0001494**

*A Translation of WORDEXPRESS, Worldwide Language Services, Tel. 001 (310) 260-7700
For Certification of this Translation please see enclosed Affidavit*

Continuation of Table 2

| No. of example | Loads | | | Ratio SbCl$_5$/HF | Composition, % by mass | Yield, % | Load, kg TCP/kg SbCl$_5$/h |
|---|---|---|---|---|---|---|---|
| | Name | kg | kmole | | | | |
| 12 | SbCl$_5$<br>HF | 35<br>20 | 0.12<br>1.0 | 1/8.3 | 1 – 0.8<br>2 – 97.2<br>3 – 1.0<br>4 – 0.1<br>5 – 0.9 | 95 | 0.14 |
| 13 | SbCl$_5$<br>HF | 45<br>11 | 0.15<br>0.55 | 1/3.7 | 1 – 1.2<br>2 – 96.5<br>3 – 1.1<br>4 - 0.1<br>5 – 1.1 | 82 | 0.11 |
| 14 | SbCl$_5$<br>HF | 60<br>7 | 0.20<br>0.35 | 1/1.8 | 1 – 1.8<br>2 – 94.8<br>3 – 1.2<br>4 – 0.1<br>5 – 2.1 | 51 | 0.08 |

**S0001495**

*A Translation of WORDEXPRESS, Worldwide Language Services, Tel.  001 (310) 260-7700*
*For Certification of this Translation please see enclosed Affidavit*

# EXHIBIT E

Apply shipping documents on this side.

Do not use this envelope for:

HILLARY PETRALIA
703-413-3000
OBLON SPIVAK
1940 DUKE STREET
ALEXANDRIA VA 22314

LTR        1 OF 1

SHIP TO:
JACOB BUCZKO, ESQ.
(213) 680-8270
KIRKLAND & ELLIS LLP
777 SOUTH FIGUEROA STREET
LOS ANGELES OFFICE
**LOS ANGELES   CA 90017-5800**



# CA 901 9-02



## UPS NEXT DAY AIR                     1
TRACKING #: 1Z W2A 491 01 9424 6006



BILLING: P/P

Reference # 1: 296506US

CS 10.1.06.    WXPIE60 75.0A 01/2008        TM

01019511212   05/05   PAC   United Parcel Service, Louisville, KY

Case 1:06-cv-00557-SLR    Document 214-2    Filed 06/10/2008    Page 32 of 42



☒Close Window

# Tracking Detail

**Your package has been delivered.**

| | |
|---|---|
| Tracking Number: | 1Z W2A 491 01 9424 600 6 |
| Type: | Package |
| Status: | **Delivered** |
| Delivered On: | 05/12/2008  9:20 A.M. |
| Signed By: | JOHNSON |
| Location: | MAIL ROOM |
| Delivered To: | LOS ANGELES,  CA,  US |
| Shipped/Billed On: | 05/09/2008 |
| Service: | NEXT DAY AIR |

### Package Progress

| Location | Date | Local Time | Description |
|---|---|---|---|
| LOS ANGELES, CA, US | 05/12/2008 | 9:20 A.M. | DELIVERY |
| | 05/12/2008 | 4:55 A.M. | OUT FOR DELIVERY |
| ONTARIO, CA, US | 05/11/2008 | 9:20 P.M. | DEPARTURE SCAN |
| ONTARIO, CA, US | 05/10/2008 | 6:29 A.M. | ARRIVAL SCAN |
| LOUISVILLE, KY, US | 05/10/2008 | 5:16 A.M. | DEPARTURE SCAN |
| | 05/10/2008 | 12:20 A.M. | ARRIVAL SCAN |
| CHANTILLY, VA, US | 05/09/2008 | 10:43 P.M. | DEPARTURE SCAN |
| | 05/09/2008 | 10:00 P.M. | ARRIVAL SCAN |
| ALEXANDRIA, VA, US | 05/09/2008 | 9:25 P.M. | DEPARTURE SCAN |
| | 05/09/2008 | 7:07 P.M. | ORIGIN SCAN |
| | 05/09/2008 | 5:07 P.M. | PICKUP SCAN |
| US | 05/09/2008 | 2:42 P.M. | BILLING INFORMATION RECEIVED |

Tracking results provided by UPS: 05/22/2008  2:22 P.M.  ET

**NOTICE:** UPS authorizes you to use UPS tracking systems solely to track shipments tendered by or for you to UPS for delivery and for no other purpose. Any other use of UPS tracking systems and information is strictly prohibited.

☒Close Window

Case 1:06-cv-00557-SLR     Document 214-2     Filed 06/10/2008     Page 33 of 42

Copyright © 1994-2008 United Parcel Service of America, Inc. All rights reserved.

# EXHIBIT F

1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -

 4
       SOLVAY, S.A.,              :   CIVIL ACTION
 5
                  Plaintiff,      :
 6
            vs.                   :
 7
       HONEYWELL SPECIALTY        :
 8     MATERIALS LLC, and         :
       HONEYWELL INTERNATIONAL    :
 9     INC.,                      :
                                  :
10                Defendants.  :   NO. 06-557 (SLR)

11
                                - - -
12
                                Wilmington, Delaware
13                              Monday, May 12, 2008
                                9:30 o'clock, a.m.
14
                                - - -
15
       BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J.
16
                                - - -
17
       APPEARANCES:
18
                 POTTER, ANDERSON & CORROON
19               BY:  RICHARD L. HORWITZ, ESQ.

20
                          -and-
21

22

23

24                              Valerie J. Gunning
                                Official Court Reporter
25
```

102

1  but I don't think it's a good use of our limited time.  But
2  I will just say, it has nothing to do with the patent.
3  There's nothing in the patent about that.
4        As a matter of fact, what I think Honeywell's
5  position is, is that they're acknowledging that keep in
6  does not mean you have to actually keep it in and they're
7  acknowledging that it's a comprising claim.  So their
8  argument comes down to most of their HF they say leaves and
9  it comes back as a gas, not as a liquid, and, therefore,
10  they don't infringe Claim 12.
11        And just to be clear, your Honor, this is for
12  Claim 12 only, not for Claim 1, for this limitation.
13        But the factual dispute is not about doctrine of
14  equivalents.  Honeywell -- excuse me -- Solvay is not
15  asserting infringement under the doctrine of equivalents, so
16  that will be off your plate, your Honor.  I'm sure you are
17  happy to hear that.
18        So, at best, there's a factual dispute about
19  when the HF comes back as a liquid or as a gas.  When it
20  comes back, the point is, your Honor, that it goes into the
21  reaction and into the liquid phase and reacts.  And that is
22  what our expert, Dr. Sandler, said.  He said if it stayed in
23  the gaseous form, it couldn't react.  It's got to dissolve
24  into the liquid.  And, at best, there's a factual dispute as
25  to whether or not the -- keeping in the HF and returning it

103

1  to the reactor in a gaseous form, at best, there's a factual
2  issue for Honeywell, as to whether that would be
3  infringement of Claim 12.
4        So just to reiterate, your Honor, what we've
5  got is, you know, Honeywell has these percentages that
6  they're showing you, saying, well, 75 percent of the HF
7  leaves the reactor and doesn't return to it.  It goes to
8  downstream equipment.  And I brought this up earlier right
9  before the break.  That is, again, a little bit of a shell
10  game.  What it does is it goes to a recycle column and then
11  comes back, just as described or similarly what is is
12  described in the '817 patent.
13        There's no dispute that the HF returns to the
14  reactor, and the dispute, at best, is whether or not, when
15  it returns, if it returns as a gas, whether or not that
16  meets the limitation, which says that it reacts in a liquid
17  phase.
18        Can you just put up this part of Claim 12, the
19  keep-in slide?
20        So, your Honor, here, from what Honeywell's
21  position is now, they are saying, well, the HF doesn't have
22  to remain in the reactor.  It can leave, but when it comes
23  back, it comes back as a gas, and, therefore, it's not kept
24  in the reactor in the liquid state, the unconverted 240,
25  most of the HF and most of the products of partial

104

1  fluorination.
2        Solvay's proposed construction, your Honor,
3  says that what happens is that these products are kept in,
4  the reactants are kept in the reactor so that they can
5  react with each other in the liquid phase, and that's what's
6  happening here.  The HF goes, returns to the reactor.
7  Whether it's in the gas phase or the liquid phase when it
8  returns, it's reacting in the liquid phase.  That's what the
9  claim requires.
10        And I think it is worth pointing out,
11  your Honor, and I made this point earlier with respect to
12  Claim 1, that if the keep-in limitation is not -- is read so
13  constrictively that nothing can leave, again, you're
14  directly contrary to the preferred embodiment, and there is
15  no -- the device that's disclosed, that keeps in the HF and
16  the underfluorinated compounds, is a device that is not the
17  reactor itself.  It has to leave the reactor and then go
18  back in.
19        So to actually adopt Honeywell's proposed
20  construction, which says it must remain in, would actually
21  exclude the preferred embodiment disclosed in the '817
22  patent.
23        THE COURT:  All right.  Thank you.
24        MR. KRUPKA:  If I could just respond to the
25  noninfringement part of that, your Honor, and not the claim

105

1  construction, because I think you've heard enough about
2  that.
3        There's no dispute that most of the HF leaves
4  the reactor in the Honeywell process.  There is no evidence
5  that more than 50 percent of the HF is in the reactor, or is
6  returned to the reactor in liquid form.  The claim requires
7  it to be kept in the liquid state, and there's absolutely no
8  evidence that Honeywell returns it in a liquid state.
9  Actually, the evidence is that we return it in a gaseous
10  state, and that most of the HF comes out of the reactor, so
11  we just don't meet that limitation under either claim
12  construction.
13        Your Honor, for invalidity, I'm going to turn it
14  over to Ms. Burson.
15        THE COURT:  All right.  Thank you.
16        MS. BURSON:  Good morning, your Honor.
17        You can turn to the invalidity tab in the binder
18  that you have.
19        With respect to the invalidity motion, it's
20  Honeywell's position that this is a straightforward motion,
21  your Honor.  Claim construction is not required for this
22  motion.  In fact, this motion is based on facts that Solvay
23  does not dispute, and for purposes of this motion, Honeywell
24  accepts these fact to be true.  And these facts relate to
25  activity that was carried out by a group of Russian

106

1  scientists in Russia.
2       Can you turn to Slide 2, please.
3       Honeywell does not dispute, for purposes of this
4  motion, and Solvay does not dispute, that there was a group
5  of Russian scientist in Russia who conceived and reduced to
6  practice a continuous process that is met by the limitations
7  in Claims 1, 5, 7 and 10 through 11 by May 1994.
8       Solvay also does not dispute that this group of
9  Russian scientists, who were actually under contract with
10  Honeywell, gave to Honeywell a report, a July 1994 report,
11  that evidenced all the work that the Russian scientists
12  performed in May 1, 1994, and they sent this report to the
13  United States, to Honeywell, and that Honeywell then took
14  that information and performed a continuous process,
15  basically duplicating what the Russians did.  And this
16  continuous process was covered by, again, the limitations of
17  these claims that we're asserting in this motion.
18       Solvay also does not dispute the priority date
19  of the '817 patent is October 23, 1995.
20       So all of this activity, the Russian work in
21  Russia, occurred in May 1994.  The work that Honeywell
22  performed in the United States following and duplicating the
23  work that the Russians had performed was done by April '95.
24  All of that was before the priority date of the April 7th
25  patent.

107

1       So it's Honeywell's position, your Honor,
2  that under these facts, the case law is clear.  It's the
3  Tyler v. Kysor case from this court, Delaware 1985, that
4  when an invention is reduced to practice in the United
5  States before the priority date of the patent at issue is
6  102(g) prior art, even if that invention would result in
7  foreign construction.
8       Exactly in Tyler, a group of Japanese scientists
9  conceived and reduced to practice the invention that they
10  then introduced the United States before the priority date
11  of the patent in dispute in that case.
12       The Court held, among several bases for finding
13  the patent to be invalid, that the work introduced into the
14  United States carried out by another group of scientists,
15  i.e., a pair of hands, constituted 102(g) prior art.
16       In fact, in the Tyler case, we have a quote that
17  we put on the slide that is also in our briefs, your Honor.
18  Although the prior invention was conceived and reduced to
19  practice in Japan in 1975, it was also in accordance with
20  the foreigners' instructions, actually and successfully
21  practiced in the United States.
22       Accordingly, the Court concludes that under
23  102(g), the prior invention having been successfully
24  practiced in this country before the other patent was
25  practiced, the prior invention was prior art and anticipated

108

1  the patents.
2       Next slide, please.
3       There are other cases that support Honeywell's
4  view, your Honor, that a prior invention, when introduced
5  into the United States, the introduction into the United
6  States establishes a date of invention in the United States.
7  These cases are cited in our brief, your Honor.
8       Next slide.
9       So based on the undisputed facts, Solvay admits
10  that it was not the first to invent a continuous process, as
11  covered by the Claims 1, 5, 7 and 10 through 11, that it
12  acknowledges that a group of Russian scientists were the
13  first to invent, and that the Russian scientists provided
14  that information to Honeywell in the May to June 1994 --
15  strike that -- the May to July 1994 time period, and that
16  duplicating what the Russians provided to Honeywell,
17  Honeywell performed this process that's covered by the
18  claims by April 1995.
19       Next slide.
20       Solvay also acknowledges that it has the burden
21  to come forward with evidence that the inventor in this
22  case, the Russians, abandoned, suppressed or concealed the
23  invention.  Solvay has produced no evidence, made no
24  arguments, that the Russians abandoned, suppressed or
25  concealed the invention, and on this basis, your Honor,

109

1  Honeywell moves that the '817 patent is invalid under
2  102(g).
3       THE COURT:  All right.  Thank you.
4       Mr. Neustadt?
5       MR. NEUSTADT:  Thank you, your Honor.
6       Well, I think there's one brief problem, and I
7  think Ms. Burson may have misspoke.  The Russians did
8  conceal the invention.  They were obligated under their
9  contract with Honeywell to conceal the invention.  I don't
10  think that is their argument.  I think she just misspoke.
11  But there isn't any question that the Russians were under a
12  secrecy agreement to conceal the invention.
13       I'd like to direct your Honor's attention to a
14  timeline for the 102(g) matter, and this is at Page 21 of
15  the Solvay book.
16       Generally, there's an antipathy about
17  invalidating a patent over secret prior art, and as your
18  Honor will recall, under 102(a), that says the art has to be
19  publicly known.  Otherwise, if it not publicly known, it's
20  not art under 102(a).  Then you have 102(b), and that deals
21  with a patent applicant filing more than a year before, and
22  that's directed to something similar.
23       102(g) is like 102(a) in that it has to do with
24  a prior invention by another, and it takes the public aspect
25  of 102(a) and it incorporates it, to a certain extent, by

110

1  102(g), as the invention that's asserted as prior art cannot
2  be abandoned, suppressed or concealed, and that's because of
3  the antipathy against secret prior art being used to
4  invalidate a prior patent. And that's exactly what we had
5  in this case.
6          If you go to the timeline, which will give the
7  basis for what has occurred here, in February of '95, that's
8  when Honeywell says that it, acting as a pair of hands, ran
9  an experiment that they had gotten from the Russians, who
10  were the inventors. So you don't have the inventors running
11  through the experiment, and I will get back to why that's a
12  distinction later.
13          Then, in April of '95, Honeywell, in its
14  process, in its procedure, said, we should prepare a patent
15  application on this work.
16          Now, at this time, and this is, you'll see in a
17  moment, the policy at Honeywell was, you don't go to the
18  time and expense of preparing a patent application if you
19  don't have a commercial product that's ready because
20  otherwise, it's just a waste. And we'll see this later,
21  this policy on the Honeywell form.
22          Then, in August of '95, and this is towards the
23  bottom, Honeywell made the determination that they didn't
24  have any market for 245. They said that people are buying
25  141b and people bought 141b because it was cheaper and it

111

1  did the same job.
2          So Honeywell knew that in order to sell 245A,
3  141b would have to be taken off the market, and this, what
4  is in the quotes, at the bottom for that August 8, 1995,
5  this is a Honeywell statement: There is no market for 245a
6  in until 140b is regulated, in other words, restricted,
7  taxed, which means it makes it much more expensive, or
8  labeled, or otherwise forced out of the market.
9          So at this time, in keeping with its policy, it
10  was not going to go ahead with the patent application,
11  because it still had no use for 241 -- 245.
12          Then, in October -- on October 23, 1995, this is
13  Solvay's filing date. This is the date Honeywell has to
14  meet. And in December of '95, Honeywell says, we now have
15  an opportunity to make some 245a, and they say they're going
16  to make it in the refrigerator appliance market.
17          So this is their first application that now they
18  may be able to sell 245fa and therefore they might file a
19  patent application on it.
20          Then, finally, they began patent preparation on
21  March 7, 1996, and then they, after the preparation, they
22  finally filed on July 3rd of '96.
23          So from the time, February of '95, at least
24  until March 7, '96, the invention was concealed in
25  accordance with Honeywell's policy.

112

1          Now, you have to keep in mind that this is a
2  method claim. If you have a product and you sell the
3  product, then you disclose, in effect, the invention. With
4  a method claim, the product does not disclose the method, as
5  is the case here, so, therefore, there was concealment,
6  because Honeywell doesn't normally tell what their methods
7  are to the public, and the Russians, of course, couldn't
8  tell anyone, because under their contract with Honeywell,
9  they were restricted from doing so.
10          So as a result, the earliest date that Honeywell
11  can get for priority with respect to this 102(g) prior art
12  is March 7 of '96, which is after the filing date for
13  (102(g) -- that Solvay has, and that then disqualifies this
14  as prior art.
15          And I would like to go to Slide 22.
16          This was Honeywell's policy. This was their
17  request to file a patent application. And in this request,
18  Honeywell tells the people who are requesting that if they
19  don't have a commercial use for this invention, we're
20  probably not going to go ahead with this, and so you have to
21  explain if there is a present commercial use.
22          And the portion that I'm going to direct the
23  Court to is this portion here, which will then come up on
24  the next slide.
25          And this says for inventions of possible use,

113

1  summarize evaluations which establish definite commercial
2  value. You have to show the definite commercial value
3  before they're going to go ahead. And they did not show the
4  definite commercial value until March 7 of '96, which was
5  beyond the priority date.
6          And if you go to the next slide, this was
7  the deposition, I think, of the creator of the form, a
8  J. Friedenson. And he asked the question, and I bolded this
9  so we could go through it quicker: Was it the policy to
10  defer the application? And then he said, if there was some
11  question whether or not it had sufficient commercial value,
12  we would then defer the application, which is consistent
13  with their policy.
14          And then we go to the next slide, which is
15  Slide 25, and this is another Honeywell document, and this
16  document has a date in the bottom, which you probably can't
17  see well on the board, but from the book, you can see it's
18  8/8/95. This was the statement that I read to you
19  previously. This is the document from which it comes. And
20  the next slide shows that statement.
21          This is Honeywell, in August of '95, saying that
22  there isn't any market for 245fa and therefore we're not
23  going to go ahead with the application.
24          Then we go to the next slide, which is Slide 27.
25  And I'm sure your Honor is aware that Allied was the

114

1  predecessor of Honeywell. That's why we see the Allied
2  logo. Here's where they are beginning to think there may be
3  a market, they've already gone beyond Solvay's priority
4  date.
5          And if you would, the next slide shows what
6  was on this December 21, 1995, memo, in the last two
7  lines.
8          The initial plans for commercialization of 245fa
9  were for the year 2002. When they were doing this, they
10 figured that we might have a market in 2003 and therefore
11 we're going to delay filing until then.
12         Then they say they've got an option to make a
13 smaller-scale production, and this might begin in '99. So
14 they are getting closer to whether or not it's useful to go
15 ahead and file a patent application on it.
16         Then we go to the next slide, and this is the --
17 another deposition of a Honeywell individual, in which he
18 confirms what was said there. And this was at this time, he
19 describes it as '96 or '97, not '95, that they wanted to
20 begin commercialization of 245 because they thought that it
21 might be -- they might be able to sell it in 2000 rather
22 than 2003. The 2003 and the 2002 are the same dates,
23 because the 2003 was January 1st of 2003.
24         So, finally, on March 7, '96, which is about
25 five, six months after the Solvay date, they actually

116

1  the same as Honeywell's product. And you might say that
2  that makes good business sense, but it does not make any
3  sense with respect to getting a disclosure out to the public
4  so they get the benefit of the patent system.
5          So in this Lutzker case, the Federal Circuit
6  affirmed the Board and set forth really what the law is,
7  that you don't get any credit where you're delaying and
8  concealing.
9          And this is at Page 1368 of this Federal Circuit
10 decision. And they refer to Lutzker having a deliberate
11 policy not to disclose his invention to the public until he
12 is ready to go into commercial production. And they say,
13 such a policy is evidence of an intent to suppress or
14 conceal the invention under 102(g), so they're saying that
15 under 102(g), that's not good art while you are suppressing
16 or concealing.
17         And, your Honor, there is one thing here that
18 you should understand, because no one really discusses it,
19 but where you have a method which you don't disclose, that
20 is concealment under 102(g). But when you file a patent
21 application, it's still concealed, but the law gives you
22 credit, because once you go ahead and file the patent
23 application, you, in effect, have done everything you
24 can to bring it to the attention of the public, and
25 therefore you shouldn't be penalized by the delays in

115

1  submitted an invention record, which was the beginning of
2  the patent application process.
3          Now, the law is pretty clear, that this
4  concealment does not entitle you to any benefit, and you
5  don't have a problem where you're talking about suppression
6  as being a label that you put on something. If something is
7  concealed for a particular time and then you unconceal it,
8  well, now that it's unconcealed, you can claim whatever
9  rights you want. It's just that you can't go back for the
10 time that you concealed it.
11         So suppression and concealment is not something
12 that is done for a label for all time. You are talking
13 about a particular time -- particular times, and in this
14 instance, the time that Honeywell was not entitled to meant
15 they ended up beyond Solvay's priority date.
16         There's a Federal Circuit case on this. This
17 is Lutzker. This arrived -- this came from a priority
18 contest, and Lutzker lost the interference because not
19 only did he have delay, Honeywell pointed out that it was
20 a 52-month delay. The Federal Circuit said, the Board
21 said, the Federal Circuit affirmed, that with this delay,
22 that creates an inference, but they then went to something
23 that was more important to them. And they said that Lutzker
24 had a specific policy that he was not going to file a patent
25 application until he was ready to sell his product, exactly

117

1  the Patent Office.
2          So even though you file an application, you get
3  a credit for nonconcealment, because you've done everything
4  you could. But in this case, as in the other cases, we're
5  talking about times before the filing of the patent
6  application where you don't get that credit.
7          Then, the Federal Circuit in Lutzker, and this
8  is the next slide, 32, said, very clearly, when the
9  activities which cause the delay go to commercialization,
10 namely, I'm not going to file my patent application until
11 I've got a product on the market, the delay will not be
12 excused. And then the Federal Circuit cites the Fitzgerald
13 case for that.
14         And then there's a third quote from Lutzker that
15 I wanted to bring to the Court's attention, and this is
16 Slide 33. And here they say Lutzker's policy of not filing
17 a patent application until his invention was ready to be
18 released commercially, and that's really the same as
19 Honeywell's policy of not filing until they believe that
20 they can sell the product. Here, in Lutzker, they say, this
21 policy is not in accord with the policy of early public
22 disclosure expected of those desiring to reap the benefits
23 of the patent system.
24         So on this point, we say that Honeywell delayed
25 until March 7 of '96. Solvay had a priority date of

118

1  October 23rd, 1995.
2       Now, there's a second argument, and this has to
3  do with the language of the statute, and it's basically an
4  unresolved argument.  There really isn't any really
5  controlling case law.
6       The statute, 102(g), initially said of another,
7  and the statute was amended in 1999 to say, of another
8  inventor.  Why the statute says it has to be of another
9  inventor, there isn't -- there isn't a lot of guidance, but
10 that is just what the language says, that there has to be
11 another inventor.
12      The way Honeywell has set up its motion, is it
13 has agreed, for purposes of its motion, that they did
14 not make the invention.  They said the Russians invented
15 it.  So we don't have another inventor to satisfy the
16 statute here.
17      Now, Honeywell refers to a 1985 decision by
18 Judge Latchum in which he said about some work done in
19 Japan, which was then brought here and which wasn't done
20 by the inventor, but which was done by someone else,
21 Judge Latchum, very quickly, went over that point.  It was
22 not an issue in that case.  Apparently, the defendant didn't
23 raise the issue there, although I'm not sure, but we'll see
24 that Judge Latchum made no consideration of that issue.  He
25 just jumped ahead and said that another didn't need to be

119

1  another inventor.  In fact, he didn't even say that.  He
2  just sort of concluded that.
3       So I'd like to bring the Court to the, really,
4  our second argument with respect to 102(g).  The first
5  argument is the suppression, the concealment.  It's really
6  the concealment.  And that is that you didn't have the work
7  done by another inventor, which is required under 102(g) in
8  order to do that.
9       So I'd like to take you to the Tyler case, and
10 in the Tyler case, you had two big distinctions that you
11 don't have in this case.
12      In Tyler, the patentee, for whatever reason,
13 admitted that the 102(g) art was prior art.  He didn't
14 contest it.  He admitted it.
15      Second of all, in Tyler, you did have a public
16 disclosure, because they had publicly disclosed it in
17 printed publications in Japan.  And when Tyler went up to
18 the Federal Circuit, the Federal Circuit did not touch
19 Judge Latchum's statement.  Instead, the Federal Circuit
20 said, we're going to rely upon the fact that the patentee
21 admitted that this was 102(g) prior art, and they did not
22 consider Judge Latchum's statement.
23      So now I'm going to take you to Judge Latchum's
24 statement, and this is at Slide 34.  And you can see here
25 that Judge Latchum was not analyzing an issue.  You know,

120

1  the patentee had already admitted it was prior art and he
2  just said that this Aokage invention was conceived and
3  reduced to practice in 1975, and then he said that someone
4  else, with his instructions, ran through the experiment
5  again in the U.S.
6       So the issue was not even considered by
7  Judge Latchum, and probably one of the reasons he didn't
8  consider it was because they had already admitted that this
9  was prior art.  And this is the next slide.
10      And this was Judge Latchum in Tyler saying,
11 I recognize that there's an independent ground for holding
12 this patent invalid.  You don't have to worry about
13 102(g).  He says Tyler admitted this was prior art.
14 So that's one reason why he didn't really have to
15 concentrate on it.
16      And if you go to the next slide, one of the
17 reasons why he may have glossed over this was because of the
18 change in the language, and I've just shown the two
19 languages.  So here was something that was duplicative of
20 the patentee already admitting it was prior art, and so he
21 really didn't analyze this issue because the defendant
22 didn't raise it, and as a result, he can still cite to it,
23 but it's really not much in the way of precedent where the
24 Court does not consider the issue.
25      And then we go to the next slide, which is

121

1  Slide 37.  And this is the Federal Circuit's statement,
2  where it decided that it was going to rely upon the
3  patentee's admission and not worry about the statement
4  under 102(g), which really wasn't resolving any issue.
5       And the Federal Circuit said, down at the
6  bottom, here again, we do not pass on the grounds on which
7  the Court concluded that Aokage was prior art within the
8  meaning of 102(g).
9       That's my argument, your Honor.
10      THE COURT:  All right.  Thank you.
11      MS. BURSON:  Your Honor, the first point I will
12 address is the last point that Mr. Neustadt had on the
13 slides, when he was relating to the -- another inventor
14 language in the statute.  Actually, in a case that's cited
15 by Solvay in their briefs is the Dow Chemical case, and Dow
16 acknowledges that there -- that even with the change in the
17 actual insertion of the word, that that did not change the
18 meaning of 102(g).  In fact, this court -- another Delaware
19 corn, but a Delaware case, specifically, acknowledged
20 in a, I believe it's a 1984 opinion, it's in our briefs,
21 that 102(g) is -- has always been talking about another
22 inventor.  There is no change in the law by the insertion of
23 the word inventor in the statute.
24      The second point is that the Tyler case,
25 actually, your Honor, specifically does hold -- I

122

1  apologize -- the Tyler case, your Honor, we had already
2  put the slide on the board, but it's on Page 600. The
3  Court plainly said, Accordingly, the Court concludes that
4  under 102(g), the Aokage invention, having been successfully
5  practiced in this country before the other patent was
6  practiced here, renders the patent invalid.
7      So I'm not sure I understand Mr. Neustadt's
8  point about the Court did not make this conclusion. The
9  Court definitely also made other grounds for finding the
10 patent invalid, including 102(b). The argument that the
11 Court also addressed is the fact that during prosecution of
12 the plaintiff's patent, the plaintiff acknowledged that the
13 defendant's patent was prior art, but that does not address
14 the 102(g) activity. That's a 102(e) issue.
15     So the acknowledgment of prior art is still a
16 separate ground for finding that the plaintiff's patent was
17 invalid. But it does not change the conclusion or the
18 analysis that the Court made under 102(g), doesn't make
19 the conclusion or analysis incorrect as a matter of law
20 either.
21     The other point that I will make, and then I
22 will go and address the arguments Mr. Neustadt made with
23 respect to Honeywell's abandonment and suppression and
24 concealment, is that the, pretty much, the grounds of
25 Solvay's motion all relate to the fact that Honeywell is the

123

1  inventor.
2      Again, under our motion, we're accepting, for
3  purposes of this motion, Solvay's contention that the
4  Russians are the inventors, and under those set of facts,
5  there is no evidence that there was an abandonment,
6  suppression or concealment. The introduction of the
7  information in the July 1994 report that Solvay points to
8  was eventually culminated in the filing of the patent
9  application, and Mr. Neustadt showed you in his timeline,
10 which took place in the 1996 time period.
11     If you could put up the rebuttal slides,
12 please.
13     And he pointed to, in his timeline, the fact
14 that there was a gap, he says, between February '95,
15 Honeywell's actual performance of work in the United States
16 and the filing of the March 1996 or the submission of the
17 1996 invention record in March and then the eventual filing
18 in July 1996.
19     Actually, there is no gap. There was a lot of
20 activity ongoing at Honeywell to diligently work and develop
21 the information under Solvay's facts that were provided by
22 the Russians.
23     Starting in the very beginning of the timeline,
24 we see that Honeywell, in 1994, files a patent application,
25 which we've already discussed this morning, the '192 patent,

124

1  that relates to a process for making 245.
2      Again, in '94, Honeywell enters into
3  negotiations with Bayer to obtain a licence to a whole
4  suite of patents so that it can practice in the United
5  States the 245 process. Without a license under this suite
6  of patents, Honeywell cannot practice the 245 process.
7      Then, in 1995, that brings us to the part of
8  the timeline that Mr. Neustadt referred to, February, takes the
9  work that the inventors, according to Solvay, from the
10 Russians, gave them, and began working through the process
11 and diligently worked from February to April 1995.
12     Then, in May 1995, the work was actually scaled
13 up into a pilot plant. And that's a fairly elaborate
14 process. That work continued throughout the summer and the
15 pilot plant actually starts up in August '95.
16     Then, again, in December '95, between August and
17 December, there is various activity in the pilot plant to
18 get the process running, and the first reported successful
19 continuous process took place in the winter of 1995 and
20 1996.
21     And then that brings us to the March 1996 date
22 that Mr. Neustadt referred to, which is when the drafting of
23 the patent application began, and the eventual filing of
24 July 1996.
25     So there was a lot of activity going on during

125

1  this time period that Mr. Neustadt alleges that there was
2  abandonment, suppression, concealment. The filing that took
3  place in July 1996 resulted in a published patent, the '706
4  patent. That patent contains information related to the
5  work throughout the February '95 to March '96 time frame.
6      The particular case that Mr. Neustadt refers to
7  is the Lutzker case. One of the main points of that case,
8  the Court found that in the published patent or the patent
9  application, the work that the inventor claimed to be
10 engaged in during those 21 to 59 months delay was not ever
11 reflected in the patent itself. That is not true in the
12 case of the Honeywell patent, the '607 patent.
13     Another point about the cases that Solvay
14 referred to in their slides, the Young and the Lutzker
15 cases. These cases are based on a 27 and 51-month delay,
16 where the Court is inferring, based on the length of delay,
17 that there was an inference of suppression, abandonment and
18 concealment.
19     That is not the argument that Solvay is making
20 here. Solvay is not saying there was such a long time that
21 there's an inference of suppression, abandonment and
22 concealment. Rather, Solvay is arguing that Honeywell had
23 this, quote unquote, commercial policy to abandon, suppress
24 or conceal.
25     The next slide, please.

126

1    THE COURT: You only have about two more
2  minutes.
3    MS. BURSON: Okay. Let's go to Slide 12.
4    That's not the right slide.
5    So Solvay tries to point to a particular form
6  that was created by one of the attorneys at Honeywell. The
7  testimony that Solvay relies on is not in any way related to
8  the '706 patent or any activities involving a commercial
9  process for making 245. These are just general statements
10  that, based on the artful questions that the deponent was
11  asked, these were general statements, and there's an
12  inference that Mr. Neustadt is making from these statements.
13  The form itself does not reflect an actual policy of
14  commercial suppression or concealment. The same form
15  acknowledges that Honeywell acknowledged there was
16  commercial application for 245 and they were doing
17  everything they could to quickly and diligently put this
18  product and this process into production.
19    Next slide, please, Ms. Wilson.
20    We've already briefly talked about the fact that
21  Honeywell began as early as 1994 to lay the groundwork so
22  that it could engage in this process and make this process,
23  the Bayer patent family of licenses, and that as early as
24  1996, Honeywell offered to sell, and did sell, 245 to
25  customers and provided sample to customers based on

127

1  the 245 that it had made at its pilot plant.
2    All of this information, your Honor, is in
3  our briefs. I guess, in conclusion, in the interests of
4  time, the point being that under Honeywell's motion, the
5  inventors are the Russians. Solvay has not put forth any
6  evidence that, under the law, Honeywell is not entitled to
7  102(g) defense and, in fact, summary judgment on its 102(g)
8  motion.
9    And then with respect to Solvay's
10  counter-motion, its motion is focused solely on the
11  fact that Honeywell are the inventors. And it points to
12  disputed facts and evidence that is accurately interpreted,
13  does not demonstrate that Honeywell had a commercial policy
14  for abandonment, suppression or concealment. In fact,
15  diligently worked through that time period to bring and
16  disclose to the public in the '706 patent a commercial
17  process that actually worked.
18    THE COURT: All right. Thank you very much.
19  Mr. Neustadt, I think you've got up to five
20  minutes and then we've got to close down because my next
21  group of folks are here.
22    MR. NEUSTADT: I will be very short, your Honor.
23    There wasn't a lot of work they were doing to
24  put in an application because the patent that they referred
25  to, the '706 patent, when it was filed, it had hypothetical

128

1  examples in it, so there wasn't any work that they were
2  putting in. They still hadn't done anything. They had this
3  policy and the policy was followed. Mainly, not that they
4  are never going to file a patent application, but they are
5  not going to incur the expense of filing an applications
6  until they know that there is some specific commercial use
7  for the product or the method that's described in this
8  application. And they followed that policy in this instance
9  throughout this period.
10    Subsequently, you know, initially, they thought
11  there wasn't going to be a market until 2003 because they
12  had to get 141 off the market. Then they said, well, maybe
13  it will be a little bit earlier, but that didn't come until
14  five, six months after Solvay already had their priority
15  date. And while the policy of deferring the cost of
16  preparing a patent application until you have a commercial
17  product may make business sense, it's just contrary to
18  the U.S. policy that if you want credit for that time,
19  you have to go ahead and file the application, because
20  that is the first step of getting that information out
21  to the public.
22    And I think the rest of it is in our brief,
23  your Honor.
24    THE COURT: All right. Thank you.
25    MR. NEUSTADT: Thank you.

129

1    THE COURT: Counsel, thank you very much. We
2  will address this as promptly as we can. We will not
3  address it too much more promptly than I ever do, because
4  when I get things out early, you all just file motions for
5  reargument and create more work for me. So you will get it
6  before the pretrial conference.
7    Thank you very much.
8    (Court recessed at 1:05 p.m.)
9    - - -